**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
No. 5: 20 - CV - 336

| | |
|---|---|
| SSG. SHANE PAGE, SPC SPENSER GANSKE, SFC CHRISTOPHER M. WILKES, Individually and on behalf of others similarly situated,<br><br>      Plaintiffs,<br><br>vs.<br><br>JOHN PICERNE, CORVIAS GROUP, LLC, d/b/a CORVIAS, BRAGG COMMUNITIES, LLC, BRAGG-PICERNE PARTNERS, LLC, CORVIAS MILITARY LIVING, LLC, CORVIAS MILITARY CONSTRUCTION, LLC, CORVIAS MANAGEMENT-ARMY, LLC, and HEATHER FULLER,<br><br>      Defendants. | **CLASS ACTION COMPLAINT** |

**CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

Plaintiffs SSG. Shane Page, SPC Spenser Ganske, SFC Christopher Wilkes, individually, and on behalf of all others similarly situated, hereby file suit against Defendants listed above and allege the following:

**NATURE OF THE ACTION**

1.      This lawsuit is brought by members of the United States Army who leased military housing from Corvias at Fort Bragg, North Carolina. As further described below, Defendants conspired to conceal potentially harmful environmental and structural housing defects from unsuspecting service members and their families and failed to comply with applicable building

- 1 -

and housing codes. Defendants knowingly leased substandard homes and charged grossly excessive fees given the abhorrent condition of the houses. Even worse, once service members signed lease contracts, Defendants instructed workers to conceal defects from tenants. Defendants maintained an intentionally misleading method of maintenance record keeping in effort to hide tenants' dissatisfaction. Defendants' culture of concealment was driven by corporate greed where financial gains were maximized to the detriment of military families and their children.

2.     This action confronts the profitability of deceit and reveals the opportunistic behavior of Corvias, a construction and property management firm originally founded in 1998 as Picerne Military Housing to provide "dramatically improved housing for America's service members and their families."

<b><u>THE PARTIES</u></b>

3.     Plaintiffs are military service members who lease residential housing at Fort Bragg, North Carolina. They bring this action to recover damages, specifically rent abatement, resulting from Defendants' conduct as more fully detailed herein below.

4.     Staff Sergeant Shane Page is a tenant of Bragg Communities, LLC, ("Bragg Communities") at Fort Bragg, Cumberland County, North Carolina, from approximately August 2016 through present.

5.     Specialist Spenser Ganske is a tenant of Bragg Communities, at Fort Bragg, Cumberland County, North Carolina, from September 2018 through present.

6.     Sergeant First Class Christopher Wilkes is a tenant of Bragg Communities, at Fort Bragg, Cumberland County, North Carolina, from March 2017 through present.

7.     Upon information and belief, Defendant John Picerne ("Picerne") is a resident and citizen of the State of Rhode Island. Picerne is the founder of Defendant Corvias. At all relevant

times herein, there has existed a unity of interest and ownership among Defendants, their predecessors, agents, and parent, such that any individuality and separateness among them has ceased, and each such entity is the alter ego of each other entity.

8. Defendant Corvias Group, LLC, d/b/a Corvias, is a Delaware limited liability company with its principal place of business in East Greenwich, Rhode Island. It is authorized to do business in, and does business in, North Carolina. Corvias is the corporate parent of all other corporate entities named in this action. At all relevant times to the allegations contained herein, Corvias was providing housing and other services for military servicemen at Fort Bragg, North Carolina. At all relevant times herein, there has existed a unity of interest and ownership among Defendants, their predecessors, agents, and parent, such that any individuality and separateness among them has ceased, and each such entity is the alter ego of each other entity.

9. Defendant Bragg Communities, LLC, ("Bragg Communities") is a Delaware limited liability company with its principal place of business at Fort Bragg, Cumberland County, North Carolina. It is authorized to do business in, and does business in, North Carolina. Its members include Bragg-Picerne Partners, LLC, and the U.S. Department of the Army. At all relevant times to the allegations contained herein, Bragg Communities was providing housing and other services for military servicemen at Fort Bragg, North Carolina. At all relevant times herein, there has existed a unity of interest and ownership among Defendants, their predecessors, agents, and parent, such that any individuality and separateness among them has ceased, and each such entity is the alter ego of each other entity.

10. Defendant Corvias Management-Army, LLC, ("Corvias Mgmt.") is a Delaware limited liability company with its principal place of business at Fort Bragg, Cumberland County, North Carolina. It is authorized to do business in, and does business in, North Carolina. At all

relevant times to the allegations contained herein, Corvias Mgmt. was providing housing and other services for military servicemen at Fort Bragg, North Carolina. At all relevant times herein, there has existed a unity of interest and ownership among Defendants, their predecessors, agents, and parent, such that any individuality and separateness among them has ceased, and each such entity is the alter ego of each other entity.

11.    Defendant Bragg-Picerne Partners, LLC ("Bragg Picerne") is a Delaware limited liability company with its principal place of business in East Greenwich, Rhode Island, which, at all times relevant to this action, was authorized to and was conducting business in the State of North Carolina.  Bragg-Picerne is a wholly-owned subsidiary of Corvias Military Living, LLC ("Corvias ML").  At all relevant times to the allegations contained herein, Bragg Picerne was providing housing and other services for military servicemen at Fort Bragg, North Carolina. At all relevant times herein, there has existed a unity of interest and ownership among Defendants, their predecessors, agents, and parent, such that any individuality and separateness among them has ceased, and each such entity is the alter ego of each other entity.

12.    Defendant Corvias ML, formerly known as Picerne Military Housing, LLC, is a Rhode Island limited liability company with its principal place of business in East Greenwich, Rhode Island, which, at all times relevant to this action, was authorized to and was conducting business in the State of North Carolina.  At all relevant times to the allegations contained herein, Corvias ML was providing housing and other services for military servicemen at Fort Bragg, North Carolina. At all relevant times herein, there has existed a unity of interest and ownership among Defendants, their predecessors, agents, and parent, such that any individuality and separateness among them has ceased, and each such entity is the alter ego of each other entity.

- 4 -

13.     Defendant Corvias Construction, LLC, ("Corvias Constr.") successor by merger to Picerne Construction/FBG, LLC, and Corvias Military Construction, LLC, is a Delaware limited liability company with its principal place of business in East Greenwich, Rhode Island, which, at all times relevant to this action, was authorized to and was conducting business in the State of North Carolina.  At all relevant times to the allegations contained herein, Corvias Constr. was providing housing and other services for military servicemen at Fort Bragg, North Carolina.  At all relevant times herein, there has existed a unity of interest and ownership among Defendants, their predecessors, agents, and parent, such that any individuality and separateness among them has ceased, and each such entity is the alter ego of each other entity.

14.     Defendant Heather Fuller ("Fuller") was, at all times relevant to this action, employed by Corvias at Fort Bragg, in Fayetteville, North Carolina.  Upon information and believe, Heather Fuller is a resident and citizen of the State of North Carolina.

15.     At all times relevant herein, Fuller was an agent and employee for Corvias and/or its Defendant entities and subsidiaries.

16.     At all times relevant herein, Fuller possessed and exercised the authority to manage, direct, supervise, administer, and oversee the military houses at Fort Bragg.

17.     At all times relevant herein, Fuller was acting within the course and scope of her agency and employment in a management capacity with respect to Fort Bragg military housing.

18.     Defendants are not persons acting under a federal officer.

19.     Defendants are joint tortfeasors, agents of the other, joint venturers, and/or engaged in the joint enterprise of leasing military housing at Fort Bragg, as well as the conduct and acts alleged herein. At all relevant times herein, there has existed a unity of interest and ownership

- 5 -

among Defendants, their predecessors, agents, and parent, such that any individuality and separateness among them has ceased, and each such entity is the alter ego of each other entity.

## JURISDICTION AND VENUE

20.     Plaintiffs re-allege the above paragraphs as if fully set forth herein.

21.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(d), as it is a class action for damages that exceed $5,000,000, exclusive of interest and costs.

22.     This Court has personal jurisdiction over Defendants because of their continuous and systematic business contacts with the State of North Carolina, the fact that Defendants manage hundreds, perhaps thousands, of military houses at Fort Bragg in Fayetteville, North Carolina, and derive substantial revenue from managing military housing in North Carolina.

23.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in this district.

## CLASS ALLEGATIONS

24.      Plaintiffs re-allege the above paragraphs as if fully set forth herein.

25.     Pursuant to the Fed. R. Civ. Pro. 23(b)(2) and (b)(3) Plaintiffs asserts two national classes based upon North Carolina state and federal law:

a.  All named tenants, also known as "residents" on Resident Occupancy Agreements, current and for the past three (3) years, who leased military housing from Defendants at Fort Bragg, North Carolina, which lacked effective moisture and air barriers between exterior cladding and wall cavities.  Plaintiffs reserve the right to propose one or more sub-classes if discovery reveals that such subclasses are appropriate.  The Class time boundary is subject to extension as discovery will disclose that Defendants concealed

evidence of actionable conduct which could not have been reasonably discovered by Plaintiffs;

b. All named tenants, also known as "residents" on Resident Occupancy Agreements, current and for the past three (3) years, who leased military housing from Defendants at Fort Bragg, North Carolina, that contained lead-based paint. Plaintiffs reserve the right to propose one or more sub-classes if discovery reveals that such subclasses are appropriate. The Class time boundary is subject to extension as discovery will disclose that Defendants concealed evidence of actionable conduct which could not have been reasonably discovered by Plaintiffs.

26. Excluded from the Classes are (a) Defendants' legal representatives, officers, assigns, directors, successors, and (b) all claims for personal injury, wrongful death, medical monitoring, or any damages different than those sought herein, except as authorized by law.

27. This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements. Plaintiffs seek to represent an ascertainable Class, as determining inclusion in the class can be done through Defendants' own records.

28. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. Members of the Class may be notified of the pendency of this action by both regular and electronic mail using a form of notice customarily used in class actions.

29.     Questions of law and fact common to the Plaintiff Class exist that predominate over questions affecting only individual members, including *inter alia*:

a.   whether Defendants breached their residential leases with Class Plaintiffs;

b.   whether Defendants violated 10 U.S. C. §2830;

c.   whether Defendants violated the North Carolina Residential Rental Agreements Act, N.C. Gen. Stat. §§ 42- 38 to 49;

d.   whether Defendants violated the Residential Lead-Based Paint Hazard Reduction Act of 1992, Title X of the Housing and Community Development Act of 1992, U.S.C. §§ 4851;

e.   whether Defendants violated the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1 *et seq*.;

f.   whether Defendants violated local housing codes including, but not limited to, Cumberland County Code, Article IV, Division 2;

g.   whether Defendants communicated untruthful information to Class Plaintiffs about the Premises, including material facts regarding the condition of the Premises of which Defendants had knowledge, as to which Class Plaintiffs lacked knowledge, of which Class Plaintiffs ought reasonably to be informed before entering into the Residential Leases (a.k.a "Resident Occupancy Agreements"), and nondisclosure of which would render Defendants' other representations regarding the safety and habitability of the Premises misleading;

h.   whether Defendants concealed material facts and information about the Premises with the intent to deceive Class Plaintiffs, which did deceive Class Plaintiffs, which Class Plaintiffs reasonably relied on, resulting in damages;

i.   whether Defendants agreed, colluded and conspired to conceal information about the Premises from Class Plaintiffs, and intentionally concealed information in furtherance of a scheme to violate state and federal housing laws;

j.   whether there was an agreement among Defendants to violate state and federal housing laws which resulted in damages to Class Plaintiffs;

k.   whether Defendants failed to meet their obligations as set out in the Ground Lease dated August 1, 2003, including, but not limited to, Section 7, which requires them to observe and comply with all applicable Federal, State and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements;

l.   whether members of the Class have sustained damages and, if so, what is the proper measure of damages; and

m. whether Defendants were unjustly enriched by their wrongful conduct as more fully detailed herein below.

n. Whether Defendants have undertaken the unauthorized assumption and exercise of the right of ownership over Class Plaintiffs' Base Allowance Housing ("BAH") to the alteration of their condition or the exclusion of Class Plaintiffs' rights;

30. Plaintiffs are members of the putative Class. The claims asserted by the Plaintiffs are typical of the claims of the members of the putative Class, as the claims arise from the same course of conduct by Defendants and the relief sought is common.

31. Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative Class, as their interests coincide with, and are not antagonistic to, the other members. Plaintiffs have retained counsel competent and experienced in both military housing and class action litigation.

32. Certification of the Class is appropriate pursuant to Fed. R. Civ. Pro. 23(b)(3) because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affection only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications. Absent a class action it would be highly unlikely that the members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery.

33. A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual actions would create.

34.     The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of the class action.

## GENERAL AND FACTUAL ALLEGATIONS

35.     In 1996, Congress established the Military Housing Privatization Initiative ("MHPI") through the 1996 Defense Authorization Act to improve the quality of housing conditions for active-duty military personnel. Pub. L. 104-106, 110 Stat. 186, 544, 10 U.S.C. § 2871, *et seq.* (1996).  MHPI provided military service branches with alternative authorities for construction, renovation and management of military housing for families and unaccompanied personnel.  Under these authorities, the Services can leverage appropriated housing construction funds and government-owned assets to attract private capital and private developers in effort to improve the quality of life for soldiers and their families. This legislation provides a way to maximize use of limited appropriated funds, land, and existing facilities to encourage private sector investment.

36.     Pursuant to the MHPI, the military was encouraged "to stimulate private sector financing of military housing construction and revitalization projects."  S. Rep. No. 104-112 (1995).

37.     The MHPI provides the Department of Defense ("DOD") with twelve alternative authorities or tools to initiate housing projects which include the authorization of direct loans and loan guarantees, differential payments to supplement service members' housing allowances, investments such as limited partnerships, stock/bond ownership, and limited liability companies, and the conveyance or lease of military housing units to the contractor.

- 10 -

38.     There are about 80 privatized projects encompassing more than 204,000 housing units located on more than 150 installations.  The Department of Defense considers these houses to be private housing.  Service members who are housed on base are paid the prevailing "base allowance housing" ("BAH") rate for their duty location, and required to reimburse the management company of their rental home the full amount of their BAH.  Before MHPI, the home was provided in lieu of the BAH.  This change creates continuous revenue flow for the life of the management contract and, conceptually, requires little additional funding from the government.

39.     Service members, including Plaintiffs, are required to pay their rent on time and commercial vendors are aware that a single call to the service members chain of command will rectify any delinquency.  Consequently, Defendants often prey on Plaintiffs' fears of reprisal even when conditions within the rental homes merit no payment whatsoever.

40.     Privatizing U.S. military housing was supposed to protect service members' families.  The military knew hazards lurked in its housing, and private companies knew that when they took over.  In 2005, the U.S. Army released an environmental study that said 75% of its 90,000 homes nationwide did not meet its own standard of quality or safety.  Twenty years after privatization, in 2016, a DOD Inspector General Report found that poor maintenance and oversight left service families vulnerable to "pervasive" health and safety hazards.

41.     Beginning in 2018, Reuters published a series of news articles detailing substandard living conditions at U.S. military bases, including lead exposure, vermin infestation, mold and other contaminants.  The reports described how military families encounter high hurdles to resolving disputes in a system that grants vast power to private landlords who manage base housing across the United States.

42.     In November 2018, the investigative arm of Congress launched an inquiry into hazards faced by occupants of housing on U.S. military bases and the oversight of those conditions by the armed services.

43.     On December 3, 2018, a hearing was held before the United States Senate's Committee on Armed Services.  At the onset of the hearing, Senator James M. Inhofe from Oklahoma stated as follows:

> Almost a year ago, I first heard from military families about the dismal conditions they faced.  Frankly, if confession is good for the soul, Janet Driver called this to my attention from Tinker Air Force Base.  And I thought this was something that was just unique to Tinker Air Force Base, and then I thought no.  It is elsewhere in Oklahoma.  But then it is also all the way around the country.  And so that was the background of how this all started.
>
> We have come to learn that it is a problem nationwide. It is a national crisis of proportions we have not seen since the scandal at Walter Reed about a decade ago.

Senator Inhofe further added,

> We continue to hear regularly from the families across the country about questionable practices, poor workmanship, and frankly, in some places about housing contractors just not caring about the families they are supposed to be serving.
>
> Additionally, as reported in the press, some of these contractors are now under investigation for defrauding the Federal Government.  I am really worried.  What else can come out of the woodwork on this?  What other problems are

- 12 -

44.     During the same Senate hearing, Elizabeth A. Field, Director, Defense and Management, Government Accountability Office, testified, "We analyzed over 8 million work order records from all 14 private partners and all 79 projects…we found anomalies in the data provided by all 14 private partners such as duplicate work orders and work orders with completion dates prior to when they were submitted."  Moreover, Field said, "The problems I detail are significant not just because they tell us that DOD's statement that the program has been successful overall may not be fully accurate, but because the Department has been using these metrics to reward and incentivize the private partners."

45.     Private military housing companies, including Defendants in this case, manipulated service and repair records to the detriment of residents to drive up profits, including "inventive fees", that could be collected as part of its contract with the government.

46.     Senator Elizabeth Warren opened her own investigation of the Military Housing Privatization Initiative and five companies, including Defendants in this case, on February 6, 2019. She submitted her written report dated April 30, 2019, which contains four conclusions:  (1) The private military housing providers have set up a complicated web of subcontractors and subsidiaries that undermines accountability for substandard conditions in military housing and makes it difficult to track revenues, profits, and the flow of funds; (2) The private military housing providers have failed to create accessible or centralized records and protocols to address complaints and reports of problems with military housing, which makes comprehensive assessment and oversight of their performance difficult and complicates efforts to improve housing quality; (3) Private housing providers are making large profits while taking minimal investment risks; and (4) The companies and their subsidiaries are receiving sizeable incentive fees even when they face substantial quality control challenges.

**FORT BRAGG & CORVIAS**

47.     Fort Bragg is the most populated military based in the United States and includes nearly 6,500 family homes.  In 2001, Picerne chartered a private jet to visit Fort Bragg and brought along his friend, Senator Jack Reed.  At the time, Senator Reed sat on the Senate Armed Services Committee which oversees military spending.  Senator Reed is now the committee's ranking member.  As a senior member of the committee, Senator Reed helps allocate funding for all federal agencies and programs each year. Reed is also a former member of the 82nd Airborne Division which is based at Bragg.

48.     According to Reuters in December 2018, Picerne's businesses, including Defendants, had spent $2.8 million on lobbying, mostly of Congress and the Defense Department, on issues related to military housing or Defendants' contracts. Picerne has given at least another $500,000.00 in political contributions.

49.     Unsurprisingly, Corvias won the Fort Bragg contract and, to accomplish its goals related to the development and management of military housing, the United States of America ("United States"), by The Secretary of the Army ("Secretary"), entered into a Ground Lease with Defendant Bragg Communities on August 1, 2003 ("Ground Lease").

50.     The legislative history reveals that Congress designed MHPI to "substantially upgrade military housing on an accelerated basis" through the utilization of new "authorities" that permit the military to offer certain cost-saving and money earning benefits to private entities as a *quid pro quo* for their provision of housing and related services to military personnel. 141 Cong. Rec. S18853 (MHPI provides "new authorities for the provision of new housing, repaired housing, [and] restored housing for our military personnel").

- 14 -

51.     According to the website for Office of the Assistant Secretary of Defense for Sustainment, "Congress established the Military Housing Privatization Initiative in 1996 as a tool to help the military improve the quality of life for its service members by improving the condition of their housing." https://www.acq.osd.mil/eie/FIM/Housing/Housing_index.html

52.     By operation of the Ground Lease and authority of 10 USC §2878, the Secretary leased property to Bragg Communities including the residential homes leased by Class Plaintiffs, for a term of fifty (50) years, for the design, management rehabilitation, renovation, maintenance of residential communities and related ancillary facilities at Fort Bragg, Fayetteville, North Carolina.

53.     Accordingly, military personnel, including Class Plaintiffs, were intended beneficiaries of MHPI and the Ground Lease which serves as a vehicle for implementation of MHPI.   MHPI and the Ground Lease were created for the express purpose of improving military houses for servicemen and women including Class Plaintiffs.

54.     By entering into a contract with The United States of America, Defendants, mainly Bragg Communities, placed themselves in such a relation with Class Plaintiffs that the law imposes an obligation upon Defendants to act in such a way that Class Plaintiffs will not be injured.

55.     Under the Ground Lease, Bragg Communities is the "Lessee", and Bragg-Picerne Partners is the "managing member" of Bragg Communities.  However, any reference to "Lessee" includes any of its sublessees, assignees, transferees, successors and *their duly authorized representatives*.

56.     According to his sworn Affidavit dated July 12, 2016, Ron Phillips ("Phillips"), former Regional Vice President of Construction for Corvias ML, "The United States Army owns and operates Fort Bragg.  Pursuant to various agreements and a fifty-year ground lease with the

- 15 -

Army, Bragg Communities, LLC is the owner of the Fort Bragg Privatized Family Housing Project (the "Project")." Phillips says further, "[v]arious Corvias Military Living, LLC affiliates are involved in the development, construction and property management of the Project. For instance, Corvias Military Construction LLC, was engaged by Bragg Communities, LLC to manage the construction and renovation of the privatized family housing at the Project. Corvias Military Construction, LLC is a wholly-owned subsidiary of Corvias Military Living, LLC."

57. On March 2, 2016, Phillips gave testimony as the corporate designee for *all* Plaintiffs including Bragg Communities, Bragg-Picerne Partners, Corvias ML and Corvias Constr. ("Corvias entities"), yet also testified he was only employed by one of them. When asked if he was still prepared to speak on behalf of all corporations he said, "Yeah. I mean, it's kind of all one flowing organization." Phillips says that all the corporations are what would be known as the Corvias "Group".

```
14        Q      Okay.  But nonetheless you are prepared to
15   speak on behalf of --
16        A      Yeah.  I mean, it's kind of all one flowing
17   organization.
18        Q      All under, I guess, now what would be known
19   as the Corvias --
20        A      Group.
```

58. At all times during the term of the Ground Lease, Bragg Communities must faithfully observe and comply with all applicable Federal, State and local laws, rules, regulations, orders, ordinances and other governmental standards and requirements.

59. Bragg Communities is required to keep the leased property, otherwise known as the "Project", in "good order and in a decent, safe, and sanitary condition" at its sole expense.

Additionally, Bragg Communities must ensure professional management and maintenance of the military housing neighborhoods consistent with the standard of a market rate residential rental development in the Fayetteville, North Carolina, area.

60.     More specifically, the Ground Lease mandates that homes, garages, carports, storage sheds, grounds and other facilities, are to be maintained to a standard that prevents deterioration beyond that which results from fair wear and tear.  That includes making sure that all family housing facilities are free of missing components, or defects, which would affect the safety, appearance, or habitability of the facilities.

61.     The Corvias entities, pursuant to the Ground Lease, obtained control over the renovation, demolition, construction and maintenance of the military housing for Fort Bragg, subject to requirements and duties imposed upon it by the Ground Lease and related documents.

62.     Upon information and belief, the Ground Lease requires the DOA and Corvias entities to observe and comply with, at its sole cost and expense, the provisions of all federal, state and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements which are applicable to the Premises.[1]

63.     Moreover, the Corvias entities are required to operate the housing at Fort Bragg in good order and in a clean, safe condition at its expense, as a first-class residential rental development for tenants.

---

[1] "The companies -- pardon me -- are required under all of the projects to comply with all federal, State, and local environmental health and safety codes. So that requirement that is in all of the contracts."  Elizabeth Fields, Director, Defense and Management, Government Accountability Office.

Senate Hearing
Transcript Dec 3 2019 pdf 90/105

64. The Corvias entities are bound by the terms of the Ground Lease and are responsible for the design, financing, demolition, renovation, ownership, management, operation and maintenance of existing and new housing units.

65. Under the Ground Lease, Corvias claims to be committed to professional management and maintenance of the neighborhoods consistent with the standards of a market rate residential rental development in the surrounding area. This is to include maintenance and repair *in accordance with military, federal, state and local codes* to ensure that all of the houses are in a condition at all times reasonably acceptable to the owner, including, but not limited to, cleaning, painting, decorating, plumbing, electrical, HVAC, appliances, carpentry, grounds-care, and such other maintenance and repair work as may be necessary."

66. The Department of the Army adopted standards that apply to the construction, renovation and condition of privatized housing. Compliance with each of the standards is mandatory unless the Assistant Secretary of the Army, Installations and Housing Office approves a waiver in writing, on a case-by-case basis.

67. All new construction and major renovations at RCI projects, including Fort Bragg, must be completed in accordance with local building codes and standards.

68. Army Pamphlet 420-1-1 (the "Army Pamphlet"), §2-29, identifies conditions standard intended to maintain housing real property to prevent its deterioration beyond that which results from normal wear and tear. Table 2-11 requires that exterior walls be structurally sound, weather tight and in a good state of repair. Roofing is required to be weather tight and free of corrosion and abnormal deterioration of individual components, and replacements for missing pieces preserve the original whole condition of the roof system. Items that pierce the roof including

- 18 -

chimneys, vent stacks, roof ventilators, and other items must function as originally designed. Flashing must prevent leaks as originally intended.

69.     Army Pamphlet §2-29, Table 2-12, also applicable to Fort Bragg, requires interior walls be free of damage, deterioration, cracks, or defective materials. Subflooring and related structural members must be safe and usable. Deteriorated subflooring must be repaired or replaced to retain the original who condition of the floor. Interior trim must be smooth, free of chipped and peeling paint.

70.     The 50-Year Ground Lease requires Defendants to manage lead-based paint in accordance with the standards and requirements established by the Army's Public Works Technical Bulletin ("PWTB") 420-70-2.

71.     Exhibit "F" of the Ground Lease is the "Final Environmental Baseline Survey for the Army Residential Communities Initiative Properties at Fort Bragg, North Carolina." ("EBS") As required by DOD policy, an EBS must be prepared before any real property can be sold, leased, transferred, or acquired. The purpose of the EBS is to establish a baseline of the environmental condition of the property. It serves as a basis for identifying areas of real property that may be contaminated.

72.     The EBS was completed and published in March 2003, then provided to Defendants both prior to and contemporaneously with the signing of the Ground Lease dated August 1, 2003.

73.     The EBS incorporates a lead-based paint survey ("Lead Survey") conducted in 675 housing units constructed prior to 1978 within Fort Bragg. The Lead Survey, prepared by Ballard, McCredie, Elliott & Associates in 1993, includes all housing communities within Fort Bragg and indicates that LBP *is present* in the housing units constructed prior to 1978. Additionally, 755 soil samples were collected at 362 housing units throughout all housing communities in Fort Bragg.

- 19 -

Analysis using x-ray fluorescence ("XRF") technology indicated lead concentrations in the soil surrounding the housing units in all housing communities exceeding regulations set by the U.S. Environmental Protection Agency ("EPA).

74.     According to EPA regulations, a soil-lead hazard is present on residential property when concentrations in the soil exceed 400 parts per million in high contact areas for children or 1,200 part per million of bare soil in the rest of the yard. *In 1993, the lead in soil analysis identified lead in the soil at concentrations as high as 83,000 ppm.*

75.     The EBS recommends further investigation to accurately determine the concentrations of lead in the soil. The EBS was not disclosed to Class Plaintiffs at the time they signed residential leases.

76.     According to the EBS, surveys conducted in 1993 reveal that lead based paint exists throughout the property, and building components that routinely tested positive for lead-based paint included door frames, window sills, window jambs, and baseboards.

77.     Defendants possessed records and information, including the EBS and Lead Survey, which identified concerning lead concentrations in the soil surrounding all housing communities. Defendants knew that lead based paint was present in housing units throughout Fort Bragg.

78.     Despite having information of the potential threat posed by lead, Defendants did not disclose the EBS and Lead Survey to all tenants. Defendants routinely omitted information concerning lead-based paint, or lead-based paint hazards, from residential lease contracts and habitually failed to disclose information such as the location of the lead-based paint and/or lead based paint hazards, and the condition of the painted surfaces.

- 20 -

79.     By operation of the Ground Lease and the PWTB, Defendants must meet the standards of the American Society for Testing and Materials ("ASTM").  "The American Society for Testing and Materials (ASTM) Sub-committee EO6.23, Abatement of Lead Hazards in Buildings was established by the U.S. Department of Housing and Urban Development (HUD) in 1991 to develop consensus guidelines for abating and mitigating lead hazards in and around buildings. The sub-committee has developed and continues to develop guidelines and standards to be used in dealing with lead hazards associated with paint, dust, airborne particulates, and soil."

80.     According to PWTB Section 2-1, the installation lead hazard management program must "(a) Comply with Federal, state, and local lead-based paint (LBP) regulations.  Army policy is to follow the more stringent regulation." Section 2-2 states, "It is an Army requirement to provide a lead hazard-free living and working environment for soldiers and their families."

81.     PWTB Section 2-3 establishes "Medical policy guidance" and states, "The Childhood Lead Poisoning Prevention (CLLP) Program on each installation consists of a multi-disciplinary core of experts who develop an overall program of lead risk reduction. Program elements include a child blood screening program; lead exposure risk questionnaires; clinically indicated screening; elevated blood lead (EBL) case management; and outreach, education, and training."

82.     The PWTB requires implementation of an "Installation Lead Hazard Management Program" including a detailed process for identification and management of lead hazards in paint, dust, and soil.  The Program is to include a lead hazard management team which understands key terms and regulatory requirements of lead hazard management.  The team is required to develop an installation lead hazard management plan.  Elements of the plan, maintained by the appropriate lead hazard management team member, include:

- 21 -

(a) Identification and prioritization of target housing and child-occupied facilities.
(b) Summaries of construction and maintenance histories taken from real property records, contract documents, and other local sources.
(c) Summaries of child and worker blood lead level screening and testing data.
(d) Identification of similar groupings of facilities for risk assessment and interim controls. (See HUD Guidelines, Chapter 5.)
(e) Results of previous paint inspections.
(f) Results of risk assessments identifying lead hazards.
(g) Recommended interim controls and abatement actions based on results of risk assessments.
(h) Records of actions taken for children with EBLs.
(i) Records of training and certification of personnel involved in LBP activities.
(j) Medical surveillance records of personnel involved in LBP activities.
(k) Results of clearance and on-going monitoring inspections showing recommended
changes to interim control procedures and abatement plans.
(l) Abatement project lists, including Whole-Neighborhood Revitalization and other
major repair projects.
(m) Records of solid waste characterization and disposal actions.
(n) Copies of contract documents/reports specifically cited in the lead management plan.
(o) Identification of sources of funding and planning, programming, budgeting, and
execution plans.
(p) Lists of projects submitted to higher headquarters through the EPR Report.

83.     Per the PWTB, The Lead Hazard Management Plan calls for the development of a lead

hazard public awareness program.  Among other requirements, occupants are to be notified at the

time of assignment to quarters concerning the known presence of lead-based paint and/or lead-

based paint hazards, and precautions they can take to protect children.  Additionally, occupants are

to be notified of the results of risk assessments and actions planned to implement interim controls

or abatement.  Occupants with young children must receive information on protecting children

from lead poisoning.  "The importance of wet mopping or wet wiping with detergent to control

lead dust levels and of washing children's hands must be stressed."  Medical screening of all

military family members under the age of six years shall be conducted in accordance with the

procedures and guidelines set forth in Memorandum, Office of the Surgeon General, DASG-PSG,

- 22 -

subject: Childhood Lead Poisoning Prevention, dated 26 May 1993. Medical surveillance programs for workers exposed to lead are outlined in:

    A.    Occupational Safety and Health Administration (OSHA), 29 CFR Part 1910.1025, Lead Standard for Non-Construction Activities Such as Routine Maintenance.

    B.    OSHA, 29 CFR Part 1926.62, Lead Exposure in Construction; Interim Final Rule.

    C.    HUD Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing.

84.    According to "Step 8" of the plan, Defendants must perform risk assessments and EBL investigations of target housing and child-occupied facilities. "The Army has adopted, as the minimum standard of care, the procedures for performance of EBL investigations found in the HUD Guidelines for the Evaluation and Control of Lead-Base Paint Hazards in Housing, Chapter 16." The elements of a risk assessment include "Gathering of information regarding the age and maintenance history of the facility, the likelihood of occupancy by children under age 6, and known findings of EBL levels in children."

85.    Ongoing monitoring [of lead-based paint] is required in all target housing and child-occupied facilities where lead-contaminated paint is known or suspected to be present, regardless of the paint's present condition. Ongoing monitoring is to include a report of findings and recommendations. The Army, and by operation of the 50-Year Lease and PWTB, adopted, as the minimum standard of care, the procedures for performance of ongoing monitoring in HUD Guidelines, Chapter 6.

86.     Per the Plan, between occupancy, target housing should be re-inspected to verify that previously controlled or abated lead hazards have not recurred, to identify the occurrence and extent of new lead hazards, and to notify occupants that there is damage to painted surfaces.

87.     Accordingly, by operation of the 50-Year Lease and PWTB, Defendants are bound by the HUD Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing.

88.     Plaintiffs are informed and believe that prior to taking possession of the housing properties per the 50-Year Lease Agreement, Defendants were provided an "Environmental Baseline Survey" ("EBS") from the government containing all available information concerning known lead-based paint and/or lead based paint hazards, the location of the hazards, and the condition of painted surfaces.  Defendants acknowledge receipt of the EBS when they executed the 50-Year Ground Lease.

89.     Defendants agreed they would not permit occupancy or use of any buildings, including those leased by Class Plaintiffs, without complying with all applicable federal, state, and local laws and regulations pertaining to lead-based paint and lead based paint hazards.  Per operation of the 50-Year Ground Lease, the PWTB and HUD Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing are applicable.

90.     By virtue of her agency and employment with the Corvias entities, Fuller also had constructive notice and knowledge of environmental contamination including, but not limited to, lead-based paint, and potentially harmful housing defects on the Premises as identified in the EBS.

91.     The Corvias entities, via Bragg Communities, and its agents, Corvias Management-Army, and Fuller, AMCC, entered into several thousand leases with Class Plaintiffs for residential base housing at Fort Bragg (the "Residential Leases"), also referred to as "Residency Occupancy Agreements" ("ROAs").

- 24 -

92.     The ROA is a contract between the servicemember as "resident" and Bragg Communities (the Corvias entity that owns the property), with Corvias signing the agreement as Bragg Communities' agent and being designated as the property manager.

93.     Class Plaintiffs' rent is the full basic allowance of housing, or BAH, which is deposited directly into Defendants' accounts. There is no ability for Class Plaintiffs to negotiate the price of housing. "Rather than receiving the BAH into their accounts and then making monthly rental payments, service members have signed a Resident Occupancy Agreement, or lease. The signed ROA gives the government permission to start the rent allotment, which equals the Soldier's BAH entitlement for his or her rank and should reflect any BAH increases or decreases that occur." "The BAH money is earmarked for rent. If the Soldier spends it, he or she will be responsible for paying rent until the problem is corrected."

94.     For a servicemember moving to a new base upon receiving orders to do so, the main priority is to start the new assignment as expeditiously as possible. This is particularly challenging for servicemembers who serve as part of high operations-tempo units vital to national security or those who need to quickly integrate into pre-deployment training. And for servicemembers relocating across the country or from overseas, there is often little or no time to meaningfully review housing options at the new duty station before arriving on base.

95.     To this same point, during the hearing on December 3, 2019, before the United States Senate's Committee on Armed Services, Senator Timothy Kaine remarked:

But they treat military tenants like they are
captives, like it is a captive audience.  People who move
from across the country to a place where they do not know
anyone, where they do not know anything about the rental
market, where they are trying to find new schools and get
accustomed to everything else -- there is a natural
tendency to want to live on base.  And the occupancy rates
will be high because of that tendency.  And so these
companies who would compete hard and try to produce a high
quality product in another business unit of the identical
company treat these folks as if they are captives and that
they do not have to treat them in the same way that they
would treat private tenants.  And I find that outrageous.

96.     The ROAs apply the laws of the State in which the Home is located to the maximum

extent that the applicable state law applies to leased premises and the court of such State have

jurisdiction over the homes, as well as any applicable Federal Laws, any applicable military rules,

regulations and/or guidelines, and the Resident Responsibility Guide, all of which are incorporated

by reference.

97.     Defendants' compliance with the Army's standards for housing at RCI Projects is

mandatory.  According to the Army's standards, roofs must be in good condition with no visible

signs of leakage and exterior finishes must have no significant signs of distress.

98.     The Army's standards require that no lead-based paint can be exposed on interior

surfaces.

99.     N.C.G.S. §42-42(a) requires Defendants to comply with the current applicable

building and housing codes and make all repairs and do whatever is necessary to put and keep the

premises in a fit and habitable condition.  Additionally, within a reasonable period of time based

upon the severity of the condition, Defendants must repair or remedy any imminently dangerous

condition on the premises after acquiring actual knowledge or receiving notice of the condition. Imminently dangerous conditions include unsafe flooring or steps, and unsafe ceilings or roofs.

100.    In accordance with N.C. Gen. Stat. Chapter 160A, Article 19, Part 6, Cumberland County Code establishes minimum standards of fitness for dwellings and environs for the initial and continued occupancy of all places of abode in the Cumberland County, where Fort Bragg family housing is located.  Division 2, § 4-71, requires that dwelling units must comply with all minimum standards of fitness for human habitation.  Floors with broken, overloaded, decayed or excessively sagging sills, beams, girders and joists are prohibited.  Floors must be in sound condition and good repair.  All load-bearing walls, exterior or interior, shall not be substantially bowed or out-of-plumb and shall be structurally sound.  Roofs shall be in sound condition and capable of supporting the load intended, and there shall be no seriously rotted, broken, or improperly supported ends.  Each dwelling unit that does not comply with the requirements of Division 2 of the Code shall be deemed substandard.

101.    Corvias Management-Army is responsible for managing Fort Bragg family housing and for providing notification to residents under Residential Leases on behalf of Bragg Communities and the Corvias entities.

102.    All notifications, statements, and representations made by Corvias Management-Army to tenants were made under and within the course and scope of Corvias Management-Army's agency with Bragg Communities.

103.    Corvias Management-Army drafts and controls the Resident Responsibility Guide provided to tenants and controls and directs virtually all representations to military families living in Fort Bragg's military housing.

- 27 -

104.     When the Corvias entities took control of housing at Fort Bragg, they had actual and constructive notice and knowledge of potentially harmful housing defects as identified in the 50-Year Lease Agreement and EBS.

105.     Since taking control of housing at Fort Bragg, Corvias received thousands of complaints and repair requests, including those from Class Plaintiffs, evidencing serious defects which existed throughout the housing community at Fort Bragg.  Defendants had actual notice of the unfit and uninhabitable state of leased premises but failed to repair.

106.     Instead, Corvias, including Corvias Management-Army, made representations to Class Plaintiffs in connection with the Residential Leases, including that the houses were structurally sound, had no potential health or safety hazards to residents, and were compatible with cotemporary standards of livability.  Defendants advertised that current renovations are compliant with current housing and building codes.

107.     On its website, http://bragg.corviasmilitaryliving.com/, Corvias compares Fort Bragg military housing to an "upscale" residential community, and advertises "upgrades and new home construction," "dedicated professional management and maintenance teams," a "24-hour responsive maintenance team", and multiple amenities akin to a civilian country club.

108.     On February 13, 2019, Picerne, Founder and Chief Executive Officer of the Corvias Group, testified before the Joint Subcommittee on Personnel & Readiness and Management Support, United States Senate Committee on Armed Forces.  Picerne referred to the "gold standard" level of care that defines Corvias from the start.  He detailed improvements and changes which, he says, already improved living conditions for tenants.

109.     On October 7, 2019, Defendant Fuller boasted to the Fayetteville Observer about Corvias' commitment to soldiers.  Fuller references major renovations that were planned "before

- 28 -

residents began raising concerns about mold, lead paint and possible carbon monoxide issues in homes last year and this year."



110.    In December 2019, Kelly Douglas, a Corvias Spokeswoman, told Reuters, "Our core mission at Corvias is clear:  Put service members and their families first.  That means providing a safe, comfortable home to those in the military who choose our housing."

111.    Class Plaintiffs relied on Defendants' representations in entering into the Residential Leases.

112.    These statements, and many others, stand in stark contrast to the abysmal housing conditions at Fort Bragg.

### STAFF SERGEANT SHANE PAGE

113.    Sergeant Shane Page ("Page") moved to 274 Spear Drive, Fort Bragg, North Carolina, on August 1, 2016, along with his wife, Brittany, and two young sons.   Unbeknownst to Page at the time he signed his residential lease,  274 Spear Drive was filled with mold, lead based paint, structural wood rot and overall disrepair.  Defendants failed to inform Page that the home lacked effective moisture and air barriers between exterior cladding and wall cavities.  Like other members of the Class, the Pages were unaware that this underlying defect caused subsequent

defects including, but not limited to, pervasive mold, structural wood rot and others. Moreover, Page had the reasonable expectation that Defendants would follow their own plans and protocols including, but not limited to, those contained in the Ground Lease and applicable state, federal and local housing laws.

114.    The Pages made their first repair request one month later on September 2, 2016, due to water damage in their son's second floor bedroom. In hindsight, Defendants' lackluster response to the repair call was a forecast of what would follow. It took weeks for Corvias to act, and they painted over the water damage instead of repairing its cause.

115.    When the Pages submitted repair requests in the proper form and fashion as provided for by Defendants, they had the reasonable expectation that the work would be completed. Given that Defendants did not reject their repair requests, the Pages relied on Defendants to complete the work.

116.    Barely a month later, water leaked from the top of the home through interior walls. "Carothers Brothers", an outside contractor hired by Defendants, was to caulk around windows, seal flashing, and repair sheet rock, but told Page that workers could not go on the roof because it was rotten and unsafe to stand on. Like the first repairman, Carothers sanded and painted, but did not repair the underlying moisture intrusion source.

117.    During following months, Page's home was infested with ants, cracks appeared in walls, the HVAC system failed, and water intrusion resulted in multiple service repair calls. Almost without exception, repairs were tardy and insufficient.

118.    In August 2018, Brittany Page detected a strong odor in their son's bedroom and noticed discoloration on a wall beneath a window where shoddy repairs had previously been made. Carothers Brothers informed her that Corvias had finally granted permission to "open up" the wall

to inspect.  The repairman removed sheet rock, then directed Page's attention to black mold and structural wood rot.  The repairman identified the substance as black mold, but insisted he was not allowed to say.   He claimed he would be fired for using the word "mold" around tenants, and Carothers would lose its contract with Corvias.  The repairman offered to leave so Brittany Page could take a photos.

119.    Brittany Page immediately reported the problem and two representatives from Corvias, "Cindy" and "Desi", responded to the house.  As predicted by the Carothers worker, the Corvias representatives inspected the mold and suggested it was "mildew".   Brittany Page expressed great concern for her son's health and demanded testing.  Both representatives argued and resisted.  The bedroom was sealed off until Carothers returned for mold abatement and wood rot repair.

120.    Later that same month, Corvias conducted an air quality test, but refused to provide test results until Brittany Page demanded.  The test results indicated elevated mold contamination which confirmed the Pages' safety concerns.  Corvias refused to acknowledge the mold problem and continued to misrepresent the condition, fitness and habitability of the home.

121.    In September 2018 the Pages discovered more moisture damage in their son's bedroom, along with visible signs of moisture intrusion beneath windows in the living and dining rooms.  Once again, Corvias refused to acknowledge the underlying moisture intrusion defect.

122.    In October 2018, rather than repair the problems, Corvias agreed to relocate the Pages and offered two alternative homes: both had visible water damage and structural defects. The Pages photographed both, filed a formal complaint, and demanded a meeting with their JAG attorney present.  Corvias promised additional repairs, but more problems followed.

- 31 -

123.    On January 9, 2019, the Pages received an email from Corvias warning they must sign a new one-year lease or face penalties including $100.00 monthly fees. Sergeant Page objected because his original lease did not require him to renew. To the contrary, his lease provided for "month-to-month" tenancy after expiration of a one year lease term. Corvias insisted the new fees were non-negotiable unless Page renewed. Page, along with other others, were intimidated by threats of new fees which seemed unaffordable. In his view, this was Corvias' attempt to bully tenants into signing new leases for defective houses. On such short notice, Page and others had nowhere else to go.

124.    In early April 2019, Corvias attempted repairs which caused the release of lead-based paint. "Nick", an environmental specialist from Corvias, acknowledged the presence of lead-based paint and that it posed a potential threat to the children.

125.    During the entire duration of the lease term(s), Defendants failed to notify the Pages of any measures taken to implement a lead hazard management plan or lead hazard public awareness plan. After signing his lease, Page received no updates related to ongoing testing, risk assessments, medical screening, re-inspection, or information regarding potential hazards posed by lead-based paint.



126.     Page expressed his dismay at a "Town Hall Meeting" held by Corvias on April 16, 2019, and explained that his children were sleeping on air mattresses in his living room because lead paint and mold still had not been abated in the upstairs.  Page wished to show photos of the defects at the meeting, but Corvias resisted.

127.     On April 24, 2019, Corvias sent two workers to the house, but both were unprepared to abate lead-based paint and mold.  They did nothing and left.   Different workers were scheduled to return on April 30, 2019, but did not.  Corvias offered no explanation.

128.     On May 13, 2019, new workers were sent to continue repairs to the windows and

walls, but did not complete the repairs.  Instead, a violent fight erupted between the workers in the

dining room and continued outside in the presence of the Page's children.

## SERGEANT FIRST CLASS CHRISTOPHER M. WILKES

129.     Sergeant First Class Christopher M. Wilkes, wife Ashley, and two-year old

daughter moved to 112 Hirsch Circle, Fort Bragg, North Carolina, in March 2017.   Their story

includes *thirty-three* repair orders submitted to Corvias and a catastrophic housing defect that

could have cost the life of a child.

130.     Unbeknownst to Wilkes at the time he signed his residential lease, 112 Hirsch

Circle was filled with mold, lead based paint, structural wood rot and overall disrepair.  Defendants

failed to inform Wilkes that the home lacked effective moisture and air barriers between exterior

cladding and wall cavities.  Like other members of the Class, the Wilkeses were unaware that this

underlying defect caused subsequent defects including, but not limited to, pervasive mold,

structural wood rot and others.    Moreover, Wilkes had the reasonable expectation that Defendants

would follow their own plans and protocols including, but not limited to, those contained in the

Ground Lease and applicable state, federal and local housing laws.

131.     Prior to arrival, Wilkes and his wife were told  they only qualified for a home in the

"Casablanca" neighborhood of Fort Bragg, and it would be months before another home became

available.  The Wilkeses were unfamiliar with Fort Bragg and the Fayetteville area.  They have no

family living in Fayetteville, and had little or no opportunity to investigate before relocating. With

what appeared to be little other choice, they signed the lease.

132.     When the Wilkeses moved into 112 Hirsch Circle, they noticed cracked bricks on

the exterior, sagging interior flooring, and plumbing problems.  Significant problems followed in

2018 including Hurricane Florence which blew shingles from the roof. The Wilkeses submitted a repair request on or about September 15, 2018, and repairs were scheduled for September 17, 2018. Defendants did not make repairs. Instead, Corvias cancelled the repair request on September 27, 2018, with no explanation. Consequently, water entered through the exterior into the attic and living areas. Wilkes placed a tarp on the roof when Corvias refused to act. Still, they heard nothing for weeks.

133.    When the Wilkeses submitted repair requests in the proper form and fashion as provided for by Defendants, they had the reasonable expectation that the work would be completed. Given that Defendants did not reject their repair requests, the Wilkeses relied on Defendants to complete the work.

134.    The Wilkeses pleaded for help until Corvias responded in December 2018. Instead of fixing the structural defects in the roof, Corvias installed new shingles to a small section. As more weeks and months passed, the defective roof started to sag.



135.     In November 2018, an aging toilet started leaking water which seeped into the already sagging bathroom floor.  Instead of replacing the toilet, a repairman only replaced a wax seal.  The floor decayed further and in March 2019 a different contractor pointed out that the floor system needed total replacement.  The contractor informed the Wilkeses that there were no adequate floor joists beneath the bathroom.

136.     In July 2019, the sagging roof became noticeably worse and Wilkes reported to Corvias.  According to a repairman, the wood under the shingles was "wet, moldy, warped and rotted."

137.     Similar problems were reported inside the home including sagging floors in the living room, bathroom and hallways.  On September 18, 2019, Ashley Wilkes reported water intrusion through multiple exterior doors. She pointed out large gaps in weather stripping.  In October 2019, pervasive wood rot necessitated floor replacement over a five-day period.

138.     On October 3, 2019,  Wilkes reported problems with the brick exterior wall adjacent to their carport.  A window frame was separating from the brick and a large crack appeared below the window.  As it turned out, the brick wall was structurally deficient and was in danger of collapsing.  A repairman pointed to inadequate reinforcements and shoddy past repairs.

139.     On December 5, 2019, Wilkes contacted Corvias because the roof was getting worse.  Roofing work was scheduled for December 13, 2019, but delayed until December 18, 2019.  By then, the roof was too weak to support repair workers.  The roof collapsed and one worker fell through.  The interior ceiling then collapsed and nearly struck the Wilkes family.





140.    Window frames throughout the home contain visible mold which persistently returns after chemical treatments.  The wood trim surrounding doors and windows is damp to the touch evidencing moisture intrusion within interior walls.



141.    Maintenance workers said they "couldn't promise" the next home will not have similar maintenance issues, and suggested the Wilkeses should consider "staying put".  The Wilkeses interpreted this to mean that most homes at Fort Bragg have defective moisture and air barriers resulting in pervasive mold and structural wood root.

142.    During the entire duration of the lease term(s), Defendants failed to notify the Wilkeses of any measures taken to implement a lead hazard management plan or lead hazard public awareness plan.  After signing his lease, Wilkes received no updates related to ongoing testing, risk assessments, medical screening, re-inspection, or information regarding potential hazards posed by lead-based paint.

### SPECIALIST SPENSER GANSKE AND EMILY GANSKE

143.    Army Specialist Spenser Ganske and his wife, Emily Ganske, moved to Fort Bragg in September 2018.  They signed a lease agreement for family housing, or "ROA", for 246 Castle Drive, but never were shown the home until they were given the keys.

- 38 -

144.    Unbeknownst to the Ganskes at the time they signed their residential lease, 246 Castle Drive was filled with mold, lead based paint, structural wood rot and overall disrepair. Defendants failed to inform the Ganskes that the home lacked effective moisture and air barriers between exterior cladding and wall cavities. Like other members of the Class, the Ganskes were unaware that this underlying defect caused subsequent defects including, but not limited to, pervasive mold, structural wood rot and others.    Moreover, the Ganskes had the reasonable expectation that Defendants would follow their own plans and protocols including, but not limited to, those contained in the Ground Lease and applicable state, federal and local housing laws

145.    Maintenance problems at 246 Caste Drive started almost immediately. Squirrels were living in the attic and their urine was soaking through the ceiling of the living room. The odor was horrific. Water intrusion, the source of which was unknown, was causing mold to grow in their daughter's upstairs' bedroom window frame. There was a large crack in a ceiling that extended down an interior wall. There was a filthy carpet that had been replaced which had nails sticking out from under it. The electrical outlets in the bathrooms were dead.

146.    The Ganskes submitted work orders for repairs, but many months passed without a response. In April 2019, Corvias told the Ganskes that their work orders were deleted.

147.    When the Ganskes submitted repair requests in the proper form and fashion as provided for by Defendants, they had the reasonable expectation that the work would be completed.    Given that Defendants did not reject their repair requests, the Ganskes relied on Defendants to complete the work.

148.    When workers finally came, they made shoddy repairs. No one checked the attic for the source of foul odors. Emily Ganske asked to have the ventilations ducts cleaned, but no workers showed up when the work was scheduled. In June 2019, Emily asked for an air quality

test to be conducted in the home. Defendants responded with a phone call in July 2020 but did not conduct the testing.

149. Workers came to the house on three separate occasions and unsuccessfully attempted to repair the faulty electrical outlets. When Emily Ganske went to the leasing office to express her frustration, the agent on duty demonstration a complete lack of concern.

150. Shortly after, Emily Ganske detected the sound of water leaking within an interior wall of the home. She searched the home and discovered that the HVAC system was leaking a large volume of water and that the closet housing the HVAC was covered in mold. She called the emergency maintenance number that Defendants had provided, and a repairman responded to remove the water with a vacuum.



151. Upon closer inspection, additional mold was discovered throughout the house which caused Spenser Ganske to contact his command and file a formal complaint.

152. Defendants sent "ServPro" to remove mold, although there was no admission that mold was present. When the ServPro worker opened the ceiling, he invited Emily Ganske to view

the condition of the attic which was soaked with water. He told Ganske that he had seen many other homes with the same problem, but he was not permitted to tell residents that mold was present. He suggested he would be fired from his job if he did.



153.    Spenser Ganske was outraged to learn about this and demanded that Corvias repair all of the issues in the home immediately. Upon information and belief, Fuller contacted ServPro and asked that the maintenance worker be terminated. Emily Ganske spoke with the ServPro supervisor and asked for the worker not to be fired.

154.    Soon after, Fuller came to Ganske's residence and insisted there were no defects. Ganske demanded the home be tested, but Fuller stated that Corvias no longer tests for mold in any home at Fort Bragg. Ganske suggested that it was best to hire her own testing experts.

155.    Fuller returned the next day and told Ganske she should move off base if she was unable to trust Corvias. Ganske asked to be relocated to another home, but Fuller said additional charges would apply which the Ganske's could not afford.

156. During the entire duration of the lease term(s), Defendants failed to notify the Ganskes of any measures taken to implement a lead hazard management plan or lead hazard public awareness plan. After signing his residential lease, Ganske received no updates related to ongoing testing, risk assessments, medical screening, re-inspection, or information regarding potential hazards posed by lead-based paint

157. Defendants systematically breached their contractual obligations including the 50-Year Lease Agreement and residential leases, and consistently violated the laws of the State laws of North Carolina, applicable Federal Laws, applicable military rules, regulations and/or guidelines, and the Resident Responsibility Guide, all of which are incorporated in residential leases.

158. Defendants conspired to conceal potentially harmful environmental and structural housing defects from Class Plaintiffs, including the underlying lack of effective moisture and air barriers between exterior cladding and wall cavities *in all homes*.

159. The ROAs incorporate the Resident Responsibility Guidelines into the Residential Leases which make no mention whatsoever that family houses are in violation of State laws of North Carolina, applicable Federal Laws, applicable military rules, regulations and/or guidelines.

160. In fact, when Class Plaintiffs questioned Defendants about conditions on the properties they leased at Fort Bragg that Plaintiffs did not fully understand, Fuller – individually and via others at her direction – actively sought to keep Plaintiffs from learning about any underlying safety hazards associated with those conditions by, among other things, misrepresenting the causes and/or nature of the conditions and seeking to have military superiors instruct Plaintiffs to stop raising questions about those conditions, all of which were contrary to policies and obligations imposed on Defendants.

- 42 -

161.     After tenants signed leases and complained about the condition of houses, Defendants instructed maintenance employees to make shoddy repairs to cut costs and, in many cases, directed maintenance workers to conceal defects and not disclose them to tenants.

162.     Upon information and belief, part of Corvias' management fees, which typically amount to around 5 percent of rent payments, depend on the Army's assessment of the company's performance on measures such as its ability to clear work and maintenance requests in a timely manner and its scores on resident satisfaction surveys.  Consequently, Defendants maintained an intentionally misleading method of maintenance record keeping in order to maximize management fees and conceal tenants' dissatisfaction from the Army.

163.     On December 27, 2018, Reuters news agency published a shocking expose detailing abysmal living conditions at Fort Bragg and Corvias' lucrative government contracts. The article garnered significant national attention and signaled Congressional scrutiny forthcoming in the immediate future.

164.     Several days later on January 9, 2019, Defendants threatened tenants, including Page, with punitive fees if they refused to sign new leases.  Tenants who exercised their contractual right to continue on a "month-to-month" basis following their initial lease term were told they had until February 9, 2019, to renew or a month-to-month fee of $100.00 would attach.

165.     Base-wide maintenance lapses remain common despite months of requests by Class Plaintiffs.  In many cases, maintenance requests were ignored yet Defendants' records indicate completion.

166.     Meanwhile, Defendants reaped millions in payments, including "incentive fees", pursuant to their contracts with the government.  Documents will show that Defendants received iron-clad assurances of profit while Class Plaintiffs lived in slum-like conditions.

- 43 -

167.     Plaintiffs are informed and believe that Community Development and Management Plans show that Defendants collected many millions in fees for construction, development and management of homes during the first decade of the 50-Year Lease.  The fees are pure profit for Defendants because maintenance expenses are covered by rent, or "BAH", from Class Plaintiffs.

168.     Defendants stand to earn millions more in equity returns as any cash left over from rental revenues after project expenses is split with the Army. This provides Defendants with additional financial incentive to limit spending for maintenance, repair and upkeep of military houses.

169.     Upon information and belief, Defendants' failure to disclose, and effort to conceal, housing defects was not the product of a deliberate policy decision by Defendants to keep this information from Class Plaintiffs but was instead contrary to their obligations and expectations of the Department of the Army.

170.     Class Plaintiffs would not have entered into the Residential Leases had Defendants disclosed material information regarding defects to family housing including, but not limited to, defective moisture and air barriers between exterior cladding and wall cavities.

171.     Defendants failed to develop, construct, renovate, maintain, operate and manage the Construction Project [Fort Bragg] with a level of skill and care over the term of [the] Lease commensurate with market rate projects located in the area of the Construction Project" as required by the Ground Lease.

172.     Defendants have failed to comply with mandatory requirements of the Ground Lease, including applicable laws, regulations, and policies applicable thereto.

- 44 -

# FIRST CLAIM FOR RELIEF
## (Violation of the North Carolina Residential Rental Agreements Act
## N.C. Gen. Stat. §42-46)

173.    Class Plaintiffs re-allege the above paragraphs as if fully set forth herein.

174.    Class Plaintiffs' residential leases with Defendants are subject to N.C. Gen. Stat. §42-46 of the Residential Rental Agreements Act.

175.    During all relevant times, Defendants had actual or apparent authority to perform landlords' obligations under the Residential Rental Agreements Act.

176.    N.C. Gen. Stat. §42-42(a)(1) requires Defendants to comply with the current applicable building codes including, but not limited to, Cumberland County Code, Article IV, Minimum Housing Code.

177.    N.C. Gen. Stat. §42-42(a)(2) requires Defendants to make all repairs and do whatever necessary to put and keep the premises in a fit and habitable condition.

178.    N.C. Gen. Stat. §42-42(a)(8) requires Defendants, within a reasonable period of time based upon the severity of the condition, repair or remedy any imminently dangerous condition on the premises after acquiring actual knowledge or receiving notice of the condition. Imminently dangerous conditions include unsafe flooring, unsafe ceilings, and excessive standing water that contributes to mold.

179.    Per N.C. Gen. Stat. §42-42(b) requires Defendants are not released from their obligations by Plaintiffs' explicit or implicit acceptance of the landlords failure to provide premises complying with N.C. Gen. Stat. §42-42, whether done before the lease was made, when it was made, or after it was made.

180.    Defendants violated N.C. Gen. Stat. §42-42 in the following particulars:

- 45 -

A. By failing to make all repairs and do whatever necessary to put and keep Plaintiffs' leased homes in fit and habitable condition;

B. By failing to repair or remedy imminently dangerous conditions including, but not limited to, unsafe flooring, unsafe ceiling and excessive standing water that contributes to mold, within a reasonable period of time based on the severity of the condition(s);

C. By breaching Cumberland County Code, Article IV, Minimum Housing Code, §4-78(b)(1) which prohibits broken, overloaded, decayed or excessively sagging sills, beams, girders and joists, and requires that floors be in sound condition and good repair;

D. By breaching Cumberland County Code, Article IV, Minimum Housing Code, §4-78(c)(1) which requires all exterior surfaces to be structurally sound, waterproof, weatherproof and rodent-proof;

E. By breaching Cumberland County Code, Article IV, Minimum Housing Code, §4-78(c)(6) which requires all exterior surfaces to be protectively covered to prevent deterioration and the entrance or penetration of moisture;

F. By breaching Cumberland County Code, Article IV, Minimum Housing Code, §4-78(d)(4) which prohibits seriously rotted or broken studs;

G. By breaching Cumberland County Code, Article IV, Minimum Housing Code, §4-78(e)(3) which requires ceilings to be substantially rodent-proof;

H. By breaching Cumberland County Code, Article IV, Minimum Housing Code, §4-78(f)(2) which prohibits seriously rotted, broken or improperly supported roofing ends;

I. By breaching Cumberland County Code, Article IV, Minimum Housing Code, §4-78(f)(5) which roofing to prevent the entrance of moisture;

- 46 -

J.  By breaching Cumberland County Code, Article IV, Minimum Housing Code, §4-79(a) which requires homes be maintained free of vermin and rodent harborage and infestation;

K.  By breaching Cumberland County Code, Article IV, Minimum Housing Code, §4-79(e) which requires all exterior surfaces including, but not limited to, window framing, to be maintained in good condition;

L.  By breaching Cumberland County Code, Article IV, Minimum Housing Code, §4-79(e) which requires all exterior surfaces to be protected from the elements and decay by applying protective covering or treatment;

M.  By breaching Cumberland County Code, Article IV, Minimum Housing Code, §4-79(e) which requires peeling, flaking and chipped paint to be eliminated;

N.  By leasing and allowing Plaintiffs to occupy dwellings in known violation of Cumberland County Code, Article IV, Minimum Housing Code, Division 2.

181.    Class Plaintiffs sustained damages as a result of Defendants' violation of N.C. Gen. Stat. §42-42 and Cumberland County Code, Article IV, Minimum Housing Code, including the overpayment of rent.

## SECOND CLAIM FOR RELIEF
### (Breach of Implied Warranty of Habitability)

182.    Class Plaintiffs re-allege the above paragraphs as if fully set forth herein.

183.    At all relevant times and pursuant to residential lease agreements, Defendants were landlord and Class Plaintiffs were tenants.

- 47 -

184.    Defendants had a duty to provide fit and habitable housing as required by N.C. Gen. Stat. §42-42, the Cumberland County Code, Article IV, Minimum Housing Code, and aforementioned state and federal regulations.

185.    Defendants warranted to Class Plaintiffs that the leased premises were in fit and habitable condition.

186.    Prior to leasing military houses to Class Plaintiffs, Defendants had actual knowledge that the leased premises had defective moisture barriers which resulting in pervasive mold, structural wood rot and other housing defects.  Defendants had actual knowledge that the leased premises were not compliant with N.C. Gen. Stat. §42-42, the Cumberland County Code, Article IV, Minimum Housing Code, and aforementioned state and federal regulations.

187.    Prior to leasing military houses to Class Plaintiffs, Defendants had actual knowledge that the leased premises contained lead-based paint, but did not comply with federal, state and local lead-based paint regulations as required by the Ground Lease and PWTB. Specifically, Defendants failed to develop and implement a lead hazard management plan including the following elements:

(a)  Identification and prioritization of target housing and child-occupied facilities;

(b) Summaries of construction and maintenance histories taken from real property records, contract documents, and other local sources;

(c)Summaries of child and worker blood lead level screening and testing data;

(d) Identification of similar groupings of facilities for risk assessment and interim controls. (See HUD Guidelines, Chapter 5.);

(e) Results of previous paint inspections;

(f) Results of risk assessments identifying lead hazards;

(g) Recommended interim controls and abatement actions based on results of risk Assessments;

- 48 -

(h) Records of actions taken for children with EBLs;

(i) Records of training and certification of personnel involved in LBP activities;

(j) Medical surveillance records of personnel involved in LBP activities;

(k) Results of clearance and on-going monitoring inspections showing recommended changes to interim control procedures and abatement plans;

(l) Abatement project lists, including Whole-Neighborhood Revitalization and other major repair projects;

(m) Records of solid waste characterization and disposal actions;

(n) Copies of contract documents/reports specifically cited in the lead management plan;

(o) Identification of sources of funding and planning, programming, budgeting, and execution plans;

(p) Lists of projects submitted to higher headquarters through the EPR Report.

188.    Consequently, the leased premises were not compliant with N.C. Gen. Stat. §42-42, the Cumberland County Code, Article IV, Minimum Housing Code, and aforementioned state and federal regulations.

189.    Defendants received thousands of complaints and repair requests, including those from Class Plaintiffs, but failed to put and keep the leased premises in fit and habitable condition within a reasonable period of time.

190.    Defendants attempts, if any, to correct defective conditions were either unsuccessful or temporary.

191.    The houses leased by Class Plaintiffs have defective moisture barriers which cause pervasive mold, structural wood rot, and other conditions which threaten the health and safety of Class Plaintiffs.  Defendants have had adequate time to repair and/or remedy the unsafe and

unsanitary conditions after years of complaints and repair requests, but have knowingly and intentionally failed to make a diligent effort to repair and/or remedy the defective conditions.

192.     Defendants breached their implied warranty of habitability resulting in damages to Class Plaintiffs, mainly the overpayment of rent.

<u>**THIRD CLAIM FOR RELIEF**</u>
**(Violation of the North Carolina Unfair and Deceptive Trade Practices Act N.C. Gen. Stat. §75-1.1, *et seq*.)**

193.     Class Plaintiffs re-allege the above paragraphs as if fully set forth herein.

194.     At all times relevant herein, Defendants were engaged in commerce in the State of North Carolina.  Defendants are proper defendants under North Carolina's UDTPA.

195.     Class Plaintiffs are members of the consuming public as defined by UDTPA, as they sought to acquire goods and services by lease- namely a habitable, properly maintained residence from Defendants at Fort Bragg.

196.     Residential rent agreements fall within N.C. Gen. Stat. Chapter 75 because the rental of residential housing is considered commerce pursuant to N.C. Gen. Stat. §75-1.1.

197.     The conduct of Defendants as set forth herein is against established public policy of the State of North Carolina; is unethical, oppressive, unscrupulous, and substantially injurious to consumers in North Carolina; and has the capacity and tendency to deceive the average consumer.

198.     Defendants, in the course of leasing residences to Class Plaintiffs violated the UDTPA in multiple respects, including without limitation: (i) breaching the implied warranty of habitability; (2) engaging in an unconscionable course of action; and (iii) using false, misleading, and deceptive practices, including:

- 50 -

(a) In failing to correct defects and demanding continued rent payments after Defendants knew that Class Plaintiffs' leased premises violated N.C. Gen. Stat. §42-46 of the Residential Rental Agreements Act;

(b) In failing to correct defects and demanding continue rent payments after Defendants knew that Class Plaintiffs' leased premises violated Cumberland County Code, Article IV, Minimum Housing Code, Division 2;

(c) In collecting rent after having knowledge of the uninhabitable nature of part and/or all of Plaintiffs' leased premises;

(d) By failing to honor promises to correct deficiencies in Plaintiffs' leased premises and continuing to demand rent;

(e) By misrepresenting the condition, fitness and habitability of rental homes;

(f) By employing a system, policies, and procedures for leasing homes which is unfair, deceptive, and misleading, and not permitted by the public policy of North Carolina and the express statutory provisions of N.C. Gen. Stat. §42-46;

(g) By utilizing false representations and deceptive measures to collect or attempt to collect rent payments from new and existing tenants, including Class Plaintiffs;

(h) Knowingly making false or misleading statements of facts concerning the need for parts, replacement, or repair service;

(i) Knowingly making false or misleading statements of facts related to the cause of pervasive mold and/or structural wood rot in the leased premises;

(j) By threatening to impose punitive fees unless Class Plaintiffs executed new leases after initial lease terms expired;

(k) Representing that work or services have been performed on, or parties replaced in, goods when the work or services were not performed or the parts replaced;

(l) Failing to disclose information concerning defects which were known to Defendants which was intended to induce Class Plaintiffs into lease agreements, or "ROAs", which Class Plaintiffs would not have entered had the information been disclosed;

(m) By undertaking actions which Defendants knew, or should have known, offend well-established public policy, state law, and was otherwise unlawful, unfair, deceptive, misleading, coercive, and substantially injurious to Plaintiffs;

(n) By employing and otherwise undertaking aforementioned procedures, policies, actions, and methods with the explicit knowledge that such conduct was in violation of applicable North Carolina law.

(o) By manipulating service and repair records to the detriment of Class Plaintiffs.

199.    The matters alleged herein were done willfully, or with the conscious disregard of the rights of Plaintiffs and each member of the Class.

200.    Defendants received thousands of complaints and repair requests, including those from Class Plaintiffs.  Many of the conditions complained of were the same unfit conditions identified in the Environmental Baseline Survey and Defendants' housing inspections.

201.    Defendants, by virtue of their course of administering, leasing, building and repairing houses at Fort Bragg were uniquely aware of the condition of the houses, including the existence of defective moisture barriers which caused mold, structural wood rot, and other potentially hazardous conditions.  Nevertheless, Defendants knowingly and intentionally leased houses to Class Plaintiffs, represented that the houses were habitable and that appropriate repair and remedy work had been undertaken in the past and would be undertaken in the future.

- 52 -

202.     Had Class Plaintiffs had an opportunity to properly inspect the houses leased to them, and had Defendants disclosed the true nature of the damage to houses, Class Plaintiffs would not have entered into residential leases or, at very least, not overpaid rent.

203.     Defendants leased Class Plaintiffs houses which were uninhabitable from the inception of the lease and Defendants subsequently refused to perform reasonable repairs to address the issues and make the houses fit for human habitation.

204.     Defendants have utilized their relationship with the military, Class Plaintiffs' status within the military, Class Plaintiffs relatively weaker economic position, and the availability (or lack thereof) of military benefits associated with moving to effectively hold Class Plaintiffs hostage in their leases until they received ordered stationing them elsewhere.

205.     Despite the aforementioned violations, Defendants collected the full amount of rent (Plaintiffs' "BAH") directly from the federal government, giving Class Plaintiffs no discount for the size, quality, or condition of their house, nor for the substance and deceptive performance of periodic and requested maintenance.

206.     Plaintiffs and members of the Class suffered actual injury as a result of Defendants' unfair and deceptive actions.  Such injury consists of, but is not limited to, the overpayment of rent.

207.     Defendants' actions were in or affecting commerce and constitute unfair and deceptive trade practices, which are proscribed by Chapter 75 of the North Carolina General Statutes.

208.     Plaintiffs and all members of the Class have been damaged and are entitled to recover treble damages and attorney's fees.

- 53 -

## FOURTH CLAIM FOR RELIEF
### (Breach of Contract)

209. Class Plaintiffs re-allege the above paragraphs as if fully set forth herein.

210. Class Plaintiffs entered valid contracts with Defendants in the form of residential leases, a/k/a "Residency Occupancy Agreements" ("ROA").

211. The ROAs defined military service members who sign the Residential Leases as "Residents".

212. Implicit in the ROAs is the warranty that Defendants were leasing Class Plaintiffs houses which were fit for human habitation. Defendants expressly warranted that leased homes were "reasonably safe and habitable for occupancy."

213. Defendants failed to comply with the material terms of the Class Plaintiffs' ROAs by failing to ensure the houses were fit for human habitation and by failing to diligently repair and remedy the conditions affecting habitation.

214. Defendants further breached the terms of ROA's by threatening to charge punitive fees unless Plaintiffs agreed to execute new leases in lieu of "month-to-month" payments as provided for in their leases.

215. Class Plaintiffs sustained damages as a result of Defendants' breaches including the overpayment of rent.

216. Because of Defendant's breaches of contract, it has been necessary for Class Plaintiffs to incur expenses and other special damages in an amount to be proven at trial.

217. As a proximate and legal result of Defendants' breaches of contract, Class Plaintiffs are entitled to an award of all their actual and consequential damages including, but not limited to, attorneys' fees and costs, in amounts to be proven at time of trial.

- 54 -

# FOURTH CLAIM FOR RELIEF
## (Negligence)

218. Class Plaintiffs re-allege the above paragraphs as if fully set forth herein.

219. Defendants owed duties to Class Plaintiffs as follows:

(a) To communicate truthful information to Class Plaintiffs regarding known defects in military housing, including material facts regarding the condition of leased homes which Defendants had knowledge, and Class Plaintiffs lacked knowledge, of which Class Plaintiffs ought reasonably to be informed before entering into residential leases;

(b) To respond promptly, effectively, and truthfully to concerns about the condition of the Premises expressed to them by Class Plaintiffs, including refraining from providing misinformation to Class Plaintiffs when responding to said concerns.

(c) To faithfully observe and comply with all applicable Federal, State and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements including, but not limited to, North Carolina's Residential Rental Agreement Act, N.C.G.S. §42-46, and Cumberland County Code, Article IV, Minimum Housing Code, Division 2;

(d) To maintain leased houses in good order and in a decent, safe and sanitary condition;

(e) To ensure professional management and maintenance of housing neighborhoods consistent with the standard of a market rate residential rental development in Fayetteville, North Carolina;

(f) To ensure that Class Plaintiffs and their families had quality housing generally reflecting contemporary community living standards;

(g) To refrain from leasing houses that did not meet minimum adequacy standards for health and safety;

(h) To undertake repairs, renovations, remediations and construction in compliance with local building codes and ordinances, and commensurate with industry standards;

(i) To maintain homes, garages, carports, storage sheds, grounds and other facilities, to a standard that prevents deterioration beyond that which results from fair wear and tear;

(j) To make sure family houses are free from missing components, or defects, which would affect the safety, appearance, or habitability or the houses;

- 55 -

(k)  To inspect houses for suitability based on environmental, health, and safety considerations prior to leasing;

(l)  To comply with the Department of the Army's adopted standards for the construction, renovation and condition of privatized housing;

(m) To comply with Army Pamphlet 420-1-1, §2-29, as related to the maintenance of military housing;

(n)  To manage lead-based paint in accordance with the standards and requirements established by the Army's Public Works Technical Bulletin, 420-70-2;

(o)  To meet the standards of the American Society for Testing and Materials Sub-committee E06.23;

(p)  To provide lead hazard-free living and working environment for Class Plaintiffs;

(q)  To conduct ongoing monitoring of military houses where lead-contaminated paint is known or suspected to be present, regardless of the paint's present condition, including procedures for performance of monitoring as set forth in HUD Guidelines, Chapter 6;

(r)  To inspect houses between occupancy to verify that previously controlled or abated lead hazards have not recurred, to identify the occurrence and extent of new lead hazards, and to notify occupants that there is damage to painted surfaces;

(s)  To comply with, and abide by, their own safety plans, safety procedures, and safety protocols for management of environmental hazards, including those identified in the EBS;

(t)  To refrain from leasing residential housing which Defendants knew or should have known would pose a health risk to residents;

(u)  To adhere to the terms of the Ground Lease which require Defendants to remediate or remove any toxic or hazardous waste, substances, or materials in, on, under or from any part of the premises including but not limited to, lead-contaminated soil materials and pesticide-contaminated soil materials;

(v)  To adhere to the terms of the Residential Leases;

(w) To adhere to federal, state and local lead-based paint regulations as required by the Ground Lease and PWTB in the aforesaid particulars;

(x)  To exercise reasonable care for the safety of Class Plaintiffs;

- 56 -

(y) To use reasonable care in the performance of Defendants' obligations as set forth in the Ground Lease;

220.    Defendants breached their duties to Class Plaintiffs in one or more of the following

particulars:

(a) Failing to communicate truthful information to Class Plaintiffs regarding known defects in military housing, including material facts regarding the condition of leased homes which Defendants had knowledge, and Class Plaintiffs lacked knowledge, of which Class Plaintiffs ought reasonably to be informed before entering into residential leases;

(b) Failing to respond promptly, effectively, and truthfully to concerns about the condition of the Premises expressed to them by Class Plaintiffs, including refraining from providing misinformation to Class Plaintiffs when responding to said concerns.

(c) Failing to faithfully observe and comply with all applicable Federal, State and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements including, but not limited to, North Carolina's Residential Rental Agreement Act, N.C.G.S. §42-46, and Cumberland County Code, Article IV, Minimum Housing Code, Division 2;

(d) Failing to maintain leased houses in good order and in a decent, safe and sanitary condition;

(e) Failing to ensure professional management and maintenance of housing neighborhoods consistent with the standard of a market rate residential rental development in Fayetteville, North Carolina;

(f) Failing to ensure that Class Plaintiffs and their families had quality housing generally reflecting contemporary community living standards;

(g) Failing to refrain from leasing houses that did not meet minimum adequacy standards for health and safety;

(h) Failing to undertake repairs, renovations, remediations and construction in compliance with local building codes and ordinances, and commensurate with industry standards;

(i) Failing to maintain homes, garages, carports, storage sheds, grounds and other facilities, to a standard that prevents deterioration beyond that which results from fair wear and tear;

(j) Failing to make sure family houses are free from missing components, or defects, which would affect the safety, appearance, or habitability or the houses;

- 57 -

(k) Failing to inspect houses for suitability based on environmental, health, and safety considerations prior to leasing;

(l) Failing to comply with the Department of the Army's adopted standards for the construction, renovation and condition of privatized housing;

(m) Failing to comply with Army Pamphlet 420-1-1, §2-29, as related to the maintenance of military housing;

(n) Failing to manage lead-based paint in accordance with the standards and requirements established by the Army's Public Works Technical Bulletin, 420-70-2;

(o) Failing to meet the standards of the American Society for Testing and Materials Sub-committee E06.23;

(p) Failing to provide lead hazard-free living and working environment for Class Plaintiffs;

(q) Failing to conduct ongoing monitoring of military houses where lead-contaminated paint is known or suspected to be present, regardless of the paint's present condition, including procedures for performance of monitoring as set forth in HUD Guidelines, Chapter 6;

(r) Failing to inspect houses between occupancy to verify that previously controlled or abated lead hazards have not recurred, to identify the occurrence and extent of new lead hazards, and to notify occupants that there is damage to painted surfaces;

(s) Failing to comply with, and abide by, their own safety plans, safety procedures, and safety protocols for management of environmental hazards, including those identified in the EBS;

(t) Failing to refrain from leasing residential housing which Defendants knew or should have known would pose a health risk to residents;

(u) Failing to adhere to the terms of the Ground Lease which require Defendants to remediate or remove any toxic or hazardous waste, substances, or materials in, on, under or from any part of the premises including but not limited to, lead-contaminated soil materials and pesticide-contaminated soil materials;

(v) Failing to adhere to federal, state and local lead-based paint regulations as required by the Ground Lease and PWTB in the aforesaid particulars;

(w) Failing to adhere to the terms of the Residential Leases including, but not limited to, threatening Class Plaintiffs with punitive fees unless they agreed to sign new leases after initial lease terms expired

(x) Failing to exercise reasonable care for the safety of Class Plaintiffs;

(y) Failing to use reasonable care to in performance of its obligations as set forth in the Ground Lease.

221. Defendants' breaches of duties as aforesaid constitute negligence, negligence *per se*, recklessness, and gross negligence.

222. As a proximate and legal result of Defendants' negligence, negligence *per se*, recklessness, and gross negligence, it has been necessary for Class Plaintiffs to incur expenses and other special damages in an amount to be proven at trial.

223. Class Plaintiffs have directly and proximately sustained damages as a result of Defendants' negligence, which damages include the overpayment of rent.

224. As a proximate and legal result of Defendants' negligence, negligence *per se*, recklessness, and gross negligence, Class Plaintiffs are entitled to an award of all their actual and consequential damages, in amounts to be proven at time of trial.

225. Defendants' conduct was undertaken grossly negligently and with reckless disregard for the foreseeable consequences to Class Plaintiffs.

226. Defendants' conduct therefore justifies and award of exemplary or punitive damages.

## FIFTH CLAIM FOR RELIEF
### (Third-Party Beneficiary of Contract)

227. Class Plaintiffs re-allege the above paragraphs as if fully set forth herein.

228. Defendants, specifically Bragg Communities, LLC, entered into the Ground Lease with The United States of America. The Ground Lease is contract which is valid and enforceable.

229. Class Plaintiffs were intended beneficiaries of the Ground Lease including, without limitation, its requirements that Defendants ensure professional management and maintenance of

- 59 -

the military housing neighborhoods consistent with the standard of a market rate residential rental development in the Fayetteville, North Carolina, area.

230.    These obligations were included in the Ground Lease to ensure that service members – such as Class Plaintiffs – and their families would be provided with safe and habitable housing while Defendants operated housing at Fort Bragg.  Recognition of Class Plaintiffs' right to performance is appropriate to effectuate the intention of the Ground Lease.  Circumstances indicate that the parties to the Ground Lease, including Defendants, intended to benefit Class Plaintiffs.

231.    Defendants breached the requirements of the Ground Lease including, but not limited to, failure to ensure professional management and maintenance of the military housing neighborhoods consistent with the standard of a market rate residential rental development in the Fayetteville, North Carolina, area.

232.    Defendants breach the requirements of the Ground Lease including, but not limited to, failure to adhere to federal, state and local lead-based paint regulations as required by the Ground Lease and PWTB in the aforesaid particulars;

233.    Defendants' conduct also breached the duty of good faith and fair dealing implied in the Ground Lease.

234.    As a direct, proximate and foreseeable result of Defendants' breaches of the Ground Lease, Class Plaintiffs, intended, direct, third-party beneficiaries of that contract, sustained damages, mainly the overpayment of rent.

235.    Class Plaintiffs are entitled to an award of all their actual and consequential damages resulting from Defendants' breaches of the Ground Lease, in amounts to be proven at time of trial.

- 60 -

## SIXTH CLAIM FOR RELIEF
### (Violation of Residential Lead-Based Paint Hazard Reduction Act)

236.    Class Plaintiff re-allege the above paragraphs as if fully set forth herein.

237.    Defendants have violated applicable provisions and associated regulations of the Residential Lead-Based Paint Hazard Reduction Act of 1992, Title X of the Housing and Community Development Act of 1992, U.S.C. §§ 4851, *et seq*.:

  A.    By failing to provide notice to Class Plaintiffs who were Residents as articulated in 42 U.S.C. § 4852d;

  B.    By failing to provide Class Plaintiffs who were Residents with any available reports or records pertaining to the presence of lead or lead-based paint hazards in the Premises;

  C.    By failing to notify Class Plaintiffs who were Residents of their right to have a 10 day period to inspect the premises for lead prior to taking possession of the Premises; and

  D.    By failing to provide Class Plaintiffs who were residents with a 10 day period to inspect the Premises for lead prior to taking possession of the premises.

238.    Given their actual and constructive knowledge regarding the presence of lead-based paint in the leased premises, Defendants failure to provide all of the statutorily required disclosures constituted a knowing violation of 42 U.S.C. § 4852d.

239.    As a direct and proximate result of Defendants' conduct, Class Plaintiffs who were Residents sustained actual damages including, without limitation, overpayment of rent given the fact the Premises were not worth the amount Class Plaintiffs paid in rent to Defendants.

240.    Per 42 U.S.C. § 4852d(b)(3), Defendants are jointly and severally liable to Class

- 61 -

Plaintiffs who were Residents in an amount equal to three times the amount of damages incurred by each such person.

241.    Per 42 U.S.C. § 4852d(b)(4), Defendants are jointly and severally liable to Class Plaintiffs who were Residents, as prevailing parties, the costs of this action, reasonable attorneys' fees, and any expert witness fees.

<u>**SEVENTH, AND ALTERNATIVE, CLAIM FOR RELIEF**</u>
**(Unjust Enrichment/Restitution)**

242.    Class Plaintiffs re-allege the above paragraphs as if fully set forth herein.

243.    Plaintiffs conferred a benefit upon Defendants by leasing residential housing from Defendants.

244.    Defendants knew, or should have known, that the homes in Fort Bragg were non-compliant with applicable Federal, State and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements including, but not limited to, North Carolina's Residential Rental Agreement Act, N.C. Gen. Stat. §42-46, and Cumberland County Code, Article IV, Minimum Housing Code, Division 2.

245.    Defendants failed to meet their obligations as set forth in the Ground Lease by failing to comply applicable Federal, State and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements including, but not limited to, North Carolina's Residential Rental Agreement Act, N.C. Gen. Stat. §42-46, and Cumberland County Code, Article IV, Minimum Housing Code, Division 2.

246.    Despite Defendants' failure to meet their obligations to Plaintiffs, Defendants collected millions of dollars in fees for construction, development, and management of residential homes since 2003 and that nearly all the fees are pure profit for Defendants because most of the Fort Bragg housing projects' expenses are covered by rent (or "BAH") income from Class

Plaintiffs. Defendants also stands to earn millions more in equity returns as it does not share with the government any cash left over from rental revenues after the projects' expenses have been covered.

247.    Plaintiffs are informed and believe that Defendants are enriched in another way: they are not obligated to repay bank loans that its military housing project at Fort Bragg has received. The bank loans, like the salaries or most workers at Fort Bragg, are paid from the housing rental stipends (or "BAH") received from the federal government.

248.    Class Plaintiffs are informed and believe that the length and nature of Defendants' conduct may render available remedies at law inadequate, in which case the use of the doctrine of unjust enrichment would be appropriate.

249.    Plaintiffs are informed and believe that the Court should allow Plaintiffs to recover Defendants' ill-gotten gains by requiring disgorgement of profits and fees reasonably created by Defendants' wrongful conduct including, but not limited to, failure to comply with applicable Federal, State and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements including, but not limited to, North Carolina's Residential Rental Agreement Act, N.C.G.S. §42-46, and Cumberland County Code, Article IV, Minimum Housing Code, Division 2. As a matter of law, it is unjust for Defendants to take and retain that benefit.

**WHEREFORE,** Class Plaintiffs pray for judgment in their favor against Defendants as follows:

1.    General, special, and consequential damages in an amount to be proven at trial, mainly rent abatement;

2.    Treble damages Defendants' unfair and deceptive trade practices as provided in N.C. Gen. Stat. §75-16;

- 63 -

3. Restitution in an amount to be determined by the Court;

4. Disgorgement of the profits and fees collected by Defendants;

5. Reasonable attorneys, fees, and costs;

6. Punitive damages for Defendants' reckless and grossly negligent conduct; and

7. For such other and further relief as the Court may deem just and proper.

PENRY | RIEMANN pllc

/s/ Neil A. Riemann
J. Anthony Penry
N.C. Bar No. 8936
andy.penry@penryriemann.com
Neil A. Riemann
N.C. Bar No. 19258
neil.riemann@penryriemann.com
2245 Gateway Access Point, Suite 203
Raleigh, NC 27607
(919) 792-3891

-AND-

BAUER & METRO, PC


Robert S. Metro
S.C. Bar No. 69494
Post Office Box 7965
Hilton Head, SC 29938
(843) 842-5297
Rmetro@bauerandmetro.com
Appearing pursuant to Local Civil Rule 83.1(e)


ATTORNEYS FOR PLAINTIFFS

June 24, 2020