# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### Civil No. 5:20-cv-00336-D

SSG SHANE PAGE, BRITTANY PAGE,
SPC SPENSER GANSKE, EMILY
GANSKE, SFC CHRISTOPHER WILKES,
ASHLEY WILKES, CPL TIMOTHY
MURPHY, and KATELYN MURPHY,
individually and on behalf of others
similarly situated,

       **Plaintiffs,**

       **vs.**

CORVIAS GROUP, LLC, BRAGG
COMMUNITIES, LLC, CORVIAS
MANAGEMENT-ARMY, LLC, BRAGG-
PICERNE PARTNERS, LLC, CORVIAS
MILITARY LIVING, LLC, and CORVIAS
CONSTRUCTION, LLC,

       **Defendants.**

## FIRST AMENDED COMPLAINT

Plaintiffs Staff Sergeant Shane Page, Brittany Page, Specialist Spenser Ganske, Emily Ganske, Sergeant First Class Christopher Wilkes, Ashley Wilkes, Corporal Timothy Murphy and Katelyn Murphy, individually, and on behalf of all others similarly situated, hereby file their first amended complaint against the Defendants, Corvias Group, LLC, Bragg Communities, LLC, Bragg-Picerne Partners, LLC, Corvias Military Living, LLC, Corvias Construction, LLC, and Corvias Management-Army, LLC and allege the following:

## I.    NATURE OF THE ACTION

1.     This lawsuit is brought by members of the United States Army who leased military housing (the "Units") from Defendants at Fort Bragg, North Carolina, and their spouses with valid

and enforceable occupancy and possessory interests in the leasehold properties during the pertinent times. As further described below, Defendants conspired to conceal harmful environmental and structural housing defects from unsuspecting service members and their families and failed to comply with applicable building and housing codes. Defendants knowingly leased substandard homes and compounded that fact by providing cut-rate, abjectly inadequate repair and maintenance service, all while charging grossly excessive rents swallowing up the whole of servicemembers' Basic Allowance for Housing ("BAH") – which should be wholly or partly refunded given the abhorrent condition of the Units. Once servicemembers signed their generic form lease contracts, also known as Resident Occupancy Agreements ("ROAs"), Defendants instructed service vendors to conceal defects from tenants. Defendants maintained an intentionally misleading method of maintenance recordkeeping in effort to hide tenants' dissatisfaction. More recently the Government Accountability Office ("GAO") found this recordkeeping to be so faulty it could not even be audited.[1] Defendants' culture of concealment was driven by corporate greed where financial gains were maximized to the detriment of military families and their children.

2. The Court need not take Plaintiffs' word for it: a critical mass of tenant pleas for help has led to Congressional and federal governmental agency investigation, hearings and reports which have revealed the unreasonable practices and intolerable conditions. After years of Defendants releasing slanted brand messaging on customer satisfaction, the nonprofit Military Family Advisory Network ("MFAN") released a report reflecting that over 67%[2] of all Bragg

---

[1] United States Government Accountability Office, Preliminary Observations on DOD's Oversight of the Condition of Privatized Military Housing, Statement of Elizabeth A. Field, Director, Defense Capabilities and Management, Dec. 3, 2019, p. 1 ("However, based on GAO's analysis of data provided by all 14 private partners, these data cannot reliably be used for ongoing monitoring of privatized housing because of data anomalies and inconsistent business practices in how these data are collected.").

[2] MFAN, Privatized Military Housing, Final Research Report: Living Conditions of Families in Privatized Military Housing, May 2019, p. 155. *See also* Military.com, Problems with Military Housing Began Decades Ago, Manager Says, Nov. 14, 2019 ("Shannon Razsadin, executive director of the Military Family Advisory Network … said the

families surveyed reported manifest effects from maintenance, repairs and remediation. The Department of the Army Inspector General corroborated the widespread servicemember dissatisfaction.[3] Heads of the largest companies, including John Picerne of Corvias, were required to testify before Congress and admitted, under oath, unacceptable conditions.[4] Mr. Picerne admitted the same in related interviews.[5] Defense Secretary Esper singled out the Corvias-created conditions at Bragg as "unconscionable."[6] This has led to announcements of sweeping structural capital investments to remedy the practices *prospectively*.[7] However, the actions by the executive and legislative branches left open the question of whether affected military families would receive any compensation for injury to date: *retrospective* relief. It is proper for the injured servicemember families to seek recourse from the judicial branch. The uniformity of the prospective structural changes announced belatedly by the company reflects common practices which should have been implemented years ago, without the need for the pleas of military families, GAO reports and Congressional hearings.

---

survey showed that military families ranked Corvias among the poorest-performing of the private property management companies serving military bases.").

[3] Inspector General, Department of the Army, Report No. ID-1903, General Special Interest Item Assessment of the Residential Communities Initiatives, 14 February – 22 March 2019. Sites inspected included Fort Bragg. *Id*., p. 3.

[4] Military.com, Problems with Military Housing Began Decades Ago, Manager Says, Nov. 14, 2019 ("In February testimony to the Senate Armed Services Subcommittee on Personnel and Readiness, Picerne stood out from other property management executives by offering an apology for how issues with military housing were allowed to accumulate. 'We let down some of our residents,' Picerne said. 'I'm sorry and we are going to fix it. We will get to the bottom of this problem and return to the gold standard.'").

[5] Military.com, Problems with Military Housing Began Decades Ago, Manager Says, Nov. 14, 2019 ("The head of a company named in a lawsuit charging mold infestation and other substandard conditions in on-base housing at Fort Meade, Maryland, last week acknowledged a history of neglect by private firms and the Defense Department in managing military housing and pledged $325 million for fixups. Management overall 'went sideways' in a series of poor decisions and inaction on budgeting and oversight, John Picerne, founder and chief executive officer of the Rhode Island-based Corvias Group, said in an interview with Military.com before the Fort Meade lawsuit was filed.").

[6] Military.com, Problems with Military Housing Began Decades Ago, Manager Says, Nov. 14, 2019 ("Picerne said at the hearing the bases that will benefit from renovations funded by the millions Corvias plans to raise include Fort Bragg, North Carolina, which has been singled out by Defense Secretary Mark Esper as one of the worst in the Army for military housing. In March, following a visit to Fort Bragg and meetings with military families, Esper, who was Army Secretary at the time, termed housing conditions at the post 'unconscionable.'").

[7] *See supra* at n.4.

3.     This action confronts the profitability of deceit and reveals the opportunistic behavior of Corvias, a construction and property management firm originally founded in 1998 as Picerne Military Housing to provide "dramatically improved housing for America's service members and their families."[8]  The company has designed its public website to appeal to relocating servicemembers and represent and tout high-quality housing, service and maintenance.   Under North Carolina law, unfair and deceptive trade practices in the context of landlord-tenant relations are actionable.   Here, the Defendants' conduct has been unfair and deceptive and in violation of their basic landlord-tenant duties.   The military families are entitled to both individual and classwide relief, including on their claims for breach of the warranty of habitability, breach of contract, and breach of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA").[9]  They are further entitled to under Fed. R. Civ. P. 23(c)(4) "issue class"[10] resolution of certain

---

[8] *See* Corvias website at http://www.corviasmilitaryliving.com/.  *See also* content from the historical Corvias website as archived at https://archive.org/web/.  *Cf. United States v. Bondars,* 2018 U.S. Dist. LEXIS 229393, *6-7 (E.D. Va. Aug. 20, 2018) (Wayback Machine results admissible – "Here, the Wayback Machine screenshots introduced by the Government comport with the requirements and purpose of Rule 902(13). They are established by a certificate of an Internet Archive Official, Office Manager Christopher Butler, and are not deficient in their authenticity. Further, they meet all procedural requirements under Rules 902(11) and 902(12).").

[9] N.C. Gen. Stat. § 75-1.1, *et seq.*  A plaintiff may plead a breach of the landlord-tenant statute imposing duties on the landlord under the implied warranty of habitability as a predicate to a UDTPA claim.  *See Dean v. Hill,* 171 N.C. App. 479, 615 S.E.2d 699 (2005); *Stolfo v. Kernodle,* 118 N.C. App. 580, 455 S.E.2d 869 (1995); *Creekside Apartments v. Poteat,* 116 N.C.App. 26, 33, 446 S.E.2d 826, 831, *rev. denied,* 338 N.C. 308, 451 S.E.2d 632 (1994); *Allen v. Simmons,* 99 N.C.App. 636, 394 S.E.2d 478 (1990).

[10] *See* Fed. R. Civ. P. 23(c)(4) (providing that "when appropriate, an action may be brought or maintained as a class action with respect to particular issues"); *Gunnells v. Healthplan Services, Inc.,* 348 F.3d 417, 442-45 (4th Cir. 2003), *cert. denied,* 542 U.S. 915 (2004) (applying the Rule; noting it can be reversible error for a district court to "fail[] to consider class certification of individual claims"); *Martin v. Behr Dayton Thermal Prods. LLC,* 896 F.3d 405 (6th Cir. 2018), *cert. denied,* 2019 WL 1231762 (U.S. Mar. 18, 2019) (evaluating toxic tort class action involving the risk of vapor intrusion into homes in a neighborhood as a result of two separate plumes of groundwater contamination; certain issues could be certified as "issue classes" under Rule 23(c)(4), even though the vapors had not invaded every home); *In re Nassau Cty. Strip Search Cases,* 461 F.3d 219, 227 (2d Cir. 2006) (permitting issue certification "regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement"); *Gates v. Rohm & Haas Co.,* 655 F.3d 255, 273 (3d Cir. 2011) (recognizing issue certification and outlining factors to be considered per Rule 23(c)(4)); *Pella Corp. v. Saltzman,* 606 F.3d 391, 394 (7th Cir. 2010) ("A district court has the discretion to split a case by certifying a class for some issues, but not others, or by certifying a class for liability alone where damages or causation may require individualized assessments.").

- 4 -

common issues to set the table for the further prosecution of individual personal injury damages claims for mold exposure where appropriate.

## II.    **THE PARTIES**

### a.   **Plaintiffs.**

4.      Plaintiffs are military servicemembers who lease residential housing at Fort Bragg, North Carolina and accordingly who have standing to sue for breach of contract under the lease contract aka the ROA, to protect their rights as lessees and occupants; and under the UDTPA as consumers of Defendants' property management services.  Plaintiffs also include adult spouses or partners of signatory tenants, who have an enforceable possessory and occupancy interest in the property for purposes of temporary recurrent private nuisance and other claims as described below. Plaintiffs bring this action to recover damages, including but not limited to rent abatement, resulting from Defendants' conduct as more fully detailed herein below.  In addition, or in the alternative, they seek declaratory and injunctive relief.  In addition, or in the alternative, they seek relief in the form of certification of one or more classes or subclasses on claims with common issues, pursuant to Fed. R. Civ. P. 23(c)(4).  The Plaintiffs allege both individual and classwide issues and claims for relief.  While one or more Plaintiffs allege that they have incurred personal injury caused by Defendants' negligence, they seek only relief under Fed. R. Civ. P. 23(c)(4) in that regard, for class purposes.[11]

---

[11] The relevant Plaintiffs allege personal injury individual claims were appropriate for purposes of tolling of the statute of limitations, both for themselves and for the putative class.  However, they request resolution of those individual claims as to damages be deferred pending resolution of the class issues under Fed. R. Civ. P. 23(c)(4). *See China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1801 (2018) (syllabus) ("*American Pipe & Constr. Co. v. Utah*, 414 U. S. 538, 94 S. Ct. 756, 38 L. Ed. 2d 713, established that the timely filing of a class action tolls the applicable statute of limitations for all persons encompassed by the class complaint and that members of a class that fails to gain certification can timely intervene as individual plaintiffs in the still-pending action, shorn of its class character. American Pipe's tolling rule also applies to putative class members who, after denial of class certification, 'prefer to bring an individual suit rather than intervene.' *Crown, Cork & Seal Co. v. Parker*, 462 U. S. 345, 350, 103 S. Ct. 2392, 76 L. Ed. 2d 628.").

Case 5:20-cv-00336-D   Document 30   Filed 08/31/20   Page 5 of 94

5.     Staff Sergeant ("SSG") **Shane Page** (Enlisted Paygrade: E-6) is, or during the last four years was, a tenant of the privatized military housing owned and managed by one or more of Defendants at Fort Bragg, Cumberland County, North Carolina ("Fort Bragg"), commencing for purposes pertinent hereto in or about August 2016.

6.     Plaintiff **Brittany Page** is the spouse of Staff Sergeant Page and has lawfully occupied the residence unit during the pertinent times as well.

7.     Specialist ("SPC") **Spenser Ganske** (Paygrade: E-4) is, or during the last four years was, a tenant of the privatized military housing owned and managed by one or more of Defendants at Fort Bragg, commencing for purposes pertinent hereto in or about September 2018.

8.     Plaintiff **Emily Ganske** is the spouse of Specialist Ganske and has lawfully occupied the residence unit during the pertinent times as well.

9.     Sergeant First Class ("SFC") **Christopher Wilkes** (E-7) is, or during the last four years was, a tenant of the privatized military housing owned and managed by one or more of Defendants at Fort Bragg, commencing for purposes pertinent hereto in or about March 2017.

10.     Plaintiff **Ashley Wilkes** is the spouse of Sergeant First Class Wilkes and has lawfully occupied the residence unit during the pertinent times as well.

11.     Corporal ("CPL") **Timothy Murphy** (E-4) is, or during the last four years was, a tenant of the privatized military housing owned and managed by one or more of Defendants at Fort Bragg, commencing for purposes pertinent hereto in or about February 2019.

12.     Plaintiff **Katelyn Murphy** is the spouse of Corporal Murphy and has lawfully occupied the residence unit during the pertinent times as well.

b. **Defendants.**

13.     Defendant **Corvias Group, LLC** ("Corvias Group") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located in East Greenwich, Rhode Island, or, Wilmington, Delaware, and at all times relevant to the allegations contained herein, was providing housing and other services for military servicemen and was the owner of Defendant Corvias Military Living.[12]  It has identified itself as the parent company of Bragg-Picerne[13] and of Corvias Military Living.[14]  Corvias Group, LLC is owned by John G. Picerne Business Trust, 2012.[15] In one or more prior actions, Corvias Group has alleged and held itself out, including before this Court,[16] as "providing housing and other services for military servicemen" at Fort Bragg.

14.     Defendant **Bragg Communities, LLC** ("Bragg Communities") is a Delaware limited liability company with its principal place of business at Fort Bragg.  It is authorized to do business in, and does business in, North Carolina.  Its members include[17] Bragg-Picerne Partners, LLC, and the U.S. Department of the Army.  At all relevant times to the allegations contained herein, Bragg Communities provided housing, property management and other services for military servicemembers and their family members at Fort Bragg.  Bragg Communities is listed as

---

[12] *Bragg Communities, LLC v. Illinois Union Ins. Co.*, No. 5:14-cv-00240-F (E.D.N.C.), Doc. 9; Doc. 16, amended complaint ¶ 3 (East Greenwich RI); No. 5:18-cv-00188-FL, Doc. 28 (Wilmington DE).
[13] No. 5:14-cv-00240-F, Doc. 10.
[14] No. 5:14-cv-00240-F, Doc. 11.
[15] *Hanna v. Amazon.com, Inc*., No. 5:18-cv-00188-FL (E.D.N.C.), Doc. 28.
[16] No. 5:18-cv-00188-FL, Doc. 1, ¶ 4.
[17] In a 2017 filing in this Court, Bragg Communities represented that its members were 1) Bragg-Picerne Partners, LLC, 2) the U.S. Department of the Army, and 3) AP Housing, LLC.  *Hanna*, No. 5:18-cv-00188-FL, Doc. 28, filed Nov. 17, 2017, pp. 1-2.  In a 2014 filing in a different case, Bragg Communities represented that its members were 1) Bragg-Picerne Partners, LLC, and 2) the U.S. Department of the Army.  *Bragg Communities, LLC*, No. 5:14-cv-00240-F, Doc. 3-2, filed April 23, 2014, page 6 of 59, state court complaint ¶ 3. The most recent NC Secretary of State filing for Bragg Communities discloses only Bragg-Picerne Partners, LLC.  2020 Annual Report, SOS ID 0651859, CA 2020 1200 2578.

the "Owner" under the ROA form lease[18] signed by servicemember tenants. Pursuant to various agreements and a fifty-year ground lease with the Army, Bragg Communities is the owner of the Fort Bragg Privatized Housing Project.[19]

15. Defendant **Corvias Management-Army, LLC** ("Corvias Management") is a Delaware limited liability company with its principal place of business at Fort Bragg. At all relevant times to the allegations contained herein, Corvias Management was providing housing and other services for military servicemen at Fort Bragg. Corvias Management is listed as the "Property Manager" under the ROA form lease signed by servicemember tenants.

16. Defendant **Bragg-Picerne Partners, LLC** ("Bragg-Picerne") is a Delaware limited liability company with its principal place of business in East Greenwich, Rhode Island. Bragg-Picerne is a wholly-owned subsidiary[20] of Corvias Military Living, LLC, which is its managing member.[21] At all relevant times to the allegations contained herein, Bragg-Picerne has provided housing and other services for military servicemen at Fort Bragg. Bragg-Picerne is the managing member[22] of Bragg Communities.

17. Defendant **Corvias Military Living, LLC** ("Corvias Military Living") is a Rhode Island limited liability company with its principal place of business in East Greenwich, Rhode Island.[23] Corvias Military Living was formerly known as Picerne Military Housing, LLC.[24] At all relevant times to the allegations contained herein, Corvias Military Living has provided housing and other services for military servicemen at Fort Bragg. Various Corvias Military Living affiliates

---

[18] An exemplar is available at the Corvias website at
http://corviasmilitaryliving.com/global_content/resident_responsibilities/Bragg_Military_ROA.pdf (accessed Aug. 31, 2020).
[19] No. 5:18-cv-00188-FL, Doc. 3-2, ¶ 11.
[20] No. 5:14-cv-00240-F, Doc. 3-2, page 6 of 59, state court complaint ¶ 3.
[21] No. 5:14-cv-00240-F, Doc. 10.
[22] No. 5:14-cv-00240-F, Doc. 9.
[23] No. 5:14-cv-00240-F, Doc. 3-2, state court complaint ¶ 5.
[24] No. 5:14-cv-00240-F, Doc. 63 pp. 4-5.

are involved in the development, construction and property management of the privatized military housing project.[25]  The corporate parent and sole member of Corvias Military Living is Corvias Group, LLC.[26]  During some or all of the pertinent times, employees of Corvias Military Living, including Ron Phillips, as of 2014 the Regional Vice President of Construction, had offices at Fort Bragg, including at 903 Armistead Street, Fort Bragg, North Carolina 28307.[27]  Corvias Military Living has in the past held itself out in pleadings filed in this Court as the owner of Units at Fort Bragg, and, as the owner of Bragg Communities.[28]

18.     Defendant **Corvias Construction, LLC** ("Corvias Construction") is a Delaware limited liability company with its principal place of business in East Greenwich, Rhode Island.[29]  Effective June 16, 2016, Corvias Construction was the successor by merger to Picerne Construction/FBG, LLC[30] and Corvias Military Construction, LLC.[31]  At all relevant times to the allegations contained herein, Corvias Construction was providing housing and other services for military servicemen at Fort Bragg, North Carolina.  Corvias Construction's predecessor, Picerne Military Construction, was organized as a Delaware limited liability company on June 3, 2005.[32]

19.     Defendants are joint tortfeasors, agents of the other, joint venturers, and/or engaged in the joint enterprise of leasing military housing at Fort Bragg, as well as the conduct and acts alleged herein.  During the pertinent times, each of the Defendants was directly and materially involved in the relevant facts, acts and omissions, rising to a level so as to have joint and several

---

[25] No. 5:14-cv-00240-F, Doc. 63 pp. 2-3.
[26] No. 5:14-cv-00240-F, Doc. 11; No. 5:18-cv-00188-FL, Doc. 28.
[27] No. 5:14-cv-00240-F, Doc. 17-1.
[28] No. 5:18-cv-00188-FL, Doc. 1, complaint ¶ 3, Doc. 16, amended complaint ¶ 2.
[29] No. 5:14-cv-00240-F, Doc. 3-2, state court complaint ¶ 3.
[30] No. 5:14-cv-00240-F, Doc. 63 pp. 2-3.
[31] Certificate of Merger, filed with the North Carolina Secretary of State, Corporations Division, SOSID: 1365103, C2017 065 01680, March 10, 2017.
[32] Certificate of Merger, filed with the North Carolina Secretary of State, Corporations Division, SOSID: 1154047, C2010 1590 0299, June 11, 2010.

- 9 -

liability in this matter due to its direct material involvement. In addition, or in the alternative, on information and belief, and to the extent that the evidence shows and equity may require, during the relevant times, there has existed a unity of interest and ownership among Defendants, their predecessors, agents, and parent, such that any individuality and separateness among them has ceased, and each such entity is the alter ego of each other entity.

20.     Defendants are not persons or entities acting under a federal officer, nor are Defendants subject to any sovereign immunity, governmental immunity or government contractor defense herein.

## III.     JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(d), as it is a class action for damages that exceed $5,000,000, exclusive of interest and costs.

22.     This Court has personal jurisdiction over Defendants because of their contacts with the State of North Carolina, the fact that Defendants build, own and manage thousands[33] of military houses at Fort Bragg in Fayetteville, North Carolina, and the fact that they derive substantial revenue from managing military housing in North Carolina.

23.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in this district.

## V.     FACTUAL ALLEGATIONS

### a.     MHPI Program.

24.     In 1996, Congress established the Military Housing Privatization Initiative ("MHPI") through the 1996 Defense Authorization Act to improve the quality of housing conditions for active-duty military personnel. Pub. L. 104-106, 110 Stat. 186, 544, 10 U.S.C. §

---

[33] According to its press releases, at Fort Bragg, Corvias Property Management is responsible for nearly 6,500 homes across 11 communities.

2871 *et seq.* (1996). The MHPI provided military service branches with alternative authorities for construction, renovation and management of military housing for families and unaccompanied personnel. Under these authorities, the Services can leverage appropriated housing construction funds and government-owned assets to attract private capital and private developers in effort to improve the quality of life for soldiers and their families. This legislation provides a way to maximize use of limited appropriated funds, land, and existing facilities to encourage private sector investment.

25. Pursuant to the MHPI, the military was encouraged "to stimulate private sector financing of military housing construction and revitalization projects." S. Rep. No. 104-112 (1995).

26. The MHPI provided the Department of Defense ("DoD") with 12 alternative authorities or tools to initiate housing projects which include the authorization of direct loans and loan guarantees, differential payments to supplement service members' housing allowances, investments such as limited partnerships, stock/bond ownership, and limited liability companies, and the conveyance or lease of military housing units to the contractor.

27. There are about 80 privatized projects encompassing more than 204,000 housing units located on more than 150 installations.[34] The DoD considers these houses to be private housing. Service members who are housed on base are paid the prevailing BAH rate for their duty location and required to reimburse the management company of their rental home the full amount of their BAH. Before the advent of the MHPI, the home was provided in lieu of the BAH. This change creates continuous revenue flow for the life of the management contract and, conceptually, requires little additional funding from the government.

---

[34] Esper, service secretaries talk privatized housing reform, U.S. Army, Oct. 9, 2019.

28.     Servicemembers, including lease signatory Plaintiffs, are required to pay their rent on time and commercial vendors are aware that a single call to the service members chain of command will rectify any delinquency.  Consequently, Defendants often prey on Plaintiffs' fears of reprisal even when conditions within the rental homes merit no payment flowing from the servicemember tenant to the landlord whatsoever.

29.     Privatizing U.S. military housing was supposed to protect service members' families.  The military knew hazards lurked in its housing, and private companies knew that when they took over.  In 2005, the U.S. Army released an environmental study that said 75% of its 90,000 homes nationwide did not meet its own standard of quality or safety.[35]

30.     Twenty years after privatization, in 2016, a DoD Inspector General Report found that poor maintenance and oversight left service families vulnerable to "pervasive" health and safety hazards.  Specifically, on October 14, 2016, the DoD Office of Inspector General issued a report to "summarize and analyze previous DoD Office of Inspector General (DoD OIG) health and safety inspections of DoD-occupied facilities and military housing."[36]  One "objective was to identify common issues and broader findings."

31.     The 2016 OIG Report findings included: "Deficiencies in electrical system safety, fire protection systems, and environmental health and safety were pervasive because of a lack of

---

[35] Haley Britzky, What we're reading: Kids at risk of lead poisoning on U.S. military bases, Axios, Aug 16, 2018. *See also* Reuters Special Report, Joshua Schneyer and Andrea Januta, Children poisoned by lead on U.S. Army bases as hazards go ignored, Aug. 16, 2018 ("The military knew hazards lurked in its housing. In 2005, the Army released an environmental study that said 75 percent of its 90,000 homes nationwide didn't meet its own standards of quality or safety. Of Benning, it said: 'As homes deteriorate, the risk of children's being exposed to hazardous materials … would increase.'").  The underlying 2005 report is, US Army Corps of Engineers Mobile District, Final Environmental Assessment for the Residential Communities Initiative at Fort Benning, Georgia, Executive Summary, June 2005, ES-1 ("The Army operates and maintains approximately 90,000 family housing units at its installations throughout the United States. More than 75 percent of the units do not meet current Army housing standards.").
[36] Summary Report, Inspections of DoD Facilities and Military Housing and Audits of Base Operations and Support Services Contracts, Department of Defense Office of Inspector General, DODIG-2017-004, October 14, 2016 ("2016 OIG Report").

adequate preventative maintenance and inspections being performed at the installations. As a result, DoD personnel and military families were exposed to health and safety hazards at installations around the world."[37]

32.    The 2016 OIG Report further found: "These systemic problems resulted in increased health and safety risks to service members."[38]

33.    The 2016 OIG Report summarized prior OIG reports and their findings of "critical deficiencies [which] included safety problems, such as … unmitigated mold growth in multiple buildings and family housing units."[39]

34.    Beginning in 2018, Reuters published[40] a series of award-winning[41] news articles detailing substandard living conditions at U.S. military bases, including lead exposure, vermin infestation, mold and other contaminants.  The reports described how military families encounter high hurdles to resolving disputes in a system that grants vast power to private landlords who manage base housing across the United States.

---

[37] *Id.*
[38] *Id.*
[39] 2016 OIG Report, findings, p. 6.  It noted that "[i]n addition to the critical mold-related deficiencies in Report No. DODIG-2014-121, we also documented mold-related problems in all three of the reports that included environmental health and safety inspections (Report Nos. DODIG-2015-013, DODIG-2015-162, and DODIG-2015-181)."  *Id.*  Of those reports, DODIG-2015-181, Continental United States Military Housing Inspections – Southeast, surveyed three installations in the Southeastern region of the continental United States—Patrick Air Force Base (AFB), Naval Station (NS) Mayport, and Fort Gordon.  DODIG-2015-162, Continental United States Military Housing Inspections – National Capital Region, surveyed two installations in the United States National Capital Region—Fort Belvoir and Joint Base Anacostia-Bolling.
[40] https://www.reuters.com/investigates/section/usa-military/.
[41] 2019 Hillman award for web journalism (http://www.hillmanfoundation.org/hillman-prizes/2019-hillman-prize-web-journalism); 2019 National Press Club award for consumer journalism in the newspaper category (https://www.press.org/newsroom/annapolis-capital-gazette-baltimore-sun-win-breaking-news-award-national-press-club);

- 13 -

35.     In November 2018, the investigative arm of Congress launched an inquiry into hazards faced by occupants of housing on U.S. military bases and the oversight of those conditions by the armed services.[42]

36.     On December 3, 2018, a hearing was held before the United States Senate's Committee on Armed Services.[43]  At the onset of the hearing, Senator James M. Inhofe from Oklahoma stated as follows:

> Almost a year ago, I first heard from military families about the dismal conditions they faced.  Frankly, if confession is good for the soul, Janet Driver called this to my attention from Tinker Air Force Base.  And I thought this was something that was just unique to Tinker Air Force Base, and then I thought no.  It is elsewhere in Oklahoma.  But then it is also all the way around the country.  And so that was the background of how this all started.
>
> We have come to learn that it is a problem nationwide.  It is a national crisis of proportions we have not seen since the scandal at Walter Reed about a decade ago.

Senator Inhofe further added,

---

[42] Deborah Nelson, M.B. Pell, Congress watchdog begins inquiry into housing hazards at U.S. military bases, Nov. 14, 2018.
[43] Committee on Armed Services, United States Senate, Hearing to Receive Testimony on Accountability to Provide Safe Military Housing and Other Building Infrastructure to Servicemembers and Their Families, March 7, 2019, Washington, D.C.  Senator Inhofe's opening statement runs from tr. pp. 2-6.

- 14 -

>     We continue to hear regularly from the families across
> the country about questionable practices, poor workmanship,
> and frankly, in some places about housing contractors just
> not caring about the families they are supposed to be
> serving.
>
>     Additionally, as reported in the press, some of these
> contractors are now under investigation for defrauding the
> Federal Government.  I am really worried.  What else can
> come out of the woodwork on this?  What other problems are

37.　　During the same Senate hearing, Elizabeth A. Field, Director, Defense and Management, Government Accountability Office, stated in written testimony, "We analyzed over 8 million work order records from all 14 private partners and all 79 projects…we found anomalies in the data provided by all 14 private partners such as duplicate work orders and work orders with completion dates prior to when they were submitted."[44]

38.　　Moreover, also in December 2019, Ms. Field was quoted as stating, "The problems I detail are significant not just because they tell us that DOD's statement that the program has been successful overall may not be fully accurate, but because the Department has been using these metrics to reward and incentivize the private partners."[45]

39.　　Private military housing companies, including Defendants in this case, manipulated service and repair records to the detriment of residents to drive up profits, including "incentive fees," that could be collected as part of its contract with the government.

---

[44] United States Government Accountability Office, Report to Congressional Addressees, DOD Needs to Strengthen Oversight and Clarify Its Role in the Management of Privatized Housing, March 2020, GAO-20-281, p. 3.
[45] Daniel Wilson, DOD's Private Housing Metrics Misleading, GAO Official Says, Law360, Dec. 3, 2019.

40.     Senator Elizabeth Warren opened her own investigation of the Military Housing Privatization Initiative and five companies, including Defendants in this case, on February 6, 2019.[46]  She submitted her written report dated April 30, 2019, which contains four conclusions:

    A.     "Conclusion One: The private military housing providers have set up a complicated web of subcontractors and subsidiaries that undermines accountability for substandard conditions in military housing and makes it difficult to track revenues, profits, and the flow of funds."

    B.     "Conclusion Two: The private military housing providers have failed to create accessible or centralized records and protocols to address complaints and reports of problems with military housing, which makes comprehensive assessment and oversight of their performance difficult and complicates efforts to improve housing quality."

    C.     "Conclusion Three: Private housing providers are making large profits while taking minimal investment risks."

    D.     "Conclusion Four: The companies and their subsidiaries are receiving sizeable incentive fees even when they face substantial quality control challenges."[47]

**b.     Fort Bragg and Corvias.**

41.     Fort Bragg is the most populated military base in the United States and includes nearly 6,500 family homes.  As much, it was viewed as the crown jewel of military housing projects.  Beginning in or about 2001, Mr. Picerne worked to position Corvias to bid on the project and succeed with its bid, including by contacting members of the Senate Armed Services Committee which oversees military spending.[48]

---

[46] Letter dated April 30, 2019 from Senator Warren to Secretary Esper et al., regarding MHPI (noting "I opened this investigation on February 6, 2019, amid reports of substandard on-base housing that was having a significant effect on morale and, in some cases, causing severe health problems for military families").
[47] *Id.*
[48] Joshua Schneyer, Andrea Januta, Special Report: As their landlord profits, soldiers battle unsafe Army homes, Reuters, Dec. 27, 2018.

- 16 -

42.     In 2001, Picerne Military Housing won the bid to develop a pilot installation at Fort Meade, Maryland, under the MHPI program.[49]

43.     According to Reuters in December 2018, Mr. Picerne's businesses, including Defendants, had spent $2.8 million on lobbying, mostly of Congress and the Defense Department, on issues related to military housing or Defendants' contracts.  Mr. Picerne has given at least another $500,000.00 in political contributions.

44.     Corvias won the Fort Bragg contract and, to accomplish its goals related to the development and management of military housing, the United States of America ("United States"), by The Secretary of the Army ("Secretary"), entered into a Ground Lease with Defendant Bragg Communities on August 1, 2003 ("Ground Lease").  At that time, the Army transferred ownership and operation of 4,746 homes to Picerne Military Housing to form Bragg Communities.[50]

45.     The legislative history reveals that Congress designed the MHPI to "substantially upgrade military housing on an accelerated basis" through the utilization of new "authorities" that permit the military to offer certain cost-saving and money earning benefits to private entities as a *quid pro quo* for their provision of housing and related services to military personnel. 141 Cong. Rec. S18853 (MHPI provides "new authorities for the provision of new housing, repaired housing, [and] restored housing for our military personnel").

46.     According to the website for Office of the Assistant Secretary of Defense for Sustainment, "Congress established the Military Housing Privatization Initiative in 1996 as a tool

---

[49] Matthew C. Godfrey, Paul Sadin, Dawn D. Vogel, Joshua Pollarine, Nicolai Kryloff, Privatizing Military Family Housing, A History of the U.S. Army's Residential Communities Initiative, 1995-2010, prepared for the Office of the Assistant Secretary of the Army, Installations, Energy & Environment, GPO, 2012, p. 166 (available as free e-book) ("Godfrey 2012").
[50] Godfrey 2012, p. 316.

to help the military improve the quality of life for its service members by improving the condition of their housing."[51]

47. By operation of the Ground Lease and under the authority of 10 U.S.C. § 2878, the Secretary leased property to Bragg Communities including the residential homes leased by Plaintiffs, for a term of 50 years, for purposes of the design, management rehabilitation, renovation, maintenance of residential communities and related ancillary facilities at Fort Bragg, Fayetteville, North Carolina.

48. Under the circumstances, military personnel, including Plaintiffs, were intended third party beneficiaries[52] of the Ground Lease which serves as a vehicle for implementation of the MHPI. The MHPI and the Ground Lease were created for the express purpose of improving military houses for servicemen and women including Plaintiffs.

49. By entering into a contract with The United States of America, Defendants, beginning with Bragg Communities, but also embracing all Defendants to the extent the operate as effectively a single integrated operation,[53] placed themselves in such a relation with Plaintiffs that the law imposes an obligation upon Defendants to act in such a way that Plaintiffs and class members will not be injured.

50. Under the Ground Lease, Bragg Communities is the "Lessee," and Bragg-Picerne Partners is the "managing member" of Bragg Communities. However, any reference to "Lessee"

---

[51] https://www.acq.osd.mil/eie/FIM/Housing/Housing_index.html.
[52] "To establish a claim based on the third party beneficiary contract doctrine, a complaint's allegations must show: (1) the existence of a contract between two other persons; (2) that the contract was valid and enforceable; and (3) that the contract was entered into for his direct, and not incidental, benefit." *Hospira Inc. v. AlphaGary Corp.*, 194 N.C. App. 695, 702-03 (2009) (quoting *Leasing Corp. v. Miller*, 45 N.C. App. 400, 405-06, 263 S.E.2d 313, 317 (emphasis added) (citation omitted), *cert. denied*, 300 N.C. 374, 267 S.E.2d 685 (1980)). "In determining whether the parties intended to benefit a third party, we must consider the surrounding circumstances as well as the language of the contract." 194 N.C. App. at 703.
[53] Unlike many of the Army's partners, Picerne is a fully integrated company, acting as owner, developer, builder, and property manager for each of the projects it oversees." Godfrey 2012, p. 166.

includes any of its sublessees, assignees, transferees, successors and *their duly authorized representatives*. A Memorandum of Ground Lease was recorded with the Cumberland County Register of Deeds on August 1, 2003.[54]

51. According to a sworn Affidavit dated July 12, 2016,[55] Ron Phillips ("Phillips"), former Regional Vice President of Construction for Corvias Military Living, averred that "[t]he United States Army owns and operates Fort Bragg. Pursuant to various agreements and a fifty-year ground lease with the Army, Bragg Communities, LLC is the owner of the Fort Bragg Privatized Family Housing Project (the 'Project')." Phillips stated further, "[v]arious Corvias Military Living, LLC affiliates are involved in the development, construction and property management of the Project. For instance, Corvias Military Construction LLC, was engaged by Bragg Communities, LLC to manage the construction and renovation of the privatized family housing at the Project. Corvias Military Construction, LLC is a wholly-owned subsidiary of Corvias Military Living, LLC."

52. On March 2, 2016, Phillips gave testimony[56] as the corporate designee for multiple Corvias entities joining to sue as plaintiffs including Bragg Communities, Bragg-Picerne Partners, Corvias Military Living and Corvias Construction, yet also testified he was only employed by one of them. When asked if he was still prepared to speak on behalf of all corporations he said, "Yeah. I mean, it's kind of all one flowing organization." Phillips says that all the corporations are what would be known as the Corvias "Group".

---

[54] Cumberland County Register of Deeds, Book 6209, Page 0824, Aug. 1, 2003.
[55] No. 5:14-cv-00240-F, Doc. 63-1.
[56] No. 5:14-cv-00240-F, Doc. 63-7.

```
14        Q     Okay.  But nonetheless you are prepared to
15   speak on behalf of --
16        A     Yeah.  I mean, it's kind of all one flowing
17   organization.
18        Q     All under, I guess, now what would be known
19   as the Corvias --
20        A     Group.
```

53.     At all times during the term of the Ground Lease, Bragg Communities must faithfully observe and comply with all applicable Federal, State and local laws, rules, regulations, orders, ordinances and other governmental standards and requirements.

54.     Bragg Communities is required to keep the leased property, otherwise known as the "Project," in "good order and in a decent, safe, and sanitary condition"[57] at its sole expense. Additionally, Bragg Communities must ensure professional management and maintenance of the military housing neighborhoods consistent with the standard of a market rate residential rental development in the Fayetteville, North Carolina, area.

55.     The Ground Lease mandates that homes, garages, carports, storage sheds, grounds and other facilities, are to be maintained to a standard that prevents deterioration beyond that which results from fair wear and tear.  That includes making sure that all family housing facilities are free of missing components, or defects, which would affect the safety, appearance, or habitability of the facilities.

---

[57]Army Regulation 210–50, Installations Housing Management, Oct. 3, 2005, p. 32, § 4-4, Adequacy standards for Government–controlled permanent party UPH ("The housing must provide a decent, safe, sanitary, and habitable accommodation in good repair.").  *See also* § 4-9 ("Continued retention is contingent upon meeting the following conditions: … b. The housing is safe, decent, and sanitary so as to be acceptable for occupancy pending revitalization.").

- 20 -

56.     The Defendants, pursuant to the Ground Lease, obtained control over the renovation, demolition, construction and maintenance of the military housing for Fort Bragg, subject to requirements and duties imposed upon it by the Ground Lease and related documents.

57.     Upon information and belief, the Ground Lease requires the Defendants to observe and comply, at their sole cost and expense, with the provisions of all federal, state and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements which are applicable to the premises and the Units.

58.     As described by Elizabeth Fields, Director, Defense and Management, Government Accountability Office, in testimony to Congress in December 2019, "[t]he companies … are required under all of the projects to comply with all federal, State, and local environmental health and safety codes. So that requirement that is in all of the contracts."[58]

59.     Defendants are required to operate the housing at Fort Bragg in good order and in a clean, safe condition at its expense, as a first-class residential rental development for tenants.

60.     Defendants are bound by the terms of the Ground Lease and are responsible for the design, financing, demolition, renovation, ownership, management, operation and maintenance of existing and new housing units.

61.     Under the Ground Lease, Corvias claims to be committed to professional management and maintenance of the neighborhoods consistent with the standards of a market rate residential rental development in the surrounding area.  This is to include maintenance and repair *in accordance with military, federal, state and local codes* to ensure that all of the houses are in a condition at all times reasonably acceptable to the owner, including, but not limited to, cleaning,

---

[58] Committee on Armed Services, United States Senate, Hearing to Receive Testimony from the Government Accountability Office on Privatized Housing Findings to Include Responses from the Military Services on Ongoing Reports of Substandard Housing Conditions and Services, Dec. 3, 2019, Washington, D.C.; testimony of Elizabeth Fields, Director, Defense and Management, Government Accountability Office, at 89:7-10.

painting, decorating, plumbing, electrical, HVAC, appliances, carpentry, grounds-care, and such other maintenance and repair work as may be necessary.

62. The Department of the Army adopted standards that apply to the construction, renovation and condition of privatized housing. Compliance with each of the standards is mandatory unless the Assistant Secretary of the Army, Installations and Housing Office approves a waiver in writing, on a case-by-case basis.

63. The purposes of the MHPI was "to obtain private sector capital and expertise to operate, manage, maintain, improve, renovate, and construct military housing (for both families and unaccompanied personnel) on or near military installations in the United States." The Army's housing privatization program, known as the RCI program, "is dedicated to building quality residential communities for soldiers and their families."[59] As such, Defendants were fairly obligated, as the private sector partners, to provide adequate and reasonable service to "operate, manage, maintain, improve, renovate, and construct" the military housing; they had a duty to be fair and nondeceptive in their representations made to servicemember prospective tenants; and they had a duty to provide "quality" communities.

64. All new construction and major renovations at RCI projects, including Fort Bragg, must be completed in accordance with local building codes and standards.

65. Publications including Department of the Army Pamphlet 420-1-1, Facilities Engineering, Housing Management, from 2009, identify standards intended to maintain housing real property to prevent deterioration beyond that which results from normal wear and tear.[60] Table 2-11[61] requires that exterior walls be structurally sound, weather tight and in a good state of repair.

---

[59] Dep't of the Army Pamphlet, 210–50, Installations Housing Management, Oct. 3, 2005, § 14-9.
[60] Dep't of the Army Pamphlet, 420-1-1, Facilities Engineering, Housing Management, April 2, 2009, § 2-29, p. 49.
[61] *Id*., p. 50.

- 22 -

Roofing is required to be weather tight and free of corrosion and abnormal deterioration of individual components, and replacements for missing pieces preserve the original whole condition of the roof system. Items that pierce the roof including chimneys, vent stacks, roof ventilators, and other items must function as originally designed. Flashing must prevent leaks as originally intended.

66. The 2009 Army Pamphlet § 2-29, Table 2-12, also applicable to Fort Bragg, requires interior walls be free of damage, deterioration, cracks, or defective materials. Subflooring and related structural members must be safe and usable. Deteriorated subflooring must be repaired or replaced to retain the original who condition of the floor. Interior trim must be smooth, free of chipped and peeling paint.[62]

67. The 50-Year Ground Lease requires Defendants to manage lead-based paint in accordance with the standards and requirements established by the Army's Public Works Technical Bulletin ("PWTB") 420-70-2.[63]

68. Exhibit "F" of the Ground Lease is the "Final Environmental Baseline Survey for the Army Residential Communities Initiative Properties at Fort Bragg, North Carolina" ("EBS"). As required by DoD policy, an EBS must be prepared before any real property can be sold, leased, transferred, or acquired. The purpose of the EBS is to establish a baseline of the environmental condition of the property. It serves as a basis for identifying areas of real property that may be contaminated.

69. The EBS was completed and published in March 2003, then provided to Defendants both prior to and contemporaneously with the signing of the Ground Lease dated August 1, 2003.

---

[62] *Id.*, pp. 49-51.
[63] Available at https://www.wbdg.org/FFC/ARMYCOE/PWTB/pwtb_420_70_2.pdf.

- 23 -

70.     The EBS incorporates a lead-based paint survey ("Lead Survey") conducted in 675 housing units constructed prior to 1978 within Fort Bragg.  The Lead Survey, prepared by Ballard, McCredie, Elliott & Associates in 1993, includes all housing communities within Fort Bragg and indicates that LBP *is present* in the housing units constructed prior to 1978.  Additionally, 755 soil samples were collected at 362 housing units throughout all housing communities in Fort Bragg. Analysis using x-ray fluorescence ("XRF") technology indicated lead concentrations in the soil surrounding the housing units in all housing communities exceeding regulations set by the U.S. Environmental Protection Agency ("EPA").

71.     According to EPA regulations, a soil-lead hazard is present on residential property when concentrations in the soil exceed 400 parts per million (ppm) in high contact areas for children or 1,200 ppm of bare soil in the rest of the yard.[64]  *In 1993, the lead in soil analysis identified lead in the soil at concentrations as high as 83,000 ppm.*

72.     The EBS recommends further investigation to accurately determine the concentrations of lead in the soil.  The EBS was not disclosed to Plaintiffs at the time they signed residential leases.

73.     According to the EBS, surveys conducted in 1993 revealed that lead based paint existed throughout the property and building components that routinely tested positive for lead-based paint included door frames, windowsills, window jambs, and baseboards.

74.     Defendants possessed records and information, including nonpublic records or records not readily accessible by the public, and including the EBS and Lead Survey, which identified concerning lead concentrations in the soil surrounding all housing communities. Defendants knew that lead based paint was present in housing units throughout Fort Bragg.

---

[64] https://nchh.org/information-and-evidence/learn-about-healthy-housing/health-hazards-prevention-and-solutions/lead.

- 24 -

75.     Despite having information of the potential threat posed by lead, Defendants did not disclose the EBS and Lead Survey to all tenants.  Defendants routinely omitted information concerning lead-based paint, or lead-based paint hazards, from residential lease contracts and habitually failed to disclose information such as the location of the lead-based paint and/or lead based paint hazards, and the condition of the painted surfaces.

76.     By operation of the Ground Lease and the PWTB, Defendants must meet the standards of the American Society for Testing and Materials ("ASTM").  ASTM Subcommittee EO6.23, Abatement of Lead Hazards in Buildings, "was established by the U.S. Department of Housing and Urban Development (HUD) in 1991 to develop consensus guidelines for abating and mitigating lead hazards in and around buildings. The sub-committee has developed and continues to develop guidelines and standards to be used in dealing with lead hazards associated with paint, dust, airborne particulates, and soil."[65]

77.     According to PWTB Section 2-1, the installation lead hazard management program must "Comply with Federal, state, and local lead-based paint (LBP) regulations.  Army policy is to follow the more stringent regulation." Section 2-2 states, "It is an Army requirement to provide a lead hazard-free living and working environment for soldiers and their families."[66]

78.     PWTB Section 2-3 establishes "Medical policy guidance" and states, "The Childhood Lead Poisoning Prevention (CLLP) Program on each installation consists of a multi-disciplinary core of experts who develop an overall program of lead risk reduction. Program elements include a child blood screening program; lead exposure risk questionnaires; clinically

---

[65] PWTB 420-70-2, p. 2-2.
[66] *Id.* at p. 2-1.

indicated screening; elevated blood lead (EBL) case management; and outreach, education, and training."[67]

79.     The PWTB requires implementation of an "Installation Lead Hazard Management Plan" including a detailed process for identification and management of lead hazards in paint, dust, and soil.  The Program is to include a lead hazard management team which understands key terms and regulatory requirements of lead hazard management.   The team is required to develop an installation lead hazard management plan.  Elements of the plan,[68] maintained by the appropriate lead hazard management team member, include:

A.     Identification and prioritization of target housing and child-occupied facilities.

B.     Summaries of construction and maintenance histories taken from real property records, contract documents, and other local sources.

C.     Summaries of child and worker blood lead level screening and testing data.

D.     Identification of similar groupings of facilities for risk assessment and interim controls.

E.     Results of previous paint inspections.

F.     Results of risk assessments identifying lead hazards.

G.     Recommended interim controls and abatement actions based on results of risk assessments.

H.     Records of actions taken for children with EBLs (elevated blood lead).

I.     Records of training and certification of personnel involved in LBP (lead based paint) activities.

J.     Medical surveillance records of personnel involved in LBP activities.

K.     Results of clearance and on-going monitoring inspections showing recommended changes to interim control procedures and abatement plans.

---

[67] *Id.* at p. 2-2.
[68] *Id.* at pp. 3-3 to 3-4.

- 26 -

L.    Abatement project lists, including Whole-Neighborhood Revitalization and other major repair projects.

M.    Records of solid waste characterization and disposal actions.

N.    Copies of contract documents/reports specifically cited in the lead management plan.

O.    Identification of sources of funding and planning, programming, budgeting, and execution plans.

P.    Lists of projects submitted to higher headquarters through the EPR (Environmental Program Requirement) Report.

80.    Per the PWTB, The Lead Hazard Management Plan called for the development of a lead hazard public awareness program.[69] Among other requirements, occupants are to be notified at the time of assignment to quarters concerning the known presence of lead-based paint and/or lead-based paint hazards, and precautions they can take to protect children. Additionally, occupants are to be notified of the results of risk assessments and actions planned to implement interim controls or abatement. Occupants with young children must receive information on protecting children from lead poisoning. "The importance of wet mopping or wet wiping with detergent to control lead dust levels and of washing children's hands must be stressed." Medical screening of all military family members under the age of six years was to be conducted in accordance with the procedures and guidelines set forth in Memorandum, Office of the Surgeon General, DASG-PSG, subject: Childhood Lead Poisoning Prevention, dated 26 May 1993. Medical surveillance programs for workers exposed to lead were outlined in:

A.    Occupational Safety and Health Administration (OSHA), 29 CFR Part 1910.1025, Lead Standard for Non-Construction Activities Such as Routine Maintenance.

B.    OSHA, 29 CFR Part 1926.62, Lead Exposure in Construction; Interim Final Rule.

---

[69] *Id.* at pp. 3-1, 3-5.

C. HUD Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing.[70]

81. According to "Step 8" of the plan, Defendants must perform risk assessments and EBL investigations of target housing and child-occupied facilities. "The Army has adopted, as the minimum standard of care, the procedures for performance of EBL investigations found in the HUD Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing, Chapter 16." The elements of a risk assessment include "Gathering of information regarding the age and maintenance history of the facility, the likelihood of occupancy by children under age 6, and known findings of EBL levels in children."[71]

82. Ongoing monitoring of lead-based paint was required in all target housing and child-occupied facilities where lead-contaminated paint is known or suspected to be present, regardless of the paint's present condition.[72] Ongoing monitoring was to include a report of findings and recommendations. The Army, and by operation of the 50-Year Lease and PWTB, adopted, as the minimum standard of care, the procedures for performance of ongoing monitoring in HUD Guidelines, Chapter 6.

83. Per the Plan, between occupancy, target housing should be re-inspected to verify that previously controlled or abated lead hazards have not recurred, to identify the occurrence and extent of new lead hazards, and to notify occupants that there is damage to painted surfaces.

84. Accordingly, by operation of the 50-Year Lease and PWTB, Defendants are bound by the HUD Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing.

85. Plaintiffs are informed and believe that prior to taking possession of the housing properties per the 50-Year Lease Agreement, Defendants were provided an EBS from the

---

[70] *Id.* at pp. 3-5, 3-6.
[71] *Id.* at pp. 3-8.
[72] *Id.* at pp. 3-13.

government containing all available information concerning known lead-based paint and/or lead based paint hazards, the location of the hazards, and the condition of painted surfaces. Defendants acknowledge receipt of the EBS when they executed the 50-Year Ground Lease.

86.     Defendants agreed they would not permit occupancy or use of any buildings, including those leased by Plaintiffs, without complying with all applicable federal, state, and local laws and regulations pertaining to lead-based paint and lead based paint hazards. Per operation of the 50-Year Ground Lease, the PWTB and HUD Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing are applicable.

87.     Over the last four years, Bragg Communities has entered into or renewed, and Corvias Management-Army serviced, several thousand ROA leases with Plaintiffs and class members regarding Units of residential base housing at Fort Bragg.

88.     The ROA is a contract between the servicemember as "resident" and Bragg Communities (the Corvias entity that owns the property), with Corvias Management-Army signing the agreement as Bragg Communities' agent and being designated as the property manager.

89.     Plaintiffs' rent is the full basic allowance of housing, or BAH, which is deposited directly into one or more of Defendants' accounts. There is no ability for Plaintiffs to negotiate the price of housing, or the ROA terms. Per the Corvias website: "Rather than receiving the BAH into their accounts and then making monthly rental payments, service members have signed a Resident Occupancy Agreement, or lease. The signed ROA gives the government permission to start the rent allotment, which equals the Soldier's BAH entitlement for his or her rank and should reflect any BAH increases or decreases that occur…."[73] "The BAH money is earmarked for rent. If the Soldier spends it, he or she will be responsible for paying rent until the problem is corrected."

---

[73] https://bragg.corviasmilitaryliving.com/relocating/ready-to-move/find-your-bah.

90.    For a servicemember moving to a new base upon receiving orders to do so, the main priority is to start the new assignment as expeditiously as possible. This is particularly challenging for servicemembers who serve as part of high operations-tempo units vital to national security or those who need to quickly integrate into pre-deployment training. And for servicemembers relocating across the country or from overseas, there is often little or no time to meaningfully review housing options at the new duty station before arriving on base.

91.    To this same point, during the hearing on December 3, 2019, before the United States Senate's Committee on Armed Services, Senator Tim Kaine remarked:[74]

> But they treat military tenants like they are captives, like it is a captive audience. People who move from across the country to a place where they do not know anyone, where they do not know anything about the rental market, where they are trying to find new schools and get accustomed to everything else -- there is a natural tendency to want to live on base. And the occupancy rates will be high because of that tendency. And so these companies who would compete hard and try to produce a high quality product in another business unit of the identical company treat these folks as if they are captives and that they do not have to treat them in the same way that they would treat private tenants. And I find that outrageous.

92.    The ROAs apply the laws of the State in which the Unit is located to the maximum extent that the applicable state law applies to leased premises and the court of such State have jurisdiction over the homes, as well as any applicable Federal Laws, any applicable military rules,

[74] Committee on Armed Services, United States Senate, Hearing to Receive Testimony from the Government Accountability Office on Privatized Housing Findings to Include Responses from the Military Services on Ongoing Reports of Substandard Housing Conditions and Services, December 3, 2019, Washington, D.C., p. 50.

- 30 -

regulations and/or guidelines, and the Resident Responsibility Guide, all of which are incorporated by reference.[75]

93.      Defendants' compliance with the Army's standards for housing at RCI Projects is mandatory.  According to the Army's standards, roofs must be in good condition with no visible signs of leakage and exterior finishes must have no significant signs of distress.

94.      The Army's standards require that no lead-based paint can be exposed on interior surfaces.

95.      N.C. Gen. Stat. § 42-42(a) requires Defendants to comply with the current applicable building and housing codes and make all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition.  Additionally, within a reasonable period of time based upon the severity of the condition, Defendants must repair or remedy any imminently dangerous condition on the premises after acquiring actual knowledge or receiving notice of the condition.  Imminently dangerous conditions include unsafe flooring or steps, and unsafe ceilings or roofs, as well as mold.

96.      In accordance with N.C. Gen. Stat. Chapter 160A, Article 19, Part 6, the Cumberland County Code[76] establishes minimum standards of fitness for dwellings and environs for the initial and continued occupancy of all places of abode in the Cumberland County, where Fort Bragg family housing is located.  Division 2, § 4-71, requires that dwelling units must comply with all minimum standards of fitness for human habitation.  Floors with broken, overloaded, decayed or excessively sagging sills, beams, girders and joists are prohibited.  Floors must be in sound condition and good repair.  All load-bearing walls, exterior or interior, shall not be

---

[75] Form lease, § 12.  The "Resident Responsibility Guide" is found online at
http://corviasmilitaryliving.com/global_content/resident_responsibilities/Fort_Bragg_RRG.pdf (accessed Aug. 31, 2020).
[76] https://library.municode.com/nc/cumberland_county/codes/code_of_ordinances.

substantially bowed or out-of-plumb and shall be structurally sound. Roofs shall be in sound condition and capable of supporting the load intended, and there shall be no seriously rotted, broken, or improperly supported ends. Each dwelling unit that does not comply with the requirements of Division 2 of the Code shall be deemed substandard.

97.     Corvias Management-Army is responsible for managing Fort Bragg family housing and for providing notification to residents under ROAs on behalf of Bragg Communities and any other Corvias entities.

98.     All notifications, statements, and representations made by Corvias Management-Army to tenants were made under and within the course and scope of Corvias Management-Army's agency with Bragg Communities.

99.     Corvias Management-Army drafts and controls the Resident Responsibility Guide provided to tenants. Corvias Management-Army, along with the other Defendants to the extent involved in maintaining and Corvias website content, and staffing the base office premises, control and direct the representations to military families living in Fort Bragg's military housing regarding their Units and the representations made to prospective residents.

100.    When the Corvias entities took control of housing at Fort Bragg, they had actual and constructive notice and knowledge of potentially harmful housing defects as identified in the 50-Year Lease Agreement and EBS.

101.    Since taking control of housing at Fort Bragg, Defendants have received thousands of complaints and repair requests, including those from Class Plaintiffs, evidencing serious defects which have existed throughout the housing developments at Fort Bragg. Defendants have had actual notice of the unfit and uninhabitable state of leased premises but have failed to repair them. In addition, Defendants have had notice of the unreasonable and inadequate maintenance, repair

- 32 -

and service practices they have engaged in, including via the computer data, metrics, and logs they maintain regarding that sector of their integrated operation.

102.    Defendants, including but not limited to Corvias Management-Army, during the last four years made representations to Plaintiffs and class members in connection with the Units, including that they were structurally sound, had no potential health or safety hazards to residents, and were compatible with contemporary standards of livability.  Defendants further has advertised that current renovations are compliant with current housing and building codes.

103.    On its website, http://bragg.corviasmilitaryliving.com/, Corvias compares Fort Bragg military housing to an "upscale"[77] residential community, and advertises "upgrades and new home construction," "dedicated professional management and maintenance teams," a "24-hour responsive maintenance team," and multiple amenities akin to a civilian country club.

104.    On February 13, 2019, Mr. Picerne, Founder and Chief Executive Officer of the Corvias Group, in written testimony provided to the Joint Subcommittee on Personnel & Readiness and Management Support, United States Senate Committee on Armed Forces, apologized that "[a]ny let down of any of our residents is unacceptable. And we are making every effort to fix it." He advised that "[w]e're returning to the "gold standard" level of resident care that defined our company, from the start."[78]

105.    In his February 13, 2019 testimony, Mr. Picerne described "steps to do a better job at resident service" being taken, and "a number of structural changes."  Plaintiffs allege that these service and structural changes should have been implemented years ago, they still have not

---

[77] See website, describing "many amenities commonly found in upscale residential neighborhoods."  At https://bragg.corviasmilitaryliving.com/how-to-apply-mobile.

[78] Statement by John G. Picerne, Founder & Chief Executive Officer, Corvias Group, Before the Joint Subcommittee on Personnel & Readiness and Management Support, United States Senate, Committee on Armed Services, Feb. 13, 2019, https://www.armed-services.senate.gov/imo/media/doc/Picerne_02-13-19.pdf.

adequately been implemented today, and, that class members who were injured and had their use and enjoyment of leaseholds substantially and unreasonably impaired during the interim are entitled to compensatory damages.

106.    On October 7, 2019, Heather Fuller, the operations director for Corvias at Fort Bragg, insisted to the Fayetteville Observer that major renovations that were planned "before residents began raising concerns about mold, lead paint and possible carbon monoxide issues in homes last year and this year."[79]  On information and belief, any contention by Defendants that they had already intended to make the recently announced capital expenditures and structural reforms prior to when Congressional hearings occurred in 2018 and 2019 is false.  In addition, Defendants based on complaints they had received and knowledge of condiytions that they had were fairly and reasonable obligated to institute capital expenditures and structural reforms prior to 2018 and prior to commencement of the class period.

107.    In December 2018, Kelly Douglas, a Corvias Spokeswoman, told Reuters, "Our core mission at Corvias is clear:  Put service members and their families first.  That means providing a safe, comfortable home to those in the military who choose our housing."[80]

108.    Plaintiffs and class members relied on Defendants' representations promulgated on their Corvias website and elsewhere, in entering into the ROAs, and in trusting in the repair and maintenance infrastructure.  Those representations stand in stark contrast to the actual housing conditions, and repair and maintenance practices and metrics, during the class period.

---

[79] https://www.fayobserver.com/news/20191007/corvias-starts-fort-bragg-housing-renovation.
[80] Joshua Schneyer and Andrea Januta, As U.S. soldiers battle landlord, confidential records shine light on his lucrative business, Reuters, Dec. 27, 2018.

- 34 -

c. **The Page Plaintiffs**.

109.     SSG Shane Page moved to 274 Spear Drive, Fort Bragg, North Carolina, on August 1, 2016, along with his wife, Brittany, and their two young sons.   Unbeknownst to the Pages at the time SSG Page signed his residential lease, 274 Spear Drive was filled with mold, lead-based paint, structural wood rot and overall disrepair.  Defendants failed to inform Page that the home lacked effective moisture and air barriers between exterior cladding and wall cavities.  Like the absent members of the class, the Pages were unaware that this underlying defect caused subsequent defects including, but not limited to, pervasive mold, structural wood rot and others.   Moreover, they had the reasonable expectation that Defendants would follow their own plans and protocols including, but not limited to, those contained in the Ground Lease and applicable state, federal and local housing laws.

110.     The Pages made their first repair request on September 2, 2016, due to water damage in their son's second floor bedroom.  In hindsight, Defendants' lackluster response to the repair call was a forecast of what would follow.  Corvias did not respond until September 21, 2016, and then painted over the interior water damage.

111.     When the Pages submitted repair requests in the proper form and fashion as provided for by Defendants, they had the reasonable expectation that the work would be completed.  Given that Defendants did not reject their repair requests, the Pages relied on Defendants to complete the work.

112.     By October 12, water leaked from the top of the home through interior walls. "Carothers Brothers," an outside contractor hired by Defendants, was to caulk around windows, seal flashing, and repair sheet rock, but told the Pages that workers could not go on the roof because

it was rotten and unsafe to stand on. Like the first repairman, Carothers sanded and painted, but did not repair the underlying moisture intrusion source.

113. During following months, the Page's home was infested with ants, cracks appeared in walls, the HVAC system failed, and water intrusion resulted in multiple service repair calls. Almost without exception, repairs were tardy and insufficient.

114. In August 2018, Brittany Page detected a strong odor in their son's bedroom and noticed discoloration on a wall beneath a window where shoddy repairs had previously been made. Carothers Brothers informed her that Corvias had finally granted permission to "open up" the wall to inspect. The repairman removed sheet rock, then directed her attention to black mold and structural wood rot. The repairman identified the substance as black mold but added he was not allowed to say that. He said he would be fired for using the word "mold" around tenants, and Carothers would lose its contract with Corvias. The repairman offered to leave so Brittany Page could take a photos.

115. Brittany Page immediately reported the problem and two representatives from Corvias, "Cindy" and "Desi", responded to the house. As predicted by the Carothers worker, the Corvias representatives inspected the mold and suggested it was "mildew." Brittany Page expressed great concern for her son's health and demanded testing. Both representatives argued and resisted. The bedroom was sealed off until Carothers returned for mold abatement and wood rot repair.

116. The Pages offered to have wall materials tested and their own expense and Corvias initially agreed. However, Corvias then disposed of the materials so that sampling was not possible.

117.    Later that same month, Corvias conducted an air quality test, but refused to provide test results until Brittany Page demanded.  The test results indicated elevated mold contamination which confirmed the Pages' safety concerns.  Corvias refused to acknowledge the mold problem and continued to misrepresent the condition, fitness and habitability of the home.

118.    In September 2018 the Pages discovered more moisture damage in their son's bedroom, along with visible signs of moisture intrusion beneath windows in the living and dining rooms.  Once again, Corvias refused to acknowledge the underlying moisture intrusion defect.

119.    In October 2018, rather than repair the problems, Corvias agreed to relocate the Pages and offered two alternative homes: both had visible water damage and structural defects. The Pages photographed both, filed a formal complaint, and demanded a meeting with their JAG attorney present.  Corvias promised additional repairs, but more problems followed.

120.    On January 9, 2019, the Pages received an email from Corvias warning they must sign a new one-year lease or face penalties including $100.00 monthly fees.  SSG Page objected because his original lease did not require him to renew.  To the contrary, his lease provided for "month-to-month" tenancy after expiration of a one-year lease term.  Corvias insisted the new fees were non-negotiable unless he renewed.  SSG Page, like others, was intimidated by threats of new fees which seemed unaffordable.  In his view, this was Corvias' attempt to bully tenants into signing new leases for defective houses.  On such short notice, the Pages, like so many other class members, had nowhere else to go; they were captives.[81]

---

[81] Scott Maucione, Military considering dropping some housing contractors after botched mold cleanup, Dec. 4, 2019, Federal News Network ("These housing companies, they had a double standard," [Senator Tim] Kaine said. 'And the double standard was they all operate in the private sphere and they lease to private tenants and they have to compete hard to make sure that they have high occupancy rates. Because, if they treat their private tenants badly, they'll go elsewhere.'  Kaine went on to explain the difference with military housing. 'They treat military tenants like they're captives, like it's a captive audience,' he said. 'People who move from across the country to a place where they don't know anyone, where they don't know anything about the rental market, where they're trying to find new schools and get accustomed to everything else, there's a natural tendency to want to live on base. And the occupancy rates will be high because of that tendency.'").

121.     In early April 2019, Corvias attempted repairs which caused the release of lead-based paint. "Nick," an environmental specialist from Corvias, acknowledged the presence of lead-based paint and that it posed a potential threat to the children.

122.     During the entire duration of the lease to date, Defendants failed to notify the Pages of any measures taken to implement a lead hazard management plan or lead hazard public awareness plan.  After signing his lease, SSG Page received no updates related to ongoing testing, risk assessments, medical screening, re-inspection, or information regarding potential hazards posed by lead-based paint.  The Pages documented some of the conditions by photo:



123.     Page expressed his dismay at a "Town Hall Meeting" held by Corvias on April 16, 2019 and explained that his children were sleeping on air mattresses in his living room because lead paint and mold still had not been abated in the upstairs.  Page wished to show photos of the defects at the meeting, but Corvias resisted.

124. On April 24, 2019, Corvias sent two workers to the house, but both were unprepared to abate lead-based paint and mold. They did nothing and left. Different workers were scheduled to return on April 30, 2019 but did not. Corvias offered no explanation.

125. On May 13, 2019, new workers were sent to continue repairs to the windows and walls but did not complete the repairs. Instead, a violent fight erupted between the workers in the dining room and continued outside in the presence of the Page's children.

126. Corvias' refusal to make proper repairs, coupled with the potential threats posed by mold and lead-based paint, led the Pages to pursue new housing. Corvias resisted and suggested their current home was safe and habitable and that no "maintenance move over," i.e., relocation due to the need for maintenance and repair work at the existing unit, was necessary. The Pages remained persistent and, after six months, were finally relocated. Upon information and belief, Corvias classified the move as a "rank eligibility move," instead of a "maintenance move over," despite having formerly told Page that he did not qualify for a rank eligibility move.

127. Just before moving out of their first home, Corvias provided a "move out sheet" containing prices for items that were to be repaired and charged to the Pages. Corvias attempted to overcharge for items for which the Pages were not obligated to pay. For example, Corvias charged the Pages for cordless blinds that were required by new housing regulations. Rather than argue, Shane Page attempted to replace the blinds by himself. Corvias refused and said the ones they used were "custom made." Corvias also attempted to charge for a window screen that its own employees had damaged during a maintenance visit. Page objected, but Corvias said it had no record of the repair order.

128. Corvias presented photos showing damage to the home and suggested more would be charged against the family. To the Pages' dismay, the photos showed damage done by Corvias'

- 39 -

own employees and subcontractors, along with wood rot in their son's former bedroom which formed the basis for their former complaints. The Pages felt helpless.

      **d.**    **The Ganske Plaintiffs.**

129.    SPC Ganske and his wife, Emily, moved to Fort Bragg in September 2018. They signed a lease agreement for 246 Castle Drive, but never were shown the home until they were given the keys.

130.    Unbeknownst to the Ganskes at the time they signed their lease, the Unit was filled with mold, lead based paint, structural wood rot and overall disrepair. Defendants failed to inform the Ganskes that the home lacked effective moisture and air barriers between exterior cladding and wall cavities. Like other members of the class, the Ganskes were unaware that this underlying defect caused subsequent defects including, but not limited to, pervasive mold, structural wood rot and others. Moreover, the Ganskes had the reasonable expectation that Defendants would follow their own plans and protocols including, but not limited to, those contained in the Ground Lease and applicable state, federal and local housing laws.

131.    Maintenance problems at 246 Caste Drive started almost immediately. Squirrels were living in the attic and their urine was soaking through the ceiling of the living room. The odor was horrific. Water intrusion, the source of which was unknown, was causing mold to grow in their daughter's upstairs' bedroom window frame. There was a large crack in a ceiling that extended down an interior wall. There was a filthy carpet that had been replaced which had nails sticking out from under it. The electrical outlets in the bathrooms were dead.

132.    The Ganskes submitted work orders for repairs, but many months passed without a response. In April 2019, Corvias told the Ganskes that their work orders were deleted.

133.    When the Ganskes submitted repair requests in the proper form and fashion for Defendants, they had the reasonable expectation that the work would be completed.  Given that Defendants did not reject their repair requests, the Ganskes reasonably relied on the expectation that Defendants would complete the work.

134.    When workers finally came, they made shoddy repairs.  No one checked the attic for the source of foul odors.  Emily Ganske asked to have the ventilations ducts cleaned, but no workers showed up as scheduled.  In June 2019, Emily asked for an air quality test to be conducted in the home.  Defendants responded with a phone call in July 2020 but did not conduct the testing.

135.    Workers came to the house on three separate occasions and unsuccessfully attempted to repair the faulty electrical outlets.  When Emily Ganske went to the leasing office to express her frustration, the agent on duty demonstration a complete lack of concern.

136.    Shortly after, Ms. Ganske detected the sound of water leaking within an interior wall of the home.  She searched the home and discovered that the HVAC system was leaking a large volume of water and that the closet housing the HVAC was covered in mold.  She called the emergency maintenance number that Defendants had provided, and a repairman responded to remove the water with a vacuum.  A photo documented the mold:



137.   Upon closer inspection, additional mold was discovered throughout the house which caused SPC Ganske to contact his command and file a formal complaint.

138.   Defendants sent ServPro[82] to remove the mold, although there was no admission that mold was actually present.  When the ServPro worker opened the ceiling, he invited Emily Ganske to view the condition of the attic which was soaked with water.  He told her that he had seen many other homes with the same problem, but he was not permitted to tell residents that mold was present; apparently, he would be fired if he did.  The Ganskes continued to take photos:



139.   SPC Ganske was outraged to learn about this and demanded that Corvias repair all of the issues in the home immediately.  Upon information and belief, Heather Fuller, the operations director for Corvias at Fort Bragg, contacted ServPro and asked that the maintenance worker be terminated.  Emily Ganske spoke with the ServPro supervisor and asked for him not to be fired.

140.   Soon after, Ms. Fuller came to Ganske residence and insisted there were no defects. The Ganskes demanded the home be tested, but Ms. Fuller stated that Corvias no longer tested for mold in any home at Fort Bragg.  It was suggested that the Ganskes to hire their own vendor.

---

[82] https://www.servpro.com/.

141.    Ms. Fuller returned the next day and told SPC Ganske she should move off base if she was unable to trust Corvias.  SPC Ganske asked to be relocated to another home, but Ms. Fuller said additional charges would apply which the Ganskes could not afford.

142.    During the entire duration of the lease, Defendants failed to notify the Ganskes of any measures taken to implement a lead hazard management plan or lead hazard public awareness plan.  After signing his residential lease, SPC Ganske received no updates related to ongoing testing, risk assessments, medical screening, re-inspection, or potential lead-based paint dangers.

**e.    The Wilkes Plaintiffs.**

143.    SFC Christopher M. Wilkes, wife Ashley, and two-year old son moved to 112 Hirsch Circle, Fort Bragg, in March 2017.   Ashley was pregnant with the Wilkes' daughter at the time. Their story includes *thirty-three* repair orders submitted to Corvias and a catastrophic housing defect that could have cost the life of a child.

144.    Unbeknownst to SFC Wilkes at the time he signed his lease, 112 Hirsch Circle was filled with mold, lead based paint, structural wood rot and overall disrepair.  Defendants failed to inform Wilkes that the home lacked effective moisture and air barriers between exterior cladding and wall cavities.  Like others, the Wilkes family was unaware that this underlying defect caused subsequent defects including, but not limited to, pervasive mold and structural wood rot. The Wilkes Plaintiffs further had the reasonable expectation that Defendants would follow the required regulations, plans and protocols including, but not limited to, those contained in the Ground Lease and applicable state, federal and local housing, landlord-tenant and consumer protection laws.

145.    Prior to arrival, SFC Wilkes and his wife were told they only qualified for a home in the "Casablanca" neighborhood of Fort Bragg, and it would be months before another home became available.  Chris and Ashley Wilkes were unfamiliar with Fort Bragg and the Fayetteville

area. They have no family living in Fayetteville and had little or no opportunity to investigate before relocating. With what appeared to be little other choice, they signed the lease.

146. When they moved into 112 Hirsch Circle, they noticed cracked bricks on the exterior, sagging interior flooring, and plumbing problems. Significant problems followed in 2018 including Hurricane Florence which blew shingles from the roof. They submitted a repair request on or about September 15, 2018, and repairs were scheduled for September 17. Defendants did not make repairs. Instead, Corvias cancelled the repair request on September 27, 2018, with no explanation. Consequently, water entered through the exterior into the attic and living areas. SFC Wilkes placed a tarp on the roof when Corvias refused to act. Still, they heard nothing for weeks.

147. When the Wilkeses submitted repair requests in the proper form and fashion, once again, they had the reasonable expectation that the work would be completed properly. The Wilkeses pleaded for help until Corvias responded in December 2018. Instead of fixing the structural defects in the roof, Corvias installed new shingles to a small section. As more weeks and months passed, the defective roof started to sag, as seen in photos:



148.    In November 2018, an aging toilet started leaking water which seeped into the already sagging bathroom floor.  Instead of replacing the toilet, a repairman only replaced a wax seal.  The floor decayed further and in March 2019 a different contractor pointed out that the floor system needed total replacement.  The contractor informed the Wilkeses that there were no adequate floor joists beneath the bathroom.

149.    In July 2019, the sagging roof became worse, as the Wilkes reported to Corvias.  According to a repairman, the wood under the shingles was "wet, moldy, warped and rotted."

150.    Similar problems were reported inside the home including sagging floors in the living room, bathroom and hallways.  On September 18, 2019, Ashley Wilkes reported water intrusion through multiple exterior doors. She pointed out large gaps in weather stripping.  In October 2019, pervasive wood rot necessitated floor replacement over a five-day period.

151.    On October 3, 2019, they reported problems with the brick exterior wall adjacent to their carport.  A window frame was separating from the brick and a large crack appeared below the window.  As it turned out, the brick wall was structurally deficient and was in danger of collapsing.  A repairman pointed to inadequate reinforcements and shoddy past repairs.

152.    On December 5, 2019, the Wilkeses contacted Corvias because the roof was getting worse.  Roofing work was scheduled for December 13 but delayed until December 18, 2019.  By then, the roof was too weak to support repair workers.  The roof collapsed and one worker fell through.  The interior ceiling then collapsed and nearly struck the Wilkes family, as per photos showing the location and the damage:

- 45 -




153.   Window frames throughout the home contain visible mold which persistently returns after chemical treatments.  The wood trim surrounding doors and windows is damp to the touch evidencing moisture intrusion within interior walls.



154.   Maintenance workers said they "couldn't promise" the next home will not have similar maintenance issues and suggested the Wilkeses should consider "staying put."  The

Wilkeses interpreted this to mean that most homes at Fort Bragg have defective moisture and air barriers resulting in pervasive mold and structural wood root.

155. During the duration of the lease, Defendants failed to notify the Wilkeses of any measures taken to implement a lead hazard management or public awareness plan. After signing his lease, Wilkes received no updates related to ongoing testing, risk assessments, medical screening, re-inspection, or information regarding potential hazards posed by lead-based paint.

156. Despite its stubborn refusal to acknowledge that its self-created maintenance shortfalls required relocation, Corvias moved the Wilkeses to 39 Viking Court on July 20, 2020. When the Wilkeses arrived, however, the "better" home was filthy. They refused to take possession until it was cleaned.

157. The Wilkeses quickly discovered serious defects including moisture-related damage in the master bathroom, and chipped paint which potentially contained lead.

 

**f.**     **The Murphy Plaintiffs.**

158. CPL Tim Murphy enlisted in the Army in August 2018 in the Infantry and is a Special Forces Candidate. Prior to enlisting in the Army at the age of 29, he was a

firefighter/paramedic in Florida who also was qualified as a HazMat response technician. He was born and raised in Florida, where he first worked with his father on remodeling homes, and then later in life, as a home inspector. Before becoming a firefighter, Tim worked with his father and learned about the building trade and also more generally about mold, which is a pervasive problem in Florida. He also had worked as a supervisor for a remediation company that specialized in working with fishing houses that had been damaged by water intrusion and sinkholes.

159. Katelyn Murphy married Tim in November 2015. Tim and Katelyn have a young daughter born in 2016. She was a healthy and happy two-year-old when the family first moved to Fort Bragg in February 2019, but rapidly began to show symptoms of exposure to toxic substances.

160. The Murphy family was assigned to a Unit. On February 21, 2019, Tim executed a lease with Bragg Communities, LLC for a townhouse at 21 Galaxy Street. That unit was one of four conjoined two-story in-line townhouse-style units with shared garages and walls on a single slab. They were poorly designed. Each had an interior HVAC and water heater area located on the first-floor interior of each unit. The attics for all four units did not have a proper fire wall between them, which allowed mold and water from the roof to freely spread through the complex. Also, the attic space was inadequate to provide proper ventilation, which increased the likelihood that water invasion would lead to mold contamination. The Galaxy Street townhomes were older units, built in approximately the 1970s.

161. The Galaxy street units were poorly constructed. For example, there was no vapor or moisture barrier between the plywood and the linoleum floors. Also, the drywall was water-permeable and not moisture-rated. The front and back doors both had visible light through the seals because they were not properly fitted, which not only led to water invasion every time it rained, but also gave bugs easy access to the home. The units had lead pipes and lead paint – an

- 48 -

obvious risk that Corvias addressed only by telling the Murphys not to drink the tap water and not to let their toddler eat paint chips. One or more Corvias representatives admitted to Tim that Corvias had used "horrible contractors" in the past and the one who built the Galaxy Street units had been "black-balled" from future contracts.

162.    The lease commenced February 26, 2019 and ran 12 months. Maintenance was to be managed by Corvias Management. The rent was the family's entire $1,134.00 per month BAH, which went directly each month to the Owner. This was later lowered to $918.00 per month, in apparent acknowledgement of the poor condition. Also, utilities were waived as Corvias apparently acknowledged that the utility bills would be too high for the Murphys to pay, given the age and condition of the home.

163.    Prior to moving in, Tim Murphy inspected the apartment and filled out a four-page list of the many defects and issues that Tim observed. Tim observed prior water damage in the kitchen, master bathroom, and upstairs bedroom. He observed that the cabinets, counters, or baseboards in the master bathroom, the half-bath and the kitchen were damaged, due at least in part to prior water invasion. He observed mushy/soft flooring in the master bathroom and the upstairs hall bathroom, due to prior water invasion. He observed a roof leak and cracked drywall around the vent in the upstairs hall bathroom. He observed a poor ceiling patch job in the master closet, likely due to repairing damage from prior water invasion. He also reported visible mold, damaged drywall and warped shelves in the outdoor storage area.

164.    When the Murphy family moved to Fort Bragg, they were all in excellent health. As a Special Forces candidate, Tim was in top physical condition and had no trouble running two miles in under 14 minutes. Katelyn too was fit and an avid runner.

- 49 -

165.     Much to the family's dismay, the following months brought a litany of problems with the property.  The work order list report that the Murphys requested from Corvias in October 2019 (which itemize by no means a complete listing of the reported problems) documented, *inter alia*, a "roof leak" on March 1, 2019; "mold in vents" on April 2, 2019, and a "flood" on May 21, 2019.  On May 29, 2019, the "cabinets fell off" in the kitchen.  On July 10, 2019, "dishwasher internal damage" was logged.  On July 19, 2019, in the worst heat of the summer, it was "A/C not cooling" and "no AC / burning smell."  Some service calls were either arbitrarily and incorrectly marked by Corvias as "cancelled" or "completed," while other service requests were deleted or never logged in the first place.  This high-level work order summary, which Corvias generated in October of 2019 after an intractable dispute had arisen with the Murphys, does not begin to do justice to the deplorable condition of 21 Galaxy Street.

166.     As early as April of 2019, the Murphys were reporting to Corvias that 21 Galaxy Street had a mold problem.  Tim found mold in the HVAC room and found cracked drywall near the HVAC air intake, which was sucking the mold from the wall interior space and distributing the spores through the home.  Corvias outsourced the response to a company called Paragon, which, on information and belief, has since been terminated for billing for inspections and remedial work that it did not actually do.  Tim directed Paragon to where there was mold in the HVAC room and showed them that there was visible black mold in the vents.  Tim also directed workers to other locations in the home that had mold and perpetually sodden flooring and cabinets.  Corvias did nothing to remediate the mold hazard.  Instead, in April they marked the item as "work completed" even though they had done nothing.  Corvias did not bother to log many subsequent reports about mold.  Plaintiffs documented the conditions by photos:

- 50 -

 

167.    Shortly after moving in, Tim came home in a light rainstorm to find his wife in tears.  She showed him that the upstairs hall bathroom had water dripping through the ceiling fan. Tim found that the surrounding ceiling was mushy to the touch and at risk of falling in. He reported to Corvias that the roof had a severe leak.  When Corvias came out to inspect, they only did a surface patch on the ceiling.  Corvias also made a minor repair on the roof flashing but denied that there was a more extensive problem with the roof or water invasion.  Since the underlying water invasion issue from the roof was not fixed, the new drywall patch soon became saturated.

 

168.     When they called Corvias on subsequent occasions about the same water invasion problem in the second-floor hall bath, Corvias voiced skepticism that the continuing water invasion in a second-floor ceiling was due to a roof leak.  Tim had evidence of the severity of the leak, showing water dripping from the ceiling vent onto the toilet seat and that the ceiling was mush around it.  Corvias refused to investigate and fix the roof leak, which was the root cause.

169.     Water continued to invade the home throughout summer 2019.  In the upstairs master bedroom, the access point from the closet to the attic sagged inward from the moisture. The water invasion was so bad that the Murphys had to seal off the master closet from the rest of the bedroom.  If they did not seal the closet door, the moisture migrated into the bedroom and fog up the bedroom windows.  The mold and mildew in the closet stank so badly that they were not able to wash the stench out of their clothes.  They had to throw everything from that closet away. Tim and Katelyn sometimes slept downstairs on the couches to escape the worst effects.  This, however, led increased exposure to carbon monoxide.  They also had to throw away the bedding from the upstairs bedrooms and the downstairs upholstered furniture before moving out.

 

170.     The air in the attic and in the general vicinity of the roof leak became increasingly foul, musty and unhealthful, and the elevated moisture content in the interior air was noticeable. By the summer of 2019, the entire upstairs reeked of mold and mildew.  The smell in the hall bathroom was particularly horrendous.  The Murphys had to keep the bathroom fan on all night, disturbing sleep and peace of mind.  They began to keep the air conditioner turned down to 66 degrees in an effort to slow the growth of the mold and mildew, making the home uncomfortably cool for Mrs. Murphy and the young daughter.

171.     Tim repeatedly directed Corvias to the upstairs hall bathroom, which had worsening water invasion and mold.  He told them that the that the spongy floor in the upstairs hall bathroom was saturated with water and was an obvious mold growth zone.  The Murphys put in multiple work orders requesting that this spongy floor be replaced.  Corvias deleted one or more of the work orders.  Finally, in August or early September, the floor was so wet that the linoleum began to peel back.  Tim investigated and discovered that there were three additional stacked layers of linoleum beneath the floor surface.  Each linoleum layer was covered with mold.



172.     When it rained, the hall bathroom floor would become so saturated with water that it would migrate out into the hall.  When the Murphys stepped on the floor in this area after a storm, water that was discolored from rusty nails in the subfloor would squirt out and drip down the stairs.  When this issue was pointed out, Corvias denied that the discoloration was from water and suggested that the discoloration was due to tile and carpet glue.  This issue too was apparently mysteriously deleted from the work order logs that Corvias gave to the Murphys in October 2019.



173.     Tim's later inspection through the closet access point into the attic space in about September of 2019 showed that the roof leak had not been properly repaired:



- 54 -

174.    Other families in the fourplex had similar water invasion issues and Corvias similarly denied that the roof was at fault.  However, the Murphy's adjoining neighbor persisted after the Murphys moved out, and Corvias ultimately had to acknowledge that the roof did indeed leak.  In early 2020, Corvias was said to have belatedly repaired or replaced the roof.

175.    Throughout the Murphys' stay at 21 Galaxy Drive, Corvias never properly remediated any of the water invasion and mold growth issues.    Instead, Corvias merely caulked or painted over or (as with the hall bathroom) a new layer of linoleum was layered over the existing wet, moldy layer.  The below photograph is representative of the problem.  It was taken next to the tub in the hall bathroom.



176.    In May 2019, the Murphy family sought Corvias' help with a flood.  The downstairs bathroom had flooded with water and the water was entering from underneath the wall.  Corvias inspected and attributed the flood to an AC line.  The Murphys asked for dehumidifiers to remove the moisture from within the walls.  Corvias refused, creating one more unremediated area of water damage and mold growth.  The baseboards in that area swelled and split open.



177.    Also in May of 2019, the family's air conditioning unit in the interior HVAC room backed up and flooded the HVAC room and out into the adjoining hallway.  Corvias came to repair but as was their usual practice, did only the bare minimum and refused to provide a dehumidifier, despite the Murphys' requests.  Water then soaked into the floor and into the thickly painted walls and baseboards and became yet another incubation area for interior mold.  Corvias did not open the wall to remediate the water damage inside it, leading to another reservoir of water and mold.



- 56 -

178.    Notwithstanding the obvious evidence of water invasion, mold and mildew, Corvias continued to deny that there was a problem with roof leaks and rejected the notion that the water invasion could be causing mold growth.  Corvias denied that mold might adversely affect the family's health.  The Murphys knew that the Unit was toxic and was making them sick.  They took to spending more time outdoors, where there were heaps of trash Corvias had not picked up, despite requests.  (*See, e.g.*, June 21, 2019, work order for "Trash clean up" marked cancelled.)

179.    In July of 2019, the heating element in the dishwasher caught on fire.  Tim smelled the burning odor, investigated and saw smoke.  Luckily Tim was a former fireman and so was able to rapidly extinguish the fire before it spread.  He called the event in to Corvias.  This event was logged but marked "cancelled." It took Corvias some two weeks to replace the dishwasher and they did nothing to check for electrical issues or other fire hazards.

180.    In July of 2019, in the thick of the summer heat, the air conditioning failed.  The capacitor on the air conditioning unit made noise whenever it was in operation, and the noise was getting worse.  This was brought to Corvias' attention but they did not investigate or remediate.  Finally, the capacitor failed and tripped the breaker.  It would have started a fire had Tim again not been there to detect the electrical fire smell and respond.

181.    The most serious and life-threatening defect of all, however, was an insidious, odorless, colorless carbon monoxide ("CO") leak. Prior to August 2019, Tim had discovered that he felt physically better when away from home on the grueling training exercises.  When he came home, his health and physical condition would deteriorate.  In August, shortly after Tim came to home recuperate from shoulder surgery, a Corvias team knocked on the door and told Tim that they had to come in to check the AC and the vents in the interior HVAC room.  They hooked up a drain to the water heater line and drained it. When Tim looked in to see what they were doing, one

- 57 -

worker told Tim that there was a bad gas leak and that the CO detector was not working. The worker's supervisor then denied there was a leak, told the worker to be quiet, and told Tim that he would have to direct any questions to management. Corvias replaced the smoke and CO detector.

182. Tim became concerned for his family's health, because news was just breaking about a potentially life-threatening CO problem on base.[83]

183. Tim called the Corvias office and was told that there was no issue with the gas line or the CO detectors at the Unit. During this time, Corvias publicly stated that it would be sending engineers to inspect potentially impacted homes. Yet on the day of the "inspection," Tim opened the door and found that Corvias had not sent a trained engineer. Instead, it was the same repairman who had worked on Tim's pipes a few weeks before. The repairman confirmed that he was not a trained engineer. The only "fix" that he made on that visit was to remove the door into the interior HVAC area, which left the high voltage in that area accessible to a curious toddler and at just the right height for her to stick her fingers into.



---

[83] *See* Associated Press, Carbon monoxide problem discovered at Fort Bragg housing, August 15, 2019 ("A family that went to the hospital with symptoms that suggested carbon monoxide poisoning has led military officials to warn dozens of families at Fort Bragg about possible exposure. News outlets report military officials said Wednesday that a combination of factors caused the issue, including partially blocked air ducts that allowed carbon monoxide to build when the laundry room's door was closed. The investigation began after the family's hospital visit Aug. 4."), https://www.armytimes.com/news/your-army/2019/08/15/carbon-monoxide-problem-discovered-at-fort-bragg-housing/.

- 58 -

184. On information and belief, Corvias did not have licensed plumbers doing the work on the gas line and water heater in the HVAC area, and did not have the system periodically inspected by a licensed plumber. Corvias' improper installation and maintenance of the CO detector at 21 Galaxy Street then compounded the risk of CO exposure.

185. Other residents during this episode noted that as was typical of its maintenance practices, Corvias was failing to do a root cause analysis or address the root cause.[84]

186. Corvias disguised this entire episode, which could have severely injured or even killed the Murphys, in a bland September 5, 2019 work order entry that said only "GHWH Inspection." The underlying screen shot which Tim captured revealed a different story -- that the root cause was "gas leak on hard line" and that Corvias had "changed combo detector" and acknowledged that this issue was a "Health/Safety" issue.

187. When Tim subsequently had the Fire Department come out to verify that the CO leak had been fixed, he also had them check that the CO monitor was working. The inspector from the fire department told him that Corvias had never had the fire department come out to test either the CO monitors or the smoke detectors.

188. Finally, on October 8, 2019, the Murphy family provided notice that they were vacating the property. The cited as a reason for the move, amongst the many problems the family had experienced, the "mold issues." Faced with untenable problems with their Corvias-owned and Corvias-managed housing, the Murphys moved into off-base housing.

---

[84] Haley Britzky, Army reporter, Task & Purpose, More than 80 homes found to be at-risk of carbon monoxide poisoning at Fort Bragg, Aug. 15, 2019 ("Tamara Terry, an active-duty Army wife of almost four years who lives in Corvias housing at Fort Bragg, told Task & Purpose that the 'entire base is appalled at what's happening.' 'What is going on? You're telling me you have over 100 homes at risk ... and you're just letting them stay there? Knowing that it's a risk, you're allowing them to still live in those homes with their children?' She added that removing the doors is 'not actually fixing the problem,' and that they should 'take out and put it somewhere else. ... They're once again not getting to the root of the problem.'"). At https://taskandpurpose.com/news/carbon-monoxide-fort-bragg.

189.     The Murphys had to pay about $4,000 out of their savings to move into adequate housing off-base.  The Murphys were fortunate that they had some personal savings from Tim's pre-enlistment work to fund the move.  By contrast, Tim's military pay, at about $24,000 per year, barely covered the family's expenses and did not leave enough cushion to pay for such a move.  Other enlisted families who are not so fortunate remain stranded in Corvias' sub-standard housing.

190.     As one final blow, Corvias withheld the Murphys' BAH for October 2019 until mid-November, which made it more difficult for the Murphys to move out of their toxic Unit.  Corvias even threatened to charge an additional $1000 for breaking the lease.  The Murphys had to take a loan to assist with moving into their new home.

191.     During the course of the Murphys' almost eight months at 21 Galaxy Street, their health deteriorated, due to their exposure to the mold and CO in the house.

192.     Katelyn Murphy developed severe fatigue, headaches and memory loss.  She also developed chronic congestion, sinus issues and respiratory distress.  The longer she was at 21 Galaxy Street, the worse she felt.  Her symptoms mostly cleared after moving out of 21 Galaxy Street, though she still suffers some residual chronic respiratory congestion.

193.     The Murphy daughter began to have severe headaches and a runny nose that would not stop, even with medication.  Finally, the pediatrician discovered that the inside of her nose was blue.  He attributed this to mold in the Unit. Her symptoms improved after the family moved.

194.     Tim, who had spent much of his time at home recuperating from shoulder surgery, developed chronic severe headaches, fatigue and respiratory distress.  He also developed severe gastrointestinal problems.  Although the headaches and fatigue lessened after moving out, he has residual effects that may adversely impact his ability to continue with his special forces training.

- 60 -

Tim's aerobic capacity has been damaged; he has trouble running a sub-14 minute two miles, which is a benchmark for special forces training.

195.    In October 2019, Tim Murphy requested a copy of the work order history for May 2019 for the Unit. He discovered that the work order history had been edited in October 2019 right before Corvias provided the report to him. Specifically, Corvias had edited the work orders to disguise the gas line leak causing the CO issue and had re-written the calls as a gas water heater inspection. Tim also noticed that Corvias had gone back and edited some of the entries in order to whitewash the pervasive issues with the home. Under the circumstances, this may have been spoliation,[85] particularly should the evidence reveal that records were deleted or manipulated subsequent to when the GAO issued its report explicitly noting the lack of accurate and complete maintenance and repair recordkeeping by housing contractors.[86]

**g.    Other factual allegations.**

196.    Defendants systematically breached their contractual obligations including the 50-Year Lease Agreement and ROAs, and consistently violated the laws of North Carolina, applicable federal law, military rules, regulations and guidelines, and contractual obligations expressly or impliedly imposed by the ROA or the Resident Responsibility Guide.

---

[85] *See Hodge v. Wal-Mart Stores, Inc*., 360 F.3d 446, 450 (4th Cir. 2004); *Vodusek v. Bayliner Marine Corp*., 71 F.3d 148, 155 (4th Cir. 1995); *Silvestri v. Gen. Motors Corp*., 271 F.3d 583, 591 (4th Cir. 2001); *McLain v. Taco Bell Corp.,* 137 N.C. App. 179, 182-92, 527 S.E.2d 712, 715-21 (2000); *Arndt v. First Union Nat. Bank*, 613 S.E.2d 274, 281-83 (2005).

[86] *See* Rose Thayer, Management company fires 17 employees, assists in federal probe into fraud in military housing crisis, Stars and Stripes, Dec. 5, 2019 ("[GAO officer] Field reviewed more than 8 million work orders from the 14 private housing companies from October 2016 to May 2019 to try to determine the quality of houses on military bases, but found the data had not been captured reliably or consistently, and could not be used. Problems included duplicate work orders and work orders with completion dates prior to when the resident submitted the request for repairs."). At https://www.stripes.com/news/management-company-fires-17-employees-assists-in-federal-probe-into-fraud-in-military-housing-crisis-1.610050.

197.    Defendants conspired to conceal potentially harmful environmental and structural housing defects from Plaintiffs and class members, including the underlying lack of effective moisture and air barriers between exterior cladding and wall cavities *in all homes*.

198.    The ROAs fail to disclose to tenants that Units are in violation of applicable laws and obligations.  While the Defendants have at their disposal detailed repair and maintenance histories of the Units and communities, they do not make this information available to prospective or incoming tenants as it relates to the history of the Unit before the new family moves in.

199.    When Plaintiffs and class members questioned Defendants about conditions on the properties they leased at Fort Bragg, Defendants' representatives on more than one occasion actively sought to keep Plaintiffs from learning about any underlying safety hazards associated with those conditions by, among other things, misrepresenting the causes or nature of the conditions and seeking to have military superiors instruct servicemember Plaintiffs to stop raising questions about those conditions.

200.    During the class period, Defendants instructed maintenance employees and outside vendors to make shoddy repairs to cut costs; directed maintenance workers and outside vendors to conceal defects and not disclose them to tenants; directed the same not to use words such as "mold;" and used terms of retention and payment for outside vendors which hindered them from engaging in a root cause analysis or providing effective service.

201.     During the pertinent times, Defendants have obtained revenue and income not only from amounts leftover from BAH payments after all operating costs and expenses are deducted, but also from those operating costs and expenses themselves, via Defendants' integrated corporate enterprise structure which allows it to direct service, property management, repair and maintenance work in many instances to Defendants' entities or affiliates.

- 62 -

202.    During the pertinent times, part of Defendants' revenues and profits were based on receipt of management fees which the Army could in theory reduce based on negative assessment of the Defendants' performance based on repair and maintenance metrics and scores on resident satisfaction surveys.  In that regard, Defendants maintained an intentionally misleading method of maintenance recordkeeping, and, employed or encouraged the use of resident surveys that were gamed to slate results toward the positive.   This conduct was unfair and deceptive.

203.    On December 27, 2018, Reuters news agency published one of a series of detailed, exhaustively sourced special reporting revealing abysmal living conditions at Fort Bragg and elsewhere, shedding light on Corvias' lucrative government contracts, and otherwise tending to show that Defendants' uniform business practices and systems were inadequate, unreasonable, unfair and deceptive in their effect on the ordinary servicemember tenant and family.  The article garnered significant national attention and led to Congressional scrutiny.

204.    Despite these developments, Defendants continued to act improperly.  For example, on January 9, 2019, Defendants threatened the Page family with punitive fees if they refused to sign new leases.  The Pages, and other tenants, who sought to exercise their contractual right to continue on a "month-to-month" basis following their initial lease term, were told they had until February 9, 2019, or some other arbitrary and improper deadline, to renew, or else a month-to-month fee of $100.00 would attach.

205.    Base-wide maintenance lapses remain common despite the above-alleged days, weeks and months of requests by Plaintiffs, and other servicemember family complaints documented in the public record and in the record before Congress in its investigation.  Lapses and inaccuracies are evident in records produced to date, showing, for example, that maintenance requests were ignored yet Defendants' records indicate they were completed.

- 63 -

206.    Meanwhile, Defendants have reaped millions in payments, including "incentive fees," pursuant to their contracts with the government. During the class period, Defendants received iron-clad assurances of profit while Plaintiffs and class members lived in conditions analogous to those caused by a "slumlord."

207.    Plaintiffs are informed and believe that Community Development and Management Plans and other records show that Defendants collected many millions of dollars in fees for construction, development and management of homes during the first decade of the 50-Year Lease. The fees are pure profit for Defendants to the extent that maintenance expenses are covered by BAH payments from Plaintiffs and class members.

208.    Defendants stand to earn millions more in equity returns from cash left over from rental revenues after project expenses, debt servicing and other deductions are accounted for.  This economic setup provides Defendants with an additional financial incentive to limit spending for maintenance, repair and upkeep of military houses.

209.    Defendants' failure to disclose, and effort to conceal, housing defects both reflected unfair and deceptive lease practices vis-à-vis servicemembers and violation of their obligations to the Department of the Army.

210.    Plaintiffs would not have entered into the ROAs had Defendants disclosed material, truthful, accurate and complete information regarding the defects to the family housing being offered, including, but not limited to, defective moisture and air barriers between exterior cladding and wall cavities, and regarding the inadequacy of customer service, repair and maintenance.

211.    Defendants have failed to develop, construct, renovate, maintain, operate and manage the Fort Bragg residential housing project with a level of skill and care over the term of

- 64 -

the 50-year Ground Lease commensurate with market rate projects located in the area of the project, or adequate to satisfying their obligations under the Ground Lease.

## V.     CLASS ALLEGATIONS

212.     Pursuant to the Fed. R. Civ. Pro. 23(b)(2) and (b)(3), Plaintiffs respectfully request that the Court certify a class defined at this time[87] as follows:

> **Class**: All named tenants in Residential Occupancy Agreements ("ROAs") with Bragg Communities, LLC for residential housing units at Fort Bragg ("Units") during the four years[88] prior to the date of filing of the complaint[89] (the "Class Period"), and their authorized occupants.

> **Subclasses**:

>> A.  Three-year SOL Subclass:  All persons in the Class, who are named tenants in ROAs and who reside or resided in the Units during the three years prior to filing.[90]

>> B.  Declaratory and prospective injunctive relief Subclass: All persons in the Class who are named tenants in ROAs that remain in effect today.

>> C.  Fed. R. Civ. P. 23(c)(4) Issue Subclass:  All persons in the Class who allege personal illness or injury causally related to mold, or other injurious conditions in the Units, from August 31, 2016 to present.[91]

213.     Excluded from the Classes are Defendants' legal representatives, officers, assigns, directors, successors, and other individuals as is normal and customary in class certification.

214.     This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements.

---

[87] Tobias Barrington Wolff, Discretion in Class Certification, University of Pennsylvania Law Review, Vol. 162:1897, at 1918 ("The power of a district court to alter the definition or scope of a plaintiff's proposed class is also well established among the lower federal courts.").

[88] The Class time limit is subject to extension to the extent that discovery may disclose that Defendants concealed evidence of actionable conduct which could not have been reasonably discovered by Plaintiffs.

[89] Plaintiffs contend that a putative class was adequately adumbrated, and tolling of any statute of limitations begins, for some or all claims, as of the date of filing of the original complaint on June 23, 2020, and therefore the Class Period commences on June 23, 2016.  Alternatively, the Class Period should commence on August 31, 2016.

[90] The three-year statute applies to claims including breach of contract; breach of the warranty of habitability/ Residential Rental Agreements Act, N.C. Gen. Stat. §§ 42-38 to 49; temporary recurrent prior nuisance; negligence.

[91] This "issue class" claim was not pled in the initial complaint.

Plaintiffs seek to represent an ascertainable class, as determining inclusion in the class can be done through review of Defendants' own records.

215. <u>Fed. R. Civ. P. 23(a)(1) (numerosity)</u>: The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. Members of the Class may be notified of the pendency of this action by both regular and electronic mail using a form of notice customarily used in class actions.

216. <u>Fed. R. Civ. P. 23(a)(2) (common issues)</u>: Questions of law and fact common to the Plaintiff Class exist, including, *inter alia*:

> A. whether Defendants breached the express or implied duties and terms reflected by the ROAs entered into with Plaintiffs and class members;
>
> B. whether Defendants violated the North Carolina Residential Rental Agreements Act, N.C. Gen. Stat. §§ 42-38 to 49 ("RRAA");
>
> C. whether Defendants violated the Residential Lead-Based Paint Hazard Reduction Act of 1992, 42 U.S.C. § 4851 *et seq*.;
>
> D. whether Defendants violated the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 *et seq*. ("UDTPA");
>
> E. whether Defendants violated local housing codes including, but not limited to, Cumberland County Code, Article IV, Division 2;
>
> F. whether Defendants communicated, through uniform marketing and disclosure practices during the class period, unfair, deceptive and untruthful information to Class Plaintiffs about the Units, communities and customer service, repair and maintenance policies and procedures, including material facts of which Defendants had knowledge, as to which class members lacked knowledge, and of which class members ought reasonably to be informed with before entering into the ROAs, and, nondisclosure of which would render Defendants' other representations regarding the safety and habitability of the Units misleading and tending to mislead an ordinary rental housing military servicemember consumer;

- 66 -

G.  whether Defendants concealed material facts and information about the Units with had a tendency to deceive Plaintiffs and class members and ordinary rental housing military servicemember consumers;

H.  whether Defendants agreed, colluded and conspired to conceal information about the residential housing units and property management practices from Plaintiffs and class members, and intentionally concealed information in furtherance of a scheme to violate state and federal housing laws;

I.  whether Defendants agreed, colluded and conspired to evade their repair and maintenance obligations by labeling housing defects as "wear and tear;"

J.  whether Defendants overcharged Plaintiffs for repair and maintenance items at the conclusion of ROAs;

K.  whether Defendants agreed, colluded and conspired to charge excessive repair fees to Plaintiffs for Defendants' own financial gain;

L.  whether there was an agreement among Defendants to violate state and federal housing laws which rose to the level of concert of action, aiding or abetting, or civil conspiracy, and which resulted in damages to Plaintiffs and class members;

M.  whether Defendants failed to meet their obligations as set out in the Ground Lease dated August 1, 2003, including, but not limited to, Section 7, which requires them to observe and comply with all applicable Federal, State and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements;

N.  Whether Defendants have undertaken the unauthorized assumption and exercise of the right of ownership over Class Plaintiffs' Base Allowance Housing ("BAH"), in whole or part, and should be required to provides refunds and restitution to Plaintiffs and class members;

O.  Whether Defendants during the class period engaged in customer service, repair and maintenance practices causing the generation of business records so incomplete and misleading as to be unreliable for purposes of reasonable audits;

P.  Whether Defendants during the class period used unfair and deceptive practices with regard to promulgating or promoting residential housing consumer experience and satisfaction surveys which are inaccurate and contradicted by more objective surveys;

Q.  Whether the capital expenditures and structural reforms announced by Defendants only after congressional hearing and mass outcry by

- 67 -

servicemember families should have been implemented earlier during or prior to the commencement of the class period and whether class members have suffered impairment of their occupancy interest in their leaseholds as a result;

R.     Whether, due to the structural inadequacy of Defendants' uniform customer service, repair and maintenance policies during the class period, the Plaintiffs and class members did not receive the rental housing product they contracted for and whether Defendants should be ordered to provide retrospective refunds of some or all BAH payments as a result;

S.     Whether, due to the structural inadequacy of Defendants' uniform customer service, repair and maintenance policies during the class period, the Plaintiffs and class members incurred substantial and unreasonable loss of use and enjoyment of their leaseholds of their homes, rising to the level of breach of the warranty of habitability, or, temporary recurrent private nuisance, for which they should be entitled to a refund reflecting the diminished rental value of the units during the class period as a result;

T.     Whether, due to the structural inadequacy of Defendants' uniform customer service, repair and maintenance policies during the class period, Defendants engaged in unfair and deceptive trade practices in the property management industry thereby causing injury to Plaintiffs and class members including but not limited to mold issues;

U.     whether Plaintiffs and class members have sustained damages and, if so, what is the proper measure of damages;

V.     Whether the Court should issue retroactive injunctive relief including award of full or partial refunds or disgorgement of BAH revenues obtained over the class period by Defendants;

W.     Whether the Court should award injunctive relief by appointing (at Defendants' expense) an auditor or special master to oversee a process of reviewing, sampling and analyzing relevant business records and data of the Defendants, including as regards: a) whether Defendants did not give Plaintiffs and class members the residential leasehold that they paid for via their BAH allotments, because Defendants failed to generate and maintain reasonably accurate or adequate repair, maintenance and service records during the class period; b) whether Defendants engaged in customer survey and customer complaint practices which were unfair and deceptive due to their variance from accurate and objective practices; and c) other topics as the Court deems appropriate in its discretion;

X.     Whether the Court should issue declaratory and injunctive relief including to declare the respective rights and obligations of the parties, consisting of

- 68 -

the Defendants on the lessor side, and the signatory servicemember tenants on the lessee side, so as to clarify the express and implied duties and responsibilities of the Defendants as landlords and property managers, and so as to enjoin one or more of the Defendants from continuing to engage in unfair, deceptive and categorically inadequate repair and maintenance practices, policies and procedures prospectively.

217.    Fed. R. Civ. P. 23(a)(3) (typicality):  Plaintiffs are members of the putative Class. The claims asserted by the Plaintiffs are typical of the claims of the members of the putative Class, as the claims arise from the same course of conduct by Defendants and the relief sought is common.

218.    Fed. R. Civ. P. 23(a)(4) (adequacy):  Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative Class, as their interests coincide with, and are not antagonistic to, the other members.  Plaintiffs have retained counsel competent and experienced in both military housing and class action litigation.

219.    Fed. R. Civ. P. 23(b)(1)(A):  A class action is appropriate because prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

220.    Fed. R. Civ. P. 23(b)(1)(B): A class action is appropriate because adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

221.    Fed. R. Civ. P. 23(b)(2):  A class action is appropriate because Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

222.    Fed. R. Civ. Pro. 23(b)(3):  Certification of a class is appropriate because questions of law or fact common to the respective members of the Class predominate over questions of law

- 69 -

or fact affection only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications. Absent a class action it would be highly unlikely that the members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery. A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual actions would create. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of the class action.

223. <u>Fed. R. Civ. P. 23(c)(4)</u>:[92] In addition, or in the alternative, the certification of a class limited to one or more of the common issues is appropriate because proof of one or more common issues of general relevance to all class members would substantially simplify their ability to proceed further with individual claims, including claims for personal injury sounding in negligence.

### FIRST CLAIM FOR RELIEF
### RRAA; breach of warranty of habitability
### (brought by Plaintiffs individually and for Subclass A)

224. Plaintiffs re-allege the above paragraphs 1 to 223 as if fully set forth herein.

225. Plaintiffs' and class members' ROAs are subject to N.C. Gen. Stat. § 42-46.

---

[92] Fed. R. Civ. P. 23(c)(4) ("(4) *Particular Issues.* When appropriate, an action may be brought or maintained as a class action with respect to particular issues.").

226.     During all relevant times, Bragg Communities was the Unit owner and a contracting party pursuant to the ROAs and subject to the coverage of the RRAA.

227.     During all relevant times, Corvias Management was the Unit property manager and a contracting party pursuant to the ROAs, an agent of the owner, and/or otherwise was subject to the coverage of the RRAA.

228.     During all relevant times, all Defendants had actual or apparent authority to perform landlords' obligations under the ROAs and the RRAA and did perform such duties, and/or otherwise was subject to the coverage of the RRAA.

229.     During all relevant times, N.C. Gen. Stat. § 42-42(a)(1) required Defendants to comply with the current applicable building codes including, but not limited to, Cumberland County Code, Article IV, Minimum Housing Code.

230.     N.C. Gen. Stat. § 42-42(a)(2) required Defendants to make all repairs and do whatever necessary to put and keep the premises in a fit and habitable condition.

231.     N.C. Gen. Stat. § 42-42(a)(8) required Defendants, within a reasonable period of time based upon the severity of the condition, to repair or remedy any imminently dangerous condition on the premises after acquiring actual knowledge or receiving notice.  Imminently dangerous conditions include unsafe flooring, unsafe ceilings, and excessive standing water that contributes to mold.

232.     During the pertinent times, Defendants, under all the facts and circumstances, had sufficient actual knowledge of pervasive defects and dangerous conditions in the Units comprising the Bragg community so as to be deemed to have been on notice for purposes of triggering any RRAA duties that had a notice prerequisite.  Defendants received numerous complaints and repair requests, including those from Plaintiffs, which were sufficient to place Defendants on notice.

- 71 -

233. Per N.C. Gen. Stat. § 42-42(b), Defendants are not released from their obligations by Plaintiffs' explicit or implicit acceptance of the landlord's failure to provide premises complying with N.C. Gen. Stat. § 42-42, whether done before the lease was made, when it was made, or after it was made.

234. Defendants violated N.C. Gen. Stat. § 42-42 in the following particulars as to Plaintiffs and class members:

A.    By failing to make all repairs and do whatever necessary to put and keep Units in fit and habitable condition;

B.    By failing to repair or remedy imminently dangerous conditions including, but not limited to, unsafe flooring, unsafe ceiling and excessive standing water that contributes to mold, within a reasonable period of time based on the severity of the conditions;

C.    By breaching Cumberland County Code, Article IV, Minimum Housing Code, § 4-78(b)(1), which prohibits broken, overloaded, decayed or excessively sagging sills, beams, girders and joists, and requires that floors be in sound condition and good repair;

D.    By breaching Minimum Housing Code § 4-78(c)(1), which requires all exterior surfaces to be structurally sound, waterproof, weatherproof and rodent-proof;

E.    By breaching Code § 4-78(c)(6), which requires all exterior surfaces to be protectively covered to prevent deterioration and the entrance or penetration of moisture;

F.    By breaching Code § 4-78(d)(4), which prohibits seriously rotted or broken studs;

G.    By breaching Code § 4-78(e)(3), which requires ceilings to be substantially rodent-proof;

H.    By breaching Code § 4-78(f)(2), which prohibits allowance of seriously rotted, broken or improperly supported roofing ends;

I.    By breaching Code § 4-78(f)(5), which requires use of adequate roofing to prevent the entrance of moisture;

- 72 -

J.      By breaching Code § 4-79(a), which requires homes be maintained free of vermin and rodent harborage and infestation;

K.      By breaching Code § 4-79(e), which requires all exterior surfaces including, but not limited to, window framing, to be maintained in good condition;

L.      By breaching Code § 4-79(e), which requires all exterior surfaces to be protected from the elements and decay by applying protective covering or treatment;

M.      By breaching Code § 4-79(e), which requires peeling, flaking and chipped paint to be eliminated; and

N.      By leasing and allowing servicemember families to occupy dwellings in known violation of relevant provisions of the Cumberland County Code, Article IV, Minimum Housing Code, Division 2.

235.    Defendants had a duty to provide fit and habitable housing not only under the RRAA but under North Carolina common law, to the extent the common law provides guidance outside of the statute.[93]

236.    Defendants warranted to Class Plaintiffs that the leased premises were in fit and habitable condition. Prior to leasing military houses to Class Plaintiffs, Defendants had actual knowledge that the leased premises had defective moisture barriers which resulting in pervasive mold, structural wood rot and other housing defects. Defendants had actual knowledge that the leased premises were not compliant with applicable law or standards.

---

[93] *See Jackson v. Housing Authority of High Point*, 73 N.C. App. 363, 372, 326 S.E.2d 295 (1985) ("We turn now to plaintiff's contentions that the trial court erroneously directed a verdict for defendant on the breach of implied warranty, breach of contract, and strict liability claims. We find merit in plaintiff's contention regarding the implied warranty of habitability claim. *Javins v. First National Realty Corp*., 428 F. 2d 1071 (D.C. Cir.), *cert. denied*, 400 U.S. 925, 27 L.Ed. 2d 185, 91 S.Ct. 186 (1970), cited by plaintiff, stands for the proposition that a landlord impliedly warrants to his tenant that leased or rented residential premises are fit for human habitation, at least to the extent of being free from observable conditions that render the premises unsafe or unsanitary. *Javins* further requires that applicable housing codes be read into the housing contract or lease agreement and made part of the implied warranty…. Our Residential Rental Agreements Act, G.S. 42-38 *et seq*., codifies the essential points in *Javins. See,* G.S. 42-42. Thus, to the extent that any implied warranty may be said to exist, it is co-extensive with the Residential Rental Agreements Act; and as discussed above, violations of the Act, while not negligence per se, are evidence of negligence. *Brooks v. Francis*, 57 N.C. App. 556, 291 S.E. 2d 889 (1982).").

- 73 -

237.    With regard to lead paint, prior to leasing military houses to Class Plaintiffs, Defendants had actual knowledge that the leased premises contained lead-based paint, but did not comply with federal, state and local lead-based paint regulations as required by the Ground Lease and PWTB.  Specifically, Defendants failed to develop and implement a lead hazard management plan including the requisite elements.   Consequently, the leased premises were not compliant with N.C. Gen. Stat. § 42-42, the Cumberland County Code, and other law.

238.    The Units leased by Plaintiffs and class members have had defective moisture barriers which cause pervasive mold, structural wood rot, and other conditions which threaten the health and safety of family members.  Defendants have had adequate time to repair and remedy the unsafe and unsanitary conditions after years of complaints and repair requests but have failed to make a reasonable effort to repair and remedy the defective conditions.

239.    Defendants breached their implied warranty of habitability resulting in damages to Class Plaintiffs.  Plaintiffs and class members sustained damages as a result of Defendants' violation of N.C. Gen. Stat. § 42-42 including out-of-pocket costs, costs representing the labor value of needless time consumed by residents seeking to repair and maintain Units themselves, and monies representing the overpayment of BAH rent amounts in whole or in part exceeding the reasonable rental value of the Units during the period of occupancy.

## SECOND CLAIM FOR RELIEF
### UDTPA
### (brought by Plaintiffs individually and for the Class)

240.    Class Plaintiffs re-allege the above paragraphs 1 to 239 as if fully set forth herein.

241.    At all times relevant herein, Defendants were engaged in commerce in the State of North Carolina.  Defendants are proper defendants under the UDTPA.

- 74 -

242. Plaintiffs and class members are members of the consuming public as defined by UDTPA, as they sought to acquire goods and services by lease, namely a habitable, properly maintained residence from Defendants at Fort Bragg.

243. Unfair and deceptive trade practices related to marketing of rental housing to prospective customers and in connection with performing landlord and property management duties are subject to the UDTPA because the rental of residential housing is considered commerce pursuant to N.C. Gen. Stat. § 75-1.1.

244. The conduct of Defendants as set forth herein is against established public policy of the State; is unethical, oppressive, unscrupulous, and substantially injurious to consumers; and has the capacity and tendency to deceive the average consumer.

245. Defendants, in the course of leasing Units to Plaintiffs and class members, violated the UDTPA in multiple respects, including without limitation:

    A.    By breaching the implied warranty of habitability and the RRAA;

    B.    By engaging in an unconscionable course of action;

    C.    By using false, misleading, and deceptive practices in connection with marketing Defendants' Units and property management services and in connection with website content meant to solicit applications from servicemembers for ROAs for Units;

    D.    By failing to correct defects and demanding continued rent payments after Defendants knew that Plaintiffs' and class members' Units and the property management service provided by Defendants violated N.C. Gen. Stat. § 42-46 and the RRAA;

    E.    By failing to correct defects and demanding continue rent payments after Defendants knew that leased premises violated Cumberland County Code, Article IV, Minimum Housing Code, Division 2;

    F.    By failing to correct defects then charging Plaintiffs for repair of the same defects at the conclusion of ROAs;

G.     By labeling housing defects as "wear and tear" in effort to avoid repair and maintenance obligations;

H.     By collecting rent after having knowledge of the uninhabitable nature of part and/or all of Plaintiffs' and class members' leased premises;

I.     By failing to honor promises to correct deficiencies in Plaintiffs' leased premises and continuing to demand rent;

J.     By misrepresenting the condition, fitness and habitability of rental homes;

K.     By charging and enforcing repair fees against Plaintiffs at the conclusion of ROAs which were not Plaintiffs' responsibility to pay;

L.     By employing a system for marketing, leasing and managing homes which is unfair, deceptive, and misleading, not permitted by the public policy of North Carolina, and in violation of N.C. Gen. Stat. § 42-46;

M.     By utilizing false representations and deceptive measures to collect or attempt to collect rent payments from new and existing tenants;

N.     By knowingly making false or misleading statements of facts concerning the need for parts, replacement, or repair service;

O.     By knowingly making false or misleading statements of facts related to the cause of pervasive mold and/or structural wood rot in the leased premises;

P.     By threatening to impose punitive fees unless Class Plaintiffs executed new leases after initial lease terms expired;

Q.     By representing that work or services have been performed on, or parties replaced in, goods when the work or services were not performed or the parts replaced;

R.     By failing to disclose information concerning defects which were known to Defendants which was intended to induce servicemembers into ROAs which they would not have entered had true information been disclosed;

S.     By undertaking conduct which Defendants knew, or should have known, offended well-established public policy, state law, and was otherwise unlawful, unfair, deceptive, misleading, coercive, and substantially injurious to Plaintiffs and class members;

T.     By manipulating service and repair records to the detriment of Plaintiffs and class members; and

U.   By manipulating customer survey records to the detriment of Plaintiffs and class members.

246.   Some or all of the improper conduct alleged herein were done willfully, or with the conscious disregard of the rights of Plaintiffs and class members.

247.   Defendants received numerous complaints and repair requests, including those from Plaintiffs and from class members.  Many of the conditions complained of were the same unfit conditions identified in the Environmental Baseline Survey and Defendants' housing inspections.  Many others consisted of conditions and problems of which the Defendants had knowledge, because they had occurred before to prior tenants, while the incoming new tenant did not have this information.

248.   Defendants, by virtue of their course of administering, leasing, building and repairing Units at Fort Bragg were uniquely aware of the condition of them, including the existence of defective moisture barriers which caused mold, structural wood rot, and other potentially hazardous conditions across entire communities of old base housing.  Nevertheless, Defendants knowingly and intentionally leased Units to Plaintiffs and class members, represented that they were habitable and that appropriate repair and remedy work had been undertaken in the past, and assured that it would be undertaken in the future. Had servicemembers had an adequate advance opportunity to properly inspect the Units and review their prior repair and maintenance history before agreeing to ROAs, and had Defendants disclosed the true fact, they would not have entered into ROAs or, at very least, would have had a means to protest and seek not to overpay rent.

249.   Defendants have utilized their relationship with the military, Plaintiffs' status within the military, Plaintiffs relatively weaker economic position, and the availability (or lack thereof) of military benefits associated with moving, to effectively hold Plaintiffs hostage in their leases until they received orders stationing them elsewhere.

- 77 -

250. Despite the aforementioned violations, Defendants collected the full amount of the BAH directly from the federal government, giving Plaintiffs no discount for the size, quality, or condition of their house, nor for the inadequate repair and maintenance.

251. Even worse, Defendants attempted to shift financial responsibility for repairs to Plaintiffs and class members by levying unfair and deceptive charges at the conclusion of lease terms. In many instances, Plaintiffs and class members were charged excessive repair fees which, if refused, subjected Plaintiffs to disciplinary measures from the military and compromised their ability to lease other houses.

252. In effort to further lessen their financial burden, Defendants refused to repair defects during tenancies by labeling them as "wear and tear" items which were not in need of replacement.

253. Plaintiffs and members of the class suffered actual injury as a direct and proximate result of Defendants' unfair and deceptive actions, including, but not limited to, the overpayment of rent during the class period.

254. Defendants' actions were in or affecting commerce and constitute unfair and deceptive trade practices, proscribed by Chapter 75 of the North Carolina General Statutes.

255. Plaintiffs and all members of the Class have been damaged and are entitled to recover compensatory damages, treble damages and attorney's fees.

### THIRD CLAIM FOR RELIEF
**Breach of Contract**
**(brought by Plaintiffs individually and for Subclass A)**

256. Plaintiffs re-allege the above paragraphs 1 to 255 as if fully set forth herein.

257. Servicemember Plaintiffs and class members entered valid contracts with Defendants in the form of ROAs.

- 78 -

258.    The ROAs and incorporated materials imposed explicit or implicit duties on Defendants Bragg Communities and Corvias Management, as owner and property manager respectively, to perform the contract so as to ensure the Units were fit for human habitation. Defendants expressly warranted that Units were "reasonably safe and habitable for occupancy."

259.    Defendants failed to comply with the material terms of the ROAs by failing to ensure the houses were fit for human habitation and by failing to diligently repair and remedy the conditions affecting habitation.

260.    During the pertinent times, Defendants breached provisions of the Corvias ROA form lease as well as of the Resident Responsibility Guide, incorporated by reference into the ROA. Defendants breached their obligation set forth at Guide section 3-1 of "providing excellent maintenance service to residents." Defendants breached their commitment set forth at Guide § 3-1 to "provide 24-hour emergency maintenance service to residents." Defendants breached their commitment set forth at Guide § 3-1 that "[r]outine maintenance will also be accomplished quickly, efficiently, and according to the highest standards." They breached their promise set forth at Guide § 3-1 to perform under "[w]ork order guidelines" which would be "created with resident safety in mind." Further, during the pertinent times, Defendants breached Guide § 1-2 wherein Corvias promised it "will assist current Residents with all housing needs concerning their current home." Defendants further breached the terms of ROAs by failing to provide promised housing in the promised condition or to manage the tenant needs properly, and by threatening to charge punitive fees unless Plaintiffs agreed to execute new leases in lieu of "month-to-month" payments as provided for in their leases.

261.    On information and belief, the remaining Defendants aside from Bragg Communities and Corvias Management were directly and materially involved in performing under

the ROAs, or otherwise directly and materially involved on the facts, so as to be fairly held jointly and severally liable for breach of contract along with Bragg Communities and Corvias Management.

262.    Plaintiffs have performed all conditions precedent under any applicable contract.

263.    Plaintiffs sustained damages as a result of Defendants' breaches of contract including the overpayment of rent, as well as incurring of out-of-pocket expenses and other consequential and special damages in an amount to be proven at trial.

264.    As a proximate and legal result of Defendants' breaches of contract, Class Plaintiffs are entitled to an award of all their actual and consequential damages including, but not limited to, attorneys' fees and costs, in amounts to be proven at time of trial.

**FOURTH CLAIM FOR RELIEF**
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(brought by Plaintiffs individually and for Subclass A)**

265.    Plaintiffs re-allege the above paragraphs 1 to 264 as if fully set forth herein.

266.    It is well-established that a contract carries with it an implied covenant by the parties to act fairly and in good faith in carrying out the agreement.[94]  Accordingly, in addition to or as a component of their claim for breach of contract, and pursuant to Fed. R. Civ. P. 8(d), Plaintiffs allege breach of the implied covenant of good faith and fair dealing.

267.    In addition to the express terms of the ROAs, there are terms that are necessarily implied to effect the intention of the parties and which are not in conflict with the express terms.

---

[94] *See Maglione v. Aegis Family Health Ctrs.*, 168 N.C. App. 49, 56, 607 S.E.2d 286, 291 (2005) (In addition to its express terms, a contract contains all terms that are necessarily implied "to effect the intention of the parties" and which are not in conflict with the express terms. Among these implied terms is the basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement. All parties to a contract must act upon principles of good faith and fair dealing to accomplish the purpose of an agreement, and therefore each has a duty to adhere to the presuppositions of the contract for meeting this purpose); *Robinson v. Deutsche Bank Nat. Tr. Co.,* No. 52-CV-590, 2013 U.S. Dist. LEXIS 50797, 2013 WL 1452933, at *11 (E.D.N.C. Apr. 9, 2013) (accord).

268. Defendants had an implicit obligation to act in good faith and make reasonable efforts to perform their obligations under the ROAs including, but not limited to, keeping the Units safe and habitable, providing adequate repair and maintenance services, providing honest information to the tenants, and not using Defendants' vastly more powerful economic position to oppress and intimidate families.

269. Plaintiffs and class members reasonably understood and expected that Defendants would in accordance with their performance of the ROAs:

A. Communicate truthful information regarding known defects in military housing, including material facts regarding the condition of leased homes, of which Defendants had knowledge, and Plaintiffs lacked knowledge;

B. Respond promptly, effectively, and truthfully to concerns about the condition of the Units expressed to them by Plaintiffs, including refraining from providing misinformation when responding to concerns;

C. Faithfully observe and comply with all applicable Federal, State and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements including, but not limited to, N.C. Gen. Stat. §§ 42-42, 42-46, and the Cumberland County Code;

D. Maintain leased houses in good order and in a decent, safe and sanitary condition;

E. Ensure professional management and maintenance of housing neighborhoods consistent with the standard of a market-rate residential rental development in Fayetteville, North Carolina;

F. Ensure that servicemembers and their families had quality housing generally reflecting contemporary community living standards;

G. Refrain from leasing houses that did not meet minimum adequacy standards for health and safety;

H. Undertake repairs, renovations, remediations and construction in compliance with local building codes and ordinances, and commensurate with industry standards and the representations made to induce families to lease;

- 81 -

I.    Maintain homes, garages, carports, storage sheds, grounds and other facilities, to a standard that prevents deterioration beyond that which results from normal wear and tear;

J.    Make sure Units are free from defects which would affect the safety, appearance, or habitability of the houses, and make sure that Units have components and construction to maintain safety;

K.    Inspect houses for suitability based on environmental, health, and safety considerations prior to leasing;

L.    To manage lead-based paint in accordance with the standards and requirements established by the Army's Public Works Technical Bulletin, No. 420-70-2;

M.    To provide a lead-hazard-free living environment;

N.    To inspect houses between occupancy to verify that previously controlled or abated lead hazards have not reoccurred, to identify the occurrence and extent of new lead hazards, and to notify occupants that there is damage to painted surfaces;

O.    To comply with, and abide by, their own safety plans, safety procedures, and safety protocols for management of environmental hazards, including those identified in the EBS; and

To refrain from leasing residential housing which Defendants knew or should have known would pose a health risk to residents.

270.    Defendants breached their implied covenant of good faith and fair dealing including, but not limited to, by engaging in the acts and omissions described hereinabove.

271.    Plaintiffs and class members sustained damages as a result of Defendants' breaches of the implied covenant of good faith and fair dealing, including due to the overpayment of rent, as well as incurring of out-of-pocket expenses and other consequential and special damages in amounts to be proven at trial.

272.    As a proximate and legal result of Defendants' breaches of contract, Plaintiffs and class members are entitled to compensatory damages.

- 82 -

# FIFTH CLAIM FOR RELIEF
## Negligence
### (brought by Plaintiffs individually and for Subclass C)

273.    Plaintiffs re-allege the above paragraphs 1 to 272 as if fully set forth herein.

274.    Defendants owed duties to Plaintiffs and class members as follows:

A.    To communicate truthful information regarding known defects in military housing, including material facts regarding the condition of leased homes which Defendants had knowledge, and Plaintiffs lacked knowledge, of which Plaintiffs ought reasonably to be informed before entering into residential leases;

B.    To respond promptly, effectively, and truthfully to concerns about the condition of the Premises expressed to them by Plaintiffs, including refraining from providing misinformation when responding to concerns;

C.    To faithfully observe and comply with all applicable Federal, State and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements including, but not limited to, N.C. Gen. Stat. § 42-46, and the Cumberland County Code;

D.    To maintain leased houses in good order and in a decent, safe and sanitary condition;

E.    To ensure professional management and maintenance of housing neighborhoods consistent with the standard of a market rate residential rental development in Fayetteville, North Carolina;

F.    To ensure that servicemembers and their families had quality housing generally reflecting contemporary community living standards;

G.    To refrain from leasing houses that did not meet minimum adequacy standards for health and safety;

H.    To undertake repairs, renovations, remediations and construction in compliance with local building codes and ordinances, and commensurate with industry standards;

I.    To maintain homes, garages, carports, storage sheds, grounds and other facilities, to a standard that prevents deterioration beyond that which results from fair wear and tear;

J.    To make sure family houses are free from missing components, or defects, which would affect the safety, appearance, or habitability or the houses;

- 83 -

K. To inspect houses for suitability based on environmental, health, and safety considerations prior to leasing;

L. To comply with the Department of the Army's adopted standards for the construction, renovation and condition of privatized housing;

M. To comply with Army Pamphlet 420-1-1, § 2-29, as related to the maintenance of military housing;

N. To manage lead-based paint in accordance with the standards and requirements established by the Army's Public Works Technical Bulletin, 420-70-2;

O. To meet the standards of the American Society for Testing and Materials Sub-committee E06.23;

P. To provide a lead-hazard-free living environment;

Q. To conduct ongoing monitoring of military houses where lead-contaminated paint is known or suspected to be present, regardless of the paint's present condition, including procedures for performance of monitoring as set forth in HUD Guidelines, Chapter 6;

R. To inspect houses between occupancy to verify that previously controlled or abated lead hazards have not recurred, to identify the occurrence and extent of new lead hazards, and to notify occupants that there is damage to painted surfaces;

S. To comply with, and abide by, their own safety plans, safety procedures, and safety protocols for management of environmental hazards, including those identified in the EBS;

T. To refrain from leasing residential housing which Defendants knew or should have known would pose a health risk to residents;

U. To adhere to the terms of the Ground Lease which require Defendants to remediate or remove any toxic or hazardous waste, substances, or materials in, on, under or from any part of the premises including but not limited to, lead-contaminated soil materials and pesticide-contaminated soil materials;

V. To adhere to the terms of the Residential Leases;

W. To adhere to federal, state and local lead-based paint regulations as required by the Ground Lease and PWTB in the aforesaid particulars;

X. To exercise reasonable care for the safety of foreseeable Plaintiffs;

Y. To otherwise use reasonable care in the performance of Defendants' obligations as set forth in the Ground Lease and otherwise;

275. Defendants breached their duties as follows with regard to Plaintiffs and class members:

A. Failing to communicate truthful information regarding known defects in military housing, including material facts regarding the condition of leased homes which Defendants had knowledge, and Plaintiffs lacked knowledge, of which Plaintiffs ought reasonably to be informed before entering into residential leases;

B. Failing to respond promptly, effectively, and truthfully to concerns about the condition of the Units expressed by Plaintiffs, including refraining from providing misinformation when responding to said concerns;

C. Failing to faithfully observe and comply with all applicable Federal, State and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements including, but not limited to, North Carolina's Residential Rental Agreement Act, N.C.G.S. §42-46, and Cumberland County Code;

D. Failing to maintain leased houses in good order and in a decent, safe and sanitary condition, both in terms of protecting Plaintiffs and class members from water intrusion and mold, acting reasonably to respond to mold complaints, and otherwise;

E. Failing to ensure professional management and maintenance of housing neighborhoods consistent with the standard of a market rate residential rental development in Fayetteville, North Carolina;

F. Failing to ensure that families had quality housing generally reflecting contemporary community living standards;

G. Failing to refrain from leasing houses that did not meet minimum adequacy standards for health and safety;

H. Failing to undertake repairs, renovations, remediations and construction in compliance with local building codes and ordinances, and commensurate with industry standards;

- 85 -

I.   Failing to maintain homes, garages, carports, storage sheds, grounds and other facilities, to a standard that prevents deterioration beyond that which results from fair wear and tear;

J.   Failing to make sure family houses are free from missing components, or defects, which would affect the safety, appearance, or habitability or the houses;

K.   Failing to inspect houses for suitability based on environmental, health, and safety considerations prior to leasing;

L.   Failing to comply with the Department of the Army's adopted standards for the construction, renovation and condition of privatized housing;

M.   Failing to comply with Army Pamphlet 420-1-1, § 2-29, as related to the maintenance of military housing;

N.   Failing to manage lead-based paint in accordance with the standards and requirements established by the Army's Public Works Technical Bulletin, 420-70-2;

O.   Failing to meet the standards of the American Society for Testing and Materials Subcommittee E06.23;

P.   Failing to provide a lead-hazard-free living environment;

Q.   Failing to conduct ongoing monitoring of military houses where lead-contaminated paint is known or suspected to be present, regardless of the paint's present condition, including procedures for performance of monitoring as set forth in HUD Guidelines, Chapter 6;

R.   Failing to inspect houses between occupancy to verify that previously controlled or abated lead hazards have not recurred, to identify the occurrence and extent of new lead hazards, and to notify occupants that there is damage to painted surfaces;

S.   Failing to comply with, and abide by, their own safety plans, safety procedures, and safety protocols for management of environmental hazards, including those identified in the EBS;

T.   Failing to refrain from leasing residential housing which Defendants knew or should have known would pose a health risk to residents;

U.   Failing to adhere to the terms of the Ground Lease which require Defendants to remediate or remove any toxic or hazardous waste, substances, or materials in, on, under or from any part of the premises

- 86 -

including but not limited to, lead-contaminated soil materials and pesticide-contaminated soil materials;

V.   Failing to adhere to federal, state and local lead-based paint regulations as required by the Ground Lease and PWTB in the aforesaid particulars;

W.   Failing to adhere to the terms of the Residential Leases including, but not limited to, threatening punitive fees unless tenants agreed to sign new leases after initial lease terms expired

X.   Failing to exercise reasonable care for the safety of reasonably foreseeable Plaintiffs and victims of injury and illness as a consequence of breach of the duty of care; and

Y.   Failing to use reasonable care in performance of Defendants' obligations as set forth in the Ground Lease or otherwise.

276.   Defendants' breaches of duties constitute negligence, gross negligence, negligence *per se*, and/or reckless and willful conduct.

277.   As a proximate and legal result of Defendants' breaches of the duty of care, Plaintiffs and class members have been injured.

278.   Plaintiffs and class members have been injured as a result of Defendants' breaches of the duty of due care, including by suffering injury to personal property, or, in some instances, by suffering injury to their person, adverse health effects, physical symptoms or significant illness, caused by mold exposure arising out of Defendants' negligence, or by other foreseeable impacts of the negligence; and have incurred out-of-pocket, actual, special or consequential damages.

279.   As a proximate and legal result of Defendants' negligence, negligence *per se*, recklessness, and gross negligence, Plaintiffs and class members are entitled to an award of damages in amounts to be proven at time of trial. To the extent that Defendants' conduct was undertaken intentionally or with reckless disregard for the foreseeable consequences to Plaintiffs and class members, and the requirements of N.C. Gen. Stat. § 1D-1 *et seq*. have been met by the evidence, Plaintiffs and class members should be awarded exemplary or punitive damages.

- 87 -

**(Violation of Residential Lead-Based Paint Hazard Reduction Act,
brought by Plaintiffs individually and for Subclass A)**

280.     Class Plaintiff re-allege the above paragraphs 1 to 279 as if fully set forth herein.

281.      Defendants have violated applicable provisions and associated regulations of the

Residential Lead-Based Paint Hazard Reduction Act of 1992, 42 U.S.C. § 4851, *et seq*.:

   A.     By failing to provide notice to Plaintiffs and class members who were
          residents as articulated in 42 U.S.C. § 4852d;

   B.     By failing to provide said residents with any available reports or records
          pertaining to the presence of lead or lead-based paint hazards in the Units;

   C.     By failing to notify eligible residents of their right to have a 10-day period
          to inspect the premises for lead prior to taking possession of the Units; and

   D.     By failing to provide said residents with a 10-day period to inspect the
          premises for lead prior to taking possession of the Units.

282.      Given their actual and constructive knowledge regarding the presence of lead-

based paint in the leased premises, Defendants' failure to provide all of the statutorily required

disclosures constituted a knowing violation of 42 U.S.C. § 4852d.  Further, the generic, inadequate

and inaccurate purported lead disclosures in Defendants' form ROAs did not amount to satisfaction

of their duties under this law.

283.      As a direct and proximate result of Defendants' conduct, Plaintiffs and class

members who were residents sustained actual damages including, without limitation, overpayment

of rent given the fact the premises were not worth the amount paid in rent to Defendants.

284.      Per 42 U.S.C. § 4852d(b)(3), Defendants are jointly and severally liable to

Plaintiffs and class members who were residents in an amount equal to three times the amount of

damages incurred by each such person.

285.      Per 42 U.S.C. § 4852d(b)(4), Defendants should be found jointly and severally

liable for all applicable costs and expenses of this action, and reasonable attorneys' fees.

**SEVENTH CLAIM FOR RELIEF**
**Temporary Recurrent Private Nuisance**
**(brought by Plaintiffs individually and for Subclass A, B & C)**

286.     Plaintiffs re-allege the above paragraphs 1 to 285 as if fully set forth herein.

287.     The Plaintiffs and class members who occupied the residential units during the pertinent times have standing to bring this claim due to their lawful possessory and occupancy interest.

288.     During the pertinent times, the Defendants proximately caused the Plaintiffs and class members to incur a substantial and unreasonable interference with their ability to use and enjoy their leasehold properties.

289.     As a direct and proximate result of Defendants' creation and maintenance of a temporary and recurrent private nuisance, the Plaintiffs and class members have been injured and damaged.  Furthermore, the nuisance conditions herein are abatable but Defendants have unreasonably refused to abate them.

290.     As a result of the Defendants' creation and maintenance of a private nuisance, the Plaintiffs and class members are entitled to compensatory damages and to injunctive relief in the form of an order requiring Defendants to abate the further persistence of the private nuisance.

**EIGHTH CLAIM FOR RELIEF**
**Declaratory and Injunctive Relief**
**(brought by Plaintiffs individually and for Subclass B)**

291.     Class Plaintiffs re-allege the above paragraphs 1 to 290 as if fully set forth herein.

292.     Plaintiffs and class members who continue to lease and occupy residential units pursuant to ongoing lease contracts with Defendants are entitled to entry of declaratory relief and for the Court to construe and clarify the express and implied terms of the form lease and declare

- 89 -

the respective rights and duties of the parties. Among other things, Plaintiffs respectfully seek declaratory relief specifying and clarifying Defendants' duties to provide adequate and fair customer service, repair and maintenance property management services, and, to undertake resident surveys in an accurate and objective manner, under the express and implied terms of the parties' agreements.

293. During the pertinent times, Defendants knew, or should have known, that the homes in Fort Bragg were non-compliant with applicable Federal, State and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements. However, Defendants failed to act appropriately under the obligations imposed by the lessor-lessee relationship.

294. Defendants failed to meet their obligations as set forth both in the ROA and incorporated materials, the implied duties flowing therewith, and in the Bragg Ground Lease, including by failing to comply applicable Federal, State and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements.

295. Despite Defendants' failure to meet their obligations to Plaintiffs, Defendants collected significant fees for construction, development, and management of residential homes since 2003 and BAH income. Defendants also stands to earn significant additional fees, BAH amounts and equity returns.

296. Plaintiffs are informed and believe that under the circumstances, and to the extent not subject to contract coverage under the ROA form lease, Defendants have been conferred a benefit by Plaintiffs and class members and have been unjustly enriched.

297. Under the circumstances, particularly due to the existence of Plaintiffs and class members who are parties to currently ongoing leases, available remedies at law may be in whole

or in part inadequate, and injunctive relief may assist to preserve the status quo pending the ultimate resolution of this action.

298.    Accordingly, in addition or in the alternative to the claims alleged above, Plaintiffs respectfully allege that the Court should order an equitable accounting, refund, disgorgement and restitution, including to the extent that actual revenues, BAH receipts and fees obtained by Defendants traceable to the Plaintiffs' and class members tenancies exceed the reasonable value of the leaseholds during the pertinent times.  Further, to the extent that an enforceable contract does not govern the rights and obligations of the parties, under the doctrine of quasi-contract, the Plaintiffs and class members have conferred a benefit on the Defendants and it would be unjust for Defendants to take and retain that benefit.

299.    Accordingly, the Court should enter declaratory and injunctive relief construing the terms of the lease agreement and the respective rights and obligations of the parties; enjoining Defendants from continuing violations of their duties as landlords and property managers herein; awarding relief in the form of appointing a special master or auditor at the Defendants' expense to engage in an accounting; awarding disgorgement and full or partial restitution of monies to eligible servicemembers; or awarding such other declaratory, injunctive or equitable relief as the Court may deem appropriate.

## **JURY DEMAND**

300.    Plaintiffs respectfully demand a trial by jury of all claims so triable.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for judgment in their favor against Defendants as follows:

1.  For designation of the Plaintiffs as class representatives;

2.  For appointment of the undersigned counsel as class counsel;

3.  For certification of a class and specified subclasses with regard to the Plaintiffs' stated claims for relief, and with regard to one or more common issues including with regard to Plaintiffs' claim for relief for negligence;

4.  For an award of actual, compensatory, special, and consequential damages in an amount to be proven at trial;

5.  For an award of rent abatement in whole or in part, prospectively and/or retrospectively;

6.  For an award of treble damages as provided by N.C. Gen. Stat. § 75-16;

7.  For an award of restitution in an amount to be determined by the Court;

8.  For disgorgement of the profits and fees collected by Defendants;

9.  For an award of reasonable attorneys' fees and costs under N.C. Gen. Stat. § 75-16.1;

10. For an award of punitive damages to the extent the evidence may show violation of Chapter 1D of the North Carolina General Statutes and proof of an aggravating factor;

11. For equitable relief to abate a nuisance; and

12. For such other and further relief as the Court may deem just and proper.

Dated:  August 31, 2020.

PENRY | RIEMANN PLLC

/s/ J. Anthony Penry
J. Anthony Penry
N.C. Bar No. 8936
2245 Gateway Access Point, Suite 203
Raleigh, NC 27607
(919) 792-3891
Andy.Penry@PenryRiemann.com

BAUER & METRO, PC

/s/ Robert S. Metro
Robert S. Metro
S.C. Bar No. 69494
Post Office Box 7965
Hilton Head, SC 29938
(843) 842-5297
Rmetro@bauerandmetro.com
Appearing pursuant to Local Rule 83.1(e)

WALLACE & GRAHAM, PA

/s/ John Hughes
Mona Lisa Wallace
NC State Bar No. 009201
John Hughes
NC State Bar No. 22126
525 N. Main Street
Salisbury, North Carolina 28144
Telephone: 704-633-5244
Fax: 704-633-9434
mwallace@wallacegraham.com
jhughes@wallacegraham.com

*Counsel for Plaintiffs*

- 93 -

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2020, I electronically filed this document with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to all

counsel of record in this case.

Dated: August 31, 2020

Respectfully submitted,

s/John Hughes
John Hughes, NC State Bar # 22126
Wallace & Graham, PA
525 N. Main Street
Salisbury, North Carolina 28144
Telephone: (704) 633-5244
Facsimile: (704) 633-9434
jhughes@wallacegraham.com

*One of the Counsel for Plaintiffs*