IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CV-336-D

| | | |
|---|---|---|
| SHANE PAGE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **ORDER** |
| v. | ) | |
| | ) | |
| CORVIAS GROUP, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

On August 31, 2020, Staff Sergeant Shane Page and Brittany Page ("the Pages"), Specialist

Spenser Ganske and Emily Ganske ("the Ganskes"), Sergeant First Class Christopher Wilkes and

Ashley Wilkes ("the Wilkeses"), and Corporal Timothy Murphy and Katelyn Murphy ("the

Murphys") (collectively, "plaintiffs") filed an amended class action complaint against Corvias

Group, LLC ("Corvias"), Bragg Communities, LLC ("Bragg Communities"), Corvias Management-

Army, LLC ("Corvias Management"), Bragg-Picerne Partners, LLC ("Bragg-Picerne"), Corvias

Military Living, LLC ("Corvias ML"), and Corvias Construction, LLC ("Corvias Construction")

(collectively, "defendants") [D.E. 30].[1] Plaintiffs allege claims under North Carolina law for (1)

breach of contract, (2) breach of implied covenant of good faith and fair dealing, (3) negligence, (4)

temporary recurrent private nuisance, (5) violations of the North Carolina Residential Rental

Agreements Act, N.C. Gen. Stat. §§ 42-38 et seq. ("RRAA"), and (6) violations of the North

Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1 et seq. ("UDTPA").

See id. ¶¶ 224–79, 286–90. Plaintiffs also allege violations of the Residential Lead-Based Paint

---

[1] On September 1, 2020, plaintiffs voluntarily dismissed their claims against John Picerne and Heather Fuller [D.E. 31]. The clerk shall amend the caption.

Hazard Reduction Act of 1992, 42 U.S.C. §§ 4851 et seq. ("RLPHRA"). See id. ¶¶ 280–85. Plaintiffs seek damages, declaratory relief, and injunctive relief. See id. at 89–92.

As explained below, the court grants in part and denies in part defendants' motion to dismiss, denies defendants' motion to strike, grants plaintiffs' motion for judicial notice, and grants plaintiffs' motion to supplement the record.

I.

Plaintiffs are military personnel and their families living in defendants' privatized military housing. Plaintiffs' allegations concern the quality and maintenance of their leased housing. See Am. Compl. [D.E. 30] ¶¶ 4–12. Specifically, the Pages moved into 274 Spear Drive, Fort Bragg, North Carolina, in August 2016. In May 2020, the Pages relocated to 69 Baltic Circle, Fort Bragg, North Carolina, due to problems in the Spear Drive home. See id. ¶¶ 109, 126; [D.E. 34-2] 3. The Ganskes have resided at 246 Castle Drive, Fort Bragg, North Carolina, since September 2018. See Am. Compl. ¶ 129. The Wilkeses moved into 112 Hirsch Circle, Fort Bragg, North Carolina, in March 2017. In July 2020, they moved to 39 Viking Court, Fort Bragg, North Carolina, because of unabated problems at the Hirsch Circle residence. See id. ¶¶ 143–56. The Murphys lived at 21 Galaxy Street, Fort Bragg, North Carolina, from February 2019 to October 2019, when they moved off base due to problems with the Galaxy Street home. See id. ¶¶ 160, 188.

Defendants are corporate entities responsible for building, providing, and maintaining privatized military housing at Fort Bragg under a 50-year lease with the United States (the "Ground Lease"). See id. ¶¶ 13–18, 44. Specifically, Corvias is a Delaware limited liability company with its principal place of business in Rhode Island that provides privatized military housing and related services. See id. ¶ 13. Corvias also is the parent company of Bragg-Picerne and Corvias ML. See id. Bragg Communities is a Delaware limited liability company with its principal place of

2

business in Fort Bragg, North Carolina. See id. ¶ 14. Bragg-Picerne and the U.S. Department of the Army are two of its three members, and Bragg-Picerne is Bragg Communities' managing member. See id. ¶ 14 & nn.17, 16. At all relevant times, Bragg Communities provided housing, property management, and other services for service members and their families residing in Fort Bragg's privatized military housing. See id. The parties' lease agreements, known as Residential Occupancy Agreements ("ROAs"), list Bragg Communities as the property "Owner." See id. ¶ 14.

Corvias Management is a Delaware limited liability company with its principal place of business in Fort Bragg, North Carolina. See id. ¶ 15. At all relevant times, Corvias Management provided housing and other services for service members and their families residing in Fort Bragg's privatized military housing. See id. The parties' ROAs list Corvias Management as the "Property Manager." See id. Bragg-Picerne is a Delaware limited liability company with its principal place of business in Rhode Island. See id. ¶ 16. Bragg-Picerne is a wholly owned subsidiary of Corvias ML and at all relevant times provided housing and other services for service members and their families residing in privatized military housing at Fort Bragg. See id. Corvias ML, formerly known as Picerne Military Housing, LLC, is a Rhode Island limited liability company with its principal place of business in Rhode Island. See id. ¶ 17. At all relevant times, Corvias ML helped develop, construct, manage, and provide other relevant services regarding privatized military housing at Fort Bragg. See id. Corvias ML's parent company, Corvias, is the company's sole member. See id. Corvias Construction is a Delaware limited liability company with its principal place of business in Rhode Island. See id. ¶ 18. At all relevant times, Corvias Construction provided housing and other services for service members and their families residing in privatized military housing at Fort Bragg. See id.

To procure housing from the defendants, each plaintiff entered into an ROA. In exchange

3

for the service members' basic allowance for housing ("BAH"), defendants agreed to provide quality housing. See id. ¶¶ 1, 87–89. The ROAs listed plaintiffs as the "Resident[s]" and Bragg Communities as the "Owner." See, e.g., [D.E. 34-2] 3. The ROAs also listed Corvias Management as the property manager responsible for managing "[t]he Home and all matters relating to this [ROA]." Id. The ROAs also contained choice-of-law and lead-based paint hazard disclosures. The ROAs' choice-of-law provision states:

> This Agreement will be governed by the laws of the State in which the Home is located (the "Applicable State Law") to the maximum extent that the Applicable State Law applies to leased premises and the courts of such State have jurisdiction over the Home, as well as any applicable Federal laws, any applicable military rules, regulations and/or guidelines, and the [Owner's Resident Responsibility Guide], all of which are hereby incorporated by reference.

Id. at 26, 34, 45, 65 (emphasis omitted).

The ROAs' lead-based paint hazard disclosure states that the resident has received a copy of a booklet regarding lead-based paint hazards if the residence was built before 1978, and disclosures related to these hazards. See, e.g., id. at 7. Although defendants had detailed knowledge of the lead-based paint hazards in housing at Fort Bragg, see Am. Compl. ¶¶ 67–86, the ROAs failed to disclose lead-based paint contamination at each of the plaintiffs' homes. See, e.g., [D.E. 34-2] 21–22, 40–41, 61–62, 83–84.

Defendants marketed "high-quality housing" to service members and their families, including plaintiffs. Am. Compl. ¶ 3. However, plaintiffs experienced numerous problems with the residences they leased from defendants. As for the Pages' residence, defendants failed to disclose problems, such as ineffective moisture and air barriers before the Pages moved into their residence. See id. ¶ 109. After moving into the residence, the Pages encountered numerous problems including water damage, insect infestations, structural damage, wood rot, mold, a defective HVAC system, and lead-

4

based paint contamination. See id. ¶¶ 109–28. Although the Pages made numerous repair requests, defendants failed to abate these problems. See id. Eventually, defendants relocated the Pages, classifying the move as a "rank eligibility move," rather than one caused by the home's maintenance problems, despite telling the Pages they did not qualify for a rank eligibility move. Id. ¶ 126.

Defendants also failed to disclose problems to the Ganskes before they moved into their residence. See id. ¶ 130. Nonetheless, after moving into the residence, the Ganskes discovered pre-existing rodent infestations, mold, water damage, structural problems, and nonfunctioning electrical outlets. See id. ¶¶ 130–31. Although the Ganskes contacted defendants about making appropriate repairs, defendants failed to do so. See id. ¶¶ 129–42. One repair worker told Mrs. Ganske that his employer would fire him if he told residents that mold was present in their homes. See id. ¶ 138.

The story is much the same for the Wilkeses. Before moving into their residence, defendants disclosed no problems. Nonetheless, after moving into their residence, the Wilkeses soon encountered problems with mold, wood rot, the structure, lead-based paint, and overall disrepair. See id. ¶¶ 144–56. For instance, the roof was so unsound that a repair worker fell through the roof, causing the interior ceiling to collapse and nearly land on members of the family. See id. ¶ 152. Although the Wilkeses submitted 33 repair requests, defendants failed to properly abate these problems. See id. ¶¶ 144–56. Eventually, defendants relocated the Wilkeses. See id. ¶ 156. After moving into their new residence at 39 Viking Court, Fort Bragg, North Carolina, the Wilkeses discovered numerous problems with that residence, including water damage and potential lead-based paint contamination. See id. ¶¶ 156–57.

As for the Murphys, defendants also failed to disclose problems with their residence before the Murphys moved into their residence. After moving into their residence, the Murphys discovered problems with water damage, wood rot, the structure, mold, the HVAC system, other appliances, and

5

overall disrepair. See id. ¶¶ 158–95. Additionally, the residence had serious problems with carbon monoxide contamination, which defendants attempted to deny and cover up. See id. ¶¶ 181–87. The Murphys also discovered lead-based paint and lead pipes in their residence. See id. ¶ 161. In response, defendants' representatives told the Murphys not to drink the water or let their children eat the paint chips. See id. As with the other plaintiffs, the Murphys made repair requests to defendants, but defendants failed to fix the problems. See id. ¶¶ 158–95. Defendants also repeatedly deleted certain of the Murphys' repair requests or sent unqualified personnel to complete repair work. See id. ¶¶ 165, 172, 183–84, 195. Due to the mold and other problems with the residence, the Murphys decided to move off base. See id. ¶ 188. The Murphys incurred financial liabilities due to the move. See id. ¶¶ 188–90. Additionally, the various problems with the residence adversely affected the Murphys' health, and these problems persist. See id. ¶¶ 191–94.

## II.

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to [the nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 352 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 576 U.S. 155 (2015). A court need not accept as true a complaint's legal conclusions, "unwarranted inferences,

6

unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a party's factual allegations must "nudge[ ] [its] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

When evaluating a motion to dismiss, a court considers the pleadings and any materials "attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011); see Fed. R. Civ. P. 10(c); Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016); Thompson v. Greene, 427 F.3d 263, 268 (4th Cir. 2005). A court may also consider a document submitted by a moving party if it is "integral to the complaint and there is no dispute about the document's authenticity" without converting the motion into one for summary judgment. Goines, 822 F.3d at 166. Additionally, a court may take judicial notice of public records. See, e.g., Fed. R. Evid. 201; Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007); Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

This court has subject-matter jurisdiction based on diversity. See 28 U.S.C. § 1332. Thus, the court applies state substantive law and federal procedural rules. See Erie R.R. v. Tompkins, 304 U.S. 64, 78–80 (1938); Dixon v. Edwards, 290 F.3d 699, 710 (4th Cir. 2002).

In resolving the dispute, this court applies North Carolina substantive law.[2] Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state law issues. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See id.; Parkway 1046, LLC v. U.S. Home Corp., 961 F.3d 301, 306 (4th Cir. 2020);

---

[2] The parties' ROAs contain a choice-of-law provision specifying that the substantive law where the residence is located applies. See, e.g., [D.E. 34-2] 26, 34, 45, 65. Because the residences are located at Fort Bragg, North Carolina, this court applies North Carolina substantive law to resolve this dispute.

7

Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from the Supreme Court of North Carolina, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted).[3] In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotation omitted); see Hicks v. Feiock, 485 U.S. 624, 630 & n.3 (1988). Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

This action also requires the court to address class allegations. A plaintiff seeking class certification under Federal Rule of Civil Procedure 23 must first satisfy Rule 23(a)'s prerequisites. Under Rule 23(a), class certification is appropriate if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). If a plaintiff has satisfied the Rule 23(a) prerequisites, the plaintiff then also must show that "class certification is proper under one of the subdivisions of Rule 23(b)." McLaurin v. Prestage Foods, Inc., 271 F.R.D. 465, 475 (E.D.N.C. 2010); see Amchem Prods., Inc. v. Windsor,

---

[3] North Carolina has no mechanism for certifying questions of state law to the Supreme Court of North Carolina. See Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013).

8

521 U.S. 591, 614 (1997). The party seeking class certification bears the burden of proof. See Lienhart v. Dryvit Sys., Inc., 255 F.3d 138, 146 (4th Cir. 2001); McLaurin, 271 F.R.D. at 475.

A motion to dismiss a complaint's class allegations should be granted when it is clear from the face of the complaint that the plaintiff cannot meet Rule 23's requirements for certification because the plaintiff has failed to allege facts sufficient for a class. See Bigelow v. Syneos Health, LLC, No. 5:20-CV-28-D, 2020 WL 5078770, at *4 (E.D.N.C. Aug. 27, 2020) (unpublished); Williams v. Potomac Fam. Dining Grp. Operating Co., No. GJH-19-1780, 2019 WL 5309628, at *5 (D. Md. Oct. 21, 2019) (unpublished). Generally, however, courts do not dismiss class allegations at the pleadings stage but instead allow for pre-certification discovery before making a certification decision under Federal Rule of Civil Procedure 23(c)(1). See Mills v. Foremost Ins. Co., 511 F.3d 1300, 1309 (11th Cir. 2008); Goodman v. Schlesinger, 584 F.2d 1325, 1332 (4th Cir. 1978).

III.

Defendants move to dismiss plaintiffs' amended complaint for failure to state a claim upon which relief can be granted because: (1) plaintiffs make impermissibly generalized allegations against defendants; (2) the federal enclave doctrine bars plaintiffs' claims under the RRAA and UDTPA; (3) plaintiffs fail to plead facts sufficient to plausibly allege their negligence claim; (4) plaintiffs as tenants may not make a claim for temporary recurring private nuisance; (5) plaintiffs may not allege breach of contract claims against defendants who are nonparties to the ROAs; (6) plaintiffs may not allege a claim for breach of the implied covenant of good faith and fair dealing simultaneously with a breach of contract claim; (7) plaintiffs failed to plausibly allege a RLPHRA claim; and (8) plaintiffs are not entitled to declaratory or injunctive relief. See [D.E. 34] 11–33; Fed. R. Civ. P. 12(b)(6). Plaintiffs disagree and argue that this action should proceed to discovery. See [D.E. 43].

9

## A.

Defendants contend the court should dismiss the amended complaint for failure to comply with Federal Rule of Civil Procedure 8(a). See [D.E. 34] 11–16. Rule 8(a) provides, in part, "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8(a)'s requirements are calculated to "give the defendant fair notice of what the [plaintiff's] claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555 (quotation omitted); see Swierkiewicz v. Sorema N. A., 534 U.S. 506, 512 (2002); Shepherd ex rel. Shepherd v. City of Shreveport, 920 F.3d 278, 287 (5th Cir. 2019); Venkatraman v. REI Sys., Inc., 417 F.3d 418, 420 (4th Cir. 2005). "As a general matter . . . collective allegations are not prohibited by [Rule 8(a)]. Rather, the allegations must simply provide [d]efendants with fair notice of the claims against them." Walker v. Apex Wind Constr. LLC, No. CIV-14-914-D, 2015 WL 348778, at *3 (W.D. Okla. Jan. 26, 2015) (unpublished); see Bryant v. Wells Fargo Bank, Nat'l Ass'n, 861 F. Supp. 2d 646, 660 (E.D.N.C. 2012); Davis v. Bowens, No. 1:11CV691, 2012 WL 2999766, at *3 (M.D.N.C. July 23, 2012) (unpublished), report and recommendation adopted, 2012 WL 4462184 (M.D.N.C. Sept. 25, 2012) (unpublished).

Defendants argue that plaintiffs fail to sufficiently distinguish among defendants in their amended complaint, requiring the court to dismiss the amended complaint. See [D.E. 34] 11–16. The amended complaint first lists each defendant and then states that

> [d]efendants are joint tortfeasors, agents of the other, joint venturers, and/or engaged in the joint enterprise of leasing military housing at Fort Bragg, as well as the conduct and acts alleged herein. During the pertinent times, each of the Defendants was directly and materially involved in the relevant facts, acts and omissions, rising to a level so as to have joint and several liability.

Am. Compl. ¶ 19. The amended complaint then proceeds to make collective allegations against "Defendants" or "Corvias" without, in many instances, identifying the individual defendants. See

Case 5:20-cv-00336-D   Document 63   Filed 09/13/21   Page 10 of 23

id. ¶¶ 224–99. Nonetheless, this method of pleading does not fail to provide defendants with fair notice of the claims against them. See, e.g., Walker, 2015 WL 348778, at *3 (holding that a complaint is not deficient for making collective allegations that fail to distinguish among defendants where the complaint sues each defendant "independently and as alter ego and/or agent of each of the other Defendants" and where the complaint alleged noncomplex claims, including nuisance and trespass (quotation omitted)). Thus, the amended complaint fairly notifies defendants of plaintiffs' claims, all arising from defendants' conduct at Fort Bragg. See Am. Compl. Accordingly, Rule 8(a) does not warrant dismissing the amended complaint.

### B.

Defendants challenge plaintiffs' RRAA and UDTPA claims. First, they argue the federal enclave doctrine bars both claims. Second, defendants contend that if the federal enclave doctrine does not bar the RRAA claim, Bragg Communities and Corvias Management are the only appropriately named defendants. Third, defendants argue plaintiffs failed to adequately plead their UDTPA claim, even if the federal-enclave doctrine does not bar it.

### 1.

Defendants argue that the federal enclave doctrine bars plaintiffs' RRAA and UDTPA claims. See [D.E. 34] 16–22. The federal enclave doctrine provides that when "the United States acquires with the consent of the state legislature land within the borders of that State . . . the jurisdiction of the Federal Government becomes exclusive." Allison v. Boeing Laser Tech. Servs., 689 F.3d 1234, 1236 (10th Cir. 2012) (quotations omitted); see Paul v. United States, 371 U.S. 245, 264 (1963). Under the doctrine, "those state laws that existed at the time the enclave was ceded to the federal government remain in force." Allison, 689 F.3d at 1237. Thus, "even though state law will not remain static outside the enclave, any changes made to the state law applicable within the

11

enclave must be a matter of federal law." Id.; see James Stewart & Co. v. Sadrakula, 309 U.S. 94, 99–100 (1940).

Defendants contend that the portion of Fort Bragg containing the residences became a federal enclave in 1940. See [D.E. 34] 16–17. They argue that because the RRAA and UDTPA were not in effect in 1940, the federal-enclave doctrine requires the court to dismiss these claims. See id. at 17–18, 20.

The court need not address the federal enclave doctrine, however, because the parties' ROAs contain a choice-of-law provision. See, e.g., [D.E. 34-2] 26, 34, 45, 65. The applicable choice-of-law rules govern the enforceability of a choice-of-law provision. See Francis v. Allstate Ins. Co., 709 F.3d 362, 369 (4th Cir. 2013); Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., 386 F.3d 581, 600–01 (4th Cir. 2004). When exercising diversity jurisdiction, federal courts must apply the choice-of-law rules of the state in which the court sits. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941), superseded by statute on other grounds; Francis, 709 F.3d at 369; DiFederico v. Marriott Int'l, Inc., 714 F.3d 796, 807 (4th Cir. 2013); Braswell Egg Co. v. Poultry Mgmt. Sys., Inc., 481 F. Supp. 3d 528, 536 (E.D.N.C. 2020). Under North Carolina law, contractual choice-of-law provisions are enforceable. See Curtis v. GE Cap. Corp., No. 5:12CV133-RLV, 2013 WL 4212932, at *3 (W.D.N.C. Aug. 15, 2013) (unpublished); Perkins v. CCH Computax, Inc., 333 N.C. 140, 141, 423 S.E.2d 780, 781 (1992), superseded by statute on other grounds, N.C. Gen. Stat. § 22B-3; Park v. Merrill Lynch, 159 N.C. App. 120, 122–23, 582 S.E.2d 375, 378 (2003).

The ROAs' choice-of-law provision states:

> This Agreement will be governed by the laws of the State in which the Home is located (the "Applicable State Law") to the maximum extent that the Applicable State Law applies to leased premises and the courts of such State have jurisdiction over the Home, as well as any applicable Federal laws, any applicable military rules, regulations and/or guidelines, and the [Owner's Resident Responsibility Guide], all

12

of which are hereby incorporated by reference.

[D.E. 34-2] 26, 34, 45, 65 (emphasis omitted).

Under North Carolina law, interpreting a written contract is a question of law for the court. See Briggs v. Am. & Efird Mills, Inc., 251 N.C. 642, 644, 111 S.E.2d 841, 843 (1960); Brown v. Between Dandelions, Inc., 273 N.C. App. 408, 410, 849 S.E.2d 67, 70 (2020); N.C. Farm Bureau Mut. Ins. Co. v. Mizell, 138 N.C. App. 530, 532, 530 S.E.2d 93, 95 (2000). "[T]he court may not ignore or delete any of [the contract's] provisions, nor insert words into it, but must construe the contract as written, in light of the undisputed evidence as to the custom, usage, and meaning of its terms." Martin v. Martin, 26 N.C. App. 506, 508, 216 S.E.2d 456, 457–58 (1975); see T.M.C.S., Inc. v. Marco Contractors, Inc., 244 N.C. App. 330, 342, 780 S.E.2d 588, 597 (2015). "If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." Hemric v. Groce, 169 N.C. App. 69, 76, 609 S.E.2d 276, 282 (2005) (quotations omitted); see Potter v. Hilemn Lab'ys, Inc., 150 N.C. App. 326, 331, 564 S.E.2d 259, 263 (2002); Bicket v. McLean Secs., Inc., 124 N.C. App. 548, 552, 478 S.E.2d 518, 521 (1996).

The ROAs' choice-of-law provision states that the parties' relationship is "governed by the laws of [North Carolina] . . . to the maximum extent that [North Carolina law] applies to leased premises . . . ." [D.E. 34-2] 26. The plain text of this unqualified phrase means that the parties intended that North Carolina laws generally applicable to leased premises would also apply to the leased premises at issue here. The provision does not limit the application of North Carolina law to those laws as they stood in 1940. Both the RRAA and UDTPA apply to leased premises elsewhere in North Carolina. See N.C. Gen. Stat. § 42-38; Battle v. O'Neal, 274 N.C. App. 356, 850 S.E.2d 359, 2020 WL 6742713, at *9 (2020) (unpublished table decision) ("Residential rental agreements fall within Chapter 75 because the rental of residential housing is considered commerce

13

pursuant to N.C. Gen. Stat. § 75-1.1."). Accordingly, under the ROAs' choice-of-law provision, the federal enclave doctrine does not bar plaintiffs' RRAA and UDTPA claims.

## 2.

Defendants argue that plaintiffs only pleaded a valid RRAA claim against two defendants: Bragg Communities and Corvias Management. See [D.E. 34] 18–19.[4] The RRAA provides that "landlord[s] shall . . . [m]ake all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition." N.C. Gen. Stat. § 42-42(a)(2). The RRAA defines "landlord" as "any owner and any rental management company, rental agency, or any other person having the actual or apparent authority of an agent to perform the duties imposed by this Article." N.C. Gen. Stat. § 42-40(3).

Defendants contend that only Bragg Communities and Corvias Management are landlords under the RRAA. See [D.E. 34] 18–19. Specifically, defendants argue that because only Bragg Communities and Corvias Management are named in the Residential Responsibility Guide ("RRG") as providing maintenance services to residents, only these two parties may be held liable under the RRAA. See id.

Plaintiffs cite no specific allegations implicating other defendants as landlords within the definition in North Carolina General Statute § 42–40(3). Accordingly, the court dismisses the RRAA claims against all defendants except Bragg Communities and Corvias Management.

## 3.

Defendants contend that plaintiffs failed to plausibly allege a UDTPA claim. See id. at

---

[4] Defendants also argue that plaintiffs fail to allege a separate breach of implied warranty of habitability claim. See [D.E. 34] 19–20. Plaintiffs, however, contend that they have alleged no such claim. See [D.E. 43] 20.

14

20–22. Specifically, defendants argue that plaintiffs' breach of contract allegations are insufficient to support a UDTPA claim. See id.

An action for unfair or deceptive trade practices is distinct from a breach of contract claim. Branch Banking & Tr. Co. v. Thompson, 107 N.C. App. 53, 61–62, 418 S.E.2d 694, 700 (1992). Even an intentional breach of contract, standing alone, will not suffice as a UDTPA claim. See id. However, conduct constituting an unfair or deceptive trade practice under the UDTPA, even arising from a contractual relationship, is actionable. See, e.g., Sampson-Bladen Oil Co. v. Walters, 86 N.C. App. 173, 175–77, 356 S.E.2d 805, 807–09 (1987). UDTPA claims require a plaintiff to prove: "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." Walker v. Fleetwood Homes of N.C., Inc., 362 N.C. 63, 71–72, 653 S.E.2d 393, 399 (2007) (quotation omitted). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. A practice is deceptive if it has the capacity or tendency to deceive." Id. at 72, 653 S.E.2d at 399 (quotation, alteration, and internal citation omitted). "[I]t is not necessary for the plaintiff to show fraud, bad faith, deliberate or knowing acts of deception, or actual deception, but plaintiff must show that the acts complained of possessed the tendency or capacity to mislead, or created the likelihood of deception." Gress v. Rowboat Co., Inc., 190 N.C. App. 773, 776, 661 S.E.2d 278, 281 (2008) (alteration and quotation omitted); see Overstreet v. Brookland, Inc., 52 N.C. App. 444, 452–53, 279 S.E.2d 1, 7 (1981).

The court rejects defendants' contention that plaintiffs failed to plausibly allege a UDTPA claim. Construing plaintiffs' allegations as true, plaintiffs have plausibly alleged intentional and fraudulent conduct sufficient to support a UDTPA claim. See Am. Compl. ¶ 245. It is irrelevant that the alleged unfair and deceptive conduct arises out of the parties' contractual relationship, because

15

plaintiffs plausibly allege that defendants engaged in conduct that is sufficiently unethical, unscrupulous, and likely to deceive. Plaintiffs alleged, inter alia, that defendants used deceptive marketing practices to entice customers, manipulated customer survey and service and repair records, and misrepresented what repairs were needed to properly fix problems and whether they had made those repairs. See id. Plaintiffs also alleged that defendants misrepresented the condition and habitability of their rental homes. See id. Taken as true, this misrepresentation is especially unscrupulous and deceptive given that for some leases, such as the Ganskes' lease, defendants never showed plaintiffs the home until after plaintiffs had signed the lease. See id. ¶ 129. Accordingly, the court denies defendants' motion to dismiss plaintiffs' UDTPA claim.

C.

Defendants argue that plaintiffs fail to plausibly allege a negligence claim under North Carolina law. See [D.E. 34] 22–25. Defendants also contend that plaintiffs have improperly alleged claims for gross negligence, negligence per se, and reckless or willful conduct. See id.

The court rejects defendants' arguments. Under North Carolina law, negligence claims consist of four elements: "(1) duty, (2) breach, (3) causation, and (4) damages." Bryant v. Adams, 116 N.C. App. 448, 465, 448 S.E.2d 832, 841 (1994); see Holley v. Burroughs Wellcome Co., 318 N.C. 352, 355, 348 S.E.2d 772, 774 (1986); Parker v. Town of Erwin, 243 N.C. App. 84, 110, 776 S.E.2d 710, 729–30 (2015); Morgan v. Cavalier Acquisition Corp., 111 N.C. App. 520, 528, 432 S.E.2d 915, 919 (1993). Additionally, North Carolina law only recognizes negligence per se claims for violations of public safety statutes. See Collins v. First Fin. Servs., Inc., No. 7:14-CV-288-FL, 2016 WL 589688, at *19 (E.D.N.C. Feb. 10, 2016) (unpublished); Stein v. Asheville City Bd. of Educ., 360 N.C. 321, 326, 626 S.E.2d 263, 266 (2006). "A public safety statute is one imposing upon the defendant a specific duty for the protection of others." Stein, 360 N.C. at 326, 626 S.E.2d

16

at 266 (quotation and alterations omitted). As for gross negligence, "[a]n act or conduct rises to the level of gross negligence when the act is done purposely and with knowledge that such act is a breach of duty to others, i.e., a conscious disregard of the safety of others." Ray v. N.C. Dep't of Transp., 366 N.C. 1, 13, 727 S.E.2d 675, 684 (2012) (quotation and emphasis omitted). "[T]he test for gross negligence turns on the totality of the circumstances [and] two factors are especially relevant—purposeful conduct and disregard for the safety of others." Id.

Plaintiffs plausibly allege numerous duties that defendants owed to plaintiffs. See Am. Compl. ¶¶ 274–75. And because the negligence claim fully incorporates the previous paragraphs in the amended complaint, plaintiffs' negligence claim incorporates a detailed set of factual allegations supporting their contention that defendants breached numerous duties they owed to plaintiffs. See id. ¶¶ 24–211, 273. Additionally, plaintiffs have plausibly alleged that defendants' conduct was intentional and disregarded plaintiffs' safety, thereby constituting gross negligence or reckless or willful conduct that proximately caused plaintiffs' injuries. See id. ¶¶ 24–211, 276, 278. Accordingly, the court denies defendants' motion to dismiss plaintiffs' negligence, gross negligence, and reckless and willful conduct claims.

As for their negligence per se claims, plaintiffs argue that they alleged the claims in passing, but plaintiffs concede that they failed to allege the claims with sufficient particularity. Thus, plaintiffs ask the court to dismiss the negligence per se claims without prejudice. See [D.E. 43] 26 n.54. The court agrees, grants defendants' motion to dismiss plaintiffs' negligence per se claims, and dismisses without prejudice plaintiffs' negligence per se claims.

## D.

Defendants argue that "[n]uisance is not a claim a tenant can assert against his or her landlord for the leased premises." [D.E. 34] 26. Defendants also contend that a private nuisance claim exists

17

only "when one makes an improper use of <u>his own property</u> and in that way injures the land or some incorporeal <u>right of one's neighbor</u>." <u>Id.</u> (quotation omitted).

"In order to establish a claim for nuisance, a plaintiff must show the existence of a substantial and unreasonable interference with the use and enjoyment of its property." <u>Shadow Grp., LLC v. Heather Hills Home Owners Ass'n</u>, 156 N.C. App. 197, 200, 579 S.E.2d 285, 287 (2003); <u>see Whiteside Ests., Inc. v. Highlands Cove, L.L.C.</u>, 146 N.C. App. 449, 455, 553 S.E.2d 431, 436 (2001). A plaintiff need not, however, "hold fee simple title . . . to recover in nuisance in every instance." <u>In re NC Swine Farm Nuisance Litig.</u>, No. 5:15-CV-13-BR, 2017 WL 5178038, at *4 (E.D.N.C. Nov. 8, 2017) (unpublished); <u>see Kent v. Humphries</u>, 303 N.C. 675, 677–79, 281 S.E.2d 43, 45–46 (1981). In North Carolina, a tenant's possessory interest is "a sufficient property interest to maintain a claim in nuisance." <u>Kent</u>, 303 N.C. at 679, 281 S.E.2d at 46; <u>cf. Maint. Equip. Co. v. Godley Builders</u>, 107 N.C. App. 343, 349, 420 S.E.2d 199, 202 (1992). Moreover, nuisance claims are not limited to nuisances created by one's neighbors. <u>See Shadow Grp.</u>, 156 N.C. App. at 200, 579 S.E.2d at 287; <u>Whiteside Ests.</u>, 146 N.C. App. at 455, 553 S.E.2d at 436 ("<u>A person</u> who intentionally creates or maintains a private nuisance is liable for the resulting injury to others . . . ." (quotation omitted and emphasis added)); <u>cf. Evans v. Lochmere Recreation Club, Inc.</u>, 176 N.C. App. 724, 727–28, 627 S.E.2d 340, 342 (2006).

Plaintiffs have plausibly alleged they have a possessory interest in their leased homes. <u>See, e.g.</u>, Am. Compl. ¶¶ 5–12. Moreover, plaintiffs have plausibly alleged a private nuisance claim. <u>See id.</u> ¶¶ 286–90. Accordingly, the court denies defendants' motion to dismiss plaintiffs' nuisance claim.

E.

Defendants argue that plaintiffs may not allege a breach of contract claim against any

18

defendant other than Bragg Communities. See [D.E. 34] 26–28. Defendants also argue that plaintiffs may not allege breach of contract of the Ground Lease as third-party beneficiaries. See id.

"[A] contract cannot bind a nonparty." E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 294 (2002); see NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n, 558 U.S. 165, 175 n.4 (2010); Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 632 (2009). Thus, in general, parties to a contract cannot maintain an action against nonparties based on the contract. See Canady v. Mann, 107 N.C. App. 252, 259, 419 S.E.2d 597, 601 (1992); see also Vitale & Assocs., LLC v. Lowden, 690 F. App'x 555, 556–57 (9th Cir. 2017) (unpublished); Richmond Health Facilities v. Nichols, 811 F.3d 192, 200–01 (6th Cir. 2016); Ferrante v. Westin St. John Hotel Co., No. 4:18-CV-108-D, 2020 WL 486198, at *6 (E.D.N.C. Jan. 29, 2020) (unpublished), appeal docketed, No. 20-1322 (4th Cir. Mar. 17, 2020). "Under North Carolina law, an authorized agent who enters into a contract on behalf of a disclosed principal generally is not personally liable to third parties for breach of contract since the contract is with the principal." Opsitnick v. Crumpler, No. 5:13-CV-835-D, 2014 WL 1682013, at *2 (E.D.N.C. Apr. 28, 2014) (unpublished) (alteration and quotation omitted); see Forbes Homes, Inc. v. Trimpi, 318 N.C. 473, 479–80, 349 S.E.2d 852, 856 (1986); Baker v. Rushing, 104 N.C. App. 240, 248, 409 S.E.2d 108, 112 (1991).

Although plaintiffs allege they were intended third-party beneficiaries of the Ground Lease, see Am. Compl. ¶ 48 & n.52, plaintiffs do not seek relief as third-party beneficiaries for breach of the Ground Lease. See id. ¶¶ 256–64. As for plaintiffs' breach of contract claim, the parties to the ROA contracts are plaintiffs, Bragg Communities as the "Owner," and Corvias Management as Bragg Communities' agent responsible for managing "the Home and all matters relating to the [ROA]." [D.E. 34-2] 3. Even though the ROA lists Corvias Management as an agent, this reference does not make Corvias Management a party to the ROA or liable for Bragg Communities' alleged

19

breach. See Crumpler, 2014 WL 1682013, at *2; Trimpi, 318 N.C. at 479–80, 349 S.E.2d at 856; Rushing, 104 N.C. App. at 248, 409 S.E.2d at 112. Accordingly, plaintiffs may only allege their breach of contract claims against Bragg Communities. See, e.g., Waffle House, 534 U.S. at 294.

In opposition, plaintiffs argue that all other defendants are liable for breach of contract because they have been materially involved in the Fort Bragg privatized military housing, creating joint and several liability for breach of contract. See [D.E. 43] 17–20. Plaintiffs do not plausibly allege, however, that the other defendants were parties to the ROAs. Additionally, plaintiffs cite no authority for the proposition that the other defendants can be jointly and severably liable based on their involvement in Fort Bragg housing. Cf. id. Accordingly, the court dismisses plaintiffs' breach of contract claim against all defendants except Bragg Communities. See, e.g., Canady, 107 N.C. App. at 259, 419 S.E.2d at 601.

Defendants also contend that plaintiffs cannot allege a separate claim for breach of the implied warranty of good faith and fair dealing. See [D.E. 34] 29–30. Plaintiffs concede that their implied warranty of good faith and fair dealing claim is merely a part of their breach of contract claim. See [D.E. 43] 25. Accordingly, the court dismisses plaintiffs' claim for breach of the implied warranty of good faith and fair dealing against all defendants except Bragg Communities. See SunTrust Bank v. Bryant/Sutphin Props., LLC, 222 N.C. App. 821, 833, 732 S.E.2d 594, 603 (2012).

F.

Defendants argue that plaintiffs failed to plausibly allege a claim under the RLPHRA. See [D.E. 34] 30–31. In 1992, due to the dangers of lead-based paint, Congress enacted the RLPHRA. See Roberts v. Hamer, 655 F.3d 578, 581 (6th Cir. 2011); Vidiksis v. E.P.A., 612 F.3d 1150, 1152 (11th Cir. 2010). The RLPHRA requires lessors to disclose to lessees the presence of "any known lead-based paint, or any known lead-based paint hazards," and authorized the

Environmental Protection Agency ("EPA") to promulgate regulations regarding the "disclosure of lead-based paint hazards in target housing which is offered for sale or lease." 42 U.S.C. § 4852d(a)(1)(B); see Roberts, 655 F.3d at 582; Vidiksis, 612 F.3d at 1152–53.[5] Accordingly, the EPA promulgated the Real Estate Notification and Disclosure Rule ("Disclosure Rule"). See 40 C.F.R. § 745.107. Section 745.107 requires lessors to "disclose to the . . . lessee the presence of any known lead-based paint and/or lead-based paint hazards in the target housing being . . . leased," and "any additional information available concerning the known lead-based paint and/or lead-based paint hazards." Id. § 745.107(a)(2). Lessors also must "provide the . . . lessee with any records or reports available to the . . . lessor pertaining to lead-based paint and/or lead-based paint hazards" in the leased housing. Id. § 745.107(a)(4). The EPA's regulations also require a lease to contain a "statement by the lessor disclosing the presence of known lead-based paint and/or lead-based paint hazards in the target housing being leased." 40 C.F.R. § 745.113(b)(2). The RLPHRA and the EPA regulations' enforcement provision provides that "[a]ny person who knowingly violates the provisions of this subpart shall be jointly and severally liable to the . . . lessee in an amount equal to 3 times the amount of damages incurred by such individual." 40 C.F.R. § 745.118(c); see 42 U.S.C. § 4852d(b)(3); Roberts, 655 F.3d at 582.

Defendants argue that because the ROA contained disclosures regarding lead-based paint and lead-based paint hazards and because through these disclosures defendants made available to plaintiffs reports regarding lead-based paint and lead-based paint hazards, defendants satisfied the requirements of the RLPHRA. See [D.E. 34] 30–31. However, the RLPHRA and the Disclosure Rule require lessors affirmatively to disclose the presence of any known lead-based paint and lead-

---

[5] Target housing refers to "any housing constructed prior to 1978." 40 C.F.R. § 745.103.

based paint hazards in homes built before 1978, not merely to make reports and records regarding those homes available to lessees. See 42 U.S.C. § 4852d(a)(1)(B); 40 C.F.R. §§ 745.107, 745.113; Vidiksis, 612 F.3d at 1157. Plaintiffs allege that defendants failed to disclose the presence of lead-based paint and lead-based paint hazards that the defendants knew about before plaintiffs signed the ROAs. See Am. Compl. ¶¶ 280–85. In fact, defendants affirmatively represented to plaintiffs that the "[l]essor has **no** knowledge of lead-based paint hazards in the housing." E.g., [D.E. 34-2] 61 (emphasis in original). Accordingly, accepting plaintiffs' allegations as true, plaintiffs have plausibly alleged violations of 42 U.S.C. § 4852d and the applicable regulations. Thus, the court denies defendants' motion to dismiss this claim.

G.

Defendants contend that plaintiffs' claim for declaratory and injunctive relief fails for the same reasons that plaintiffs' other claims fail. See [D.E. 34] 32–33. Defendants also contend that plaintiffs' claim for declaratory and injunctive relief fails because, under North Carolina law, plaintiffs' claims are remedies and not causes of action. See id.

The court construes plaintiffs' claim for declaratory and injunctive relief as seeking remedies for plaintiffs' other claims. Thus, the court grants in part and denies in part defendants' motion to dismiss consistent with the treatment of each claim in this order.

IV.

Defendants move to strike plaintiffs' class allegations. See [D.E. 36]. A motion to strike a complaint's class allegations under Rule 12(f) should be granted when it is clear from the face of the complaint that the plaintiff cannot meet Federal Rule of Civil Procedure 23's requirements for certification because the plaintiff has failed to properly allege facts sufficient to make out a class. See Bigelow, 2020 WL 5078770, at *4; Williams, 2019 WL 5309628, at *5. Generally, however,

22

courts do not strike class allegations at the pleadings stage but instead allow for pre-certification discovery before making a certification decision under Federal Rule of Civil Procedure 23(c)(1). See Mills, 511 F.3d at 1309; Goodman, 584 F.2d at 1332.

Defendants move to strike plaintiffs' class allegations on basis of the allegations contained in the amended complaint alone. See [D.E. 36]. The court has reviewed the amended complaint, the arguments, and the governing law, and the court denies defendants' motion to strike plaintiffs' class allegations.

## V.

In sum, the court GRANTS in part and DENIES in part defendants' motions to dismiss [D.E. 33, 38], DENIES defendants' motion to strike [D.E. 36], GRANTS plaintiffs' motion for judicial notice [D.E. 53], and GRANTS plaintiffs' motion to supplement the record [D.E. 58].

SO ORDERED. This 13 day of September, 2021.

JAMES C. DEVER III
United States District Judge