# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

| | | |
|---|---|---|
| **SSG SHANE PAGE, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 5:20-cv-00336-D** |
| | ) | |
| **BRAGG COMMUNITIES, LLC, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| _____ | ) | |

## SPC SPENSER GANSKE'S AND EMILY GANSKE'S SUPPLEMENTAL JULY 8, 2022 RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiffs, SPC Spenser Ganske and Emily Ganske, by and through their undersigned attorneys, pursuant to Fed. R. Civ. P. 26 and 33, by way of supplementing their prior answers to the interrogatories propounded by Defendants, state as follows:

**Interrogatory No. 1**. State Your full name, address, date of birth, current and past marital status (including the date(s) of marriage and the full name of your spouse(s) (if applicable), Social Security number, driver's license number and cell phone number(s) and email(s) used while residing at Fort Bragg.

**Answer:**

Plaintiffs object to the interrogatory to the extent it is overbroad, unduly burdensome and harassing. For example, information about a past marriage outside of the pertinent time period relevant herein is irrelevant nor likely to lead to the discovery of material and admissible evidence.

Without waiving any objections, Plaintiffs state:

**Emily Ganske**
**4727 Whitewater Lane**

**Crestview, FL 32539**

██████████

**910-964-5583**
**NC 000049332948**
**emilydraehn@gmail.com**

**Spenser Ganske**
**4727 Whitewater Lane**
**Crestview, FL 32539**

██████████

**910-920-8845**
**NC 000045513818**
**spenserganske@gmail.com**

**Interrogatory No. 2**. Identify all persons who are likely to have personal knowledge of any fact alleged in the pleadings, and state the subject matter of the personal knowledge possessed by each such person.

<u>**Answer:**</u>

**Plaintiffs object to the extent the discovery request would require the disclosure of information that may only be appropriately disclosed under the auspices of an appropriate Court-approved confidentiality protective order. Without waiving any objections:**

1. **All named Plaintiffs and Defendants, along with the individuals identified in their respective initial disclosures and discovery responses.**

2. **All current and former tenants/residents of Corvias military housing at Fort Bragg during the class period.**

3. **Alec & Shelby Tomaszewski**
   **244 Capital Castle Drive**
   **Fort Bragg, NC 28307**

   **The Tomaszewskis were neighbors of the Ganskes and have personal knowledge of the housing defects at 246 Castle Drive.**

4. **Shelly Draehn**
   **2135 Old Mill Creek Road**

2

Brenham, TX 77833
979-406-0032

Ms. Draehn is Emily Ganske's mother and has personal knowledge of housing defects via her communications with the Ganskes. Ms. Draehn also visited military housing at Fort Bragg.

5. **Mary Schumpert**
   4834 Jaske Rd.
   Brenham, TX 77833
   979-551-0835

   Ms. Schumpert is Spenser Ganske's mother and has personal knowledge of housing defects via her communications with the Ganskes. Ms.Ganske Schumpert also visited military housing at Fort Bragg.

6. **John Picerne**
   Founder/Chairman of the Board – Corvias
   1405 S County Trail #530
   East Greenwich, RI 02818
   401-228-2800

   Plaintiffs are informed and believe that Mr. Picerne has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

7. **Patrick Bucolo**
   Resident Manager-Corvias
   Fort Bragg

   Plaintiffs are informed and believe that Mr. Bucolo has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

8. **Leonard Jones**
   Resident Manager-Corvias
   Fort Bragg

   Plaintiffs are informed and believe that Mr. Jones has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

9. **Amber Smiley**
   Resident Assistant Manager-Corvias
   Fort Bragg

   Plaintiffs are informed and believe that Ms. Smiley has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

10. **Vanessa Hargrave**
**Resident Associate-Corvias**
**Fort Bragg**

Plaintiffs are informed and believe that Ms. Hargrave has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

11. **Jenneisha Monroe**
**Resident Associate-Corvias**
**Fort Bragg**

Plaintiffs are informed and believe that Ms. Monroe has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

12. **Mallory Dixon**
**Resident Service Specialist-Corvias**
**Fort Bragg**

Plaintiffs are informed and believe that Ms. Dixon has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

13. **Kianna Amos**
**Resident Service Specialist-Corvias**
**Fort Bragg**
Plaintiffs are informed and believe that Ms. Amos has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

14. **Heather Fuller**
**Operations Director- Corvias Management**
**1405 S County Trail #530**
**East Greenwich, RI 02818**
**401-228-2800**

Plaintiffs are informed and believe that Ms. Fuller has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

15. **Deb Osmanski**
**Former Program Office Administrator (Office Manager)**
**Corvias-Fort Bragg**
**Current Address Unknown**
**Current Employer is ER Wagner in Menomonee Falls, Wisconsin**
**800-558-5596**

Plaintiffs are informed and believe that Ms. Osmanski has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

16. **Michael Melia**
   **Former Director of Construction – Corvias**
   **Current Address Unknown**
   **Current Employer is RQ Construction in Pinehurst, North Carolina**
   **760-631-7707**

   Plaintiffs are informed and believe that Mr. Melia has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

17. **Jeremy Stefanko**
   **Former Senior Maintenance Manager**
   **Corvias Military Living, LLC**
   **Current Address Unknown**
   **Currently Employed by Cumberland County, NC**

   Plaintiffs are informed and believe that Mr. Stefanko has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

18. **Steve Maxwell**
   **Former Facilities Director**
   **Corvias Military Living, LLC**
   **Current Address Unknown**
   **Currently Employed by Balfour Beatty Communities in Wetumpka, Alabama**

   Plaintiffs are informed and believe that Mr. Maxwell has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

19. **Steve Boothe**
   **Former Director of Facilities Operations**
   **Corvias Military Living, LLC**
   **Current Address Unknown**
   **Currently Employed by Hunt Companies in Providence, Rhode Island**

   Plaintiffs are informed and believe that Mr. Boothe has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

20. **Charles Connors**
   **Director of Capital Assets**
   **Corvias Group**
   **1405 S County Trail #530**
   **East Greenwich, RI 02818**
   **401-228-2800**

Plaintiffs are informed and believe that Mr. Connors has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

21. Chuck Cavaretta
    Former Vice President of Construction
    Corvias
    Current Address Unknown
    Current Employed by The Cassidy in Winter Haven, Florida

    Plaintiffs are informed and believe that Mr. Cavaretta has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

22. John Shay
    Senior Vice President of Construction & Development
    Corvias
    1405 S County Trail #530
    East Greenwich, RI 02818
    401-228-2800

    Plaintiffs are informed and believe that Mr. Shay has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

23. Cindy Hart
    Assistant Operations Director- Corvias
    Fort Bragg, North Carolina

    Plaintiffs are informed and believe that Ms. Hart has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

24. Mike Sarisky
    Operations Director-Corvias
    Fort Bragg, North Carolina

    Plaintiffs are informed and believe that Mr. Sarisky has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

25. Mark Foraker
    Former Business Director – Corvias (Fort Bragg)
    Current Address Unknown
    Currently Employed by Barvin in Houston, Texas

6

Plaintiffs are informed and believe that Mr. Foraker has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

26. **Toni Cornelius**
    **Professional Engineer-Cornelius Consulting**
    **4004 Park Avenue**
    **Wilmington, NC 28403**

    Plaintiffs are informed and believe that Ms. Cornelius has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

27. **Robert Smith**
    **Maintenance Manager- Corvias, Fort Bragg**
    **1405 S County Trail #530**
    **East Greenwich, RI 02818**
    **401-228-2800**

    Plaintiffs are informed and believe that Mr. Smith has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

28. **Robert Leonard**
    **Facilities Director- Corvias, Fort Bragg**
    **1405 S County Trail #530**
    **East Greenwich, RI 02818**
    **401-228-2800**

    Plaintiffs are informed and believe that Mr. Leonard has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

29. **John Teague**
    **Service Center Coordinator- Corvias, Fort Bragg**
    **51 Skytrain Drive**
    **Fort Bragg, NC 28307**
    **910-764-4868**

    Plaintiffs are informed and believe that Mr. Teague has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

30. **Katie Culbreth**
    **Service Center Coordinator-Corvias, Fort Bragg**

7

51 Skytrain Drive
Fort Bragg, NC 28307
910-764-4868

Plaintiffs are informed and believe that Ms. Culbreth has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

31. Michele Wooten
Staff Accountant- Corvias
406 Pershing Ct.
Fort Riley, KS 66442
785-717-2244

Plaintiffs are informed and believe that Ms. Wooten has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

32. Scottie Miller
Former Senior Manager- Corvias, Fort Bragg
Current Address Unknown
Currently Employed by Hunt Military Housing in Austin, Arkansas

Plaintiffs are informed and believe that Mr. Smith has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

33. Matt Brigman
HVAC Installer
Sandhills Heating, Refrigeration & Electrical
Laurinburg, NC

Plaintiffs are informed and believe that Mr. Brigman is a maintenance worker for an outside vendor who worked on HVAC systems in military houses at Fort Bragg, NC.

34. Scotty Locklear
J&L Contractors & Maintenance Services
Pembroke, NC 28372
910-280-0901

Plaintiffs are informed and believe that Mr. Locklear has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

35. Elizabeth A. Field

Director, Defense Capabilities and Management
United States Government Accountability Office
441 G St., NW
Washington, DC 20548
202-512-2775

Ms. Field has knowledge of the GAO's monitoring of privatized housing including analysis of data provided by all 14 private partners. Ms. Field authored a report entitled, "Military Housing Privatization: Preliminary Observations on DOD's Oversight of the Condition of Privatized Military Housing. Ms. Fields testified on these topics before the Senate Armed Services Committee.

36. **Hon. Ryan D. McCarthy**
    **Former Secretary of the United States Army**
    **Millennium Corporation**
    **1400 Crystal Drive, Suite 400**
    **Arlington, VA 22202**
    **703-436-1343**

    As part of his duties as Secretary of the Army, Mr. McCarthy monitored the status and condition of military housing. He visited Army installations across the country to observe the condition of military housing, including a visit to Fort Bragg in September 2020. Following his visit, McCarthy stated, "What you saw over time is an abdication of responsibility. We outsource this to a corporation. That's the danger when you set up these public-private partnerships. Over time, you get lazy. As an institution, we got lazy. The wake-up call came two years ago. It is embarrassing and it is awful".

37. **Col. Phillip Sounia**
    **Former Garrison Commander- Fort Bragg**
    **United States Army**
    **Address Unknown**

38. **Senator Elizabeth Warren**
    **309 Hart Senate Office Building**
    **Washington, DC 20510**
    **202-224-4543**

    Senator Warren investigated military housing companies and submitted a written report dated April 30, 2019.

39. **Shannon Razsadin**
    **Executive Director of Military Family Advisory Network**
    **22015 W. 66th St.**
    **Unit 860635**

Shawnee, KS 66286
202-821-4195

Ms. Razsadin and MFAN released a report that over 67% of all Bragg families surveyed reported manifest effects from maintenance, repairs and remediation.

40. **Heather Beckstrom**
Current or Former Tenant/Resident
Address Unknown
bckstromheather@gmail.com

Ms. Beckstrom has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

41. **Stephanie Blackadar**
Current or Former Tenant/Resident
Address Unknown
juggalatis@hotmail.com

Ms. Blackadar has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

42. **Jessica Brueck**
Current of Former Tenant/Resident
Address Unknown
Jessica.lynn.brueck@gmail.com

Ms. Brueck has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

43. **Regan Burke**
Current or Former Tenant/Resident
Address Unknown
morethanamilkmaid@yahoo.com

Ms. Burke has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

44. **Courtney Burks**
Current or Former Tenant/Resident
Address Unknown
courtflavin@yahoo.com

Ms. Burks has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

45. **Cacee Cobarrubia**
**Current or Former Tenant/Resident**
**Address Unknown**
**Cacee.nesbit93@yahoo.com**

Ms. Cobarrubia has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

46. **Shyla Curry**
**Current or Former Tenant/Resident**
**Address Unknown**
**Shylacurry98@gmail.com**

Ms. Curry has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

47. **Marissa Dilliard**
**Current or Former Tenant Resident**
**Address Unknown**
**Marrissa.dilliard@gmail.com**

Ms. Dilliard has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

48. **Pennalla Evans**
**Current or Former Tenant/Resident**
**Address Unknown**
**Mrsevans3013@gmail.com**

Ms. Evans has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

49. **Vicki Ragsdale**
**Current or Former Tenant/Resident**
**Address Unknown**
**Mrsforcier1031@gmail.com**

Ms. Ragsdale has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

50. **Tia Geisler**
**Current or Former Tenant/Resident**
**Address Unknown**
**Tia.c.geisler@gmail.com**

Ms. Geisler has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

51. **Julie Hilliard**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **Juliehilliard23@gmail.com**

Ms. Hilliary has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

52. **Sarah Lenox**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **Sarahjclark1747@gmail.com**

Ms. Lenox has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

53. **Jacqueline Haven Lyons**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **havenbrandhorst@gmail.com**

Ms. Lyons has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

54. **Chanda Martin**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **Chandamartin279@gmail.com**

Ms. Martin has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

55. **Emya Roberts**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **Emyareneerob15@gmail.com**

Ms. Roberts has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

56. **Tamara Terry**
    **Current or Former Tenant/Resident**
    **Address Unknown**

Jcm72611@gmail.com

Ms. Terry has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

57. **Amber Woollett**
    Current or Former TenantResident
    Address Unknown
    amberdw@live.com

    Ms. Woollett has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

58. **Sabrina Collins**
    Current or Former Tenant/Resident
    Current Contact Information Unknown

    Ms. Collins has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

59. **Danielle Olson**
    Current or Former Tenant/Resident
    Current Contact Information Unknown

    Ms. Olson has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

60. **Tara Michelle**
    Current or Former Tenant/Resident
    Current Contact Information Unknown

    Ms. Michelle has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

61. **Ashlee Monzalvo**
    Current or Former Tenant/Resident
    Current Contact Information Unknown

    Ms. Monzalvo has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

62. **Toby DeJoinville**
    Current or Former Tenant/Resident
    Current Contact Information Unknown

Ms. DeJoinville has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

63. **Amber Lace**
   **Current or Former Tenant/Resident**
   **Current Contact Information Unknown**

   Ms. Lace has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

64. **Courtney Wong**
   **Current or Former Tenant/Resident**
   **Current Contact Information Unknown**

   Ms. Wong has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

65. **Alexis Danielle Martin**
   **Current or Former Tenant/Resident**
   **Current Contact Information Unknown**

   Ms. Martin has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

66. **Liz Stitt**
   **Current or Former Tenant/Resident**
   **Current Contact Information Unknown**

   Ms. Stitt has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

67. **Taylor Hinshaw**
   **Current or Former Tenant/Resident**
   **Current Contact Information Unknown**

   Ms. Hinshaw has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

68. **Cassandra Manis**
   **Current or Former Tenant/Resident**
   **Current Contact Information Unknown**

   Ms. Manis has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

69. **Lillian Bradford**

Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Bradford has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

70. **Lorena Butler**
Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Butler has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

71. **Jennalynn Apedaile Thomas**
Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Thomas has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

72. **Danielle Jackson**
Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Jackson has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

73. **Lee Nash**
Current or Former Tenant/Resident
Current Contact Information Unknown

Mr. Nash has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

74. **Tyler Cissna**
Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Cissna has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

75. **Jessica Lynn Brueck**
Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Brueck has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

76. **Alena Martinez**
**Current or Former Tenant/Resident**
**Current Contact Information Unknown**

Ms. Martinez has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

77. **Meagan Heady Solorzano**
**Current or Former Tenant/Resident**
**Current Contact Information Unknown**

Ms. Solorzano has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

78. **Sharon Land**
**Current or Former Tenant/Resident**
**Current Contact Information Unknown**

Ms. Land has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

79. **Taylor Bryant**
**Current or Former Tenant/Resident**
**Current Contact Information Unknown**

Ms. Bryant has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

80. **Jessica Allen**
**Current or Former Tenant/Resident**
**Current Contact Information Unknown**

Ms. Allen has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

81. **Jennifer Burt**
**Current or Former Tenant/Resident**
**Current Contact Information Unknown**

Ms. Burt has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

82. **Briana Kramp**

Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Kramp has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

83. **KayKay Jackson**
    Current or Former Tenant/Resident
    Current Contact Information Unknown

    Ms. Jackson has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

84. **Hannah Gagnon**
    Current or Former Tenant/Resident
    Current Contact Information Unknown

    Ms. Gagnon has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

85. **Cat Billet**
    Current or Former Tenant/Resident
    Current Contact Information Unknown

    Ms. Billet has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

86. **JayBee Bar**
    Current or Former Tenant/Resident
    Current Contact Information Unknown

    Ms. Bar has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

87. **Jayla Garcia**
    Current or Former Tenant/Resident
    Current Contact Information Unknown

    Ms. Garcia has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

88. **Kayla Reed**
    Current or Former Tenant/Resident
    Current Contact Information Unknown

Ms. Reed has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

89. **Brittany Opsomer**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Opsomer has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

90. **Kaytlin Erickson**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Erickson has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

91. **Amanda Anderson**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **a.anderson0228@gmail.com**

    Ms. Anderson has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

92. **Amy Lohrenz and Major Michael Lohrenz are former residents. These individuals may have knowledge as per their lawsuit,** *see Lohrenz v. Bragg Communities, LLC,* **No. 5:2022cv00044 (E.D.N.C.).**

93. **Plaintiffs in the** *Addi* **case and witnesses identified in that case may have knowledge regarding Corvias business operations, customer service, repair and maintenance practices, which while occurring at Fort Meade in Maryland could be relevant insofar as they reflect common corporate practices that were also used and imposed at Fort Bragg.** *See Addi v. Corvias Management-Army, LLC,* **No. 1:2019cv03253 (D. Md.).**

<u>Supplemental Answer dated 5/6/22:</u>

<u>DESIGNATED AS CONFIDENTIAL PER PROTECTIVE ORDER</u>



**NONCONFIDENTIAL:**

Hannah Hurd, Assistant Resident Manager at Corvias, Fort Bragg, North Carolina, United States. May have knowledge regarding Corvias property management practices. States that she oversees a team of five in the Pope and Ardennes communities.

Don Agel, Agel's Home Inspections, Fayetteville NC. Phone: (910) 224-5076. May have knowledge regarding repair, maintenance, tenant service issues.

Wina Hathaway. Employed in contracts and vendor management with Corvias, at Fort Bragg, since 2014. May have knowledge regarding repair, maintenance, tenant service issues.

PFC Anthony Blankenship, wife Brittney, son Jason. Per news reports, this family moved to Fort Bragg in August 2018:

19

**Pfc. Anthony Blankenship points to mold on the grout of his bathroom and a greenish mildew stain around the tiles next to the toilet.**

**"That's kind of a mold pattern growing underneath," he says. "Workers at times just put new grout over the mold. At times, contractors wouldn't show up at all for problems ranging from clogged plumbing to faulty ventilation ducts."**

**"We'd call again, and they'd say we don't have any recollection you put in a work order," says Blankenship, who moved into this ranch-style house at Fort Bragg, N.C., back in August with his wife, Brittney, and their toddler, Jason. "A lot of families, unfortunately, their house is worse than ours," says Brittney.**[1]

**Heath Burleson. Corvias Partnership Advisor. Public biography shows intimate involvement in Corvias MHPI matters.**[2] **Corvias materials state that in 2019 he was one of the key executives who belatedly agreed that Corvias would fund $325M in direct investment into its Army portfolio in order to remedy the longstanding housing problems. According to Corvias, as the Senior Vice President of Operations, he was responsible for the oversight and management of Corvias' managers across the Army and AF portfolio. In 2018 he assumed the role of Partnership Advisor for the Corvias Property Management portfolio which has a 2020 annual budget of $435M and development/construction budget of $335M.**

**Mark Esper. In his role as Secretary of Defense, Esper went on record regarding the poor housing conditions. Examples:**

**"In too many cases, it is clear the private housing companies failed to uphold their end of the bargain, a failure that was enabled by the Army's insufficient oversight," Esper said. "We are determined to investigate these problems and to hold our housing contractors and chains of command accountable."**[3]

**SGT Terry Blood and wife, Krysta. Tenants of the Corvias housing at Fort Bragg. Ms. Blood may have subsequently been hired by Corvias. Their complaints are described in news articles:**

**Sgt. Terry Blood and his wife, Krysta … showed the shoddy repairs at their house at Fort Bragg.**

**Krysta points to the ceiling inside a closet in her garage. She says a subcontractor just plastered over what is a widening stain from a leak that has also damaged the floor. The source of the leak is the bathtub.**

---

[1] https://www.cpr.org/2019/03/08/shoddy-maintenance-of-military-housing-under-scrutiny-by-senate-military-leaders/

[2] https://www.congress.gov/116/meeting/house/110611/witnesses/HHRG-116-AP18-Bio-BurlesonM-20200303.pdf

[3] https://apnews.com/article/2f34561f12c743ec8ef349becd9c0802.

**"For four years, that tub water has been leaking from children's baths," she says. "Can you imagine what kind of water has been in between the floors for that time?"**

**Are their friends having troubles as well?**

**"Pretty much the exact same issues," says Terry Blood. "Actually one of our friends right across the street, they just got surveyed, and they have found cracks. In the summer months they have grass growing up through their floor."[4]**

Col. Kyle Reed, Fort Bragg Garrison Commander.  May have knowledge regarding the Corvias MHPI involvement at Fort Bragg.  Should have knowledge regarding the fallout from the press coverage, publicity and Congressional hearings occurring in 2018-19, including steps the Army forced Corvias to take to remedy matters.[5]

Greg Jackson, Chief of Housing, Fort Bragg, Directorate of Public Works. May have knowledge regarding the Corvias MHPI involvement at Fort Bragg.  Should have knowledge regarding the fallout from the press coverage, publicity and Congressional hearings occurring in 2018-19, including steps the Army forced Corvias to take to remedy matters. Has knowledge regarding how in the past, residents thought Housing (Army) and Corvias were synonymous (which would tend to disincentivize soldiers from complaining).[6]

Krista Lindholm.  Fort Bragg tenant.  May have knowledge of housing problems at Fort Bragg.  Quoted as saying: "I've seen the mold, and it's legit," Krista Lindholm said of mold in a neighbor's house. "They're sick, their kids are sick and housing is just not coming and dealing with it."[7]

Donnie R. Smith, Maintenance Manager at Corvias.  May have knowledge regarding Corvias repair and maintenance practices.  Contact information: Administrator, Dual Impact LLC, Fayetteville, North Carolina; Donnie Smith Construction, LLC, 426 North Whittington Lane, Dunn, NC, donniecsmith@embarqmail.com, (910) 890-3660, (910) 897-4847.

Lisa Sanford.  She was an assistant property manager, Corvias, Fort Bragg, 2005 to November 2017.  She may now be working as a community manager in the Raleigh area.

Marcy C. Woodard.  2908 Winton Drive, Fayetteville NC.  Employed as an IT service manager at Corvias, Fort Bragg, November 2017 to present.  Previously employed as an IT

---

[4] https://www.wamc.org/2019-03-07/shoddy-maintenance-of-military-housing-under-scrutiny-by-senate-military-leaders.
[5] https://www.fayobserver.com/story/news/2019/04/19/installation-housing-initiatives-see-way-forward-residents-speak-up-at-town-halls/64863691007/
[6] https://www.fayobserver.com/story/news/2019/04/19/installation-housing-initiatives-see-way-forward-residents-speak-up-at-town-halls/64863691007/
[7] https://www.wral.com/soldiers-families-complain-to-tillis-about-fort-bragg-housing/18662015/

management lead (2015-17), a network administrator (2010-2015) and as a desktop administrator (2006-2010), and resident service specialist (2005-06) for Corvias/Picerne.

Peter Sims, managing director for Corvias. He has knowledge regarding Corvias being compelled to install HVAC replacements and other renovations at 5,300 homes at Fort Bragg.[8] This renovation work was being done as part of Corvias' agreement to pay $325 million toward housing improvements subsequent to the late 2018 Reuters news article and resultant controversy and Congressional hearings.

Taylor Padgett. Fort Bragg Corvias housing resident. Complained of mold problems in her housing occurring since February 2021.

> As the problem got worse, she hired an independent home inspector who went through the house and found major issues with the maintenance of the home. He said they contributed to the mold problem.

> "We found a bunch of damage issues with the exterior and roofing problems," said Don Agel of Agel Home inspections. "There was cracked brick veneer allowing water to get into her child's playroom."

> He also found problems with the water heater and stove.

> "There is a natural gas leak at the water heater and a natural gas leak at the oven," Agel said.

> The Padgett family is currently in an on-post hotel while the property management company makes repairs.[9]

Mary Humphreys. Corvias corporate spokesperson. Denied that there were any problems at the Padgett's residence.

Fort Bragg Garrison Command Sgt. Major Jeffery Loehr. May have knowledge regarding the MHPI housing program and the Corvias housing issues.

Regan Burke. Fort Bragg Corvias home tenant. Complained of mold problems with her Corvias home:

> Regan Burke's family was moved to two different temporary houses on-post since September 2020 after mold was found all over her original house.

> Burke said a military inspector from on-post said the home "was uninhabitable."

---

[8] https://www.corvias.com/news/corvias-updates-more-85-percent-fort-bragg-homes
[9] https://www.cbs17.com/news/local-news/cumberland-county-news/fort-bragg-officials-call-mold-issues-with-on-base-housing-a-high-priority/

Last week, the family was finally placed into new permanent housing but was still trying to get someone to pay for the replacement of their mold-infested possessions.

Regarding the problems being experienced Padgett, Burke, and other homeowners, Loehr said: "As the housing property management, Corvias is responsible for ensuring prompt and professional maintenance.[10]

Unidentified Corvias employee, first name Leonard. Leonard was a gentleman who called into CSPAN to speak about how he was working for Corvias when he was fired from his job at Fort Bragg in 2019. He called on or about July 22, 2019 to complain that he was being unjustly blamed for the housing issues. He said he was age 67; that it was a shame how the residents were treated; that he and other employees lost their jobs; that the company was trying to make the workers feel it was their fault; that they did what they had to do to keep their jobs; that he was there for 10 years; and that he knew what these military wives were talking about.[11]

Authors of the Army Inspector General Report, Report ID-1903, Feb.-March 2019.[12] The report found that family concerns about health and safety issues in military housing are widespread, revealing systemic problems with relationships between the Army and housing contractors. The government's current oversight of these projects was insufficient to identify housing challenges. Inspectors found there was lack of joint authority, confusion regarding roles and responsibilities, lack of training, dramatic personnel cuts and lack of transparency among privatized housing companies. Inspectors uncovered a 2013 Army policy that specifically prohibited health and welfare inspections of military housing. Two-thirds of the 1,180 residents of military privatized housing communities who participated in the IG survey stated they were dissatisfied with their overall housing experience. Sixty-four percent said they would move off post if there were no financial costs or concerns, according to the report. The review was ordered by then-Secretary of the Army Mark Esper in the wake of reports about widespread problems of mold, water leakage, vermin infestations and other problems in military housing.[13]

<u>Supplemental Answer dated 7/8/22</u>:
Please note the following corrections to the response to Interrogatory 2:

    3.    Alec & Shelby Tomaszewski
          244 Castle Drive
          Fort Bragg, NC 28307

---

[10] https://www.cbs17.com/news/local-news/cumberland-county-news/fort-bragg-officials-call-mold-issues-with-on-base-housing-a-high-priority/
[11] https://www.c-span.org/video/?c4809169/user-clip-corvias-employee-fired-called-report-unjustly-blamed-housing-issues

[12] https://www.army.mil/e2/downloads/rv7/families/releaseable-housing-inspection.pdf
[13] https://www.upandcomingweekly.com/local-news-briefs/6565-military-housing-still-a-problem

The Tomaszewskis were neighbors of the Ganskes and have personal knowledge of the housing defects at 246 Castle Drive.

5.      Mary Schumpert
        4834 Jaske Rd.
        Brenham, TX 77833
        979-551-0835

Ms. Schumpert is Spenser Ganske's mother and has personal knowledge of housing defects via her communications with the Ganskes. Ms. Schumpert also visited military housing at Fort Bragg.

**Interrogatory No. 3**. State in detail Your employment history for the last ten (10) years. For all military service, identify where You were stationed, where You resided while stationed there, and Your duties and responsibilities at each station.

**Answer:**

Plaintiff objects to the interrogatory to the extent that it purports to seek information that is irrelevant and not likely to lead to the discovery of admissible evidence. Plaintiff further objects on grounds the interrogatory is overly broad and unduly burdensome in seeking employment information pre-dating the relevant time period.

Without waiving any objections, Plaintiffs state:

1.      **Emily Ganske:** Ms. Ganske was in the past a bartender at "Chilis" Restaurant in both Fayetteville, NC and Brenham, TX. She was also a bar manager at "Houlihan's" in Conroe, TX. She was also a bartender at the Cactus Lounge in Willis, TX. Ms. Ganske has been a stay-at-home mother for the past approximately three years.

2.      **Spenser Ganske:** Spenser Ganske has been in the United States Army for the past approximately six years. Spc. Ganske's first duty station was at Fort Bragg where he resided with Emily Ganske and their minor child. Ganske was with the same Army unit during his entire assignment at Fort Bragg. His duties were and are related to training against chemical warfare. The Ganskes first resided off-base at 303 Whipple Tree Lane, Fayetteville, NC, 28314, then moved on base to 246 Castle Drive, Fort Bragg, NC, followed by a short duration at 509 Northampton Road, Fayetteville, NC, 28303. Ganske's next duty station is Eglin Airforce Base where Spc. Ganske's special forces group is based with the Army. His duties remain related to chemical warfare defenses. The Ganskes moved to 4727 Whitewater Lane, Crestview, FL 32539. Prior to enlisting, he was employed at the Apple Ford Dealership in Brenham, TX, for mechanical work. Prior to the Army, Ganske was also employed as a "disposal hand" at Key Energy.

**Interrogatory No. 4**. Identify where You have lived in the last ten (10) years including the address, the dates You resided there, whether it was a single family or multifamily structure, whether You owned or rented/leased the residence, and the name and contact information of any owner, lessor and/or property manager if you rented/leased the residence.

**Answer:**

Plaintiff objects to the interrogatory to the extent that it purports to seek information that is irrelevant and not likely to lead to the discovery of admissible evidence. Plaintiff further objects on grounds the interrogatory is overly broad and unduly burdensome in seeking employment information pre-dating the relevant time period.

Without waiving any objections, Plaintiffs state:

Prior to their marriage and moving to Fort Bragg with Spenser Ganske in 2018, Emily Ganske resided at 800 Marie Street, Brenham, TX. Previous to that, Emily Ganske rented a home in Conroe, TX, but does not recall the address given it was so long ago. Emily Ganske does not recall the owner and/or property managers given it was so long ago.

Prior to enlisting in the Army and moving to Fort Bragg, Spenser Ganske rented a house in Brenham, TX, but does not recall the address given it was so long ago. Spenser Ganske does not recall the owner and/or property managers given it was so long ago.

The Ganskes first resided off-base at 303 Whipple Tree Lane, Fayetteville, NC, 28314, then moved on base to 246 Castle Drive, Fort Bragg, NC, followed by a short duration at 509 Northampton Road, Fayetteville, NC, 28303.

**Supplemental Answer dated 5/6/22:**

**Emily Ganske, pre-marriage:**

800 Marie Street, Brenham, TX 77833. Emily Ganske rented the home. (Spenser did not live there; nor did ███. She does not have a personal recollection of who was the owner, lessor, or property manager. According to public records information, this is a single-family home; this property has approximately 1,768 square feet of floor space; it was built in 1995; the current record owner is Damian K. Jemaa, 1403 Salem Court, College Station TX 77845.

**Spenser Ganske, pre-marriage:**

Spenser resided in Brenham, Texas prior to Fort Bragg. He cannot exactly recall his addresses in Brenham TX; he was renting. Spenser Ganske's Lexis report reflects the following two home addresses in Brenham, TX which are also in his voter registration data: 411 Hilltop Acres Lane; 1602 S. Austin Street (3 bedroom, 1 bath per Zillow); in

Brenham TX 77833. Voting registration information reflects he was living at the S. Austin Street address as of 2006-08; and the Hilltop Acres address.

**Fayetteville/Fort Bragg:**

Spenser moved from Texas to 195 Ashley Street, at Fort Bragg, and he lived there for 6 or 7 months, in 2016. That was a Corvias address. He had a dependent showing; ██. But it was simply Spenser living there. Emily was still back at 800 Marie Street, with ██.

The next home, at 303 Whipple Tree Lane, Fayetteville NC 28314 was a single-family residence. The home was rented. Spenser, Emily and ██ all lived there together. The Ganskes do not recall the landlord's name. The current Cumberland County GIS information for the address shows the following owner information: Chadwick Bukle, PSC 10 Box 165, FBO, AE 09589. Public record information reflects the house has two bedrooms and two baths. The Ganskes lived there around the 2017-2018 time period.

Then, they moved to the subject Corvias home at 246 Castle Drive, Fort Bragg, NC 28307. This was part of a triplex. Spenser and Emily lived there with their daughter, Kira. They rented from Corvias. The time period was from Sept. 2018 onward until when they left – Corvias would have the exact dates. Bragg Communities, LLC was the owner. Corvias Management Army, LLC was the landlord. The Ganskes lived there until they moved out to Northampton Road.

Next, the family moved to 509 Northampton Road, Fayetteville, NC 28303. According to public record information, this is a single-family home with three bedrooms and two bathrooms, and the current record owner is Darling Peguero. A deed recorded for the sale of the Northampton Road property to the Ganskes as buyers reflects a date of 6/2/21 and that the document was recorded at Book 11141, Page 642, Cumberland County Register of Deeds. Lender was Movement Mortgage LLC. An assessment record recorded at Book 11104, Page 197 reflects the lender was Freedom Mortgage. The home was owned by the Ganskes. They resided there with their daughter ██.

**Current address:**

4727 Whitewater Lane, Crestview, FL 32539-5756. Per public records information, this is a single family dwelling with three bedrooms and two baths. It is owned by the Ganskes. They live there with their daughter. They have lived there from Jan. 29, 2022 to present.

**Supplemental Answer dated 7/8/22:**

**Fayetteville/Fort Bragg:**

Spenser moved from Texas to 195 Ashley Street, at Fort Bragg, and he lived there for 6 or 7 months, in 2016. That was a Corvias address. He had a dependent showing; ██ But it was simply Spenser living there. Emily was still back at 800 Marie Street and

██████ **was living with Spenser's mother. This corrects an inadvertent misstatement from the Supplemental Answer dated 5/6/22.**

**Interrogatory No. 5**. Describe in detail any inspection, remediation, maintenance and/or repairs related to housing or habitability issues, including but not limited to mold, water intrusion, water leakage, water seepage, or flooding You experienced at any address identified in Your previous answer, including all communications and actions that You or others took in response.

**Answer**:

**Plaintiffs object to the extent that the interrogatory is overly broad and unduly burdensome and seeks information neither relevant nor likely to lead to the discovery of admissible evidence, including to the extent that the discovery requests seeks information predating the relevant class period.**

**Without waiving any objections, Plaintiffs state:**

**Plaintiffs are informed and believe that Defendants possess all inspection, remediation, maintenance and/or repair records that are responsive to this request. Plaintiffs further make reference to the facts alleged in the Amended Complaint. Plaintiffs also add the following:**

**The Ganskes moved on-base at Fort Bragg in September of 2018. They were not able to view the home before they moved in.**

**Corvias, the landlord, had the Ganskes to come sign the lease to secure the home, but the Ganskes never actually saw the home until they got the keys.**

**In or about October 2018 was when the Ganskes started calling Corvias to have multiple work orders put in on things that were wrong with the home.**

**They had squirrels living in the attic, and they could smell the urine and odor soaking through their roof in the living room area.**

**They noticed mold in their daughter's upstairs bedroom and bathroom windows.**

**There was a huge crack in their ceiling going down the wall.**

**The carpet was not replaced and it was filthy with a couple of bleach spots, nails sticking out through the carpet, and with the surface of the carpet coming up in certain places in the home.**

**And none of the plug-ins in all of the bathrooms in the house worked.**

27

After the Ganskes called those work orders in, they waited until April 2019 to complain and ask why none of the work had been completed.  It turned out that the lady working at the Corvias "community center" never actually put their work orders in, or, everything got deleted when they had a change in management.

After that, it was a fight for the family to get anybody from Corvias to come do anything in the house.

Mrs. Ganske put in a work order to have their ducts cleaned because no one ever showed up to clean theirs when it was scheduled for the routine cleaning in April 2019.  The workers who showed up to do the work only did half of the vents.  The other ones they said they could not get in to work on and so, they promised that they would be back to finish that part at a later time.  They never came back, and when confronted, denied saying and doing that.

The Ganskes were still getting bad smells in the home to where Mrs. Ganske had to keep candles or wax warmers lit in the house 24/7.  But no one came and checked out the attic or elsewhere to see why the family was smelling bad things in the home.

In June 2019, Mrs. Ganske requested to have an air quality test done in the home to see what was going on. In July, the Ganskes got a phone call from a lady at the community center asking questions to get the air quality test completed for them. Then the testing never happened.

In August 2019, someone finally came out to fix the mold problem in the Ganske's daughter's bedroom and bathroom.  Corvias sent someone out three times to fix the plugs that were never completed.  The last time or so, Corvias said they put in a new part on a plug but they never did, so the plugs still were not working.

Finally, after all of this nonsense, Mrs. Ganske finally had enough and went in the office and threatened to stop the BAH rental lease payments if Corvias did not get the residence fixed and did not get the family the air quality test.  The Corvias woman told Mrs. Ganske that it was not a good idea and showed that Corvias honestly did not care about the family's problems in the house.

Not too long after that, Mrs. Ganske heard a leaking noise in one of the walls, and it sounded like it was in the ceiling too.  She turned everything off in the house so that she could listen for it.  It turned out that it was their HVAC unit in the house that was leaking. When Mrs. Ganske opened the door, it was flooded, and that was how she found the major mold problem.

The ceiling of the unit was covered in mold, the outside was covered in mold, and the flooring was black from the water dripping on it.

28

Mrs. Ganske called the Corvias landlord emergency line for them to come fix the problem before it got worse. Sometime that night a man showed up to vacuum all the water out. Mrs. Ganske watched him as he was doing everything to make sure he got it all.

The man then told Mrs. Ganske that she had to pay him $20 for his services that night, She told him that he needed to take that up with Corvias.

After he left, Mrs. Ganske began taking pictures of all the mold damage, and she opened the unit up and got pictures of the inside as well. Then she started looking around the house to see what else she could find, and that was when she found mold around the smoke detector upstairs as well.

After all of this happening and Mrs. Ganske finding where these problems were, she went up to the Corvias office and requested all of the work orders be printed out, because she had been requesting for tests to be done and everyone ignored the situation like it was nothing. She informed her husband of what was going on.

SPC Ganske contacted his command and was told to make an IG (Inspector General) complaint. The Ganskes went and filed an IG complaint and Corvias told them that they had been taking care of the situation -- which they obviously were not because the problem would have been found a long time ago if Corvias had taken the family seriously.

Mrs. Ganske ended up contacting the CSM (Command Sergeant Major) and told him about all of the family's problems in the house. The CSM and a DPW (Directorate of Public Works) man showed up to the house to do an assessment. The DPW representative brought his moisture detector and it was reading 25-27 in the closet. She took him upstairs to show them the little bit of mold that they had around the smoke detector and where they had the problems in the bathroom and bedroom.

After that, still, no one from Corvias came and no one closed off the problem areas so they would not contaminate the rest of the home. Frankly, Corvias just really seemed like they were not too worried about it.

Corvias ended up sending ServPro to the house to vacuum off the surface mold. However, ServPro did not close off the area properly and did not properly cover furniture or any of the carpet.

ServPro had to come back to cut out the ceiling, and they were supposed to properly clean off all of the mold from everything it was on. When the worker cut open the ceiling, he had Mrs. Ganske come inside so he could show Mrs. Ganske what was going on. She saw that everything in the surrounding area in the attic was wet. The man mentioned mold being in the attic and told Mrs. Ganske to not let them close the attic up until every single thing was dry in there or the problem would keep coming back and that they needed to replace the insulation.

After the man got done showing Mrs. Ganske the situation, she stayed in there talking to him while he was doing everything. They started talking about all the mold in other people's homes on post. Mrs. Ganske mentioned to him how Corvias kept lying and not admitting that they had a mold problem.

The man said that they (Servpro) are supposed to do the same things – that is, lying. He said how they were not allowed to tell residents about the problems they had in their homes, but he did not feel like it was right to hide things.

Mrs. Ganske told her husband about the problem in the attic and SPC Ganske called up to the Corvias office to tell them they needed to fix every single thing.

Heather (the Corvias manager) got word of what the Servpro man was telling Mrs. Ganske and then called his boss to try to get him in trouble and fired. Mrs. Ganske had to talk to the man's boss on the phone and lie to him that he never said anything so he would not get in trouble for being honest with her.

Shortly after that, Corvias wanted to come and seal the attic up, but Mrs. Ganske would not let them because of the mold that she saw on one of the air ducts in the attic. She then had seven people show up at the house (Heather from Corvias, Tammy from Corvias, three DPW men, the CSM, and a mold specialist) and the Corvias people denied there was a problem. Mrs. Ganske asked if they could have the mold in the attic tested and they told her that it was not mold and they no longer test for mold in any of the homes.

Mrs. Ganske grew upset and asked why the family was not put in a different home or a hospitality suite while all of this work was going on. Heather told her it was not dangerous to be in the home because they "didn't have mold." Mrs. Ganske then asked if the others would let their family live there and no one could answer. By this point, Mrs. Ganske did not trust what she was being told and did not believe that Corvias would actually fix the problem because they could not even admit to a problem in the first place.

Mrs. Ganske told them that she would hire her own mold company to come out and test things and that Mrs. Ganske would get in the attic to take more pictures of everything. However, Corvias had someone come and seal off the area so that Mrs. Ganske could not have access to it.

The next day, Heather came back to the home to talk to Mrs. Ganske. She told Mrs. Ganske that if the family could not trust Corvias, then they needed to move off post. Mrs. Ganske was upset because it was Corvias who was not doing its job and fixing the homes properly.

Mrs. Ganske asked Heather about moving homes since Corvias did not want to do anything about the attic of the existing home. Heather said that Corvias would find the Ganskes a new home but that the Ganskes had to pay to move. However, on their limited income, the family could not readily afford to move and further, the family should not have had to pay to move because of something that was not their fault.

SPC Ganske called Corvias and Corvias told him that they would be charging the family $1,400 to move to a new home, on top of what the Ganskes already paid in BAH. This was very upsetting. It would mean that the family would have had to pay Corvias $2,579 in one month to move to a clean safe home for their family.

Mrs. Ganske let the Corvias workers come back and close the ceiling up, but they did a horrible job. Corvias also sent a man out to check the mold around the smoke detector and all he did was put a bigger smoke detector over it and hid the problem.

The head tech for Corvias then came back out to check the work and he said everything was completed and looked great. In fact, it did not look great though, there was still mold, and it looked like the ceiling was not even closed up all the way.

A lady from DPW came and inspected the work and she said it looked horrible and that Corvias needed to come back and clean everything properly and finish the work. They finally sent the same head tech man to scrub the mold off of the HVAC unit after they had closed everything out saying it was completed.

In short, Corvias' approach was to put a band-aid on everything and call it a day, and that was not how it should be. The Ganskes were distressed because a family should not have to fight with a housing company to make sure they are not breathing in mold. Nor should a tenant family have to threaten the landlord in order to get them to do the right thing.

Supplemental Answer dated 5/6/22:

With regard to whether Mr. or Mrs. Ganske ever had significant inspections or repairs at other residences where they have lived aside from the Corvias home on Castle Drive at Fort Bragg:

The Ganskes owned their home at the 509 Northampton Road address. There may have been one or more inspection reports prepared in connection with the purchase or the sale of that home.

The Ganskes own their home at the current Whitewater Lane address. There may have been one or more inspection reports prepared in connection with the purchase or the sale of that home.

While they resided at the Brenham Texas address, the Ganskes can recall a time when the air conditioning broke and they had no cool air. They were able to get it fixed in a timely manner.

Further facts regarding the defective maintenance and repairs at the Fort Bragg Corvias home: Emily Ganske recalls that the windows at the house had mold around them. The wood around the windows was rotting. In places one could stick one's finger into the wood.

They took some of the wood off. They talked to "TJ," female, head of maintenance. The windows were encased in metal. Corvias would not pay to replace the windows that were encased in metal, which caused mold. TJ was a middle aged white female. There was also a male named JT. This was circa 2018-2020. They worked out of the community center for the Corregidor Courts/Bougainville community.

At their Bragg house, the big issue was the ductwork. They had an HVAC closet. There was mold in the area of the HVAC unit, the AC unit. The duct area was covered with mold. There was mold around the AC vents. Corvias marked areas on the ceiling where supposedly Corvias was going to go in and replace the HVAC ducts. Corvias personnel or contractors marked with paint or marker or spraypaint the ceiling with some "X" marks. It looked like Corvias was getting ready to cut out the walls and access the HVAC ducts.

However, as it turned out, Corvias never did replace the duct work or the insulation, as best as the Ganskes could tell. When the Ganskes moved out, they kept in touch with a friend – Alec and Shelby Tomaszewski – who was a neighbor near their old home. The neighbor said that after the Ganskes moved out, they never saw Corvias go in to finish the work. Instead, they believe Corvias did not replace the HVAC and instead just rented the house out to a new family.

When the Ganskes complained, Corvias wanted them to go to the hospitality suite. However, Corvias was too cheap to pay to board their two dogs. So, they ultimately just found a new place to live that was off base.

The Ganske story of the Corvias mold specialist is: They complained. Corvias cut the area open. Corvias said that none of it was mold. Emily wanted to hire her own mold spcialist to look at it. Five or six people came by to examine. A mold specialist person came by for Corvias who said the moisture was high but what was growing there was not mold.

After Emily said she would just hire her own consultant to come test it, Corvias taped up the area and barred the family from having access to it.

They had initially gotten approval for an air quality test, but, it did not happen.

The ServPro man who came said, there was mold in the attic. He said, do not let Corvias close up the area. Corvias who proceeded to try to fire the individual for discussing mold.

It appeared that Corvias had instructed contractors that they could not use the word mold. There were two vendors for her home – Servpro, and, Precision.

Interrogatory No. 6. State each and every instance in which You contend a defendant failed to properly address a housing or habitability issue, including but not limited to alleged water or moisture intrusion, leak, ceiling or roof leak, flooring issue, structural issue, lead-based paint,

mold, or suspect fungal growth; provide the dates thereof; and state what You contend the defendant should have done differently. Set forth all facts on which You base Your contentions. If You are relying on any written documents or records, identify those documents and records, and state the material in each document which You contend demonstrates improper conduct.

**Answer:** See Plaintiffs' response to Interrogatory #5. Additionally, Plaintiffs add the following:

Work orders regarding squirrels in the attic and mold issues in the front upstairs bedroom were deleted.

When the Ganskes saw the house, there was water damage in the back upstairs bedroom that the worker told us was just messed up paint. As it turned out, it was water that was going through the windows and leaking into the walls causing the paint to droop and expand.

When the Ganskes told Corvias about the crack in their ceiling and wall, Corvias said the house was just settling and would paste over it. But towards the end of their stay, a different contractor said that it was supposed to be cut out and repaired correctly, not just pasted over.

When the Ganskes noticed the window in the front dining room that had rot and water damage, one of the head of maintenance people said that because the windows are encased in metal, everyone on post will always have a mold/water damage problem.

When Mrs. Ganske found the mold in the HVAC closet, the floor was flooded, and mold covered the ceiling, unit, walls, floor, inside the unit, literally everywhere. Corvias eventually sent someone out to take a look. Mrs. Ganske was told that there was no mold, even though she had plenty of pictures. Corvias sent a whole crew of people to come take a look including a mold expert who denied the problem. Once Mrs. Ganske told them that she would hire her own person to come look at things, Corvias taped the area restricting access.

Mrs. Ganske also requested an air quality test and it was approved, but once Corvias saw the mold it was never done.

When a ServPro worker came to dry out the family's HVAC closet, he told Mrs. Ganske not to let them seal it up, that he sees mold in many base houses, and that Corvias tells the contractors not to say it is mold.

Then when Mrs. Ganske told a Corvias worker that she was told there was mold in the attic, they called the ServPro supervisor and tried to get the honest worker fired. Mrs. Ganske had to talk to his boss so he would keep his job.

The back door was rotten, so Corvias needed to remove the old door and replace it with a new one. Mrs. Ganske was home when the workers said everything looked fine and they were just going to put the new door in. Mrs. Ganske then stuck her foot through the rotten wood and pulled it apart. The worker then said he thought it was going to just be an easy job because after her house, he was leaving for vacation. In short, had Mrs. Ganske not been there that day, the workers would have left the rotten wood under the new door that would have just caused more problems. Also, they got blood on her living room wall and then just painted over it.

When the Ganskes called about the mold behind the light switch cover, they were told that they should not touch it and that Corvias would be caulking around the covers so they could not be taken off anymore. That was covering up, not addressing, the problem.

The water damage around the toilet in the master bathroom never got fixed.

The mold in the master shower never got fixed.

Corvias was supposed to cut out the ceiling in the entire downstairs to replace all the vents, yet that never happened.

Water stains and water issues in the dining room area were never fixed nor did Corvias ever indicate that it had determined why it was happening.

**Supplemental Answer dated 5/6/22:**

Plaintiffs have provided responsive information regarding Defendants' failures to address housing issues and habitability in connection with the other interrogatories herein, one or more of which ask overlapping questions.

The things the Defendants should have done differently include:

1. Making a full and fair assessment of the existing housing conditions for the inventory of 6000 to 7000 housing units, or homes, that Corvias took over responsibility for when it won the bid for the 50 year ground lease for the housing at Fort Bragg in 2003.

2. Communicating a fair and accurate assessment of the true condition of the existing housing inventory, and what would be needed to make sure the housing was in an acceptable and habitable status for the military families, to the Army, prior to or at the time of the bid award in 2003.

3. Once Corvias won the bid and entered into the 50 year contract, Corvias had a duty to use Corvias Construction to tear down and rebuild or extensively renovate the deficient units. It should never have required the amount of tenant suffering from living in poor conditions, that occurred, before Corvias would remedy the problems. As it turned out, it was only after tenant complaints across multiple bases, investigative news coverage by Reuters and

others, and Congressional hearings, that Corvias announced it would spend over $300 million to remedy the problems. If Corvias had timely and properly remedied the problems years earlier when it should have done so, the Plaintiffs would not have incurred their suffering and damages.

4. Once Corvias won the 50 year contract, the evidence indicates that the company's top management was far more interested in expanding Corvias' portfolio of bases, and branching out into new areas like managing the housing for students bodies at schools, rather than carrying out and adequately funding its 50 year commitment to provide excellent livable housing. Corvias should have focused on carrying out the duties it had agreed to perform at the outset of the 50 year contract, rather than abandoning them.

5. By the time the putative class period opened, in 2016, the situation on the ground at Fort Bragg was that Corvias was understaffing its tenant service, repair and maintenance capacity, and had not spent the monies or exercised the initiative to tear down and renovate the numerous units (like those of the Plaintiffs) that were in unacceptable condition. Corvias should have been better funding and staffing tenant service, repair and maintenance, and should have rebuilt or renovated applicable units.

6. As of 2016, Corvias was using remote call centers to save money. Corvias should have had adequate, properly funded, supported, overseen, audited, and trained, employed Corvias staff at the base, to interact and communicate with tenants and their families and to address their concerns.

7. As of 2016, Corvias had engendered a corporate culture which led to a pattern and practice of fraudulent, unfair and deceptive conduct and practices by its customer service and repair and maintenance personnel. Corvias should not have allowed these practices to occur.

8. Most of the repair and maintenance personnel were outsourced, that is to say, the typical Corvias repair and maintenance workers who came out to the families' homes were not employed by Corvias at all, due to Corvias' desire to minimize costs and overhead and not have to pay employee wages and benefits. Corvias should not have used outsourced personnel. It should have had more of a directly employed, well-supported presence.

9. As of 2016, the outside vendors Corvias used for repair and maintenance received poor to mediocre pay. They were not well-supervised by Corvias. Corvias should have paid them better and supervised and trained them better. Instead, Corvias made sure that they acted unfairly and deceptively toward customers when it came to root causes, chronic and longstanding unit problems, water damage and rot and mold. Corvias should not have allowed this situation to flourish. Corvias was aware of the fact that (or was willfully blind to the fact that) the housing was replete with units that were plagued with problems and unacceptable for leasing out to families. Corvias should

have replaced or rebuilt those units to start with. But aside from that fact, Corvias should have adequately repaired and maintained those units. Corvias should have not told contractors not to use the word "mold." It should not have encouraged contractors to minimize problems and lie to tenants about conditions. It should not have kept its repair and maintenance vendors on such a limited budget and scope of authority that they were not allowed to work to address root cause problems.

10. As of 2016, Corvias was using its pattern and practice of fraud and deception with regard to repair and maintenance to result in purported work orders and unit and tenant records that were false because they omitted key data regarding water damage, mold, tenant complaints, and other such things.

11. As of 2016, Corvias in the tenant-facing part of its enterprise, both through its own direct employees and through its contractors, took a position of blanket denial that mold problems existed. This was improper given the true facts.

12. Corvias should have trained and overseen its staff and vendors such that their work order records and tenant and unit records were true and accurate and could later be properly reviewed and audited. It did not. The faulty state of the records was later noted by the GAO and by one or more of the Plaintiffs themselves.

13. Corvias knew or should have known as of 2016 that the HVAC systems in units were badly compromised by water damage, mold and filth collecting in the HVAC ductwork. Corvias furthermore knew or should have known that in the cases of many of the homes, access to see inside the ductwork was impractical. In short, Corvias knew, while the tenants did not, of conditions like those reflected by the ductwork in the home of the Thomas family (see supplemental documents produced). Corvias never should have allowed the conditions to grow to that extent, and never should have allowed unwitting tenants, mainly families with young children, to live in that environment.

14. Corvias knew that the housing for the lower enlisted servicemembers was far worse than some of the housing reserved only for the higher ranked tenants such as upper level officers. Corvias however failed to remedy the problem in time to prevent the experiences endured by the Plaintiffs.

15. Corvias knew that lower ranked servicemember tenants who leased the Corvias homes were much more likely to have spouses, and one or more infants or young children, compared to other families in other leased housing settings. This cohort group has higher vulnerability to filthy and unsafe conditions in the homes.

16. Corvias knew that many of the families resided in leased units that were not self-standing, but rather, were in structures that also had one, two, or three other units in them. Corvias as the owner and the landlord had the duty to

36

ensure the upkeep and safety of the structure exterior, the roofing, the HVAC system, and the common areas. Corvias knew that the conditions in one unit could suffer due to the conduct of tenants in other adjoining units or due to its own failure to adequately maintain and service the other units. One or more of the Plaintiffs who lived in structures with more than one unit in them noted the presence of smells of moldy, mildewed, water-rotted conditions, and Corvias was also aware that the older the unit or the structure, the more like that it had problems that worsened over time unless Corvias rebuilt or renovated the structure.

**Interrogatory No. 7**. Describe in detail every instance in which You sent or received a complaint, inquiry, or other communication concerning a housing or habitability issue, including but not limited to water or moisture intrusion, leak, ceiling or roof leak, flooring issue, structural issue, lead-based paint, mold, or suspect fungal growth in (or on the outside or perimeter of) military housing at Fort Bragg, including all follow-up communications and actions that You or others took in response to each such issue and identify the persons involved.

**Answer:**

**Objection. This interrogatory is vague and overly broad. Plaintiffs cannot recall "every instance" where a communication was made concerning military housing defects.**

**Without waiving any objections, Plaintiffs state:**

**See Plaintiffs' response to Interrogatory #5 and #6.**

**Plaintiffs are informed and believe that Defendants are in possession of all maintenance and repair requests submitted by Plaintiffs, along with all records related to Defendants' responses. Additionally, Plaintiffs make reference to the facts and allegations set out in the Amended Complaint.**

**Supplemental Answer dated 5/6/22:**

**Plaintiffs complained of housing and habitability issues to Corvias with regard to the Castle Drive home as should be documented in Corvias' own records, to the extent they are reliable. Plaintiffs describe their complaints and their communications with Corvias in their response to interrogatory number 5, above.**

**Interrogatory No. 8**. If You allege you were exposed to mold, lead-based paint, or other allegedly harmful substances while at Fort Bragg, describe such exposure in detail including the

date such exposure took place, where such exposure took place, the date You first experienced symptoms and any how You confirmed such exposure involved the alleged substance. If You are relying on any written documents or records, identify those documents and records, and state the material in each document which You contend demonstrates the presence of the alleged substance.

**Answer:**

**Objection. Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home. Rather, Plaintiffs are seeking, *inter alia,* allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times. *See In re NC Swine Farm Nuisance Litig.,* Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony). Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.**

**Without waiving any objections, Plaintiffs state:**

**See Plaintiffs' response to Interrogatory #5 and #6.**

**Supplemental Answer dated 5/6/22:**

**Plaintiffs allege that they were exposed to mold and air that passed through filthy HVAC ducts while at the Castle Road address.**

**Interrogatory No. 9.** State whether or not You have been treated by, diagnosed by, or admitted to any hospital or other healthcare facility in the last ten (10) years and if so, state the name of the hospital or facility, the dates of treatment, diagnosis, or admission, the illness or condition involved and the names and addresses of the health care provider(s) who treated You.

**Answer:**

**Objection. Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure**

to the harmful conditions at the Fort Bragg home. Rather, Plaintiffs are seeking, *inter alia,* allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times. *See In re NC Swine Farm Nuisance Litig.,* **Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony). Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.**

**Without waiving any objections, Plaintiffs state:**

**Plaintiffs are willing to meet and confer with Defendants for purposes of facilitating appropriately limited medical records discovery. However, broad medical discovery such as in a personal injury case is not appropriate herein.**

**Supplemental Answer dated 5/6/22:**

**Plaintiffs will allow the Defendants to seek to obtain copies of their family's medical records for the last ten years, except, that Plaintiffs object to the Defendants obtaining Ms. Ganske's OB/GYN records.**

**As to family medical records – The Ganskes recall going to the Robinson Clinic at Fort Bragg and they saw Dr. Garcia. Also, Spenser Ganske had various physical fitness tests. The Ganskes object to producing their OB GYN records as she had an ectopic pregnancy and there are some personal photos and it should not be relevant.**

**SUPPLEMENTAL ANSWER DATED 7/8/2022:**

**Plaintiffs provided their signed revised Medical Authorizations to Defendants on May 27, 2022 and June 8, 2022.**

**While in Brenham, Emily continued to go by her maiden name ("Draehn"). Spenser and Emily believe that ▇▇▇ while at Brenham, went to St. Joseph's. They don't remember the full name of the healthcare center. It's just a walk-in clinic there. Therefore, doctors varied and they do not remember any doctors' names. Spenser does not remember being seen in Brenham within the ten-year period. In Brenham, Emily was seen at St Josephs a couple times. Again, it is a walk-in clinic and she does not remember the treating physicians' names.**

**While in Fort Bragg, Emily continued to go by her maiden name for a while. She changed her name to her married name, Emily Ganske, while living there. Thus, some medical records will be found under the maiden name and others under the married name. Emily recalls going to the Robinson Clinic at Fort Bragg, and Dr. Garcia was her Primary Doctor. Spenser was seen by several times at Robinson Clinic by doctors assigned to his Army Unit, but he does not recall the names of the doctors treating him as they varied. He was also seen at the Womack ER, but he does not recall the name of the doctor treating him. ▇▇▇ only received shots and a physical at Robinson Clinic. They do not recall the names of any of the**

treating physicians for ███ as they varied as well. ███ was seen once at the emergency room at Womack ER, and Spenser and Emily do not recall the names of the doctor and other treating medical staff. Also, Spenser Ganske had various military physical fitness tests.

While in Crestview, neither ███ nor Emily have been seen there. Spenser had to get some vaccinations in Florida by the brigade medical team.

**Interrogatory No. 10**. State whether You have undergone a physical examination in the last ten (10) years. If so, state the date of any such examination, where it was conducted, who conducted the examination and whether there is a report or other Document concerning such physical examination.

**Answer:**

Objection. Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home. Rather, Plaintiffs are seeking, *inter alia*, allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times. *See In re NC Swine Farm Nuisance Litig.*, Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony). Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.

Without waiving any objections, Plaintiffs state:

Plaintiffs are willing to meet and confer with Defendants for purposes of facilitating appropriately limited medical records discovery. However, broad medical discovery such as in a personal injury case is not appropriate herein.

**Supplemental Answer dated 5/6/22:**

Plaintiffs will allow the Defendants to seek to obtain copies of their family's medical records for the last ten years, except, that Plaintiffs object to the Defendants obtaining Ms. Ganske's OB/GYN records.

**SUPPLEMENTAL ANSWER DATED 7/8/2022:**

See Plaintiffs' Answer to Interrogatory 9 above, as supplemented.

**Interrogatory No. 11**. State whether You have consulted any health care provider in the past ten (10) years. If so, specify in detail the nature of the condition for which You consulted the health care provider and the name and address of each health care provider who provided treatment for the condition.

**Answer:**

**Objection. Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home. Rather, Plaintiffs are seeking, inter alia, allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times. *See In re NC Swine Farm Nuisance Litig.,* Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony). Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.**

**Without waiving any objections, Plaintiffs state:**

**Plaintiffs are willing to meet and confer with Defendants for purposes of facilitating appropriately limited medical records discovery. However, broad medical discovery such as in a personal injury case is not appropriate herein.**

**Supplemental Answer dated 5/6/22:**

**Plaintiffs will allow the Defendants to seek to obtain copies of their family's medical records for the last ten years, except, that Plaintiffs object to the Defendants obtaining Ms. Ganske's OB/GYN records.**

**SUPPLEMENTAL ANSWER DATED 7/8/2022:**

**See Plaintiffs' Answer to Interrogatory 9 above, as supplemented.**

**Interrogatory No. 12**. State whether You ever experienced any respiratory conditions, breathing difficulties, asthma, allergies, headaches, skin conditions, chronic nasal congestion, chronic sinus infections, or lead poisoning symptoms. If so, describe the treatment You received for such condition, including the name and address of each healthcare provider who treated you,

the time period in which you were treated, and any prescription or over-the-counter medications taken to treat such conditions.

**Answer:**

Objection. **Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home. Rather, Plaintiffs are seeking, inter alia, allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times. *See In re NC Swine Farm Nuisance Litig.*, Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony). Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.**

**Without waiving any objections, Plaintiffs state:**

**Plaintiffs are willing to meet and confer with Defendants for purposes of facilitating appropriately limited medical records discovery. However, broad medical discovery such as in a personal injury case is not appropriate herein.**

**Supplemental Answer dated 5/6/22:**

**Plaintiffs will allow the Defendants to seek to obtain copies of their family's medical records for the last ten years, except, that Plaintiffs object to the Defendants obtaining Ms. Ganske's OB/GYN records.**

**SUPPLEMENTAL ANSWER DATED 7/8/2022:**

**See Plaintiffs' Answer to Interrogatory 9 above, as supplemented.**

**Interrogatory No. 13**. Describe the injuries You contend You sustained as a result of the Your military housing experience at Fort Bragg. If you claim You are still afflicted with or suffering from the effects of any such injury, describe Your claim and all supporting evidence in detail.

**Answer:**

Objection. Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home. Rather, Plaintiffs are seeking, *inter alia*, allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times. *See In re NC Swine Farm Nuisance Litig.*, Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony). Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.

Without waiving any objections, Plaintiffs state:

See Plaintiffs' response to Interrogatory #5.

Plaintiffs during the pertinent times suffered discomfort, annoyance, irritation and loss of use of their ability to enjoy their property. *See In re NC Swine Farm Nuisance Litig.*, No. 5 7:14-cv-00180-BR (E.D.N.C.), jury instructions filed at Doc. 262, on April 26, 2018, at p. 14 (private nuisance jury instruction for damages: "The plaintiffs claim that the interference with the use and enjoyment of his or her property has caused him or her anger, embarrassment, annoyance, inconvenience, decreased quality of life, and/or physical and mental discomfort. There is no fixed formula for placing a value on these alleged harms. You will determine what is fair compensation by applying logic and common sense to the evidence.").

Plaintiffs further suffered from a loss of the comfort, quiet and enjoyment and habitability of their rented premises during the pertinent times.

Plaintiffs further suffered from the injury of not getting the benefit of their bargain with regard to their rented housing. During the pertinent times, the Plaintiffs duly and timely paid any and all rent that was due and owing for their rented Corvias military housing home. However, they did not receive the quality of rented housing to which they were entitled and for which, with their limited means, they paid.

**Supplemental Answer dated 5/6/22:**

Plaintiffs will allow the Defendants to seek to obtain copies of their family's medical records for the last ten years, except, that Plaintiffs object to the Defendants obtaining Ms. Ganske's OB/GYN records.

**SUPPLEMENTAL ANSWER DATED 7/8/2022:**

See Plaintiffs' Answer to Interrogatory 9 above, as supplemented.

43

**Interrogatory No. 14**. If You were treated, attended or examined by any physician(s) or others for the injuries identified in responses to Interrogatories 12-13, state the names and addresses of all such persons and the nature of the medical treatment given by each physician or other person. If any diagnostic tests were performed, state the type of test performed, name and address of the place where it was performed, date each test was performed and what each test disclosed.

**Answer:**

Objection. Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home. Rather, Plaintiffs are seeking, *inter alia*, allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times. *See In re NC Swine Farm Nuisance Litig.,* Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony). Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.

Without waiving any objections, Plaintiffs state:

Plaintiffs are willing to meet and confer with Defendants for purposes of facilitating appropriately limited medical records discovery. However, broad medical discovery such as in a personal injury case is not appropriate herein.

**Supplemental Answer dated 5/6/22:**

Plaintiffs will allow the Defendants to seek to obtain copies of their family's medical records for the last ten years, except, that Plaintiffs object to the Defendants obtaining Ms. Ganske's OB/GYN records.

**SUPPLEMENTAL ANSWER DATED 7/8/2022:**

See Plaintiffs' Answer to Interrogatory 9 above, as supplemented.

**Interrogatory No. 15**. Identify any communications, whether written or oral, You had with any person, including but not limited to other residents of Fort Bragg, environmental

consultants, and members and civilian employees of the Army, media outlet, or federal, state or local government agency, official, staff member or employee wherein you discussed any alleged housing issues at Fort Bragg, including but not limited to mold, health or habitability issues.

**Answer:**

**Objection. This Interrogatory is vague and overly broad. Plaintiffs cannot possibly remember and recount each and every conversation, written or oral, that they had over the course of multiple years, let alone the topic of each conversation.**

**Without waiving any objections, Plaintiffs state:**

**See Plaintiffs' response to Interrogatory #5 and #6.**

**Defendants are believed to have records kept in the normal course of business and reflecting numerous of the complaints and relevant communications from, to and with the Plaintiffs, or either of them.**

**Supplemental Answer dated 5/6/22:**

**Plaintiffs described their interactions and communications that they could recall with regard to their housing at Fort Bragg, in their response to the interrogatories above. They respectfully direct Defendants to those responses.**

**Interrogatory No. 16.** If You have ever been convicted or pleaded guilty, no contest, or entered an Alford plea to an offense punishable by imprisonment of more than one year or any crime of dishonesty or false statement, regardless of the punishment actually imposed, please state the date of each conviction or plea, the name and location of the court in which You were convicted or pleaded in, and the crime of which you were convicted or pleaded guilty, no contest, or entered an Alford plea to.

**Answer:**

**Objection. Plaintiffs object to the extent that the discovery requests is overly broad, unduly burdensome, unlimited in time, and otherwise harassing and seeking of irrelevant information that is not likely to lead to the discovery of relevant evidence. Plaintiffs further**

object that the scope of the request is unlimited in time. Plaintiffs further object to the extent the discovery requests would purport to elicit information on old matters or misdemeanor matters with no potential relevance herein.

Without waiving any objections:

Not applicable.

**Interrogatory No. 17.** Identify each person whom You may call as an expert witness at trial. With respect to each expert, state his or her name and address, the subject matter on which the expert is expected to testify, the substance of the facts and opinion to which the expert is expected to testify, and a summary of the grounds for each opinion.

**Answer:**

Objection. The time for the Plaintiffs to be obligated to name any of their experts in this matter has not yet arrived.

Without waiving any objections, Plaintiffs state:

Plaintiffs have not yet selected their expert witnesses in this matter.

Plaintiffs reserve the right to supplement this response in due course.

**Interrogatory No. 18**. List any photographs, diagrams, or other exhibits which You or your attorney have which you will or may introduce at trial.

**Answer:**

Objection. The time for the Plaintiffs to be obligated to determine and disclose their list of exhibits for trial in this matter has not yet arrived.

Without waiving any objections, Plaintiffs state:

Plaintiffs have not yet selected their exhibits in this matter.

Plaintiffs reserve the right to supplement this response in due course.

**Interrogatory No. 19**.  Have You ever been named as a plaintiff or defendant in any type of litigation other than this lawsuit?  If so, please state the name, county court or federal district, and case number as well as the outcome of the litigation.

**Answer**:

**Objection.  Plaintiffs object to the extent that the discovery requests is overly broad, unduly burdensome, unlimited in time, and otherwise harassing and seeking of irrelevant information that is not likely to lead to the discovery of relevant evidence.**

**Without waiving any objections:**

**No.**

**Interrogatory No. 20**.  Please state the full names and dates of birth of any person who resides, or resided at the time period of the allegations contained in the Amended Complaint, with You at Fort Bragg.

**Answer:**

**Objection.  Plaintiffs wish to safeguard relevant information regarding their minor children.**

**Without waiving any objections, Plaintiffs state:**

**No other individuals resided with Plaintiffs' family during the relevant times.**

**Supplemental Answer dated 5/6/22:**

**Kira Ganske.**

**Interrogatory No. 21**.  Itemize and show how you calculate any damages claimed by You in this Action, whether economic, non-economic, or other.

**Answer**:

Objection. This interrogatory calls for a legal conclusion and attorney work product. Moreover, Plaintiffs have not formulated a settlement demand at this stage.

Without waiving any objections, Plaintiffs state:

See Plaintiffs' response to Interrogatory #13.

**Supplemental Answer dated 5/6/22:**

Actual damages will be calculated in accordance with the allowable categories of damages under the North Carolina Pattern Jury Instructions and/or traditional jury instructions for whichever causes of action the Court may allow to go to trial. Contract damages could be measured by the total amount of the BAH rent paid by the soldier or on his behalf, or some percentage thereof, on the theory that the soldier paid to receive decent accommodations, did not receive them, and did not receive the benefit or the bargain. Damages for private nuisance would include damages for discomfort, annoyance, irritation, annoyance, and loss of use and enjoyment. Damages for breach of the warranty of habitability may include via the measure of damages by the difference between the value of the rented premises in its uninhabitable condition and its fair market rental value otherwise. Under Chapter 75, a prevailing plaintiff may be entitled to three times actual damages.

Plaintiffs reserve the right to supplement to the extent they are able to identify damages in other respects including out of pocket expenses; moving expenses; costs associated with relocating to a new home that would not otherwise have been expended; values of lost or damaged clothing, linens or furniture; etc.

Plaintiffs do not claim lost wages or lost income (e.g., taking time away from work because of the conditions at the home, and suffering lost wages as a result).

Plaintiffs reserve the right to allege other claims including but not limited to punitive damages if the discovery so supports in assessing the gravity of the fraud and recklessness-related allegations in the complaint, e.g. regarding the work order process and purported tenant customer service facility of the enterprise.

Date:  July 8, 2022                    Respectfully submitted,

                                       s/John Hughes
Mona Lisa Wallace
NC State Bar No. 009201
John Hughes
NC State Bar No. 22126
WALLACE & GRAHAM, PA
525 N. Main Street
Salisbury, North Carolina 28144
Telephone: 704-633-5244
Fax: 704-633-9434
mwallace@wallacegraham.com
jhughes@wallacegraham.com

J. Anthony Penry
N.C. Bar No. 8936
PENRY | RIEMANN PLLC
2245 Gateway Access Point, Suite 203
Raleigh, NC 27607
(919) 792-3891
Andy.Penry@PenryRiemann.com

Robert S. Metro
S.C. Bar No. 69494
BAUER & METRO, PC
Post Office Box 7965
Hilton Head, SC 29938
(843) 842-5297
Rmetro@bauerandmetro.com
Appearing pursuant to Local Rule 83.1(e)

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 8, 2022 I served this document on counsel for the Defendants

herein, by <u>email</u>, as follows:

Mark P. Henriques
Matthew F. Tilley
WOMBLE BOND DICKINSON (US) LLP
3500 One Wells Fargo Center
301 South College Street
Charlotte, North Carolina 28202-6025
E-mail: Mark.Henriques@wbd-us.com
E-mail: Matthew.Tilley@wbd-us.com

Thomas J. Yoo
HOLLAND & KNIGHT LLP
400 S. Hope St., 8th Floor
Los Angeles, CA 90071
Thomas.Yoo@hklaw.com

Jessica L. Farmer
HOLLAND & KNIGHT LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Jessica.Farmer@hklaw.com

Date: July 8, 2022                    Respectfully submitted,

                                      s/John Hughes
                                      Mona Lisa Wallace
                                      NC State Bar No. 009201
                                      John Hughes
                                      NC State Bar No. 22126
                                      WALLACE & GRAHAM, PA
                                      525 N. Main Street
                                      Salisbury, North Carolina 28144
                                      Telephone: 704-633-5244
                                      Fax: 704-633-9434
                                      mwallace@wallacegraham.com
                                      jhughes@wallacegraham.com

DocuSign Envelope ID: 45C052FF-35DA-42BF-B907-A0F090AA94E3

# VERIFICATION

I, pursuant to 28 U.S.C. § 1746 hereby declare under penalty of perjury the following is true and correct:

1. I am a competent adult, over the age of eighteen, and this Declaration is based on my personal knowledge.

2. I am a Plaintiff in the military housing lawsuit brought against the Corvias enterprise for the housing at Fort Bragg.

3. From time to time, I have provided information to my lawyers to prepare "interrogatory responses."

4. I have now been asked to verify that as to the responses being served, the information that is in them that came from me or that I know personally, in fact is true to the best of my knowledge. I have gone over these interrogatory responses.

5. Where those responses contain facts about my family or me personally and other facts of which I have personal knowledge, I swear and affirm under penalty of perjury that those facts and statements are true to the best of my knowledge.

6. Where the facts are based on information provided by other people, I state that I believe that information to be true.

7. Where the facts are about other things like facts learned from public records, I am relying on my attorneys and the investigation that my attorneys did.

8. I declare under penalty of perjury that the foregoing is true and correct.

Dated: 7/7/2022 _____

Signature: _____

Printed name: Emily Ganske


Dated: _____

Signature: _____

Printed name: Spenser Ganske

DocuSign Envelope ID: BC9C72CA-B6F0-4B08-9817-CF561C7AF25D

# VERIFICATION

I, pursuant to 28 U.S.C. § 1746 hereby declare under penalty of perjury the following is true and correct:

1. I am a competent adult, over the age of eighteen, and this Declaration is based on my personal knowledge.

2. I am a Plaintiff in the military housing lawsuit brought against the Corvias enterprise for the housing at Fort Bragg.

3. From time to time, I have provided information to my lawyers to prepare "interrogatory responses."

4. I have now been asked to verify that as to the responses being served, the information that is in them that came from me or that I know personally, in fact is true to the best of my knowledge. I have gone over these interrogatory responses.

5. Where those responses contain facts about my family or me personally and other facts of which I have personal knowledge, I swear and affirm under penalty of perjury that those facts and statements are true to the best of my knowledge.

6. Where the facts are based on information provided by other people, I state that I believe that information to be true.

7. Where the facts are about other things like facts learned from public records, I am relying on my attorneys and the investigation that my attorneys did.

8. I declare under penalty of perjury that the foregoing is true and correct.

Dated: _____

Signature: _____

Printed name: Emily Ganske

Dated: 7/7/2022
_____

Signature: _____Spenser Ganske_____

Printed name: Spenser Ganske

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **SSG SHANE PAGE, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 5:20-cv-00336-D** |
| | ) | |
| **BRAGG COMMUNITIES, LLC, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| _____ | ) | |

**TIMOTHY AND KATELYN MURPHY'S**
**SUPPLEMENTAL JULY 8, 2022 RESPONSES TO**
**DEFENDANTS' FIRST SET OF INTERROGATORIES**

Plaintiffs, Timothy and Katelyn Murphy, by and through their undersigned attorneys, and by way of supplementing their answers to the interrogatories propounded by Defendants, pursuant to Fed. R. Civ. P. 26 and 33, state as follows:

Plaintiffs assert attorney-client privileges and immunities as to all communications between Plaintiffs and legal counsel, and thus object to producing or disclosing such communications. Undersigned counsel asserts work-product privileges and immunities as to their own work product. Plaintiffs therefore object to producing such work-product. Plaintiffs assert work-product privileges and immunities as to all communications and documentation prepared in anticipation of litigation and thus object to producing such work product.

In setting forth these answers, Plaintiffs do not waive any attorney-client, work-product, or other privilege or immunity which may attach to information called for in, or which may be responsive to, these interrogatories. Plaintiffs do not concede the relevance or materiality of these interrogatories, the subject matter of these interrogatories, or documents produced in response to

these interrogatories. Plaintiffs reserve the right to question the competency, relevancy, materiality, privilege, and admissibility of any documents produced or referred to herein. Plaintiffs also reserve the right to revise, correct, supplement, or clarify any of their answers or documents referred to herein. The above objections, privileges, and immunities are asserted in response to each of the following interrogatories as if set forth verbatim at the beginning of the answers to each interrogatory:

**Interrogatory No. 1**. State Your full name, address, date of birth, current and past marital status (including the date(s) of marriage and the full name of your spouse(s) (if applicable), Social Security number, driver's license number and cell phone number(s) and email(s) used while residing at Fort Bragg.

**Answer:**

**Plaintiffs object to the interrogatory to the extent it is overbroad, unduly burdensome and harassing. For example, information about a past marriage outside of the pertinent time period relevant herein is irrelevant nor likely to lead to the discovery of material and admissible evidence.**

**Without waiving any objections, Plaintiffs state:**

**Timothy Scott Murphy (left military 10/4/21, now a civilian)**
**7554 Decatur Drive**
**Fayetteville, NC 28303**

**352-262-8111 / 352-575-8144**
**usairborne.89@gmail.com**
**Murphboy22@gmail.com (old email)**

**Katelyn Murphy**
**7554 Decatur Drive**
**Fayetteville, NC 28303**

**910-920-8845**
**lovekate690@gmail.com**

2

**Interrogatory No. 2**. Identify all persons who are likely to have personal knowledge of any fact alleged in the pleadings, and state the subject matter of the personal knowledge possessed by each such person.

**Answer:**

**Plaintiffs object to the extent the discovery request would require the disclosure of information that may only be appropriately disclosed under the auspices of an appropriate Court-approved confidentiality protective order. Without waiving any objections:**

1. **All named Plaintiffs and Defendants, along with the individuals identified in their respective initial disclosures and discovery responses.**

2. **All current and former tenants/residents of Corvias military housing at Fort Bragg during the class period.**

3. **Angela and Nathan Nolan**
   **Former Neighbor, Galaxy Street address**
   **Current contact information unknown**

   **Mr. and Mrs. Nolan were neighbors on the north side of the four-unit (quadruplex) building. The Nolan's unit address may have been 23 Galaxy Street. They shared a carport and adjoining walls and roof in the four-unit building. Plaintiffs spoke with them generally about the housing problems. It is believed that the Nolans had work done to their own unit.**

4. **Ashley (last name unknown).**
   **Former Neighbor, Galaxy Street address**
   **Current contact information unknown**

   **Ashley was a neighbor with a unit in the four-unit building. Her unit address may have been 19 Galaxy Street. Plaintiffs spoke with them generally about the housing problems. It is believed that she moved because of the mold and the poor housing conditions.**

5. **Phil and Katie Smith.**
   **Former Neighbor, Galaxy Street address**
   **Current contact information unknown**

   **Mr. and Mrs. Smith were neighbors with a unit in the four-unit building, on Galaxy Street. Plaintiffs spoke with them generally about the housing problems. It is believed that the Smiths had issues but gave up on trying to get**

Corvias to fix them; this included floods in their living room, flooring issues, carpet, linoleum, wet carpet issues. May still be living in the neighborhood.

6. **Katie (last name unknown).**
   **Former Neighbor, Galaxy Street address**
   **Current contact information unknown**

   Katie was a neighbor who lived not in, but near the four-unit building where the Plaintiffs were residing. Her unit address may have been 15 Galaxy Street. Plaintiffs spoke with them generally about the housing problems. It is believed that she had complaints about the poor housing conditions.

7. **John Picerne**
   **Founder/Chairman of the Board – Corvias**
   **1405 S County Trail #530**
   **East Greenwich, RI 02818**
   **401-228-2800**

   Plaintiffs are informed and believe that Mr. Picerne has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

8. **Patrick Bucolo**
   **Resident Manager-Corvias**
   **Fort Bragg**

   Plaintiffs are informed and believe that Mr. Bucolo has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

9. **Leonard Jones**
   **Resident Manager-Corvias**
   **Fort Bragg**

   Plaintiffs are informed and believe that Mr. Jones has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

10. **Amber Smiley**
    **Resident Assistant Manager-Corvias**
    **Fort Bragg**

    Plaintiffs are informed and believe that Ms. Smiley has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

11. **Vanessa Hargrave**
    **Resident Associate-Corvias**
    **Fort Bragg**

Plaintiffs are informed and believe that Ms. Hargrave has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

12. **Jenneisha Monroe**
    **Resident Associate-Corvias**
    **Fort Bragg**

    Plaintiffs are informed and believe that Ms. Monroe has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

13. **Mallory Dixon**
    **Resident Service Specialist-Corvias**
    **Fort Bragg**

    Plaintiffs are informed and believe that Ms. Dixon has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

14. **Kianna Amos**
    **Resident Service Specialist-Corvias**
    **Fort Bragg**
    Plaintiffs are informed and believe that Ms. Amos has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

15. **Heather Fuller**
    **Operations Director- Corvias Management**
    **1405 S County Trail #530**
    **East Greenwich, RI 02818**
    **401-228-2800**

    Plaintiffs are informed and believe that Ms. Fuller has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

16. **Deb Osmanski**
    **Former Program Office Administrator (Office Manager)**
    **Corvias-Fort Bragg**
    **Current Address Unknown**
    **Current Employer is ER Wagner in Menomonee Falls, Wisconsin**
    **800-558-5596**

    Plaintiffs are informed and believe that Ms. Osmanski has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

17. **Michael Melia**
    **Former Director of Construction – Corvias**
    **Current Address Unknown**
    **Current Employer is RQ Construction in Pinehurst, North Carolina**

5

**760-631-7707**

Plaintiffs are informed and believe that Mr. Melia has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

18. **Jeremy Stefanko**
    **Former Senior Maintenance Manager**
    **Corvias Military Living, LLC**
    **Current Address Unknown**
    **Currently Employed by Cumberland County, NC**

    Plaintiffs are informed and believe that Mr. Stefanko has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

19. **Steve Maxwell**
    **Former Facilities Director**
    **Corvias Military Living, LLC**
    **Current Address Unknown**
    **Currently Employed by Balfour Beatty Communities in Wetumpka, Alabama**

    Plaintiffs are informed and believe that Mr. Maxwell has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

20. **Steve Boothe**
    **Former Director of Facilities Operations**
    **Corvias Military Living, LLC**
    **Current Address Unknown**
    **Currently Employed by Hunt Companies in Providence, Rhode Island**

    Plaintiffs are informed and believe that Mr. Boothe has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

21. **Charles Connors**
    **Director of Capital Assets**
    **Corvias Group**
    **1405 S County Trail #530**
    **East Greenwich, RI 02818**
    **401-228-2800**

    Plaintiffs are informed and believe that Mr. Connors has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

6

22. **Chuck Cavaretta**
    **Former Vice President of Construction**
    **Corvias**
    **Current Address Unknown**
    **Current Employed by The Cassidy in Winter Haven, Florida**

    Plaintiffs are informed and believe that Mr. Cavaretta has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

23. **John Shay**
    **Senior Vice President of Construction & Development**
    **Corvias**
    **1405 S County Trail #530**
    **East Greenwich, RI 02818**
    **401-228-2800**

    Plaintiffs are informed and believe that Mr. Shay has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

24. **Cindy Hart**
    **Assistant Operations Director- Corvias**
    **Fort Bragg, North Carolina**

    Plaintiffs are informed and believe that Ms. Hart has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

25. **Mike Sarisky**
    **Operations Director-Corvias**
    **Fort Bragg, North Carolina**

    Plaintiffs are informed and believe that Mr. Sarisky has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

26. **Mark Foraker**
    **Former Business Director – Corvias (Fort Bragg)**
    **Current Address Unknown**
    **Currently Employed by Barvin in Houston, Texas**

    Plaintiffs are informed and believe that Mr. Foraker has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

7

27. **Toni Cornelius**
    **Professional Engineer-Cornelius Consulting**
    **4004 Park Avenue**
    **Wilmington, NC 28403**

    **Plaintiffs are informed and believe that Ms. Cornelius has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.**

28. **Robert Smith**
    **Maintenance Manager- Corvias, Fort Bragg**
    **1405 S County Trail #530**
    **East Greenwich, RI 02818**
    **401-228-2800**

    **Plaintiffs are informed and believe that Mr. Smith has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.**

29. **Robert Leonard**
    **Facilities Director- Corvias, Fort Bragg**
    **1405 S County Trail #530**
    **East Greenwich, RI 02818**
    **401-228-2800**

    **Plaintiffs are informed and believe that Mr. Leonard has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.**

30. **John Teague**
    **Service Center Coordinator- Corvias, Fort Bragg**
    **51 Skytrain Drive**
    **Fort Bragg, NC 28307**
    **910-764-4868**

    **Plaintiffs are informed and believe that Mr. Teague has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.**

31. **Katie Culbreth**
    **Service Center Coordinator-Corvias, Fort Bragg**
    **51 Skytrain Drive**
    **Fort Bragg, NC 28307**
    **910-764-4868**

Plaintiffs are informed and believe that Ms. Culbreth has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

32. **Michele Wooten**
    **Staff Accountant- Corvias**
    **406 Pershing Ct.**
    **Fort Riley, KS 66442**
    **785-717-2244**

    Plaintiffs are informed and believe that Ms. Wooten has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

33. **Scottie Miller**
    **Former Senior Manager- Corvias, Fort Bragg**
    **Current Address Unknown**
    **Currently Employed by Hunt Military Housing in Austin, Arkansas**

    Plaintiffs are informed and believe that Mr. Smith has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

34. **Matt Brigman**
    **HVAC Installer**
    **Sandhills Heating, Refrigeration & Electrical**
    **Laurinburg, NC**

    Plaintiffs are informed and believe that Mr. Brigman is a maintenance worker for an outside vendor who worked on HVAC systems in military houses at Fort Bragg, NC.

35. **Scotty Locklear**
    **J&L Contractors & Maintenance Services**
    **Pembroke, NC 28372**
    **910-280-0901**

    Plaintiffs are informed and believe that Mr. Locklear has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

36. **Elizabeth A. Field**
    **Director, Defense Capabilities and Management**
    **United States Government Accountability Office**
    **441 G St., NW**

Washington, DC 20548
202-512-2775

Ms. Field has knowledge of the GAO's monitoring of privatized housing including analysis of data provided by all 14 private partners. Ms. Field authored a report entitled, "Military Housing Privatization: Preliminary Observations on DOD's Oversight of the Condition of Privatized Military Housing. Ms. Fields testified on these topics before the Senate Armed Services Committee.

37. **Hon. Ryan D. McCarthy**
    **Former Secretary of the United States Army**
    **Millennium Corporation**
    **1400 Crystal Drive, Suite 400**
    **Arlington, VA 22202**
    **703-436-1343**

    As part of his duties as Secretary of the Army, Mr. McCarthy monitored the status and condition of military housing. He visited Army installations across the country to observe the condition of military housing, including a visit to Fort Bragg in September 2020. Following his visit, McCarthy stated, "What you saw over time is an abdication of responsibility. We outsource this to a corporation. That's the danger when you set up these public-private partnerships. Over time, you get lazy. As an institution, we got lazy. The wake-up call came two years ago. It is embarrassing and it is awful".

38. **Col. Phillip Sounia**
    **Former Garrison Commander- Fort Bragg**
    **United States Army**
    **Address Unknown**

    May have knowledge regarding the housing conditions given his post.

39. **Senator Elizabeth Warren**
    **309 Hart Senate Office Building**
    **Washington, DC 20510**
    **202-224-4543**

    Senator Warren investigated military housing companies and submitted a written report dated April 30, 2019.

40. **Shannon Razsadin**
    **Executive Director of Military Family Advisory Network**
    **22015 W. 66th St.**
    **Unit 860635**
    **Shawnee, KS 66286**

202-821-4195

Ms. Razsadin and MFAN released a report that over 67% of all Bragg families surveyed reported manifest effects from maintenance, repairs and remediation.

41. **Heather Beckstrom**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **bckstromheather@gmail.com**

    Ms. Beckstrom has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

42. **Stephanie Blackadar**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **juggalatis@hotmail.com**

    Ms. Blackadar has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

43. **Jessica Brueck**
    **Current of Former Tenant/Resident**
    **Address Unknown**
    **Jessica.lynn.brueck@gmail.com**

    Ms. Brueck has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

44. **Regan Burke**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **morethanamilkmaid@yahoo.com**

    Ms. Burke has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

45. **Courtney Burks**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **courtflavin@yahoo.com**

    Ms. Burks has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

46. **Cacee Cobarrubia**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **Cacee.nesbit93@yahoo.com**

    Ms. Cobarrubia has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

47. **Shyla Curry**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **Shylacurry98@gmail.com**

    Ms. Curry has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

48. **Marissa Dilliard**
    **Current or Former Tenant Resident**
    **Address Unknown**
    **Marrissa.dilliard@gmail.com**

    Ms. Dilliard has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

49. **Pennalla Evans**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **Mrsevans3013@gmail.com**

    Ms. Evans has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

50. **Vicki Ragsdale**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **Mrsforcier1031@gmail.com**

    Ms. Ragsdale has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

51. **Tia Geisler**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **Tia.c.geisler@gmail.com**

Ms. Geisler has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

52. **Julie Hilliard**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **Juliehilliard23@gmail.com**

    Ms. Hilliary has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

53. **Sarah Lenox**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **Sarahjclark1747@gmail.com**

    Ms. Lenox has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

54. **Jacqueline Haven Lyons**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **havenbrandhorst@gmail.com**

    Ms. Lyons has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

55. **Chanda Martin**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **Chandamartin279@gmail.com**

    Ms. Martin has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

56. **Emya Roberts**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **Emyareneerob15@gmail.com**

    Ms. Roberts has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

57. **Tamara Terry**
    **Current or Former Tenant/Resident**
    **Address Unknown**

Jcm72611@gmail.com

Ms. Terry has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

58. **Amber Woollett**
    Current or Former TenantResident
    Address Unknown
    amberdw@live.com

    Ms. Woollett has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

59. **Sabrina Collins**
    Current or Former Tenant/Resident
    Current Contact Information Unknown

    Ms. Collins has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

60. **Danielle Olson**
    Current or Former Tenant/Resident
    Current Contact Information Unknown

    Ms. Olson has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

61. **Tara Michelle**
    Current or Former Tenant/Resident
    Current Contact Information Unknown

    Ms. Michelle has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

62. **Ashlee Monzalvo**
    Current or Former Tenant/Resident
    Current Contact Information Unknown

    Ms. Monzalvo has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

63. **Toby DeJoinville**
    Current or Former Tenant/Resident
    Current Contact Information Unknown

Ms. DeJoinville has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**64. Amber Lace**
**Current or Former Tenant/Resident**
**Current Contact Information Unknown**

Ms. Lace has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**65. Courtney Wong**
**Current or Former Tenant/Resident**
**Current Contact Information Unknown**

Ms. Wong has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**66. Alexis Danielle Martin**
**Current or Former Tenant/Resident**
**Current Contact Information Unknown**

Ms. Martin has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**67. Liz Stitt**
**Current or Former Tenant/Resident**
**Current Contact Information Unknown**

Ms. Stitt has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**68. Taylor Hinshaw**
**Current or Former Tenant/Resident**
**Current Contact Information Unknown**

Ms. Hinshaw has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**69. Cassandra Manis**
**Current or Former Tenant/Resident**
**Current Contact Information Unknown**

Ms. Manis has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**70. Lillian Bradford**

Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Bradford has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**71. Lorena Butler**
Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Butler has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**72. Jennalynn Apedaile Thomas**
Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Thomas has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**73. Danielle Jackson**
Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Jackson has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**74. Lee Nash**
Current or Former Tenant/Resident
Current Contact Information Unknown

Mr. Nash has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**75. Tyler Cissna**
Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Cissna has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**76. Jessica Lynn Brueck**
Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Brueck has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

77. **Alena Martinez**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Martinez has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

78. **Meagan Heady Solorzano**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Solorzano has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

79. **Sharon Land**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Land has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

80. **Taylor Bryant**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Bryant has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

81. **Jessica Allen**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Allen has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

82. **Jennifer Burt**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Burt has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

83. **Briana Kramp**

Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Kramp has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

84. **KayKay Jackson**
   Current or Former Tenant/Resident
   Current Contact Information Unknown

   Ms. Jackson has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

85. **Hannah Gagnon**
   Current or Former Tenant/Resident
   Current Contact Information Unknown

   Ms. Gagnon has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

86. **Cat Billet**
   Current or Former Tenant/Resident
   Current Contact Information Unknown

   Ms. Billet has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

87. **JayBee Bar**
   Current or Former Tenant/Resident
   Current Contact Information Unknown

   Ms. Bar has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

88. **Jayla Garcia**
   Current or Former Tenant/Resident
   Current Contact Information Unknown

   Ms. Garcia has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

89. **Kayla Reed**
   Current or Former Tenant/Resident
   Current Contact Information Unknown

Ms. Reed has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

90. **Brittany Opsomer**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Opsomer has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

91. **Kaytlin Erickson**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Erickson has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

92. **Amanda Anderson**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **a.anderson0228@gmail.com**

    Ms. Anderson has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

93. **Amy Lohrenz and Major Michael Lohrenz are former residents. These individuals may have knowledge as per their lawsuit,** *see Lohrenz v. Bragg Communities, LLC,* **No. 5:2022cv00044 (E.D.N.C.).**

94. **Plaintiffs in the** *Addi* **case and witnesses identified in that case may have knowledge regarding Corvias business operations, customer service, repair and maintenance practices, which while occurring at Fort Meade in Maryland could be relevant insofar as they reflect common corporate practices that were also used and imposed at Fort Bragg.** *See Addi v. Corvias Management-Army, LLC,* **No. 1:2019cv03253 (D. Md.).**

19

**DESIGNATED AS CONFIDENTIAL PER PROTECTIVE ORDER**



**NONCONFIDENTIAL:**

Hannah Hurd, Assistant Resident Manager at Corvias, Fort Bragg, North Carolina, United States. May have knowledge regarding Corvias property management practices. States that she oversees a team of five in the Pope and Ardennes communities.

Don Agel, Agel's Home Inspections, Fayetteville NC. Phone: (910) 224-5076. May have knowledge regarding repair, maintenance, tenant service issues.

Wina Hathaway. Employed in contracts and vendor management with Corvias, at Fort Bragg, since 2014. May have knowledge regarding repair, maintenance, tenant service issues.

PFC Anthony Blankenship, wife Brittney, son Jason. Per news reports, this family moved to Fort Bragg in August 2018:

Pfc. Anthony Blankenship points to mold on the grout of his bathroom and a greenish mildew stain around the tiles next to the toilet.

"That's kind of a mold pattern growing underneath," he says. "Workers at times just put new grout over the mold. At times, contractors wouldn't show up at all for problems ranging from clogged plumbing to faulty ventilation ducts."

"We'd call again, and they'd say we don't have any recollection you put in a work order," says Blankenship, who moved into this ranch-style house at Fort Bragg, N.C., back in August with his wife, Brittney, and their toddler, Jason. "A lot of families, unfortunately, their house is worse than ours," says Brittney.[1]

Heath Burleson. Corvias Partnership Advisor. Public biography shows intimate involvement in Corvias MHPI matters.[2] Corvias materials state that in 2019 he was one of the key executives who belatedly agreed that Corvias would fund $325M in direct investment into its Army portfolio in order to remedy the longstanding housing problems. According to Corvias, as the Senior Vice President of Operations, he was responsible for the oversight and management of Corvias' managers across the Army and AF portfolio. In 2018 he assumed the role of Partnership Advisor for the Corvias Property Management portfolio which has a 2020 annual budget of $435M and development/construction budget of $335M.

Mark Esper. In his role as Secretary of Defense, Esper went on record regarding the poor housing conditions. Examples:

"In too many cases, it is clear the private housing companies failed to uphold their end of the bargain, a failure that was enabled by the Army's insufficient oversight," Esper said. "We are determined to investigate these problems and to hold our housing contractors and chains of command accountable."[3]

SGT Terry Blood and wife, Krysta. Tenants of the Corvias housing at Fort Bragg. Ms. Blood may have subsequently been hired by Corvias. Their complaints are described in news articles:

Sgt. Terry Blood and his wife, Krysta … showed the shoddy repairs at their house at Fort Bragg.

Krysta points to the ceiling inside a closet in her garage. She says a subcontractor just plastered over what is a widening stain from a leak that has also damaged the floor. The source of the leak is the bathtub.

---

[1] https://www.cpr.org/2019/03/08/shoddy-maintenance-of-military-housing-under-scrutiny-by-senate-military-leaders/
[2] https://www.congress.gov/116/meeting/house/110611/witnesses/HHRG-116-AP18-Bio-BurlesonM-20200303.pdf
[3] https://apnews.com/article/2f34561f12c743ec8ef349becd9c0802.

**"For four years, that tub water has been leaking from children's baths," she says. "Can you imagine what kind of water has been in between the floors for that time?"**

**Are their friends having troubles as well?**

**"Pretty much the exact same issues," says Terry Blood. "Actually one of our friends right across the street, they just got surveyed, and they have found cracks. In the summer months they have grass growing up through their floor."[4]**

**Col. Kyle Reed, Fort Bragg Garrison Commander.  May have knowledge regarding the Corvias MHPI involvement at Fort Bragg.  Should have knowledge regarding the fallout from the press coverage, publicity and Congressional hearings occurring in 2018-19, including steps the Army forced Corvias to take to remedy matters.[5]**

**Greg Jackson, Chief of Housing, Fort Bragg, Directorate of Public Works. May have knowledge regarding the Corvias MHPI involvement at Fort Bragg.  Should have knowledge regarding the fallout from the press coverage, publicity and Congressional hearings occurring in 2018-19, including steps the Army forced Corvias to take to remedy matters. Has knowledge regarding how in the past, residents thought Housing (Army) and Corvias were synonymous (which would tend to disincentivize soldiers from complaining).[6]**

**Krista Lindholm.  Fort Bragg tenant.  May have knowledge of housing problems at Fort Bragg.  Quoted as saying: "I've seen the mold, and it's legit," Krista Lindholm said of mold in a neighbor's house. "They're sick, their kids are sick and housing is just not coming and dealing with it."[7]**

**Donnie R. Smith, Maintenance Manager at Corvias.  May have knowledge regarding Corvias repair and maintenance practices.  Contact information: Administrator, Dual Impact LLC, Fayetteville, North Carolina; Donnie Smith Construction, LLC, 426 North Whittington Lane, Dunn, NC, donniecsmith@embarqmail.com, (910) 890-3660, (910) 897-4847.**

**Lisa Sanford.  She was an assistant property manager, Corvias, Fort Bragg, 2005 to November 2017.  She may now be working as a community manager in the Raleigh area.**

**Marcy C. Woodard.  2908 Winton Drive, Fayetteville NC.  Employed as an IT service manager at Corvias, Fort Bragg, November 2017 to present.  Previously employed as an IT**

---

[4] https://www.wamc.org/2019-03-07/shoddy-maintenance-of-military-housing-under-scrutiny-by-senate-military-leaders.
[5] https://www.fayobserver.com/story/news/2019/04/19/installation-housing-initiatives-see-way-forward-residents-speak-up-at-town-halls/64863691007/
[6] https://www.fayobserver.com/story/news/2019/04/19/installation-housing-initiatives-see-way-forward-residents-speak-up-at-town-halls/64863691007/
[7] https://www.wral.com/soldiers-families-complain-to-tillis-about-fort-bragg-housing/18662015/

management lead (2015-17), a network administrator (2010-2015) and as a desktop administrator (2006-2010), and resident service specialist (2005-06) for Corvias/Picerne.

Peter Sims, managing director for Corvias. He has knowledge regarding Corvias being compelled to install HVAC replacements and other renovations at 5,300 homes at Fort Bragg.[8] This renovation work was being done as part of Corvias' agreement to pay $325 million toward housing improvements subsequent to the late 2018 Reuters news article and resultant controversy and Congressional hearings.

Taylor Padgett. Fort Bragg Corvias housing resident. Complained of mold problems in her housing occurring since February 2021.

As the problem got worse, she hired an independent home inspector who went through the house and found major issues with the maintenance of the home. He said they contributed to the mold problem.

"We found a bunch of damage issues with the exterior and roofing problems," said Don Agel of Agel Home inspections. "There was cracked brick veneer allowing water to get into her child's playroom."

He also found problems with the water heater and stove.

"There is a natural gas leak at the water heater and a natural gas leak at the oven," Agel said.

The Padgett family is currently in an on-post hotel while the property management company makes repairs.[9]

Mary Humphreys. Corvias corporate spokesperson. Denied that there were any problems at the Padgett's residence.

Fort Bragg Garrison Command Sgt. Major Jeffery Loehr. May have knowledge regarding the MHPI housing program and the Corvias housing issues.

Regan Burke. Fort Bragg Corvias home tenant. Complained of mold problems with her Corvias home:

Regan Burke's family was moved to two different temporary houses on-post since September 2020 after mold was found all over her original house.

Burke said a military inspector from on-post said the home "was uninhabitable."

---

[8] https://www.corvias.com/news/corvias-updates-more-85-percent-fort-bragg-homes
[9] https://www.cbs17.com/news/local-news/cumberland-county-news/fort-bragg-officials-call-mold-issues-with-on-base-housing-a-high-priority/

Last week, the family was finally placed into new permanent housing but was still trying to get someone to pay for the replacement of their mold-infested possessions.

Regarding the problems being experienced Padgett, Burke, and other homeowners, Loehr said: "As the housing property management, Corvias is responsible for ensuring prompt and professional maintenance.[10]

Unidentified Corvias employee, first name Leonard. Leonard was a gentleman who called into CSPAN to speak about how he was working for Corvias when he was fired from his job at Fort Bragg in 2019. He called on or about July 22, 2019 to complain that he was being unjustly blamed for the housing issues. He said he was age 67; that it was a shame how the residents were treated; that he and other employees lost their jobs; that the company was trying to make the workers feel it was their fault; that they did what they had to do to keep their jobs; that he was there for 10 years; and that he knew what these military wives were talking about.[11]

Authors of the Army Inspector General Report, Report ID-1903, Feb.-March 2019.[12] The report found that family concerns about health and safety issues in military housing are widespread, revealing systemic problems with relationships between the Army and housing contractors. The government's current oversight of these projects was insufficient to identify housing challenges. Inspectors found there was lack of joint authority, confusion regarding roles and responsibilities, lack of training, dramatic personnel cuts and lack of transparency among privatized housing companies. Inspectors uncovered a 2013 Army policy that specifically prohibited health and welfare inspections of military housing. Two-thirds of the 1,180 residents of military privatized housing communities who participated in the IG survey stated they were dissatisfied with their overall housing experience. Sixty-four percent said they would move off post if there were no financial costs or concerns, according to the report. The review was ordered by then-Secretary of the Army Mark Esper in the wake of reports about widespread problems of mold, water leakage, vermin infestations and other problems in military housing.[13]

Interrogatory No. 3. State in detail Your employment history for the last ten (10) years. For all military service, identify where You were stationed, where You resided while stationed there, and Your duties and responsibilities at each station.

---

[10] https://www.cbs17.com/news/local-news/cumberland-county-news/fort-bragg-officials-call-mold-issues-with-on-base-housing-a-high-priority/

[11] https://www.c-span.org/video/?c4809169/user-clip-corvias-employee-fired-called-report-unjustly-blamed-housing-issues

[12] https://www.army.mil/e2/downloads/rv7/families/releaseable-housing-inspection.pdf

[13] https://www.upandcomingweekly.com/local-news-briefs/6565-military-housing-still-a-problem

**Answer:**

Plaintiffs object to the interrogatory to the extent that it purports to seek information that is irrelevant and not likely to lead to the discovery of admissible evidence. Plaintiffs further object on grounds the interrogatory is overly broad and unduly burdensome in seeking employment information pre-dating the relevant time period.

Without waiving any objections, Plaintiffs state:

1. __Tim Murphy:__ As of 2012, Tim worked in fire rescue at the fire department, until he went into the military. That was in Williston FL. While working as a firefighter/paramedic he was also qualified as a HazMat response technician. He also did construction work with his father, at Dan Murphy home remodeling, until his father passed in 2018. on remodeling homes, and then later in life, as a home inspector. When he worked with his father, Tim learned about the building trade and also more generally about mold. He also had worked as a supervisor for a remediation company that specialized in working with fishing houses that had been damaged by water intrusion and sinkholes. In 2018, he went into the military. First, he was stationed at Fort Benning, GA for infantry basic training. He went to airborne school at Fort Benning. In January 2019, he came to Fort Bragg solely for a special operations qualification course. However, when in training, he was injured. Subsequently, he was honorably discharged with a disability rating. Today, Tim works as a project manager position at a company (Showcase Restorations) and also has his own home remodeling company with a proper license and insurance.

2. __Katelyn Murphy:__ Katelyn during the 2011-14 time period worked at Publix in customer service and she also waiting tables at the Copper Monkey in Gainesville FL from 2013-14. She worked as office staff, retinal specialist, Vitreo Retinal, Gainesville FL, from 2014 to 2016. Then she was a stay-at-home Mom. In 2020, she began to work at a rape crisis center, as a domestic violence and sexual assault victim advocate. She also writes children's books for children, under grant funding.

**Interrogatory No. 4**. Identify where You have lived in the last ten (10) years including the address, the dates You resided there, whether it was a single family or multifamily structure, whether You owned or rented/leased the residence, and the name and contact information of any owner, lessor and/or property manager if you rented/leased the residence.

**Answer:**

Plaintiffs object to the interrogatory to the extent that it purports to seek information that is irrelevant and not likely to lead to the discovery of admissible evidence. Plaintiffs

further object on grounds the interrogatory is overly broad and unduly burdensome in seeking employment information pre-dating the relevant time period.

Without waiving any objections, Plaintiffs state:

See Plaintiff's Response to Interrogatory #3. In addition, for Tim Murphy, when he was young, Tim was residing at 20451 East Levy Street, in Williston FL. Tim's mother Cindy Murphy owned the home. It was the family home; he lived there with family. He moved out when he got married to 1140 NE State Road 47, Trenton FL with Katelyn. He lived there until he joined the military. The couple rented the 1140 address home from Katelyn's mother Dennette Hide. While at Fort Benning, he lived in the barracks there. Then Katelyn moved in with him when he moved over to Fort Bragg. The family now resides at the home located at 7554 Decatur Drive, Fayetteville, NC 28303. They moved there after Fort Bragg. Strother Property Management, which recently changed its name to Empower, is the landlord for this leased home.

Prior to her marriage with Tim, circa 2012, Katelyn was living in Tampa, but does not recall the exact address. She later moved to Gainesville but does not recall the exact address.

**Supplemental Answer dated 5/6/22:**

Bragg residence: 21 Galaxy Street, Quadraplex home – Pope Neighborhood.

**Historical Residences:**

Timothy Murphy lived at 20451 East Levy Street, Williston, FL from 2003 – 2015 (Tim's Mother Cindy Murphy owned the home). Per Zillow, it has four bedrooms, two bathrooms, and 1,801 square feet.

In 2015, When he and Katelyn married, he moved in with Katelyn at 1140 NE State Road [Route] 47, Trenton, FL. They rented this house from Katelyn's mother, Dennette Hide, until 2018. Per Zillow, the residence had three bedrooms, two bathrooms, and 1,008 square feet.

In Aug. 27, 2018, Tim moved to Fort Benning. While he was at Fort Benning, Katelyn and ███ lived at 20451 East Levy Street, Williston, FL. Per Zillow, this residence has four bedrooms, two bathrooms, and 1,801 square feet.

When Tim left Fort Benning on Feb. 14, 2019, Tim, Katelyn and ███ moved to 21 Galaxy Street (Pope neighborhood), Fort Bragg.

Tim, Katelyn and ███ moved out of that Fort Bragg location on Oct. 11, 2019, and moved to 7554 Decatur Dr., Fayetteville. Per Zillow, this residence has three bedrooms, two bathrooms, and 1,250 square feet.

Circa 2012 for Katelynn – she moved several times in 2012 and cannot remember the addresses. The name of the Apartment Complexes were: Polos Apartments, The Gardens

Apartments, The Reflections Apartments. All in Gainesville, Florida. ██████ was born while they lived at the Trenton, FL, location.

**Interrogatory No. 5**. Describe in detail any inspection, remediation, maintenance and/or repairs related to housing or habitability issues, including but not limited to mold, water intrusion, water leakage, water seepage, or flooding You experienced at any address identified in Your previous answer, including all communications and actions that You or others took in response.

**Answer**:

**Plaintiffs object to the extent that the interrogatory is overly broad and unduly burdensome and seeks information neither relevant nor likely to lead to the discovery of admissible evidence, including to the extent that the discovery requests seeks information predating the relevant class period.**

**Without waiving any objections, Plaintiffs state:**

**Plaintiffs are informed and believe that Defendants possess all inspection, remediation, maintenance and/or repair records that are responsive to this request. Plaintiffs make reference to the facts alleged in the Amended Complaint. Plaintiffs also add the following:**

**On February 21, 2019, Tim executed a lease with the Corvias landlord for a unit at 21 Galaxy Street. That unit was one of four two-story in-line townhouse-style units with shared garages and walls on a single slab.**

**The units were poorly designed. Each had an interior HVAC and water heater area located on the first-floor interior. The attics for the units did not have a proper fire wall between them, which allowed mold and water from the roof to freely spread throughout the four-unit building.**

**Also, the attic space was inadequate to provide proper ventilation, which increased the likelihood that water invasion would lead to mold contamination.**

**Inside the Galaxy street units, there was no vapor or moisture barrier between the plywood and the linoleum floors. The drywall was water-permeable and was not moisture-rated.**

**The front and back doors both had visible light through the seals because they were not properly fitted. That led to water invasion every time it rained and gave insects access to the home.**

27

The units had lead pipes and lead paint. Corvias told the Murphys not to drink the tap water and not to let their toddler eat the paint chips.

One or more Corvias representatives admitted to Tim that Corvias had used "horrible contractors" in the past and the one who built the Galaxy Street units had been "black-balled" from future contracts.

The rent was the family's entire $1,134.00 per month BAH. This was later lowered to $918.00 per month, in apparent acknowledgement of the poor condition. Also, utilities were waived as Corvias apparently acknowledged that the utility bills would be too high for the Murphys to pay, given the age and condition of the home.

Prior to moving in, Tim Murphy inspected the unit and filled out a four-page list of the many defects and issues that he observed. He saw prior water damage in the kitchen, master bathroom, and upstairs bedroom. The cabinets, counters, and baseboards in the master bathroom, the half-bath and the kitchen were damaged, reflecting prior water invasion.

Tim observed mushy/soft flooring in the master bathroom and the upstairs hall bathroom, due to prior water invasion. He saw a roof leak and cracked drywall around the vent in the upstairs hall bathroom. There was a poor ceiling patch job in the master closet, apparently from repairing damage from prior water invasion. There was visible mold, damaged drywall and warped shelves in the outdoor storage area.

Once they moved in, the family experienced numerous problems with the property. The Corvias work order list dating from October 2019 (which is not a complete listing of the reported problems) reported things like a "roof leak" on March 1, 2019; "mold in vents" on April 2, 2019, and a "flood" on May 21, 2019.

On May 29, 2019, the "cabinets fell off" in the kitchen.

On July 10, 2019, "dishwasher internal damage" was logged.

On July 19, 2019, in the worst heat of the summer, it was "A/C not cooling" and "no AC / burning smell."

Various work orders and service calls were falsely marked by Corvias as "cancelled" or "completed." Other service requests were deleted or never logged in the first place.

As early as April of 2019, the Murphys were reporting to Corvias that 21 Galaxy Street had a mold problem. Tim found mold in the HVAC room and found cracked drywall near the HVAC air intake, which was sucking the mold from the wall interior space and distributing the spores through the home.

Corvias outsourced the response to a company called Paragon, which, on information and belief, was at one time terminated for billing for inspections and remedial work that it

28

did not actually do. However while Corvias eventually said it would not work with Paragon, it is believed that Corvias has still used Paragon since then.

Tim directed Paragon to where there was mold in the HVAC room and showed them that there was mold in the vents. Tim directed workers to other locations in the unit with mold and sodden flooring and cabinets.

However, Corvias did nothing to remediate the mold hazard. Instead, in April 2019, Corvias marked the item as "work completed" even though they had done nothing. Corvias did not bother to log many subsequent reports about mold.

Plaintiffs started to document the conditions by photos. (Please see photos in the Complaint and in the document production).

After moving in, Tim came home in a light rainstorm to find his wife in tears. She showed him that the upstairs hall bathroom had water dripping through the ceiling fan. Tim found that the surrounding ceiling was mushy to the touch and at risk of falling in.

He reported to Corvias that the roof had a severe leak. When Corvias came out to inspect, they only did a surface patch on the ceiling. Corvias also made a minor repair on the roof flashing but denied that there was a more extensive problem with the roof or water invasion. Since the underlying water invasion issue from the roof was not fixed, the new drywall patch soon became saturated.

When they called Corvias on subsequent occasions about the same water invasion problem in the second-floor hall bath, Corvias voiced doubt that the water invasion in a second-floor ceiling was due to a roof leak. Meanwhile there was water dripping from the ceiling vent onto the toilet seat and the ceiling was mushy around it. Corvias refused to investigate and fix the roof leak, or its root cause.

Water came in the home throughout summer 2019. In the upstairs master bedroom, the access point from the closet to the attic sagged inward from the moisture.

The Murphys had to seal off the master closet from the rest of the bedroom. This was because if they did not seal the closet door, the moisture migrated into the bedroom and would fog up the bedroom windows.

The mold and mildew in the closet stank so badly that the Murphys were not able to wash the stench out of their clothes. They had to throw everything from that closet away.

Tim and Katelyn sometimes slept downstairs on the couches to escape the worst effects. This, however, led to exposure to carbon monoxide.

They also had to throw away the bedding from the upstairs bedrooms and the downstairs upholstered furniture before moving out.

The air in the attic and in the vicinity of the roof leak was foul and musty. The elevated moisture content in the interior air was noticeable. By the summer of 2019, the entire upstairs reeked of mold and mildew.

The smell in the hall bathroom was particularly horrendous. The Murphys had to keep the bathroom fan on all night, disturbing sleep and peace of mind. They began to keep the air conditioner turned down to 66 degrees in an effort to slow the growth of the mold and mildew, making the home uncomfortably chilly for Mrs. Murphy and their young daughter.

Tim repeatedly directed Corvias to the upstairs hall bathroom, which had water invasion and mold. He told them that the that the spongy floor in the upstairs hall bathroom was saturated with water and was an obvious mold growth zone. The Murphys put in multiple work orders requesting that this spongy floor be replaced. Corvias deleted one or more of the work orders.

Finally, in August or early September, the floor was so wet that the linoleum began to peel back. Tim investigated and discovered that there were three additional stacked layers of linoleum beneath the floor surface. Each linoleum layer was covered with mold.

When it rained, the hall bathroom floor would become so saturated with water that it would leak out into the hall. When the Murphys stepped on the floor in this area after a storm, water that was discolored from rusty nails in the subfloor would squirt out and drip down the stairs.

When this issue was pointed out, Corvias denied that the discoloration was from water and suggested that the discoloration was due to tile and carpet glue. This issue too was apparently deleted from the work order logs that Corvias gave to the Murphys in October 2019.

Tim's later inspection through the closet access point into the attic space in about September of 2019 showed that the roof leak had not been properly repaired.

Other families in the fourplex had similar water invasion issues. Corvias similarly denied that the roof was at fault. However, the Murphy's adjoining neighbor persisted after the Murphys moved out, and Corvias ultimately had to acknowledge that the roof did indeed leak. In early 2020, Corvias was said to have belatedly repaired or replaced the roof.

Throughout the Murphys' stay at 21 Galaxy Drive, Corvias never properly remediated any of the water invasion and mold growth issues. Instead, Corvias merely caulked or painted over or (as with the hall bathroom) a new layer of linoleum was layered over the existing wet, moldy layer.

In May 2019, the Murphy family sought Corvias' help again. The downstairs bathroom had flooded with water and the water was entering from underneath the wall. Corvias inspected and attributed the flood to an AC line. The Murphys asked for dehumidifiers to remove the moisture from within the walls. Corvias refused, creating one

30

more unremediated area of water damage and mold growth. The baseboards in that area swelled and split open.

Also in May of 2019, the family's air conditioning unit in the interior HVAC room backed up and flooded the HVAC room and out into the adjoining hallway. Corvias came to repair but did only the bare minimum and refused to provide a dehumidifier, despite requests. Water then soaked into the floor and into the thickly painted walls and baseboards and became yet another incubation area for interior mold. Corvias did not open the wall to remediate the water damage inside it, leading to another reservoir of water and mold.

Corvias continued to deny that there was a problem with roof leaks and rejected the notion that the water invasion could be causing mold growth. Corvias denied that mold might adversely affect the family's health. The Murphys believed that the unit was toxic and was making them sick. They took to spending more time outdoors, where there were heaps of trash Corvias had not picked up, despite requests. (*See, e.g.*, June 21, 2019, work order for "Trash clean up" marked cancelled.)

In July of 2019, the heating element in the dishwasher caught on fire. Tim smelled the burning odor, investigated and saw smoke. Luckily Tim was a former fireman and so was able to rapidly extinguish the fire before it spread. He called the event in to Corvias. This event was logged but marked "cancelled." It took Corvias some two weeks to replace the dishwasher and they did nothing to check for electrical issues or other fire hazards.

In July of 2019, in the thick of the summer heat, the air conditioning failed. The capacitor on the air conditioning unit made noise whenever it was in operation, and the noise was getting worse. This was brought to Corvias' attention, but they did not investigate or remediate. Finally, the capacitor failed and tripped the breaker. It would have started a fire had Tim again not been there to detect the electrical fire smell and respond.

The most serious and life-threatening defect of all, however, was an insidious, odorless, colorless carbon monoxide ("CO") leak. Prior to August 2019, Tim had discovered that he felt physically better when away from home on grueling training exercises. When he came home, his health and physical condition would deteriorate.

In August, shortly after Tim came to home recuperate from shoulder surgery, a Corvias team knocked on the door and told Tim that they had to come in to check the AC and the vents in the interior HVAC room. They hooked up a drain to the water heater line and drained it. When Tim looked in to see what they were doing, one worker told Tim that there was a bad gas leak and that the CO detector was not working. The worker's supervisor then denied there was a leak, told the worker to be quiet, and told Tim that he would have to direct any questions to management. Corvias replaced the smoke and CO detector.

Tim became concerned for his family's health, because news was just breaking about a potentially life-threatening CO problem on base. See Associated Press, Carbon monoxide problem discovered at Fort Bragg housing, August 15, 2019 ("A family that went to the hospital with symptoms that suggested carbon monoxide poisoning has led military officials to warn dozens of families at Fort Bragg about possible exposure. News outlets report

military officials said Wednesday that a combination of factors caused the issue, including partially blocked air ducts that allowed carbon monoxide to build when the laundry room's door was closed. The investigation began after the family's hospital visit Aug. 4."),

Tim called the Corvias office and was told that there was no issue with the gas line or the CO detectors at the unit. Corvias publicly stated that it would be sending engineers to inspect potentially impacted homes. Yet on the day of the "inspection," Tim opened the door and found that Corvias had not sent a trained engineer. Instead, it was the same repairman who had worked on Tim's pipes a few weeks before.

The repairman confirmed that he was not a trained engineer. The only "fix" that he made on that visit was to remove the door into the interior HVAC area, which left the high voltage in that area accessible to a curious toddler and at just the right height for her to stick her fingers into.

On information and belief, Corvias did not have licensed plumbers doing the work on the gas line and water heater in the HVAC area, and did not have the system periodically inspected by a licensed plumber. Corvias' improper installation and maintenance of the CO detector at 21 Galaxy Street then compounded the risk of CO exposure.

Other residents during this episode noted that as was typical of its maintenance practices, Corvias was failing to do a root cause analysis or address the root cause. See Haley Britzky, Army reporter, Task & Purpose, More than 80 homes found to be at-risk of carbon monoxide poisoning at Fort Bragg, Aug. 15, 2019 ("Tamara Terry, an active-duty Army wife of almost four years who lives in Corvias housing at Fort Bragg, told Task & Purpose that the 'entire base is appalled at what's happening.' 'What is going on? You're telling me you have over 100 homes at risk ... and you're just letting them stay there? Knowing that it's a risk, you're allowing them to still live in those homes with their children?' She added that removing the doors is 'not actually fixing the problem,' and that they should 'take out and put it somewhere else. ... They're once again not getting to the root of the problem.'").

Corvias disguised this entire episode, which could have severely injured or even killed the Murphys, in a bland September 5, 2019 work order entry that said only "GHWH Inspection." The underlying screen shot which Tim captured revealed a different story -- that the root cause was "gas leak on hard line" and that Corvias had "changed combo detector" and acknowledged that this issue was a "Health/Safety" issue.

When Tim subsequently had the Fire Department come out to verify that the CO leak had been fixed, he also had them check that the CO monitor was working. The inspector from the fire department told him that Corvias had never had the fire department come out to test either the CO monitors or the smoke detectors.

Finally, on October 8, 2019, the Murphy family gave notice that they were vacating the property. The cited as a reason for the move, amongst the many problems the family had experienced, the "mold issues." The Murphys moved into off-base housing.

32

The Murphys had to pay about $4,000 out of their savings to move into housing off-base. The Murphys were fortunate that they had some personal savings from Tim's pre-enlistment work to fund the move. Tim's military pay, at about $24,000 per year, barely covered the family's expenses and did not leave enough cushion to pay for a move.

Corvias withheld the Murphys' BAH for October 2019 until mid-November, which made it more difficult for the Murphys to move out of their unit. Corvias threatened to charge an additional $1000 for breaking the lease. The Murphys had to take a loan to assist with moving into their new home.

During the course of the Murphys' almost eight months at 21 Galaxy Street, their health deteriorated, due to their exposure to the mold and CO in the house.

Katelyn Murphy developed fatigue, headaches and memory loss. She had congestion, sinus issues and respiratory distress. The longer she was at 21 Galaxy Street, the worse she felt. Her symptoms mostly cleared after moving out of 21 Galaxy Street.

The young daughter began to have headaches and a runny nose that would not stop, even with medication. Finally, the pediatrician discovered that the inside of her nose was blue. He attributed this to mold in the unit. Her symptoms improved after the family moved.

Tim, who had spent much of his time at home recuperating from shoulder surgery, developed chronic severe headaches, fatigue and respiratory distress. He also developed gastrointestinal problems. The headaches and fatigue lessened after moving out.

In October 2019, Tim Murphy requested a copy of the work order history for the unit. He discovered that the work order history had been edited in October 2019 right before Corvias provided the report to him.

Specifically, Corvias had edited the work orders to disguise the gas line leak causing the CO issue and had re-written the calls as a gas water heater inspection.

Tim also noticed that Corvias had gone back and edited some of the entries in order to whitewash the pervasive issues with the home.

Supplemental Answer dated 5/6/22:

With regard to whether Mr. or Mrs. Murphy ever had significant inspections or repairs at other residences where they have lived aside from the Corvias home at Fort Bragg:

The Plaintiffs have not to date located additional responsive information.

Interrogatory No. 6. State each and every instance in which You contend a defendant failed to properly address a housing or habitability issue, including but not limited to alleged water

or moisture intrusion, leak, ceiling or roof leak, flooring issue, structural issue, lead-based paint, mold, or suspect fungal growth; provide the dates thereof; and state what You contend the defendant should have done differently. Set forth all facts on which You base Your contentions. If You are relying on any written documents or records, identify those documents and records, and state the material in each document which You contend demonstrates improper conduct.

**Answer**:  See Plaintiffs' response to Interrogatory #5.

**Supplemental Answer dated 5/6/22:**

With regard to whether Mr. or Mrs. Murphy ever had significant habitability issues at other residences where they have lived aside from the Corvias home at Fort Bragg:  The Plaintiffs have not to date located additional responsive information.

With regard to the habitability issues at Fort Bragg:  By way of supplemental information, the Plaintiffs state as follows:

Sounia Situation – Carbon Monoxide Poisoning:  On or about August 15, 2019, a neighbor across the street had to be hospitalized for carbon monoxide poisoning and the local news came in.[14]

In response, the Murphy's understanding is that then-garrison commander Col. Phillip Sounia took the media to a beautiful officer's housing section of Bragg (off limits to enlisted personnel), which in no way reflected the condition of most properties, and said something like, "Look, our houses are beautiful. They're fine."

It is unknown whether Heather Fuller or anyone else associated with Corvias educated Col. Sounia on the nature of the actual lower-level enlisted-soldier housing conditions at the housing that Corvias oversaw.  It is believed that Ms. Fuller and Col. Sounia were in close touch with one another during that time period.  Plaintiffs contend that Corvias, as the self-professed expert on housing, had the primary duty to inform Army personnel about the real facts of the housing situation.  Corvias did not do that until too late, meaning that many families had to suffer living through unacceptable housing conditions, before belatedly under media, public, Army and Congressional pressure, the company finally agreed to spend $300 million-plus to renovate and teardown homes.

---

[14] https://www.wect.com/2019/08/15/ft-bragg-family-hospitalized-after-reported-carbon-monoxide-poisoning-home/#:~:text=FAYETTEVILLE%2C%20N.C.%20(WNCN)%20%E2%80%94,released%20on%20the%20same%20day.

According to public information, on or about June 23, 2020, Col. Sounia, who had been the Fort Bragg garrison commander, was relieved of the command because of a "loss of trust and confidence in his abilities to command."[15]   The details are unknown and Plaintiffs will supplement as they learn more.

The Murphy family heard that the Galaxy property was officer housing in the 70s and subsequently became enlisted housing.

A couple days after the news that a neighbor was hospitalized for carbon monoxide, Katelyn saw several people in suits across the street at the neighbor's property. About four days later, there was a knock on their door and there were Corvias Alabama personnel. They smelled for gas and asked them to leave the house.

Plaintiffs do not know why it was that Corvias had to bring in personnel from one of the other military bases it managed the housing for, when Corvias has led the public to believe that the company had enough staff at Bragg to adequately manage the housing situation.

The Murphy's daughter, ███ was there at this time (2-3 years old).  Katelyn was a stay-at-home mother and ███ was with her all day. ███ started having headaches.

The neighbor's address (with the carbon monoxide/gas leaks) was also on Galaxy Street.   The properties in this Galaxy Street neighborhood had the same general design/floorplan although some of the laundry rooms were different. Presumably, the same manufacturer built these homes in 1970s.  Corvias, of course, should readily have this exact information which it would have received when it first bid on the Bragg project, or subsequently after 2003 as it owned and leased out the housing.

In the Galaxy Street units, the Murphys noticed that water heaters and gas were located next to living room and kitchen (centrally located gas, air conditioning, water heater with no ventilation-unvented). Propane gas would burn and the post-combustion gases would pervade the living area and kitchen.

They believe they could smell, were affected by, the gases.  Katelyn can recall instances when she would walk into the kitchen and forget what she was doing.

Corvias Poor Work: Corvias pulled the doors off of the air conditioning and inside closet, which actually increased their exposure to off gassing and created an electrical shock hazard (high voltage electrical equipment exposure (220 Volts within arm's reach of daughter)) in a house with a three-year old.

Tim told Corvias that was the last straw. They had to get out of the house for the sake of their family. The remedies proposed by Corvias were unacceptable.  One was to take an A/C vent cover and put it on the door.  Tim, who has knowledge, expertise and experience in construction and building code standards, told them that their proposal failed to satisfy the

---

[15] https://taskandpurpose.com/news/fort-bragg-garrison-commander-relieved/

code requirements.  It was obvious to him, by that time, that Corvias – not just as a one-off event but as a profound and fundamental matter of their business model and their business structure, their culture --  was not going to handle the issue properly and the family was going to have to get out of the uninhabitable housing.

Katelyn called the Corvias representatives almost weekly asking for doors and they never did anything to mitigate the hazard they created. They didn't even tape it off.

Tim believes, based on his experience and expertise, that the work that Corvias has recently announced making a capital investment of $300 million to do now, completely replacing HVAC systems, should have been done years ago.

He has heard that that these homes were to be remodeled in the early 2000s and Corvias said at the time that they didn't need to be remodeled – they handled it with just a facelift. They put carpet in, they put linoleum over other linoleum (which also proved to ensure mold stayed in the home), and they used heavy paint called Kilz to cover up lead-based paint and mold, etc.

His own expertise was such that a contractor at Bragg wanted to hire him, ironically, to do work on Corvias housing renovation work once the company finally announced it was putting up the funds.  He declined.  His reasons why included the poor to mediocre pay that came with Corvias projects; the abysmal quality of the Corvias repair, maintenance and construction efforts when it had come to their own home on Galaxy Street; and the evidence that Corvias still had not changed its culture or its ways.

He recall that he was offered $27.00 per hour as a supervisor.  The contractor told him that Paragon was still working for Corvias -- Paragon being a contractor who had done the shoddy work on his home at Galaxy Street.  This fact – them still using Paragon – along with others, told him that Corvias did not care.  He did not want his name associated with it.  He was embarrassed about the work performed there and the quality of his work is important to him.

In short, even after the news of the terrible military housing and the complaints made by the families at Bragg and elsewhere came out, and even after Mr. Picerne had testified to Congress in 2019, Corvias was still using Paragon.

During the pertinent times, the circumstances indicated that Corvias was badly mismanaging its housing.  Homes that had no business still being in use without substantial renovations or rebuilds were nonetheless still in use.  Corvias though owning its own vertically integrated construction business (Corvias Construction), was failing to recognize the unacceptable quality of the housing, failing to address the root cause of the poor habitability conditions and tenant complaints and repair requests, and on information and belief, misleading the Army that wholesale renovation/rebuilding was not necessary.  Corvias while getting paid millions from the Army and servicemember rents, yet it only had a small number of hired employee repair and maintenance persons on-site at Bragg.  Most of the work was farmed out to independent contractors who Corvias poorly paid without insurance

and no healthcare. The result was undertrained, low-morale and low-quality, even with substance-abusing repair people showing up to homes.

One contractor said he pays the guys on Tuesdays, because he knows they like to do meth on the weekends. Corvias paid for no better than ragtag repair crews, who were never allowed to evaluate nor so much as mention to the customer (the tenant) the root causes of the recurrent problems. (If they even had the capacity to determine them).

A contractor said to Tim how once an employee came in with a homeless person, someone in a suit and a woman and that one or more of them were going to do his work for him because he was too drunk to work. The Corvias standard was low pay, a ragtag crew, not drug testing, and poor quality. Tim wanted to have nothing to do with this.

On the issue of being able to inspect home before moving in: Corvias will say that families like the Murphys had ample chance to look at the home before they agreed to the lease and moved in. That is misleading. First, the types of problems these homes had were often ones going on below the surface and out of ready sight. They were problems the landlord and owner should have known about, but not the newly arriving family seeing the unit for the first time. These are generally young families, with limited education; without construction or building experience.

Military housing is a lottery type system. If you don't have a home, you have to stay at a hotel. The Murphys could not stay in officer housing. Tim's rank was not high enough. And they had limited resources, limiting their housing choices. In their early interactions with Corvias, the company led them to believe 1) that there was a huge demand for the on-base homes, so they better jump at the first opportunity to get one; and 2) that the housing was fine, they could trust Corvias, and any problems they noticed would be fixed.

They were offered two homes to choose from. Corvias sold them on 21 Galaxy Street by saying it was high level officer housing, superior to other houses. They were told they could inspect it one time and Corvias had someone else interested in the house so they should hurry. Tim was given about 20 minutes to look at the house. Tim told the Corvias people that he saw a few things during his walkthrough. They told him to write down whatever he found and they would fix the issues within 48 hours. He believed that as a good faith response and he accepted it. In the first five days, he created a punchlist and he specifically noted mold in the vent. Again, they promised they would fix within 48 hours. But they did not.

In that regard, the average servicemember family will not learn of how poor the Corvias tenant service, repair and maintenance practices are, until after they have signed the lease and moved in.

The Galaxy Street unit had a centrally located HVAC. Tim noted the fact that in newer and safer construction, the water heaters are usually placed away from the living area within the home (like in the garage) as they can explode. The hot water heater by being centrally located in the home was in a less safe place.

A lot of the houses had plumbing issues. However, Corvias always blamed it on the soldiers. Corvias would say that water problems in the home were caused by soldiers not putting a towel on the water on the floor to sop it up. That's the same thing Corvias told Tim – that if there was water on the floor, it was because the family members were not using a towel. The message was: any water damage is your fault.

At one point, a contractor said to Tim that a lot of the houses were going to collapse so it would be good if they were going to be able to get to them before that happened, to pull them apart and rebuild/renovate.

During the limited walkthrough afforded to Tim Murphy at move-in for Galaxy Street, it was impossible for him just based on that walkthrough to discover that the house was inhabitable. However, by the end of their tenancy and based on his extensive experience in the construction industry, his informed opinion would be that the house was absolutely uninhabitable.

Again, he was noting problems even before he moved into the 21 Galaxy Street address with his family – he made the punch list right at the start, and believed in good faith that Corvias would fix the problems. He also believed and assumed, in good faith, that there were no serious underlying root problems with the unit that the owner or landlord were allowing to continue along – known to the landlord but not to the tenants.

On the first day he walked in and documented the problems he found, and Corvias said they would quickly resolve the issues. The family took the Corvias person at her word. But they did not fix the problems.

The reason he took the house to start with was based on the pressure from Corvias that, if you don't take it, someone else would. And the promises from Corvias that the housing was fine. As to the Galaxy Street home, Corvias made it seem like they won the lottery when they leased it.

Mold in the vents were never addressed. The repair folks said they couldn't remove the vent from the wall because it was covered by several layers of paint. He measured it to be 1/8" thick of paint – you cannot pull the vent off.

He fears, however, that the conditions of the HVAC ductwork inside the vent resembled what has come to light for other homes. See photos regarding the Thomas home, produced in supplemental document production.

From talking to others, Tim also learned that the lower personnel were closing out work orders without the upper level management knowing. It appears that Corvias failed to have an audit or oversight system in effect to prevent this unfair and deceptive practice.

Katelyn recalls that about five days after they moved in, Tim was gone for an extended period and she was stuck with the situation alone. Corvias only fixed the small items, or did minor things, but did nothing for the bigger issues. At one point she had a fan

needed fixing. The guy who came to fix the fan told her that the floor was rotted, but he would not fix it. He said words to the effect of, "Your floor is really spongy, it's like your floor is going to fall through."

Some of the workers who came by the house were disrespectful and rude to Katelyn, saying things like, "You don't know what you're talking about." She can recall an exchange like that occurring after they had been in the Galaxy Street home for about two weeks.

The workers were also loud and messy. For instance, when they came to fix the bathroom ceiling, they would leave insulation on the hallway floor. This was offensive to a family with a young child.

The neighbor was having the same problem. They were not fixing work orders and her husband was away. Tim came back a month later and soon had to leave for another three weeks. Once he got back, the problem became more clear to him.

Another time, they woke up one morning and there was about an inch of water in their downstairs bathroom. Tim checked the piping and the problem was not obvious. The Murphy family called in an emergency work order and Corvias came out. The worker said that the A/C line backed up. Walls were saturated at the base and even the interior. The worker was supposed to bring in a dehumidifier to reduce the moisture, but did not. They called in another work order for this, and it was not provided. This supplemental work was necessary to prevent future/further issues.

Regarding complaints: When they first started complaining, Corvias would say words to the effect of "don't worry, we'll send someone out." They said they had a required response time for mold of 24-48 hours. But, when the personnel would come out, they would only remedy the problem – not fix it.

Tim and Katelyn finally figured this out once it happened enough times that they saw a pattern. That's when Tim escalated the problem by emailing them a couple times a day. He doesn't know if they got blacklisted, but it appeared that Corvias employees were told to stop responding to Murphy complaints.

In September-October 2019: They called Corvias repeatedly. Once when Tim called them, the person on phone said, "Oh, your 21 Galaxy Street. We were told that Cindy Hart is handling your situation" or something similar. They actually filed complaints and never heard anything back. Tim was emailed surveys and he would fill them out and hear nothing back. Even when he told them the wood was rotted, Corvias would tell them that if they did any damage, they would be charged for it. And, that it would be reported to his chain of command (i.e., a threat).

Surveys would be emailed to Tim/Katelyn and say, "Now that your work order is done, complete the survey." At least half of the time, the work was not even done yet.

When the family first got to Fort Bragg, complaints had to go through a complaint line (telephone): call 800 number, record the issue, wait for help in a 24 to 48 hour period.

Then, Corvias implemented by July 2019 a new, online process for complaint management. Cindy Hart gave an explanation for why Corvias had switched to the new system. She said that sometimes those operators would mess up so it was better to have an online portal to expedite the process. Corvias said it was more efficient.

Corvias never explained to the Plaintiffs or their neighbors that the real reason why it was having to go to the new complaint management system was because of the trouble the company was in over the publicity over the terrible housing for many soldier families. In fact, the timeline shows that after the Reuters article in late 2018, and after Mr. Picerne was called to testify at Congres and to apologize, Corvias told Congress that it was ending the use of remote call centers as part of its overall effort to remedy the problems. That is different from that the Corvias personnel told the Murphys.

It is believed that Corvias also put in the internet complaint management system in order to try to save labor costs by eliminating the need for additional full-time Bragg-located employee hires.

Cindy Hart came out with two people on one occasion to the Galaxy Street home. One person claimed to be an Environmental Specialist (he was African American; he said he was a licensed and/or trained biologist).

The other was said to be the Head Technician (Caucasian, middle aged with ponytail, wearing a red Corvias shirt; Cindy introduced him as being from the construction side of the company). (By comparison, the typical Corvias repair people would often show up at the house in an old T-shirt and pants).

The Head Technician agreed with Tim that the house had a façade going on – it was not as good as it looked. The environmental specialist said something like "Well, don't pull that duct work out. If you damage something, we can report it to your chain of command." (This is one reason why Plaintiffs are entitled to discovery from Corvias and from the Army on relevant communications – to see whether Chain of Command have any idea that such threats were being made.).

In about September/October 2019. Cindy brought in its so-called environmental specialist to try to disprove Tim's allegations. The Environmental Specialist found out that Tim was a HazMat Technician. He tried to tell Tim that the holes in the linoleum were dirt. Katelyn, Tim and ███ were there at the time of the visit. The Environmental Specialist claimed, "There is no such thing as mold."

███ Problems: Headaches started with their young daughter, ███ within a month of moving to the property. Katelyn took ███ to the doctor, and the doctors said it could be allergies, but they didn't know. ███ started getting black spots under her eyes in a couple of months and had constant allergies.

The house had few windows and Katelyn recalls that it was hard to breathe in. She got concerned again about how ████ looked and took her to the doctor again. ████s nose was blue inside. The doctor became concerned. He said that they needed to get out of the house they were in and move to another residence. The doctor felt that something in the house was affecting ████. Katelyn recalls that the doctor wrote them a letter hoping that would help get them a new place to live, but that did not work. Meanwhile, Katelyn herself was having constant allergies, headaches and wasn't feeling good.

They gave the letter to Cindy Hart (she believes), but Corvias did nothing. The family dealt with Cindy as they understood her to be the manager of the community that their home was in.

Corvias was going to charge them $3000 to let them get out of the lease.

Katelyn recalls that other women with babies and toddlers in their community were also having some of the same issues. There was a girl next door to them who had to leave the home next door because the baby was getting so sick from living in that house. As soon as that family moved, the baby was no longer sick.

**Work Orders:** The Murphys have evidence showing how the work order language changed over time. Corvias would send someone out, they would not fix the problem, but the work order would say otherwise.

It took several weeks to get Cindy Hart to get them the work order history, but they finally got it. Tim noticed an error from looking over one of the work orders, but Cindy Hart's response was something like, "Well, that's what I have."

The Murphys were specifically told that they were only allowed to speak to Cindy Hart.

The electronic work order system had a "last edited" date that shows when the language changed in some instances.

**Paragon:** Paragon was a contractor that did some ceiling repairs at their property because of a roof leak that never was properly addressed. The family would joke that after their repairs happened, you could actually multitask when sitting on the toilet as water would drip on you: "You could take a shower and go to the bathroom at the same time."

Regarding families/homes with similar situations:

23 Galaxy Street – Nathan and Angela Nolan – they had to have their whole house stripped, upstairs, where they had a water leak. There was a sweet-sour odor of ammonia they had, like urea. They had to stay in hotel when work was done.

**19 Galaxy Street** – They went in one day and the neighbor said they were having flooding problems in their home. Instead of fixing the problem (weather stripping, etc.), Corvias pulled up carpeting and installed linoleum in the house because intruding water was easier to cope with that way.

Plaintiffs may seek to qualify Tim Murphy as an expert, as well as a Plaintiff, in light of his education and experience in construction and homes. Based on the information that he has reviewed so far, starting out from his own family's facts regarding the Galaxy Street address, Tim is of the opinion that:

- The Galaxy Street home was in unacceptable and uninhabitable condition when Corvias leased it to his family.

- The home in the condition that it was in, when his family lived there, needed a complete teardown and rebuild. Comparing the condition of that home to other residential properties that may be "flipped," or renovated, prior to being rented out or sold, this unit at Galaxy Street needed more than a routine renovation.

- Under the circumstances (lack of true and accurate information from the company; use of bad faith, unfair and deceptive practices in tenant communications, tenant service, repair and maintenance), the presence of lead paint and/or pipes in the home was unacceptable.

- The unit needed a whole new roof. The attic space was highly humid. Studs were rotted. The floor was rotted.

- Corvias should have known that the house was uninhabitable. Presumably, Corvias in both its owner and landlord and property manager and construction company capacities, knew the prior history of the unit, knew of past repair and maintenance issues, and knew of past tenant complaints.

- The conditions in the home indicated years of faulty maintenance and repair. In the bathroom, there were four layers of linoleum, each with mold problems. This suggests they didn't get rid of mold, in the past, but hid it with a new layer of linoleum – three times.

- The conditions were rendered worse because Corvias had told contractors and vendors only to engage in very limited (and cheaper) tasks, both when the Murphys were there, and, inferably, over the years prior to that dating back to 2003. As an example, regarding the defective roof, when the Paragon contractor came to fix the bathroom ceiling, they told Tim they were not there to fix the attic problem. It was another example of taking a "band aid" approach to handing major problems.

42

**Interrogatory No. 7**. Describe in detail every instance in which You sent or received a complaint, inquiry, or other communication concerning a housing or habitability issue, including but not limited to water or moisture intrusion, leak, ceiling or roof leak, flooring issue, structural issue, lead-based paint, mold, or suspect fungal growth in (or on the outside or perimeter of) military housing at Fort Bragg, including all follow-up communications and actions that You or others took in response to each such issue and identify the persons involved.

**Answer:**

**Objection. This interrogatory is vague and overly broad. Plaintiffs cannot recall "every instance" where a communication was made concerning military housing defects.**

**Without waiving any objections, Plaintiffs state:**

**See Plaintiffs' response to Interrogatory #5.**

**Plaintiffs are informed and believe that Defendants are in possession of all maintenance and repair requests submitted by Plaintiffs, along with all records related to Defendants' responses. Additionally, Plaintiffs make reference to the facts and allegations set out in the Amended Complaint.**

**Supplemental response dated 5/6/22:**

**Plaintiffs have provided all responsive information they have regarding complaints, inquiries and communications, in connection with the other interrogatory responses herein. Plaintiffs respectfully request that the Defendants review those responses.**

**Interrogatory No. 8**. If You allege you were exposed to mold, lead-based paint, or other allegedly harmful substances while at Fort Bragg, describe such exposure in detail including the date such exposure took place, where such exposure took place, the date You first experienced symptoms and any how You confirmed such exposure involved the alleged substance. If You are relying on any written documents or records, identify those documents and records, and state the material in each document which You contend demonstrates the presence of the alleged substance.

**Answer:**

**Objection. Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home. Rather, Plaintiffs are seeking, *inter alia,* allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times. *See In re NC Swine Farm Nuisance Litig.,* Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony). Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.**

**Without waiving any objections, Plaintiffs state:**

**See Plaintiffs' response to Interrogatory #5.**

**Supplemental Answer dated 5/6/22:**

**Plaintiffs allege that they were exposed to mold and air that passed through filthy HVAC ducts while at the Fort Bragg address.**

**Plaintiffs are in the process of obtaining the family's medical records and reserve the right to supplement this response.**

**SUPPLEMENTAL ANSWER DATED 7/8/2022:**

**Plaintiffs provided their signed revised Medical Authorizations to Defendants on May 27, 2022 and June 8, 2022.**

**Interrogatory No. 9**. State whether or not You have been treated by, diagnosed by, or admitted to any hospital or other healthcare facility in the last ten (10) years and if so, state the name of the hospital or facility, the dates of treatment, diagnosis, or admission , the illness or condition involved and the names and addresses of the health care provider(s) who treated You.

**Answer:**

**Objection. Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home. Rather, Plaintiffs are seeking, *inter alia*, allowable damages for private nuisance, including for their discomfort, annoyance and loss**

of use and enjoyment of their home during the pertinent times. *See In re NC Swine Farm Nuisance Litig.*, Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony). Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.

Without waiving any objections, Plaintiffs state:

Plaintiffs are willing to meet and confer with Defendants for purposes of facilitating appropriately limited medical records discovery. However, broad medical discovery such as in a personal injury case is not appropriate herein.

<u>Supplemental response dated 5/6/22</u>:

Plaintiffs are in the process of obtaining copies of their medical records and reserve the right to supplement this response.

<u>SUPPLEMENTAL ANSWER DATED 7/8/2022</u>:

Plaintiffs provided their signed revised Medical Authorizations to Defendants on May 27, 2022 and June 8, 2022.

As to medical providers Plaintiffs have seen in the last 10 years, Timothy Murphy, while living in Williston Florida, saw Dr. David Wise, Nature Coast Medical Group. Mr. Murphy was treated at Sandhill Medical Clinic for an abrasion and was treated at Clarks Clinic in Fort Bragg by Dr. Ormsbee.

Katelyn Murphy recalls seeing a provider in Shands Hospital. While living in Williston with her mother-in-law, Ms. Murphy was seen at UF Health Internal Medicine (Dr. Maska). Ms. Murphy was also treated at Cape Fear Family Medicine, Owen Drive, Fayetteville, NC, Womack Army Hospital ER, and Cape Fear Orthopedics.

The Murphys' daughter, ███ was born at Shands Hospital in Gainesville, and was seen by Alliance Pediatrics in Gainesville. ███ was also treated at Kidzcare Pediatrics in Spring Lake, NC, Womack Hospital, Cape Fear Hospital, Carolina Child Neurology, and Cape Fear Pediatrics.

**Interrogatory No. 10**. State whether You have undergone a physical examination in the last ten (10) years. If so, state the date of any such examination, where it was conducted, who conducted the examination and whether there is a report or other Document concerning such physical examination.

**Answer:**

Objection.  Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home.   Rather, Plaintiffs are seeking, *inter alia,* allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times.  *See In re NC Swine Farm Nuisance Litig.,* **Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony).  Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.**

Without waiving any objections, Plaintiffs state:

Plaintiffs are willing to meet and confer with Defendants for purposes of facilitating appropriately limited medical records discovery.  However, broad medical discovery such as in a personal injury case is not appropriate herein.

**Supplemental response dated 5/6/22:**

Plaintiffs are in the process of obtaining copies of their medical records and reserve the right to supplement this response.

**SUPPLEMENTAL ANSWER DATED 7/8/2022:**

See Plaintiffs' Answer to Interrogatory 9 above, as supplemented.

**Interrogatory No. 11**. State whether You have consulted any health care provider in the past ten (10) years. If so, specify in detail the nature of the condition for which You consulted the health care provider and the name and address of each health care provider who provided treatment for the condition.

**Answer:**

Objection.  Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home.   Rather, Plaintiffs are seeking, *inter alia,* allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times.  *See In re NC Swine Farm Nuisance Litig.,* **Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL**

11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony). Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.

Without waiving any objections, Plaintiffs state:

Plaintiffs are willing to meet and confer with Defendants for purposes of facilitating appropriately limited medical records discovery. However, broad medical discovery such as in a personal injury case is not appropriate herein.

Supplemental response dated 5/6/22:

Plaintiffs are in the process of obtaining copies of their medical records and reserve the right to supplement this response.

SUPPLEMENTAL ANSWER DATED 7/8/2022:

See Plaintiffs' Answer to Interrogatory 9 above, as supplemented.

Interrogatory No. 12. State whether You ever experienced any respiratory conditions, breathing difficulties, asthma, allergies, headaches, skin conditions, chronic nasal congestion, chronic sinus infections, or lead poisoning symptoms. If so, describe the treatment You received for such condition, including the name and address of each healthcare provider who treated you, the time period in which you were treated, and any prescription or over-the-counter medications taken to treat such conditions.

Answer:

Objection. Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home. Rather, Plaintiffs are seeking, *inter alia*, allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times. *See In re NC Swine Farm Nuisance Litig.*, Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony). Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.

Without waiving any objections, Plaintiffs state:

Plaintiffs are willing to meet and confer with Defendants for purposes of facilitating appropriately limited medical records discovery. However, broad medical discovery such as in a personal injury case is not appropriate herein.

**Supplemental response dated 5/6/22:**

Plaintiffs are in the process of obtaining copies of their medical records and reserve the right to supplement this response.

**SUPPLEMENTAL ANSWER DATED 7/8/2022:**

See Plaintiffs' Answer to Interrogatory 9 above, as supplemented.

**Interrogatory No. 13**. Describe the injuries You contend You sustained as a result of the Your military housing experience at Fort Bragg. If you claim You are still afflicted with or suffering from the effects of any such injury, describe Your claim and all supporting evidence in detail.

**Answer:**

Objection. Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home. Rather, Plaintiffs are seeking, *inter alia*, allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times. *See In re NC Swine Farm Nuisance Litig.,* Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony). Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.

Without waiving any objections, Plaintiffs state:

See Plaintiffs' response to Interrogatory #5.

Plaintiffs during the pertinent times suffered discomfort, annoyance, irritation and loss of use of their ability to enjoy their property. *See In re NC Swine Farm Nuisance Litig.,* No. 5 7:14-cv-00180-BR (E.D.N.C.), jury instructions filed at Doc. 262, on April 26, 2018, at p. 14 (private nuisance jury instruction for damages: "The plaintiffs claim that the interference with the use and enjoyment of his or her property has caused him or her anger,

embarrassment, annoyance, inconvenience, decreased quality of life, and/or physical and mental discomfort. There is no fixed formula for placing a value on these alleged harms. You will determine what is fair compensation by applying logic and common sense to the evidence.").

Plaintiffs further suffered from a loss of the comfort, quiet and enjoyment and habitability of their rented premises during the pertinent times.

Plaintiffs further suffered from the injury of not getting the benefit of their bargain with regard to their rented housing. During the pertinent times, the Plaintiffs duly and timely paid any and all rent that was due and owing for their rented Corvias military housing home. However, they did not receive the quality of rented housing to which they were entitled and for which, with their limited means, they paid.

Supplemental response dated 5/6/22:

Plaintiffs are in the process of obtaining copies of their medical records and reserve the right to supplement this response.

SUPPLEMENTAL ANSWER DATED 7/8/2022:

See Plaintiffs' Answer to Interrogatory 9 above, as supplemented.

Interrogatory No. 14. If You were treated, attended or examined by any physician(s) or others for the injuries identified in responses to Interrogatories 12-13, state the names and addresses of all such persons and the nature of the medical treatment given by each physician or other person. If any diagnostic tests were performed, state the type of test performed, name and address of the place where it was performed, date each test was performed and what each test disclosed.

Answer:

Objection. Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home. Rather, Plaintiffs are seeking, *inter alia*, allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times. *See In re NC Swine Farm Nuisance Litig.,* Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living

with unpleasant swine farm odor did not require medical expert testimony).  Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.

Without waiving any objections, Plaintiffs state:

Plaintiffs are willing to meet and confer with Defendants for purposes of facilitating appropriately limited medical records discovery.  However, broad medical discovery such as in a personal injury case is not appropriate herein.

Supplemental response dated 5/6/22:

Plaintiffs are in the process of obtaining copies of their medical records and reserve the right to supplement this response.

SUPPLEMENTAL ANSWER DATED 7/8/2022:

See Plaintiffs' Answer to Interrogatory 9 above, as supplemented.


Interrogatory No. 15.  Identify any communications, whether written or oral, You had with any person, including but not limited to other residents of Fort Bragg, environmental consultants, and members and civilian employees of the Army, media outlet, or federal, state or local government agency, official, staff member or employee wherein you discussed any alleged housing issues at Fort Bragg, including but not limited to mold, health or habitability issues.


Answer:

Objection.  This Interrogatory is vague and overly broad.  Plaintiffs cannot possibly remember and recount each and every conversation, written or oral, that they had over the course of multiple years, let alone the topic of each conversation.

Without waiving any objections, Plaintiffs state:

See Plaintiffs' response to Interrogatory #5.

Defendants are believed to have records kept in the normal course of business and reflecting numerous of the complaints and relevant communications from, to and with the Plaintiffs, or either of them.

At one point, Tim Murphy sent a letter to JAG, and communicated with Captain Monea, who wrote back in an email and a letter under letterhead.  Tim met personally with him as well.

Plaintiffs described their interactions and communications that they could recall with regard to their housing at Fort Bragg, in their response to the interrogatories above. They respectfully direct Defendants to those responses.

**Interrogatory No. 16.** If You have ever been convicted or pleaded guilty, no contest, or entered an Alford plea to an offense punishable by imprisonment of more than one year or any crime of dishonesty or false statement, regardless of the punishment actually imposed, please state the date of each conviction or plea, the name and location of the court in which You were convicted or pleaded in, and the crime of which you were convicted or pleaded guilty, no contest, or entered an Alford plea to.

**Answer:**

**Objection.** Plaintiffs object to the extent that the discovery requests is overly broad, unduly burdensome, unlimited in time, and otherwise harassing and seeking of irrelevant information that is not likely to lead to the discovery of relevant evidence. Plaintiffs further object that the scope of the request is unlimited in time. Plaintiffs further object to the extent the discovery requests would purport to elicit information on old matters or misdemeanor matters with no potential relevance herein.

Without waiving any objections:

For Katelyn Murphy – Not applicable.

For Tim Murphy – Not applicable. (In or about the 2007-08 time period, as a young man, Tim and a friend were hunting and shot a deer. As it turned out, this was outside of the hunting season, and so, the game warden charged him. He was briefly detained in jail because he lacked the funds to get out at the time. It was believed to be merely a misdemeanor.).

**Interrogatory No. 17.** Identify each person whom You may call as an expert witness at trial. With respect to each expert, state his or her name and address, the subject matter on which

the expert is expected to testify, the substance of the facts and opinion to which the expert is expected to testify, and a summary of the grounds for each opinion.

**Answer:**

**Objection.  The time for the Plaintiffs to be obligated to name any of their experts in this matter has not yet arrived.**

**Without waiving any objections, Plaintiffs state:**

**Plaintiffs have not yet selected their expert witnesses in this matter.**

**Plaintiffs reserve the right to supplement this response in due course.**

**Interrogatory No. 18**.  List any photographs, diagrams, or other exhibits which You or your attorney have which you will or may introduce at trial.

**Answer:**

**Objection.  The time for the Plaintiffs to be obligated to determine and disclose their list of exhibits for trial in this matter has not yet arrived.**

**Without waiving any objections, Plaintiffs state:**

**Plaintiffs have not yet selected their exhibits in this matter.**

**Plaintiffs reserve the right to supplement this response in due course.**

**Interrogatory No. 19**.  Have You ever been named as a plaintiff or defendant in any type of litigation other than this lawsuit?  If so, please state the name, county court or federal district, and case number as well as the outcome of the litigation.

**Answer**:

**Objection.  Plaintiffs object to the extent that the discovery requests is overly broad, unduly burdensome, unlimited in time, and otherwise harassing and seeking of irrelevant information that is not likely to lead to the discovery of relevant evidence.**

**Without waiving any objections:**

**No.**

**Interrogatory No. 20**.  Please state the full names and dates of birth of any person who resides, or resided at the time period of the allegations contained in the Amended Complaint, with You at Fort Bragg.

**<u>Answer:</u>**

**Objection.  Plaintiffs wish to safeguard relevant information regarding their minor children.**

**Without waiving any objections, Plaintiffs state:**

**No other individuals resided with Plaintiffs' family during the relevant times.**

**Objection.  Plaintiffs' do not wish to identify their minor children.  No other individuals resided with Plaintiffs.**

**<u>Supplemental Answer dated 5/6/22</u>:**

██████████

**Interrogatory No. 21**.  Itemize and show how you calculate any damages claimed by You in this Action, whether economic, non-economic, or other.

**<u>Answer</u>:**

**Objection.  This interrogatory calls for a legal conclusion and attorney work product. Moreover, Plaintiffs have not formulated a settlement demand at this stage.**

**Without waiving any objections, Plaintiffs state:**

**See Plaintiffs' response to Interrogatory #13.**

**<u>Supplemental Answer dated 5/6/22</u>:**

**Actual damages will be calculated in accordance with the allowable categories of damages under the North Carolina Pattern Jury Instructions and/or traditional jury**

instructions for whichever causes of action the Court may allow to go to trial. Contract damages could be measured by the total amount of the BAH rent paid by the soldier or on his behalf, or some percentage thereof, on the theory that the soldier paid to receive decent accommodations, did not receive them, and did not receive the benefit or the bargain. Damages for private nuisance would include damages for discomfort, annoyance, irritation, annoyance, and loss of use and enjoyment. Damages for breach of the warranty of habitability may include via the measure of damages by the difference between the value of the rented premises in its uninhabitable condition and its fair market rental value otherwise. Under Chapter 75, a prevailing plaintiff may be entitled to three times actual damages.

Plaintiffs reserve the right to supplement to the extent they are able to identify damages in other respects including out of pocket expenses; moving expenses; costs associated with relocating to a new home that would not otherwise have been expended; values of lost or damaged clothing, linens or furniture; etc.

Plaintiffs do not claim lost wages or lost income (e.g., taking time away from work because of the conditions at the home, and suffering lost wages as a result).

Plaintiffs reserve the right to allege other claims including but not limited to punitive damages if the discovery so supports in assessing the gravity of the fraud and recklessness-related allegations in the complaint, e.g. regarding the work order process and purported tenant customer service facility of the enterprise.

Date:  July 8, 2022.

Respectfully submitted,

s/John Hughes
Mona Lisa Wallace
NC State Bar No. 009201
John Hughes
NC State Bar No. 22126
WALLACE & GRAHAM, PA
525 N. Main Street
Salisbury, North Carolina 28144
Telephone: 704-633-5244
Fax: 704-633-9434
mwallace@wallacegraham.com
jhughes@wallacegraham.com

J. Anthony Penry
N.C. Bar No. 8936
PENRY | RIEMANN PLLC
2245 Gateway Access Point, Suite 203
Raleigh, NC 27607
(919) 792-3891
Andy.Penry@PenryRiemann.com

Robert S. Metro
S.C. Bar No. 69494
BAUER & METRO, PC
Post Office Box 7965
Hilton Head, SC 29938
(843) 842-5297
Rmetro@bauerandmetro.com
Appearing pursuant to Local Rule 83.1(e)

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 8, 2022 I served this document on counsel for the Defendants

herein, by <u>email</u>, as follows:

Mark P. Henriques
Matthew F. Tilley
WOMBLE BOND DICKINSON (US) LLP
3500 One Wells Fargo Center
301 South College Street
Charlotte, North Carolina 28202-6025
E-mail: Mark.Henriques@wbd-us.com
E-mail: Matthew.Tilley@wbd-us.com

Thomas J. Yoo
HOLLAND & KNIGHT LLP
400 S. Hope St., 8th Floor
Los Angeles, CA 90071
Thomas.Yoo@hklaw.com

Jessica L. Farmer
HOLLAND & KNIGHT LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Jessica.Farmer@hklaw.com

Date: July 8, 2022.                     Respectfully submitted,

s/John Hughes
Mona Lisa Wallace
NC State Bar No. 009201
John Hughes
NC State Bar No. 22126
WALLACE & GRAHAM, PA
525 N. Main Street
Salisbury, North Carolina 28144
Telephone: 704-633-5244
Fax: 704-633-9434
mwallace@wallacegraham.com
jhughes@wallacegraham.com

56

DocuSign Envelope ID: 36CA902E-3CEE-44D5-BD52-D7C87A2115BA

# VERIFICATION

I, pursuant to 28 U.S.C. § 1746 hereby declare under penalty of perjury the following is true and correct:

1. I am a competent adult, over the age of eighteen, and this Declaration is based on my personal knowledge.

2. I am a Plaintiff in the military housing lawsuit brought against the Corvias enterprise for the housing at Fort Bragg.

3. From time to time, I have provided information to my lawyers to prepare "interrogatory responses."

4. I have now been asked to verify that as to the responses being served, the information that is in them that came from me or that I know personally, in fact is true to the best of my knowledge. I have gone over these interrogatory responses.

5. Where those responses contain facts about my family or me personally and other facts of which I have personal knowledge, I swear and affirm under penalty of perjury that those facts and statements are true to the best of my knowledge.

6. Where the facts are based on information provided by other people, I state that I believe that information to be true.

7. Where the facts are about other things like facts learned from public records, I am relying on my attorneys and the investigation that my attorneys did.

8. I declare under penalty of perjury that the foregoing is true and correct.

Dated: _7/7/2022_____

Signature: _____

Printed name: Katelyn Murphy

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **SSG SHANE PAGE, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 5:20-cv-00336-D** |
| | ) | |
| **BRAGG COMMUNITIES, LLC, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

_____

### SSG SHANE PAGE'S[1] AND BRITTANY PAGE'S SUPPLEMENTAL JULY 8, 2022 RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiffs, SSG Shane Page and Brittany Page, by and through their undersigned attorneys, and by way of supplementing their answers to the interrogatories propounded by Defendants, pursuant to Fed. R. Civ. P. 26 and 33, state as follows:

Plaintiffs assert attorney-client privileges and immunities as to all communications between Plaintiffs and legal counsel, and thus object to producing or disclosing such communications. Undersigned counsel asserts work-product privileges and immunities as to their own work product. Plaintiffs therefore object to producing such work-product. Plaintiffs assert work-product privileges and immunities as to all communications and documentation prepared in anticipation of litigation and thus object to producing such work product.

In setting forth these answers, Plaintiffs do not waive any attorney-client, work-product, or other privilege or immunity which may attach to information called for in, or which may be

---

[1] Shane Page is in Africa with limited connectivity. Plaintiffs are endeavoring to obtain a signed verification page from his wife signing in her capacity as his power of attorney. Update: as of 7/8/22, SSG Page is in Bosnia. However, Plaintiffs are working with him so that he can review information.

responsive to, these interrogatories. Plaintiffs do not concede the relevance or materiality of these interrogatories, the subject matter of these interrogatories, or documents produced in response to these interrogatories. Plaintiffs reserve the right to question the competency, relevancy, materiality, privilege, and admissibility of any documents produced or referred to herein. Plaintiffs also reserve the right to revise, correct, supplement, or clarify any of their answers or documents referred to herein. The above objections, privileges, and immunities are asserted in response to each of the following interrogatories as if set forth verbatim at the beginning of the answers to each interrogatory:

**Interrogatory No. 1**. State Your full name, address, date of birth, current and past marital status (including the date(s) of marriage and the full name of your spouse(s) (if applicable), Social Security number, driver's license number and cell phone number(s) and email(s) used while residing at Fort Bragg.

**Answer:**

**Plaintiffs object to the interrogatory to the extent it is overbroad, unduly burdensome and harassing. For example, information about a past marriage outside of the pertinent time period relevant herein is irrelevant nor likely to lead to the discovery of material and admissible evidence.**

**Without waiving any objections, Plaintiffs state:**

**Brittany M. Page**
**69 Baltic Circle**
**Fort Bragg, NC 28307**
█████████████

**828-390-1829**
**NC 000034227128**
**Watsonbrittany282@yahoo.com**

**SSG Shane Page**
**69 Baltic Circle**
**Fort Bragg, NC 28307**
███████

2

███████
**315-460-6897**
**NC 000036896571**
**Sppackfan19@gmail.com**

**Interrogatory No. 2**. Identify all persons who are likely to have personal knowledge of any fact alleged in the pleadings, and state the subject matter of the personal knowledge possessed by each such person.

**Answer:**

Plaintiffs object to the extent the discovery request would require the disclosure of information that may only be appropriately disclosed under the auspices of an appropriate Court-approved confidentiality protective order. Without waiving any objections:

1. All named Plaintiffs and Defendants, along with the individuals identified in their respective initial disclosures and discovery responses.

2. All current and former tenants/residents of Corvias military housing at Fort Bragg during the class period.

3. Jessica Mundus
   Former Neighbor
   Florida Address Unknown
   910-527-3506

   Ms. Mundus was the Pages' neighbor at 274 Spear Drive and has personal knowledge of housing defects via her verbal communications and interaction with the Pages.

4. Kayla Sanchez
   Address Unknown (Fort Bliss, El Paso, TX)
   432-248-7542

   Ms. Sanchez is a friend of the Pages who previously resided at Fort Bragg, North Carolina. Ms. Sanchez was present when Corvias conducted water intrusion testing at 274 Spear Drive and other repair work.

5. Jonathan Whalen
   Morganton, NC
   828-334-7251

Mr. Whalen is a friend of the Pages who visited frequently and has personal knowledge of housing defects via verbal communications and interaction with the Pages.

6. Suzy Fitzgerald
   2850 Fish Hatchery Road
   Morganton, NC
   828-438-9944

   Ms. Fitzgerald is a friend of the Pages who visited frequently and has personal knowledge of the housing defects via verbal communications and interaction with the Pages.

7. Capt. Jason Ritch
   Fort Polk, LA
   803-727-5302

   Capt. Ritch was the officer in charge of inspecting military following the "town hall meetings". Capt. Ritch was also Sfg. Shane Page's team leader.

8. John Picerne
   Founder/Chairman of the Board – Corvias
   1405 S County Trail #530
   East Greenwich, RI 02818
   401-228-2800

   Plaintiffs are informed and believe that Mr. Picerne has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

9. Patrick Bucolo
   Resident Manager-Corvias
   Fort Bragg

   Plaintiffs are informed and believe that Mr. Bucolo has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

10. Leonard Jones
    Resident Manager-Corvias
    Fort Bragg

    Plaintiffs are informed and believe that Mr. Jones has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

11. Amber Smiley
    Resident Assistant Manager-Corvias
    Fort Bragg

Plaintiffs are informed and believe that Ms. Smiley has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

12. **Vanessa Hargrave**
    **Resident Associate-Corvias**
    **Fort Bragg**

    Plaintiffs are informed and believe that Ms. Hargrave has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

13. **Jenneisha Monroe**
    **Resident Associate-Corvias**
    **Fort Bragg**

    Plaintiffs are informed and believe that Ms. Monroe has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

14. **Mallory Dixon**
    **Resident Service Specialist-Corvias**
    **Fort Bragg**

    Plaintiffs are informed and believe that Ms. Dixon has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

15. **Kianna Amos**
    **Resident Service Specialist-Corvias**
    **Fort Bragg**
    Plaintiffs are informed and believe that Ms. Amos has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

16. **Heather Fuller**
    **Operations Director- Corvias Management**
    **1405 S County Trail #530**
    **East Greenwich, RI 02818**
    **401-228-2800**

    Plaintiffs are informed and believe that Ms. Fuller has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

17. **Deb Osmanski**
    **Former Program Office Administrator (Office Manager)**
    **Corvias-Fort Bragg**
    **Current Address Unknown**
    **Current Employer is ER Wagner in Menomonee Falls, Wisconsin**
    **800-558-5596**

5

Plaintiffs are informed and believe that Ms. Osmanski has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

18. **Michael Melia**
    **Former Director of Construction – Corvias**
    **Current Address Unknown**
    **Current Employer is RQ Construction in Pinehurst, North Carolina**
    **760-631-7707**

    Plaintiffs are informed and believe that Mr. Melia has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

19. **Jeremy Stefanko**
    **Former Senior Maintenance Manager**
    **Corvias Military Living, LLC**
    **Current Address Unknown**
    **Currently Employed by Cumberland County, NC**

    Plaintiffs are informed and believe that Mr. Stefanko has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

20. **Steve Maxwell**
    **Former Facilities Director**
    **Corvias Military Living, LLC**
    **Current Address Unknown**
    **Currently Employed by Balfour Beatty Communities in Wetumpka, Alabama**

    Plaintiffs are informed and believe that Mr. Maxwell has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

21. **Steve Boothe**
    **Former Director of Facilities Operations**
    **Corvias Military Living, LLC**
    **Current Address Unknown**
    **Currently Employed by Hunt Companies in Providence, Rhode Island**

    Plaintiffs are informed and believe that Mr. Boothe has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

22. **Charles Connors**
    **Director of Capital Assets**

6

**Corvias Group**
**1405 S County Trail #530**
**East Greenwich, RI 02818**
**401-228-2800**

**Plaintiffs are informed and believe that Mr. Connors has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.**

23. **Chuck Cavaretta**
    **Former Vice President of Construction**
    **Corvias**
    **Current Address Unknown**
    **Current Employed by The Cassidy in Winter Haven, Florida**

    **Plaintiffs are informed and believe that Mr. Cavaretta has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.**

24. **John Shay**
    **Senior Vice President of Construction & Development**
    **Corvias**
    **1405 S County Trail #530**
    **East Greenwich, RI 02818**
    **401-228-2800**

    **Plaintiffs are informed and believe that Mr. Shay has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.**

25. **Cindy Hart**
    **Assistant Operations Director- Corvias**
    **Fort Bragg, North Carolina**

    **Plaintiffs are informed and believe that Ms. Hart has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.**

26. **Mike Sarisky**
    **Operations Director-Corvias**
    **Fort Bragg, North Carolina**

    **Plaintiffs are informed and believe that Mr. Sarisky has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.**

27. **Mark Foraker**
   **Former Business Director – Corvias (Fort Bragg)**
   **Current Address Unknown**
   **Currently Employed by Barvin in Houston, Texas**

   Plaintiffs are informed and believe that Mr. Foraker has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

28. **Toni Cornelius**
   **Professional Engineer-Cornelius Consulting**
   **4004 Park Avenue**
   **Wilmington, NC 28403**

   Plaintiffs are informed and believe that Ms. Cornelius has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

29. **Robert Smith**
   **Maintenance Manager- Corvias, Fort Bragg**
   **1405 S County Trail #530**
   **East Greenwich, RI 02818**
   **401-228-2800**

   Plaintiffs are informed and believe that Mr. Smith has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

30. **Robert Leonard**
   **Facilities Director- Corvias, Fort Bragg**
   **1405 S County Trail #530**
   **East Greenwich, RI 02818**
   **401-228-2800**

   Plaintiffs are informed and believe that Mr. Leonard has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

31. **John Teague**
   **Service Center Coordinator- Corvias, Fort Bragg**
   **51 Skytrain Drive**
   **Fort Bragg, NC 28307**
   **910-764-4868**

Plaintiffs are informed and believe that Mr. Teague has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

32. **Katie Culbreth**
    **Service Center Coordinator-Corvias, Fort Bragg**
    **51 Skytrain Drive**
    **Fort Bragg, NC 28307**
    **910-764-4868**

    Plaintiffs are informed and believe that Ms. Culbreth has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

33. **Michele Wooten**
    **Staff Accountant- Corvias**
    **406 Pershing Ct.**
    **Fort Riley, KS 66442**
    **785-717-2244**

    Plaintiffs are informed and believe that Ms. Wooten has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

34. **Scottie Miller**
    **Former Senior Manager- Corvias, Fort Bragg**
    **Current Address Unknown**
    **Currently Employed by Hunt Military Housing in Austin, Arkansas**

    Plaintiffs are informed and believe that Mr. Smith has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

35. **Matt Brigman**
    **HVAC Installer**
    **Sandhills Heating, Refrigeration & Electrical**
    **Laurinburg, NC**

    Plaintiffs are informed and believe that Mr. Brigman is a maintenance worker for an outside vendor who worked on HVAC systems in military houses at Fort Bragg, NC.

36. **Scotty Locklear**
    **J&L Contractors & Maintenance Services**
    **Pembroke, NC 28372**
    **910-280-0901**

9

Plaintiffs are informed and believe that Mr. Locklear has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

37. **Elizabeth A. Field**
    **Director, Defense Capabilities and Management**
    **United States Government Accountability Office**
    **441 G St., NW**
    **Washington, DC 20548**
    **202-512-2775**

    Ms. Field has knowledge of the GAO's monitoring of privatized housing including analysis of data provided by all 14 private partners. Ms. Field authored a report entitled, "Military Housing Privatization: Preliminary Observations on DOD's Oversight of the Condition of Privatized Military Housing. Ms. Fields testified on these topics before the Senate Armed Services Committee.

38. **Hon. Ryan D. McCarthy**
    **Former Secretary of the United States Army**
    **Millennium Corporation**
    **1400 Crystal Drive, Suite 400**
    **Arlington, VA 22202**
    **703-436-1343**

    As part of his duties as Secretary of the Army, Mr. McCarthy monitored the status and condition of military housing. He visited Army installations across the country to observe the condition of military housing, including a visit to Fort Bragg in September 2020. Following his visit, McCarthy stated, "What you saw over time is an abdication of responsibility. We outsource this to a corporation. That's the danger when you set up these public-private partnerships. Over time, you get lazy. As an institution, we got lazy. The wake-up call came two years ago. It is embarrassing and it is awful".

39. **Col. Phillip Sounia**
    **Former Garrison Commander- Fort Bragg**
    **United States Army**
    **Address Unknown**

    May have knowledge regarding the housing conditions given his post.

40. **Senator Elizabeth Warren**
    **309 Hart Senate Office Building**
    **Washington, DC 20510**
    **202-224-4543**

Senator Warren investigated military housing companies and submitted a written report dated April 30, 2019.

41. **Shannon Razsadin**
    **Executive Director of Military Family Advisory Network**
    **22015 W. 66th St.**
    **Unit 860635**
    **Shawnee, KS 66286**
    **202-821-4195**

    Ms. Razsadin and MFAN released a report that over 67% of all Bragg families surveyed reported manifest effects from maintenance, repairs and remediation.

42. **Heather Beckstrom**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **bckstromheather@gmail.com**

    Ms. Beckstrom has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

43. **Stephanie Blackadar**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **juggalatis@hotmail.com**

    Ms. Blackadar has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

44. **Jessica Brueck**
    **Current of Former Tenant/Resident**
    **Address Unknown**
    **Jessica.lynn.brueck@gmail.com**

    Ms. Brueck has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

45. **Regan Burke**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **morethanamilkmaid@yahoo.com**

    Ms. Burke has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**46. Courtney Burks**
   Current or Former Tenant/Resident
   Address Unknown
   courtflavin@yahoo.com

   Ms. Burks has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**47. Cacee Cobarrubia**
   Current or Former Tenant/Resident
   Address Unknown
   Cacee.nesbit93@yahoo.com

   Ms. Cobarrubia has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**48. Shyla Curry**
   Current or Former Tenant/Resident
   Address Unknown
   Shylacurry98@gmail.com

   Ms. Curry has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**49. Marissa Dilliard**
   Current or Former Tenant Resident
   Address Unknown
   Marrissa.dilliard@gmail.com

   Ms. Dilliard has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**50. Pennalla Evans**
   Current or Former Tenant/Resident
   Address Unknown
   Mrsevans3013@gmail.com

   Ms. Evans has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**51. Vicki Ragsdale**
   Current or Former Tenant/Resident
   Address Unknown
   Mrsforcier1031@gmail.com

Ms. Ragsdale has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

52. Tia Geisler
    Current or Former Tenant/Resident
    Address Unknown
    Tia.c.geisler@gmail.com

    Ms. Geisler has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

53. Julie Hilliard
    Current or Former Tenant/Resident
    Address Unknown
    Juliehilliard23@gmail.com

    Ms. Hilliary has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

54. Sarah Lenox
    Current or Former Tenant/Resident
    Address Unknown
    Sarahjclark1747@gmail.com

    Ms. Lenox has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

55. Jacqueline Haven Lyons
    Current or Former Tenant/Resident
    Address Unknown
    havenbrandhorst@gmail.com

    Ms. Lyons has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

56. Chanda Martin
    Current or Former Tenant/Resident
    Address Unknown
    Chandamartin279@gmail.com

    Ms. Martin has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

57. Emya Roberts
    Current or Former Tenant/Resident
    Address Unknown

Emyareneerob15@gmail.com

Ms. Roberts has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

58. Tamara Terry
    Current or Former Tenant/Resident
    Address Unknown
    Jcm72611@gmail.com

    Ms. Terry has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

59. Amber Woollett
    Current or Former TenantResident
    Address Unknown
    amberdw@live.com

    Ms. Woollett has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

60. Sabrina Collins
    Current or Former Tenant/Resident
    Current Contact Information Unknown

    Ms. Collins has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

61. Danielle Olson
    Current or Former Tenant/Resident
    Current Contact Information Unknown

    Ms. Olson has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

62. Tara Michelle
    Current or Former Tenant/Resident
    Current Contact Information Unknown

    Ms. Michelle has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

63. Ashlee Monzalvo
    Current or Former Tenant/Resident
    Current Contact Information Unknown

14

Ms. Monzalvo has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

64. **Toby DeJoinville**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. DeJoinville has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

65. **Amber Lace**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Lace has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

66. **Courtney Wong**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Wong has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

67. **Alexis Danielle Martin**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Martin has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

68. **Liz Stitt**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Stitt has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

69. **Taylor Hinshaw**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Hinshaw has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

70. **Cassandra Manis**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Manis has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

71. **Lillian Bradford**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Bradford has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

72. **Lorena Butler**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Butler has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

73. **Jennalynn Apedaile Thomas**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Thomas has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

74. **Danielle Jackson**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Jackson has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

75. **Lee Nash**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Mr. Nash has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

76. **Tyler Cissna**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

Ms. Cissna has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**77. Jessica Lynn Brueck**
**Current or Former Tenant/Resident**
**Current Contact Information Unknown**

Ms. Brueck has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**78. Alena Martinez**
**Current or Former Tenant/Resident**
**Current Contact Information Unknown**

Ms. Martinez has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**79. Meagan Heady Solorzano**
**Current or Former Tenant/Resident**
**Current Contact Information Unknown**

Ms. Solorzano has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**80. Sharon Land**
**Current or Former Tenant/Resident**
**Current Contact Information Unknown**

Ms. Land has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**81. Taylor Bryant**
**Current or Former Tenant/Resident**
**Current Contact Information Unknown**

Ms. Bryant has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**82. Jessica Allen**
**Current or Former Tenant/Resident**
**Current Contact Information Unknown**

Ms. Allen has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**83. Jennifer Burt**

Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Burt has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

84. **Briana Kramp**
Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Kramp has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

85. **KayKay Jackson**
Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Jackson has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

86. **Hannah Gagnon**
Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Gagnon has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

87. **Cat Billet**
Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Billet has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

88. **JayBee Bar**
Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Bar has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

89. **Jayla Garcia**
Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Garcia has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

90. **Kayla Reed**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Reed has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

91. **Brittany Opsomer**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Opsomer has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

92. **Kaytlin Erickson**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Erickson has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

93. **Amanda Anderson**
    **Current or Former Tenant/Resident**
    **Address Unknown**
    **a.anderson0228@gmail.com**

    Ms. Anderson has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

94. **Amy Lohrenz and Major Michael Lohrenz are former residents. These individuals may have knowledge as per their lawsuit,** *see Lohrenz v. Bragg Communities, LLC,* **No. 5:2022cv00044 (E.D.N.C.).**

95. **Plaintiffs in the** *Addi* **case and witnesses identified in that case may have knowledge regarding Corvias business operations, customer service, repair and maintenance practices, which while occurring at Fort Meade in Maryland could be relevant insofar as they reflect common corporate practices that were also used and imposed at Fort Bragg.** *See Addi v. Corvias Management-Army, LLC,* **No. 1:2019cv03253 (D. Md.).**

**Supplemental Answer dated 5/6/22:**



**NONCONFIDENTIAL:**

      **Hannah Hurd, Assistant Resident Manager at Corvias, Fort Bragg, North Carolina, United States. May have knowledge regarding Corvias property management practices. States that she oversees a team of five in the Pope and Ardennes communities.**

      **Don Agel, Agel's Home Inspections, Fayetteville NC. Phone: (910) 224-5076. May have knowledge regarding repair, maintenance, tenant service issues.**

      **Wina Hathaway. Employed in contracts and vendor management with Corvias, at Fort Bragg, since 2014. May have knowledge regarding repair, maintenance, tenant service issues.**

      **PFC Anthony Blankenship, wife Brittney, son Jason. Per news reports, this family moved to Fort Bragg in August 2018:**

Pfc. Anthony Blankenship points to mold on the grout of his bathroom and a greenish mildew stain around the tiles next to the toilet.

"That's kind of a mold pattern growing underneath," he says. "Workers at times just put new grout over the mold. At times, contractors wouldn't show up at all for problems ranging from clogged plumbing to faulty ventilation ducts."

"We'd call again, and they'd say we don't have any recollection you put in a work order," says Blankenship, who moved into this ranch-style house at Fort Bragg, N.C., back in August with his wife, Brittney, and their toddler, Jason. "A lot of families, unfortunately, their house is worse than ours," says Brittney.[2]

Heath Burleson. Corvias Partnership Advisor. Public biography shows intimate involvement in Corvias MHPI matters.[3] Corvias materials state that in 2019 he was one of the key executives who belatedly agreed that Corvias would fund $325M in direct investment into its Army portfolio in order to remedy the longstanding housing problems. According to Corvias, as the Senior Vice President of Operations, he was responsible for the oversight and management of Corvias' managers across the Army and AF portfolio. In 2018 he assumed the role of Partnership Advisor for the Corvias Property Management portfolio which has a 2020 annual budget of $435M and development/construction budget of $335M.

Mark Esper. In his role as Secretary of Defense, Esper went on record regarding the poor housing conditions. Examples:

"In too many cases, it is clear the private housing companies failed to uphold their end of the bargain, a failure that was enabled by the Army's insufficient oversight," Esper said. "We are determined to investigate these problems and to hold our housing contractors and chains of command accountable."[4]

SGT Terry Blood and wife, Krysta. Tenants of the Corvias housing at Fort Bragg. Ms. Blood may have subsequently been hired by Corvias. Their complaints are described in news articles:

Sgt. Terry Blood and his wife, Krysta … showed the shoddy repairs at their house at Fort Bragg.

Krysta points to the ceiling inside a closet in her garage. She says a subcontractor just plastered over what is a widening stain from a leak that has also damaged the floor. The source of the leak is the bathtub.

---

[2] https://www.cpr.org/2019/03/08/shoddy-maintenance-of-military-housing-under-scrutiny-by-senate-military-leaders/
[3] https://www.congress.gov/116/meeting/house/110611/witnesses/HHRG-116-AP18-Bio-BurlesonM-20200303.pdf
[4] https://apnews.com/article/2f34561f12c743ec8ef349becd9c0802.

"For four years, that tub water has been leaking from children's baths," she says. "Can you imagine what kind of water has been in between the floors for that time?"

Are their friends having troubles as well?

"Pretty much the exact same issues," says Terry Blood. "Actually one of our friends right across the street, they just got surveyed, and they have found cracks. In the summer months they have grass growing up through their floor."[5]

Col. Kyle Reed, Fort Bragg Garrison Commander. May have knowledge regarding the Corvias MHPI involvement at Fort Bragg. Should have knowledge regarding the fallout from the press coverage, publicity and Congressional hearings occurring in 2018-19, including steps the Army forced Corvias to take to remedy matters.[6]

Greg Jackson, Chief of Housing, Fort Bragg, Directorate of Public Works. May have knowledge regarding the Corvias MHPI involvement at Fort Bragg. Should have knowledge regarding the fallout from the press coverage, publicity and Congressional hearings occurring in 2018-19, including steps the Army forced Corvias to take to remedy matters. Has knowledge regarding how in the past, residents thought Housing (Army) and Corvias were synonymous (which would tend to disincentivize soldiers from complaining).[7]

Krista Lindholm. Fort Bragg tenant. May have knowledge of housing problems at Fort Bragg. Quoted as saying: "I've seen the mold, and it's legit," Krista Lindholm said of mold in a neighbor's house. "They're sick, their kids are sick and housing is just not coming and dealing with it."[8]

Donnie R. Smith, Maintenance Manager at Corvias. May have knowledge regarding Corvias repair and maintenance practices. Contact information: Administrator, Dual Impact LLC, Fayetteville, North Carolina; Donnie Smith Construction, LLC, 426 North Whittington Lane, Dunn, NC, donniecsmith@embarqmail.com, (910) 890-3660, (910) 897-4847.

Lisa Sanford. She was an assistant property manager, Corvias, Fort Bragg, 2005 to November 2017. She may now be working as a community manager in the Raleigh area.

Marcy C. Woodard. 2908 Winton Drive, Fayetteville NC. Employed as an IT service manager at Corvias, Fort Bragg, November 2017 to present. Previously employed as an IT

---

[5] https://www.wamc.org/2019-03-07/shoddy-maintenance-of-military-housing-under-scrutiny-by-senate-military-leaders.

[6] https://www.fayobserver.com/story/news/2019/04/19/installation-housing-initiatives-see-way-forward-residents-speak-up-at-town-halls/64863691007/

[7] https://www.fayobserver.com/story/news/2019/04/19/installation-housing-initiatives-see-way-forward-residents-speak-up-at-town-halls/64863691007/

[8] https://www.wral.com/soldiers-families-complain-to-tillis-about-fort-bragg-housing/18662015/

management lead (2015-17), a network administrator (2010-2015) and as a desktop administrator (2006-2010), and resident service specialist (2005-06) for Corvias/Picerne.

Peter Sims, managing director for Corvias. He has knowledge regarding Corvias being compelled to install HVAC replacements and other renovations at 5,300 homes at Fort Bragg.[9] This renovation work was being done as part of Corvias' agreement to pay $325 million toward housing improvements subsequent to the late 2018 Reuters news article and resultant controversy and Congressional hearings.

Taylor Padgett. Fort Bragg Corvias housing resident. Complained of mold problems in her housing occurring since February 2021.

> As the problem got worse, she hired an independent home inspector who went through the house and found major issues with the maintenance of the home. He said they contributed to the mold problem.

> "We found a bunch of damage issues with the exterior and roofing problems," said Don Agel of Agel Home inspections. "There was cracked brick veneer allowing water to get into her child's playroom."

> He also found problems with the water heater and stove.

> "There is a natural gas leak at the water heater and a natural gas leak at the oven," Agel said.

> The Padgett family is currently in an on-post hotel while the property management company makes repairs.[10]

Mary Humphreys. Corvias corporate spokesperson. Denied that there were any problems at the Padgett's residence.

Fort Bragg Garrison Command Sgt. Major Jeffery Loehr. May have knowledge regarding the MHPI housing program and the Corvias housing issues.

Regan Burke. Fort Bragg Corvias home tenant. Complained of mold problems with her Corvias home:

> Regan Burke's family was moved to two different temporary houses on-post since September 2020 after mold was found all over her original house.

> Burke said a military inspector from on-post said the home "was uninhabitable."

---

[9] https://www.corvias.com/news/corvias-updates-more-85-percent-fort-bragg-homes
[10] https://www.cbs17.com/news/local-news/cumberland-county-news/fort-bragg-officials-call-mold-issues-with-on-base-housing-a-high-priority/

Last week, the family was finally placed into new permanent housing but was still trying to get someone to pay for the replacement of their mold-infested possessions.

Regarding the problems being experienced Padgett, Burke, and other homeowners, Loehr said: "As the housing property management, Corvias is responsible for ensuring prompt and professional maintenance.[11]

Unidentified Corvias employee, first name Leonard.  Leonard was a gentleman who called into CSPAN to speak about how he was working for Corvias when he was fired from his job at Fort Bragg in 2019.  He called on or about July 22, 2019 to complain that he was being unjustly blamed for the housing issues. He said he was age 67; that it was a shame how the residents were treated; that he and other employees lost their jobs; that the company was trying to make the workers feel it was their fault; that they did what they had to do to keep their jobs; that he was there for 10 years; and that he knew what these military wives were talking about.[12]

Authors of the Army Inspector General Report, Report ID-1903, Feb.-March 2019.[13] The report found that family concerns about health and safety issues in military housing are widespread, revealing systemic problems with relationships between the Army and housing contractors. The government's current oversight of these projects was insufficient to identify housing challenges. Inspectors found there was lack of joint authority, confusion regarding roles and responsibilities, lack of training, dramatic personnel cuts and lack of transparency among privatized housing companies. Inspectors uncovered a 2013 Army policy that specifically prohibited health and welfare inspections of military housing.  Two-thirds of the 1,180 residents of military privatized housing communities who participated in the IG survey stated they were dissatisfied with their overall housing experience. Sixty-four percent said they would move off post if there were no financial costs or concerns, according to the report. The review was ordered by then-Secretary of the Army Mark Esper in the wake of reports about widespread problems of mold, water leakage, vermin infestations and other problems in military housing.[14]

Interrogatory No. 3. State in detail Your employment history for the last ten (10) years.

For all military service, identify where You were stationed, where You resided while stationed there, and Your duties and responsibilities at each station.

**Answer:**

---

[11] https://www.cbs17.com/news/local-news/cumberland-county-news/fort-bragg-officials-call-mold-issues-with-on-base-housing-a-high-priority/
[12] https://www.c-span.org/video/?c4809169/user-clip-corvias-employee-fired-called-report-unjustly-blamed-housing-issues
[13] https://www.army.mil/e2/downloads/rv7/families/releaseable-housing-inspection.pdf
[14] https://www.upandcomingweekly.com/local-news-briefs/6565-military-housing-still-a-problem

Plaintiffs object to the interrogatory to the extent that it purports to seek information that is irrelevant and not likely to lead to the discovery of admissible evidence. Plaintiffs further object on grounds the interrogatory is overly broad and unduly burdensome in seeking employment information pre-dating the relevant time period.

Without waiving any objections, Plaintiffs state:

1. **Brittany Page:** Prior to the Page's marriage in February 2015, Ms. Page resided at 219 Erwin St., Morganton, NC, 28655, where she rented an apartment. Ms. Page worked as an in-home nursing aid. That work was for Bayada and one other company, name not known. In 2019, Ms. Page started working as a substitute teacher at Fort Bragg, NC, until end-2021. It was for Department of Defense education, DOD GA. Ms. Page has also been working at Lowe's Home Improvement in Rayford, NC, for approximately one year. She is currently working only at Lowe's, in the garden center.

2. **Shane Page:** In 2012, SSG Page was at Fort Wainright, AL, and resided in Army barracks housing. He returned from Afghanistan in April 2012, then was a "fire team leader" and a "gun team leader". He was at Fort Drum, NY, starting July 2013, and lived in Army barracks housing. He was a "fire team leader", a "gun team leader", and held various other specialty roles. In February 2015, the Pages were married. Starting April 2015, the Pages relocated to Fort Bragg, North Carolina, where they first resided at 686 Daharan Drive, Fayetteville, NC, 28314, for approximately one year. That first home was not with Corvias. The Pages then moved to 274 Spear Drive, Fort Bragg, NC, in summer 2016, and remained there until summer 2020. They moved there because SSG Page was deploying to Afghanistan and there had been break-ins in the neighborhood, so it was a safety issue. They thought Spear Drive would be safer. The Pages currently live at 69 Baltic Circle, Fort Bragg, NC. SSG Page was a squad leader in the 82nd Airborne and is currently a combat advisor.

**Interrogatory No. 4**. Identify where You have lived in the last ten (10) years including the address, the dates You resided there, whether it was a single family or multifamily structure, whether You owned or rented/leased the residence, and the name and contact information of any owner, lessor and/or property manager if you rented/leased the residence.

**Answer:**

Plaintiffs object to the interrogatory to the extent that it purports to seek information that is irrelevant and not likely to lead to the discovery of admissible evidence. Plaintiffs further object on grounds the interrogatory is overly broad and unduly burdensome in seeking employment information pre-dating the relevant time period.

Without waiving any objections, Plaintiffs state:

See Plaintiff's Response to Interrogatory #3.

**Supplemental Answer dated 5/6/22:**

Ms. Page's public records data reflects that as of 2007, she was residing at 990 Hopewell Road, Morganton NC 28655-8252. This was her mother's house.

Prior to the Page's marriage in February 2015, Ms. Page had moved from her mother's house to 219 Erwin St., Morganton, NC, 28655, where she rented an apartment in a house. The landlord was a local man. Brittany cannot remember his name. She lived there until circa 2015-16 when she got married and she and her husband moved to Fort Bragg. The structure was a home that had been converted into apartments. She believes there were three total apartments in it. She believes that a company called Breeden Real Estate owns that home now. It is still being let out as apartments. Brittany believes that the owner of Breeden is a woman named Cindy.

An internet search reflects Breeden Real Estate, phone 1-828-438-4111, email **info@breedenrealestate.com**, address 301-B South Green Street, Morganton, NC 28655, with Cindy Ross as a Property Manager there.

The public records data also reflects Brittany Page residing at 686 Daharan Drive, Fayetteville NC circa 2016. This was rented. The landlord was a private woman that owned the home, but Plaintiffs do not recall her name.

A GIS search reflects the record owner of 686 Daharan Drive today is Corette Rogers, at that address.

The Page family then moved from the Daharan Drive address to the Fort Bragg address of 274 Spear Drive. Public record information indicates that the census data for that geographical region is as follows: median head of household age is 21; median income is $44,276; median education is 14 years.

Public records reflect other prior addresses for Shane Page of: 290 N Indiana Ave, Watertown NY 13601-2985; and 2970 Stillwater Drive, Billings MT 59102-6145.

**Interrogatory No. 5**. Describe in detail any inspection, remediation, maintenance and/or repairs related to housing or habitability issues, including but not limited to mold, water intrusion, water leakage, water seepage, or flooding You experienced at any address identified in Your previous answer, including all communications and actions that You or others took in response.

**Answer**:

Plaintiffs object to the extent that the interrogatory is overly broad and unduly burdensome and seeks information neither relevant nor likely to lead to the discovery of admissible evidence, including to the extent that the discovery requests seeks information predating the relevant class period.

Without waiving any objections, Plaintiffs state:

Plaintiffs are informed and believe that Defendants possess all inspection, remediation, maintenance and/or repair records that are responsive to this request. Plaintiffs make reference to the facts alleged in the Amended Complaint. Plaintiffs also add the following:

During the Page's stay in Fort Bragg housing (274 Spear), they ran into an enormous number of problems with their home and with how Corvias customer service, repair and maintenance service worked so poorly.

The family had to deal with long-outstanding issues that resulted in many personal hours of the family's time spent arguing their case and missing special occasions and family time, only to have Corvias come and cut more corners instead of fixing the original issue at hand.

Damage originally started in their youngest son's bedroom upstairs; his window started leaking after rain from a hurricane. Later the Pages noticed the leaking throughout the home. The Pages became very concerned about the quality of the housing for their son and for the family. It became a constant source of worry. Meanwhile, the company was every month taking rent in the form of the family's whole BAH.

At the Corvias home, after Hurricane Matthew, the Pages began noticing water damage in their living room window, dining room window, their back entryway door into their living room, and above their pantry. There was serious water intrusion and Corvias acted improperly and very poorly and would never fix the root cause.

When the Pages first noticed this damage, they called in a work order to have the water damage fixed. Corvias sent in workers but all that they did was to put a "band aid" on the problem – they sanded down water spots and repainted the area. The real underlying issue of why and how all this water intrusion was happening, and what sort of long-term damage it was causing both in the visible parts of the home, and the parts that were not easily visible, was never resolved.

The first time the walls were opened was after the family noticed the damage in their son's bedroom. Months prior to the talk of opening the walls and the mold inhibitors, the Pages made them open the wall upstairs in their son's room. That was how they knew there was mold in the home.

Corvias would not allow testing on the mold. The Carothers brothers who were the contractors at that specific time told Mrs. Page that it was mold but that they were not allowed to say that because they would lose their contract with Corvias. They were only allowed to say that it was mildew and nothing to worry about.

When Mrs. Page asked for a sample to send off for testing at her expense, Desi the maintenance manager said that was fine, but before Mrs. Page could do it, he bagged it all up and threw it in the back of his truck and left.

There were numerous contractors who came out to work on the windows.

There were numerous times Corvias employees came out to evaluate the damage and work on the damage.

The problems went on for weeks and months. It was a grinding daily source of concern for the family and especially with the young child.

At one point, an ICE (Interactive Customer Evaluation) complaint was sent in and the Pages had a sit-down meeting with Cindy, the Corvias housing manager for their neighborhood, and then maintenance manager Jeremy.

They came to an agreement that the walls would be opened and a water intrusion test would be completed on all the walls in the home. When the water intrusion test was complete and after any mold was removed that was found, at that point, mold inhibitors were supposed to be applied to the windows and any spots that the company deemed to be a place where water could leak in the future.

At one point Corvias' contractor told the Pages that they were only hired to sand down water spots and repaint the walls. SSG Page told them that this was not what Cindy and himself had discussed and that he needed to contact Cindy before they began the work.

The workers came back out later and said their contract had been updated and that they were to open the walls and clean any areas that looked like mold and to caulk the inside of the windows. When SSG Page asked them about the water intrusion test and the mold inhibitor, they stated that this was not something they did and that Corvias would have to use someone else to complete this work after the windows were re-closed.

SSG Page tried to contact Cindy (from Corvias) about that and despite multiple efforts, he was unable to contact her by phone call, text message or otherwise. Having to attend to these problems with his housing made SSG Page's life more difficult with the demands of his military service.

The family made Corvias re-open the work order. When the maintenance worker from Corvias opened the window, the Pages noticed the paint on the windows and asked what the chances were that it contained lead due to the multiple times the windows had been worked on. They noted the decaying and chipped state of the paint and the multiple times

the windows had been worked on. The Corvias employee called his boss, who was maintenance manager Steve Maxwell.

Mr. Maxwell came out and conducted a 3M lead test on the windows but it looked like he did it incorrectly, and then he told the family that the windows were safe. Mrs. Page had a feeling that the test was done incorrectly so the Pages went to the 3M webpage and watched the tutorial video on how to properly conduct the lead test. They then went to their local store and purchased four 3M lead test kits to test the paint on their own.

The Page's children at this time had been sleeping downstairs in their living room on an air mattress to prevent the chance of the lead and dust entering their systems. This was a further unreasonable and substantial interference with their use and enjoyment of their home, for which they were paying a full BAH and the military family had very limited financial resources to start with.

Mrs. Page then proceeded to conduct the lead test based on the instruction tutorial on 3M's website and identified that the window frames tested positive for lead-based paint.

The Pages then contacted DPW who told them to have a lead exposure test done on Mrs. Page and their two children. The family got lead tests done through their health care provider on post.

Mrs. Page spoke with the housing director, Cindy, and others at DPW. Nick, the environmental specialist, came to their house with a maintenance worker, Chris. Much to the Page's dismay, Steve (Corvias maintenance manager) who had incorrectly conducted the lead test was not there to see the result. Steve had said that he would be there for him and Nick to discuss all of the work that was going to be done to ensure that the lead-based paint would not be a health issue to the family. The family felt left in the lurch.

The Pages also at one point attended a Corvias town hall meeting, which was being held online on "Facebook Live." During the meeting, the Pages tried to speak to the Corvias people, but they were not very accommodating. Corvias would not engage and said they could talk about things later.

Again, the problems went on for weeks and months. The above is only a summary of some of what happened. The customer service, repair and maintenance records of Corvias should contain additional information.

The experience caused harassment, discomfort, annoyance, and loss of use and enjoyment of the leasehold, for the Plaintiffs' family.

<u>Supplemental Answer dated 5/6/22</u>:

With regard to whether Mr. or Mrs. Page ever had significant inspections or repairs at other residences where they have lived aside from the Corvias home at Fort Bragg: They do not recall any at this time.

Further facts regarding the habitability issues at the Bragg home include the following: On the medical issues, Brittany Page had chronic sinusitis. She has access on her patient portal to certain medical information. The sinusitis problem is still ongoing. The Pages are allowing medical records production in this regard.

On the HVAC ducts, Brittany recalls that right before the Pages moved out of the Bragg home, the company never fixed it during their tenancy. She was not able to look in the ducts, but they could see in the vents, which looked like they had not been cleaned in years. They could see the buildup. Also, when they moved it was supposed to be for a maintenance move over and they were supposed to get $600 back to pay for the move. However, Corvias changed it to a change in rank move over and Corvias eliminated the return of any payment to the family. Corvias actually told the family that they owed money because of alleged damage to the house. The family never paid it and has never heard from anyone about it again.

The house was constantly dusty, dust on doorframes, even with the change of the filters for the HVAC. This is consistent with the HVAC being worn out and clogged up.

Corvias finally came in and fixed the HVAC right before the Pages left. They have now supposedly fixed the HVAC post-wide. Based on what the Pages have heard, that happened maybe a year back. Corvias made a big deal out of it. They started with senior enlisted, moved down to junior enlisted, and redid everyone's HVAC post-wide. The Plaintiffs believe it was reckless and intentional for Corvias to have failed to make these renovations in years past. The Pages had to suffer through living in the housing before it was renovated or rebuilt.

At one point, Brittany saw a junior enlisted home with black mold. The home was on Seay Street, in the junior enlisted housing. (To her, Junior enlisted means – E 1 thru E 5. Senior is E 6 to E 9.) She learned about the mold by accident when she was just following up on a report on Tik Tok on homes being vandalized in their neighborhood. She called Corvias.

The MPs said we won't go in to take pictures because the black mold is so bad.

Brittany worries that Corvias was not giving new incoming families a warning about the mold and the other bad conditions.

Brittany asked her friend Kayla Sanchez about these issues, she knows most of the facts.

Brittany recalls that another neighborhood in the Casablanca community also had older homes. She heard that Corvias moved everybody out, then later tore them all down. She does not know what it was about the homes that caused the teardown. She is concerned that older homes may have had lead or asbestos in the homes.

Today her husband is in senior enlisted – so no wonder it is somewhat better at Baltic Circle.  But it depends on the neighborhood.  Some of the Normandy houses are very old. The generals' housing, by contrast, is really nice.

She recalls that the Corvias people called the mold mildew instead.

She recalls how one worker/contractor guy said "I am going to go take a break, you can go and youtube black mold.  I will be back in a minute."  In other words, he could not use the word mold, but was encouraging Brittany to research it for herself.

Another time the workers showed up having been drinking.  There was another contractor where the employees fought in front of their children. Brittany asked them to leave and the next day the owner came by her house, apologized and asked if his company could continue to work on the house, and Brittany allowed it because of the apology.

There was another time when Corvias came in and opened up windows in the childrens' rooms and they were sanding the walls with lead paint exposed. Brittany told them that they could not perform that work until they used a proper enclosure to ensure it would not create lead exposure issues through the HVAC or any other way. She made them stop the work, seal the bedrooms and shut the vents until they could come back and properly address the lead exposure risk. Her children, during this time, had no access to their bedrooms and belongings.

Regarding the mold – at one point, the Corvias person, Dezi (maintenance manager), another person who was a contractor, said Brittany can have a sample.  But the Corvias person bagged and took it off before Brittany could get it.

She recalls hearing that there was housing on Riley and Adkin Streets, that area, where in the past multiple infants had reportedly died.  She did not know the reason.  She heard that later they tore the whole neighborhood down.  It was on Riley Road, you pass it going to Riley or the Yadkin Gate.

**Interrogatory No. 6**. State each and every instance in which You contend a defendant failed to properly address a housing or habitability issue, including but not limited to alleged water or moisture intrusion, leak, ceiling or roof leak, flooring issue, structural issue, lead-based paint, mold, or suspect fungal growth; provide the dates thereof; and state what You contend the defendant should have done differently. Set forth all facts on which You base Your contentions. If You are relying on any written documents or records, identify those documents and records, and state the material in each document which You contend demonstrates improper conduct.

**Answer:** See Plaintiffs' response to Interrogatory #5.

**Supplemental Answer dated 5/6/22:**

Plaintiffs have provided responsive information regarding Defendants' failures to address housing issues and habitability in connection with the other interrogatories herein, one or more of which ask overlapping questions.

Defendants have asked Plaintiffs to describe "what the defendant should have done differently." (See discovery letter dated 4/25/22, p. 11). To the extent that the question calls for expert testimony, it is largely premature, as the due date for the Plaintiffs to name their experts has not yet arrived. To the extent this is a contention interrogatory, it is once again somewhat premature. However, based on the information obtained to date, Plaintiffs show as follows:

The things the Defendants should have done differently include:

1. Making a full and fair assessment of the existing housing conditions for the inventory of 6000 to 7000 housing units, or homes, that Corvias took over responsibility for when it won the bid for the 50 year ground lease for the housing at Fort Bragg in 2003.

2. Communicating a fair and accurate assessment of the true condition of the existing housing inventory, and what would be needed to make sure the housing was in an acceptable and habitable status for the military families, to the Army, prior to or at the time of the bid award in 2003.

3. Once Corvias won the bid and entered into the 50 year contract, Corvias had a duty to use Corvias Construction to tear down and rebuild or extensively renovate the deficient units. It should never have required the amount of tenant suffering from living in poor conditions, that occurred, before Corvias would remedy the problems. As it turned out, it was only after tenant complaints across multiple bases, investigative news coverage by Reuters and others, and Congressional hearings, that Corvias announced it would spend over $300 million to remedy the problems. If Corvias had timely and properly remedied the problems years earlier when it should have done so, the Plaintiffs would not have incurred their suffering and damages.

4. Once Corvias won the 50 year contract, the evidence indicates that the company's top management was far more interested in expanding Corvias' portfolio of bases, and branching out into new areas like managing the housing for students bodies at schools, rather than carrying out and adequately funding its 50 year commitment to provide excellent livable housing. Corvias should have focused on carrying out the duties it had agreed to perform at the outset of the 50 year contract, rather than abandoning them.

5. By the time the putative class period opened, in 2016, the situation on the ground at Fort Bragg was that Corvias was understaffing its tenant service, repair and maintenance capacity, and had not spent the monies or exercised the initiative to tear down and renovate the numerous units (like those of the Plaintiffs) that were in unacceptable condition. Corvias should have been better funding and staffing tenant service, repair and maintenance, and should have rebuilt or renovated applicable units.

6. As of 2016, Corvias was using remote call centers to save money. Corvias should have had adequate, properly funded, supported, overseen, audited, and trained, employed Corvias staff at the base, to interact and communicate with tenants and their families and to address their concerns.

7. As of 2016, Corvias had engendered a corporate culture which led to a pattern and practice of fraudulent, unfair and deceptive conduct and practices by its customer service and repair and maintenance personnel. Corvias should not have allowed these practices to occur.

8. Most of the repair and maintenance personnel were outsourced, that is to say, the typical Corvias repair and maintenance workers who came out to the families' homes were not employed by Corvias at all, due to Corvias' desire to minimize costs and overhead and not have to pay employee wages and benefits. Corvias should not have used outsourced personnel. It should have had more of a directly employed, well-supported presence.

9. As of 2016, the outside vendors Corvias used for repair and maintenance received poor to mediocre pay. They were not well-supervised by Corvias. Corvias should have paid them better and supervised and trained them better. Instead, Corvias made sure that they acted unfairly and deceptively toward customers when it came to root causes, chronic and longstanding unit problems, water damage and rot and mold. Corvias should not have allowed this situation to flourish. Corvias was aware of the fact that (or was willfully blind to the fact that) the housing was replete with units that were plagued with problems and unacceptable for leasing out to families. Corvias should have replaced or rebuilt those units to start with. But aside from that fact, Corvias should have adequately repaired and maintained those units. Corvias should have not told contractors not to use the word "mold." It should not have encouraged contractors to minimize problems and lie to tenants about conditions. It should not have kept its repair and maintenance vendors on such a limited budget and scope of authority that they were not allowed to work to address root cause problems.

10. As of 2016, Corvias was using its pattern and practice of fraud and deception with regard to repair and maintenance to result in purported work orders and unit and tenant records that were false because they omitted key data regarding water damage, mold, tenant complaints, and other such things.

11. As of 2016, Corvias in the tenant-facing part of its enterprise, both through its own direct employees and through its contractors, took a position of blanket denial that mold problems existed. This was improper given the true facts.

12. Corvias should have trained and overseen its staff and vendors such that their work order records and tenant and unit records were true and accurate and could later be properly reviewed and audited. It did not. The faulty state of the records was later noted by the GAO and by one or more of the Plaintiffs themselves.

13. Corvias knew or should have known as of 2016 that the HVAC systems in units were badly compromised by water damage, mold and filth collecting in the HVAC ductwork. Corvias furthermore knew or should have known that in the cases of many of the homes, access to see inside the ductwork was impractical. In short, Corvias knew, while the tenants did not, of conditions like those reflected by the ductwork in the home of the Thomas family (see supplemental documents produced). Corvias never should have allowed the conditions to grow to that extent, and never should have allowed unwitting tenants, mainly families with young children, to live in that environment.

14. Corvias knew that the housing for the lower enlisted servicemembers was far worse than some of the housing reserved only for the higher ranked tenants such as upper level officers. Corvias however failed to remedy the problem in time to prevent the experiences endured by the Plaintiffs.

15. Corvias knew that lower ranked servicemember tenants who leased the Corvias homes were much more likely to have spouses, and one or more infants or young children, compared to other families in other leased housing settings. This cohort group has higher vulnerability to filthy and unsafe conditions in the homes.

16. Corvias knew that many of the families resided in leased units that were not self-standing, but rather, were in structures that also had one, two, or three other units in them. Corvias as the owner and the landlord had the duty to ensure the upkeep and safety of the structure exterior, the roofing, the HVAC system, and the common areas. Corvias knew that the conditions in one unit could suffer due to the conduct of tenants in other adjoining units or due to its own failure to adequately maintain and service the other units. One or more of the Plaintiffs who lived in structures with more than one unit in them noted the presence of smells of moldy, mildewed, water-rotted conditions, and Corvias was also aware that the older the unit or the structure, the more like that it had problems that worsened over time unless Corvias rebuilt or renovated the structure.

**Interrogatory No. 7**. Describe in detail every instance in which You sent or received a complaint, inquiry, or other communication concerning a housing or habitability issue, including but not limited to water or moisture intrusion, leak, ceiling or roof leak, flooring issue, structural issue, lead-based paint, mold, or suspect fungal growth in (or on the outside or perimeter of) military housing at Fort Bragg, including all follow-up communications and actions that You or others took in response to each such issue and identify the persons involved.

**Answer:**

**Objection. This interrogatory is vague and overly broad. Plaintiffs cannot recall "every instance" where a communication was made concerning military housing defects.**

**Without waiving any objections, Plaintiffs state:**

**See Plaintiffs' response to Interrogatory #5.**

**Plaintiffs are informed and believe that Defendants are in possession of all maintenance and repair requests submitted by Plaintiffs, along with all records related to Defendants' responses. Additionally, Plaintiffs make reference to the facts and allegations set out in the Amended Complaint.**

**Supplemental Answer dated 5/6/22:**

**Plaintiffs complained of housing and habitability issues to Corvias with regard to the Fort Bragg home as should be documented in Corvias' own records, to the extent they are reliable. Plaintiffs describe their complaints and their communications with Corvias in their response to interrogatory number 5, above.**

**Interrogatory No. 8**. If You allege you were exposed to mold, lead-based paint, or other allegedly harmful substances while at Fort Bragg, describe such exposure in detail including the date such exposure took place, where such exposure took place, the date You first experienced symptoms and any how You confirmed such exposure involved the alleged substance. If You are relying on any written documents or records, identify those documents and records, and state the material in each document which You contend demonstrates the presence of the alleged substance.

**Answer:**

**Objection.  Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home.   Rather, Plaintiffs are seeking, inter alia, allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times.   *See In re NC Swine Farm Nuisance Litig.,* Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony).  Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.**

**Without waiving any objections, Plaintiffs state:**

**See Plaintiffs' response to Interrogatory #5.**

**Supplemental Answer dated 5/6/22:**

**Plaintiffs allege that they were exposed to mold and air that passed through filthy HVAC ducts while at the Fort Bragg address.**

**Interrogatory No. 9**. State whether or not You have been treated by, diagnosed by, or admitted to any hospital or other healthcare facility in the last ten (10) years and if so, state the name of the hospital or facility, the dates of treatment, diagnosis, or admission , the illness or condition involved and the names and addresses of the health care provider(s) who treated You.

**Answer:**

**Objection.  Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home.   Rather, Plaintiffs are seeking, inter alia, allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times.   See In re NC Swine Farm Nuisance Litig., Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony).  Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.**

**Without waiving any objections, Plaintiffs state:**

Plaintiffs are willing to meet and confer with Defendants for purposes of facilitating appropriately limited medical records discovery. However, broad medical discovery such as in a personal injury case is not appropriate herein.

**Supplemental Answer dated 5/6/22:**

The Page family will agree to allow Defendants to obtain their family's medical records for the past ten years.

**Names of doctors:**

**Dr. Edwin B. Robins**
**Robinson Health Clinic**
**1722 Tagatay St Bldg C, Fort Bragg, NC, 28310**
**Phone: 910 907 8282**

**Joel Health Clinic & Dental Clinic**
**4861 Logistics St, Fort Bragg, NC 28307**
**Phone: (910) 907-5635**

**SUPPLEMENTAL ANSWER DATED 7/8/2022:**

Plaintiffs provided their signed revised Medical Authorizations to Defendants on May 27, 2022 and June 8, 2022.

As to medical providers Plaintiffs have seen in the last 10 years, other than the Robinson Health Clinic and Joel Health Clinic, Plaintiffs recall the following:

While in Morganton, Brittany did not have a primary physician and was only seen at a local urgent care. She does not recall the address of the urgent care location. Also, ▮▮▮▮ was seen at Mountainview Pediatrics and saw Dr. Whally and Dr. Clapp.

Prior to being at Fort Bragg, Shane was at Fort Drum and was seen by team medic (sick call). He does not recall any names of those medics.

While in Fort Bragg, ▮▮▮▮ and ▮▮▮▮ have been seen by Dr. Robins at Robinson Health Clinic (now Joel Health Clinic, because the Army moved the clinics around). They have seen Dr. Robins the entire time since the Page family has been at Bragg. ▮▮▮▮ has also seen Dr. Ursulla Chesney (Joel Health Clinic) here.

If Shane is sick: he goes to sick call if it is in the morning; or, the team medic if it's after PT hours. He does not recall the names of medics he has seen. These change constantly as well.

Brittany has always been seen at Robinson Health Clinic and is currently being seen by Dr. Diagastoni. She does not recall the name of any prior doctor she has seen here.

37

Plaintiffs do not recall any additional information related to their family's ten-year medical history.

**Interrogatory No. 10**. State whether You have undergone a physical examination in the last ten (10) years. If so, state the date of any such examination, where it was conducted, who conducted the examination and whether there is a report or other Document concerning such physical examination.

**Answer:**

**Objection. Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home. Rather, Plaintiffs are seeking, inter alia, allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times.** *See In re NC Swine Farm Nuisance Litig.,* **Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony). Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.**

**Without waiving any objections, Plaintiffs state:**

**Plaintiffs are willing to meet and confer with Defendants for purposes of facilitating appropriately limited medical records discovery. However, broad medical discovery such as in a personal injury case is not appropriate herein.**

**Supplemental Answer dated 5/6/22:**

**The Page family will agree to allow Defendants to obtain their family's medical records for the past ten years.**

**SUPPLEMENTAL ANSWER DATED 7/8/2022:**

**Plaintiffs provided their signed revised Medical Authorizations to Defendants on May 27, 2022 and June 8, 2022.**

**As to medical providers Plaintiffs have seen in the last 10 years, other than Shane Page being seen by the team medic (sick call), Plaintiffs only recall having been seen by the providers listed above.**

**Interrogatory No. 11**. State whether You have consulted any health care provider in the past ten (10) years. If so, specify in detail the nature of the condition for which You consulted the health care provider and the name and address of each health care provider who provided treatment for the condition.

**Answer:**

**Objection. Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home. Rather, Plaintiffs are seeking,** *inter alia,* **allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times.** *See In re NC Swine Farm Nuisance Litig.,* **Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony). Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.**

**Without waiving any objections, Plaintiffs state:**

**Plaintiffs are willing to meet and confer with Defendants for purposes of facilitating appropriately limited medical records discovery. However, broad medical discovery such as in a personal injury case is not appropriate herein.**

**Supplemental Answer dated 5/6/22:**

**The Page family will agree to allow Defendants to obtain their family's medical records for the past ten years.**

**SUPPLEMENTAL ANSWER DATED 7/8/2022:**

**See Plaintiffs' Answer to Interrogatory 9 above, as supplemented.**

**Interrogatory No. 12**. State whether You ever experienced any respiratory conditions, breathing difficulties, asthma, allergies, headaches, skin conditions, chronic nasal congestion, chronic sinus infections, or lead poisoning symptoms. If so, describe the treatment You received for such condition, including the name and address of each healthcare provider who treated you,

the time period in which you were treated, and any prescription or over-the-counter medications taken to treat such conditions.

**Answer:**

Objection. Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home. Rather, Plaintiffs are seeking, *inter alia*, allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times. *See In re NC Swine Farm Nuisance Litig.*, Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony). Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.

Without waiving any objections, Plaintiffs state:

Plaintiffs are willing to meet and confer with Defendants for purposes of facilitating appropriately limited medical records discovery. However, broad medical discovery such as in a personal injury case is not appropriate herein.

**Supplemental Answer dated 5/6/22:**

The Page family will agree to allow Defendants to obtain their family's medical records for the past ten years.

**SUPPLEMENTAL ANSWER DATED 7/8/2022:**

See Plaintiffs' Answer to Interrogatory 9 above, as supplemented.

**Interrogatory No. 13**. Describe the injuries You contend You sustained as a result of the Your military housing experience at Fort Bragg. If you claim You are still afflicted with or suffering from the effects of any such injury, describe Your claim and all supporting evidence in detail.

**Answer:**

Objection.  Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home.   Rather, Plaintiffs are seeking, *inter alia*, allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times.  *See In re NC Swine Farm Nuisance Litig.,* **Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony).  Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.**

Without waiving any objections, Plaintiffs state:

See Plaintiffs' response to Interrogatory #5.

Plaintiffs during the pertinent times suffered discomfort, annoyance, irritation and loss of use of their ability to enjoy their property. *See In re NC Swine Farm Nuisance Litig.,* **No. 5 7:14-cv-00180-BR (E.D.N.C.), jury instructions filed at Doc. 262, on April 26, 2018, at p. 14 (private nuisance jury instruction for damages: "The plaintiffs claim that the interference with the use and enjoyment of his or her property has caused him or her anger, embarrassment, annoyance, inconvenience, decreased quality of life, and/or physical and mental discomfort. There is no fixed formula for placing a value on these alleged harms. You will determine what is fair compensation by applying logic and common sense to the evidence.").**

Plaintiffs further suffered from a loss of the comfort, quiet and enjoyment and habitability of their rented premises during the pertinent times.

Plaintiffs further suffered from the injury of not getting the benefit of their bargain with regard to their rented housing.  During the pertinent times, the Plaintiffs duly and timely paid any and all rent that was due and owing for their rented Corvias military housing home.  However, they did not receive the quality of rented housing to which they were entitled and for which, with their limited means, they paid.

**Supplemental Answer dated 5/6/22:**

The Page family will agree to allow Defendants to obtain their family's medical records for the past ten years.

**SUPPLEMENTAL ANSWER DATED 7/8/2022:**

See Plaintiffs' Answer to Interrogatory 9 above, as supplemented.

**Interrogatory No. 14**. If You were treated, attended or examined by any physician(s) or others for the injuries identified in responses to Interrogatories 12-13, state the names and addresses of all such persons and the nature of the medical treatment given by each physician or other person. If any diagnostic tests were performed, state the type of test performed, name and address of the place where it was performed, date each test was performed and what each test disclosed.

**Answer:**

**Objection. Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home. Rather, Plaintiffs are seeking, *inter alia*, allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times. *See In re NC Swine Farm Nuisance Litig.,* Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony). Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.**

**Without waiving any objections, Plaintiffs state:**

**Plaintiffs are willing to meet and confer with Defendants for purposes of facilitating appropriately limited medical records discovery. However, broad medical discovery such as in a personal injury case is not appropriate herein.**

**Supplemental Answer dated 5/6/22:**

**The Page family will agree to allow Defendants to obtain their family's medical records for the past ten years.**

**SUPPLEMENTAL ANSWER DATED 7/8/2022:**

**See Plaintiffs' Answer to Interrogatory 9 above, as supplemented.**

**Interrogatory No. 15**.  Identify any communications, whether written or oral, You had with any person, including but not limited to other residents of Fort Bragg, environmental consultants, and members and civilian employees of the Army, media outlet, or federal, state or local government agency, official, staff member or employee wherein you discussed any alleged housing issues at Fort Bragg, including but not limited to mold, health or habitability issues.

<u>Answer:</u>

**Objection.  This Interrogatory is vague and overly broad.  Plaintiffs cannot possibly remember and recount each and every conversation, written or oral, that they had over the course of multiple years, let alone the topic of each conversation.**

**Without waiving any objections, Plaintiffs state:**

**See Plaintiffs' response to Interrogatory #5.**

**Defendants are believed to have records kept in the normal course of business and reflecting numerous of the complaints and relevant communications from, to and with the Plaintiffs, or either of them.**

<u>**Supplemental Answer dated 5/6/22**</u>**:**

**Plaintiffs described their interactions and communications that they could recall with regard to their housing at Fort Bragg, in their response to interrogatory number 5.**

**Interrogatory No. 16.**  If You have ever been convicted or pleaded guilty, no contest, or entered an Alford plea to an offense punishable by imprisonment of more than one year or any crime of dishonesty or false statement, regardless of the punishment actually imposed, please state the date of each conviction or plea, the name and location of the court in which You were convicted or pleaded in, and the crime of which you were convicted or pleaded guilty, no contest, or entered an Alford plea to.

43

**Answer:**

**Objection.  Plaintiffs object to the extent that the discovery requests is overly broad, unduly burdensome, unlimited in time, and otherwise harassing and seeking of irrelevant information that is not likely to lead to the discovery of relevant evidence.  Plaintiffs further object that the scope of the request is unlimited in time. Plaintiffs further object to the extent the discovery requests would purport to elicit information on old matters or misdemeanor matters with no potential relevance herein.**

**Without waiving any objections:**

**Not applicable.**

**Interrogatory No. 17.**  Identify each person whom You may call as an expert witness at trial.  With respect to each expert, state his or her name and address, the subject matter on which the expert is expected to testify, the substance of the facts and opinion to which the expert is expected to testify, and a summary of the grounds for each opinion.

**Answer:**

**Objection.  The time for the Plaintiffs to be obligated to name any of their experts in this matter has not yet arrived.**

**Without waiving any objections, Plaintiffs state:**

**Plaintiffs have not yet selected their expert witnesses in this matter.**

**Plaintiffs reserve the right to supplement this response in due course.**

**Interrogatory No. 18**.  List any photographs, diagrams, or other exhibits which You or your attorney have which you will or may introduce at trial.

**Answer:**

**Objection.  The time for the Plaintiffs to be obligated to determine and disclose their list of exhibits for trial in this matter has not yet arrived.**

**Without waiving any objections, Plaintiffs state:**

44

**Plaintiffs have not yet selected their exhibits in this matter.**

**Plaintiffs reserve the right to supplement this response in due course.**

**Interrogatory No. 19**.  Have You ever been named as a plaintiff or defendant in any type of litigation other than this lawsuit?  If so, please state the name, county court or federal district, and case number as well as the outcome of the litigation.

**Answer**:

**Objection.  Plaintiffs object to the extent that the discovery requests is overly broad, unduly burdensome, unlimited in time, and otherwise harassing and seeking of irrelevant information that is not likely to lead to the discovery of relevant evidence.**

**Without waiving any objections:**

**No.**

**Interrogatory No. 20**.  Please state the full names and dates of birth of any person who resides, or resided at the time period of the allegations contained in the Amended Complaint, with You at Fort Bragg.

**Answer:**

**Objection.  Plaintiffs wish to safeguard relevant information regarding their minor children.**

**Without waiving any objections, Plaintiffs state:**

**No other individuals resided with Plaintiffs' family during the relevant times.**

**Objection.  Plaintiffs' do not wish to identify their minor children.  No other individuals resided with Plaintiffs.**

**Supplemental Answer dated 5/6/22:**

**Plaintiffs provide the names of their minor children as Confidential information under the terms of the protective order:**

45

**Names of minors:**

1. ████████████████████████

2. ████████████████████████

**Interrogatory No. 21**.  Itemize and show how you calculate any damages claimed by You in this Action, whether economic, non-economic, or other.

**Answer**:

**Objection.  This interrogatory calls for a legal conclusion and attorney work product. Moreover, Plaintiffs have not formulated a settlement demand at this stage.**

**Without waiving any objections, Plaintiffs state:**

**See Plaintiffs' response to Interrogatory #13.**

**Supplemental Answer dated 5/6/22:**

**Actual damages will be calculated in accordance with the allowable categories of damages under the North Carolina Pattern Jury Instructions and/or traditional jury instructions for whichever causes of action the Court may allow to go to trial.  Contract damages could be measured by the total amount of the BAH rent paid by the soldier or on his behalf, or some percentage thereof, on the theory that the soldier paid to receive decent accommodations, did not receive them, and did not receive the benefit or the bargain. Damages for private nuisance would include damages for discomfort, annoyance, irritation, annoyance, and loss of use and enjoyment.  Damages for breach of the warranty of habitability may include via the measure of damages by the difference between the value of the rented premises in its uninhabitable condition and its fair market rental value otherwise. Under Chapter 75, a prevailing plaintiff may be entitled to three times actual damages.**

**Plaintiffs reserve the right to supplement to the extent they are able to identify damages in other respects including out of pocket expenses; moving expenses; costs associated with relocating to a new home that would not otherwise have been expended; values of lost or damaged clothing, linens or furniture; etc.**

**Plaintiffs do not claim lost wages or lost income (e.g., taking time away from work because of the conditions at the home, and suffering lost wages as a result).**

**Plaintiffs reserve the right to allege other claims including but not limited to punitive damages if the discovery so supports in assessing the gravity of the fraud and recklessness-related allegations in the complaint, e.g. regarding the work order process and purported tenant customer service facility of the enterprise.**

Date: July 8, 2022.                    Respectfully submitted,

                                       s/John Hughes
                                       Mona Lisa Wallace
                                       NC State Bar No. 009201
                                       John Hughes
                                       NC State Bar No. 22126
                                       WALLACE & GRAHAM, PA
                                       525 N. Main Street
                                       Salisbury, North Carolina 28144
                                       Telephone: 704-633-5244
                                       Fax: 704-633-9434
                                       mwallace@wallacegraham.com
                                       jhughes@wallacegraham.com

                                       J. Anthony Penry
                                       N.C. Bar No. 8936
                                       PENRY | RIEMANN PLLC
                                       2245 Gateway Access Point, Suite 203
                                       Raleigh, NC 27607
                                       (919) 792-3891
                                       Andy.Penry@PenryRiemann.com

                                       Robert S. Metro
                                       S.C. Bar No. 69494
                                       BAUER & METRO, PC
                                       Post Office Box 7965
                                       Hilton Head, SC 29938
                                       (843) 842-5297
                                       Rmetro@bauerandmetro.com
                                       Appearing pursuant to Local Rule 83.1(e)

                                       *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2022 I served this document on counsel for the Defendants

herein, by email, as follows:

Mark P. Henriques
Matthew F. Tilley
WOMBLE BOND DICKINSON (US) LLP
3500 One Wells Fargo Center
301 South College Street
Charlotte, North Carolina 28202-6025
E-mail: Mark.Henriques@wbd-us.com
E-mail: Matthew.Tilley@wbd-us.com

Thomas J. Yoo
HOLLAND & KNIGHT LLP
400 S. Hope St., 8th Floor
Los Angeles, CA 90071
Thomas.Yoo@hklaw.com

Jessica L. Farmer
HOLLAND & KNIGHT LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Jessica.Farmer@hklaw.com

Date:  July 8, 2022.                    Respectfully submitted,

s/John Hughes
Mona Lisa Wallace
NC State Bar No. 009201
John Hughes
NC State Bar No. 22126
WALLACE & GRAHAM, PA
525 N. Main Street
Salisbury, North Carolina 28144
Telephone: 704-633-5244
Fax: 704-633-9434
mwallace@wallacegraham.com
jhughes@wallacegraham.com

# VERIFICATION

I, pursuant to 28 U.S.C. § 1746 hereby declare under penalty of perjury the following is true and correct:

1. I am a competent adult, over the age of eighteen, and this Declaration is based on my personal knowledge.

2. I am a Plaintiff in the military housing lawsuit brought against the Corvias enterprise for the housing at Fort Bragg.

3. From time to time, I have provided information to my lawyers to prepare "interrogatory responses."

4. I have now been asked to verify that as to the responses being served, the information that is in them that came from me or that I know personally, in fact is true to the best of my knowledge. I have gone over these interrogatory responses.

5. Where those responses contain facts about my family or me personally and other facts of which I have personal knowledge, I swear and affirm under penalty of perjury that those facts and statements are true to the best of my knowledge.

6. Where the facts are based on information provided by other people, I state that I believe that information to be true.

7. Where the facts are about other things like facts learned from public records, I am relying on my attorneys and the investigation that my attorneys did.

8. I declare under penalty of perjury that the foregoing is true and correct.


Dated: _____

Signature: _____

Printed name: Brittany Page


Dated: _____7/8/2022_____

Signature: _____

Printed name: Shane Page

# VERIFICATION

I, pursuant to 28 U.S.C. § 1746 hereby declare under penalty of perjury the following is true and correct:

1. I am a competent adult, over the age of eighteen, and this Declaration is based on my personal knowledge.

2. I am a Plaintiff in the military housing lawsuit brought against the Corvias enterprise for the housing at Fort Bragg.

3. From time to time, I have provided information to my lawyers to prepare "interrogatory responses."

4. I have now been asked to verify that as to the responses being served, the information that is in them that came from me or that I know personally, in fact is true to the best of my knowledge. I have gone over these interrogatory responses.

5. Where those responses contain facts about my family or me personally and other facts of which I have personal knowledge, I swear and affirm under penalty of perjury that those facts and statements are true to the best of my knowledge.

6. Where the facts are based on information provided by other people, I state that I believe that information to be true.

7. Where the facts are about other things like facts learned from public records, I am relying on my attorneys and the investigation that my attorneys did.

8. I declare under penalty of perjury that the foregoing is true and correct.

Dated: 7/8/2022 _____

Signature: _____

Printed name: Brittany Page


Dated: _____

Signature: _____

Printed name: Shane Page

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

SSG SHANE PAGE, et al.      )
                                   )

      Plaintiffs,            )
                                   )

v.                                )       CASE NO. 5:20-cv-00336-D
                                   )

BRAGG COMMUNITIES, LLC, et al.     )
                                   )

      Defendants.          )
                                   )

_____    )

## SFC CHRISTOPHER WILKES' AND ASHLEY WILKES' SUPPLEMENTAL JULY 8, 2022 RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiffs, Sergeant First Class (SFC) Christopher Wilkes and Ashley Wilkes, by and through their undersigned attorneys, and by way of supplementing their answers to the interrogatories propounded by Defendants, pursuant to Fed. R. Civ. P. 26 and 33, state as follows:

Plaintiffs assert attorney-client privileges and immunities as to all communications between Plaintiffs and legal counsel, and thus object to producing or disclosing such communications. Undersigned counsel asserts work-product privileges and immunities as to their own work product. Plaintiffs therefore object to producing such work-product. Plaintiffs assert work-product privileges and immunities as to all communications and documentation prepared in anticipation of litigation and thus object to producing such work product.

In setting forth these answers, Plaintiffs do not waive any attorney-client, work-product, or other privilege or immunity which may attach to information called for in, or which may be responsive to, these interrogatories. Plaintiffs do not concede the relevance or materiality of these interrogatories, the subject matter of these interrogatories, or documents produced in response to

these interrogatories. Plaintiffs reserve the right to question the competency, relevancy, materiality, privilege, and admissibility of any documents produced or referred to herein. Plaintiffs also reserve the right to revise, correct, supplement, or clarify any of their answers or documents referred to herein. The above objections, privileges, and immunities are asserted in response to each of the following interrogatories as if set forth verbatim at the beginning of the answers to each interrogatory:

**Interrogatory No. 1**. State Your full name, address, date of birth, current and past marital status (including the date(s) of marriage and the full name of your spouse(s) (if applicable), Social Security number, driver's license number and cell phone number(s) and email(s) used while residing at Fort Bragg.

**Answer:**

**Plaintiffs object to the interrogatory to the extent it is overbroad, unduly burdensome and harassing. For example, information about a past marriage outside of the pertinent time period relevant herein is irrelevant nor likely to lead to the discovery of material and admissible evidence.**

**Without waiving any objections, Plaintiffs state:**

**Ashley Wilkes**
**Westefalenstr.22**
**Apt. 2**
**Wiesbaden, Germany 65191**

**+49 015224465487**
**TN 113196122**
**ashleyrisonwilkes@gmail.com**

**Sergeant First Class (SFC) Christopher Wilkes**
**Westefalenstr.22**
**Apt. 2**
**Wiesbaden, Germany 65191**

**+49 015224464657**

2

**TN  132893888**
[Wilkes180sx@gmail.com](mailto:Wilkes180sx@gmail.com)

**Interrogatory No. 2**. Identify all persons who are likely to have personal knowledge of any fact alleged in the pleadings, and state the subject matter of the personal knowledge possessed by each such person.

**Answer:**

**Plaintiffs object to the extent the discovery request would require the disclosure of information that may only be appropriately disclosed under the auspices of an appropriate Court-approved confidentiality protective order.  Without waiving any objections:**

1. **All named Plaintiffs and Defendants, along with the individuals identified in their respective initial disclosures and discovery responses.**

2. **All current and former tenants/residents of Corvias military housing at Fort Bragg during the class period.**

3. **Deborah J. Coulter**
   **198 Marguis Way**
   **Freeport, FL 32435**
   **615-584-5414**

   **Ms. Coulter is Ashley's Wilkes' mother and has personal knowledge of housing defects based on her visits to Fort Bragg and interaction with Ashley Wilkes.**

4. **Terry W. Coulter**
   **198 Marguis Way**
   **Freeport, FL 32435**
   **615-594-3214**

   **Mr. Coulter is Ashley Wilkes' stepfather and has personal knowledge of housing defects based on his visits to Fort Bragg and interaction with Ashley Wilkes.**

5. **Dawn Wilkes**
   **133 Apple Valley Way**
   **Florence, MT 59833**
   **406-370-3354**

3

Ms. Wilkes is Christopher Wilkes' mother and has personal knowledge of housing defects based on her interaction with Ashley Wilkes and Christopher Wilkes.

6. **Clay Bodo and Katie Bodo**
   **104 Hirsch Circle**
   **Fort Bragg, NC**
   **330-265-7380**

   The Bodos were neighbors of the Wilkes at Fort Bragg and have personal knowledge of housing defects.

7. **Cody Cloteaux and Ruby Cloteaux**
   **114 Hirsch Circle**
   **Fort Bragg, NC**
   **832-580-2776**

   The Cloteauxs were neighbors of the Wilkes at Fort Bragg and have personal knowledge of housing defects.

8. **Kevin Faz and Dinorah Faz**
   **Current Address Unknown**
   **214-744-9849**

   The Fazs were neighbors of the Wilkes at Fort Bragg and have personal knowledge of housing defects.

9. **Stefan Smith and Ali Smith**
   **Current Address Unknown**
   **801-725-8502**

   The Smiths were neighbors of the Wilkes at Fort Bragg and have personal knowledge of housing defects.

10. **Brandon Southerland and Miranda Southerland**
    **Current Address Unknown**
    **915-491-3354**

    The Southerlands are friends of the Wilkes and have personal knowledge of housing defects at Fort Bragg.

11. **Command Sergeant Major (CSM) Brian Narducci**
    **United States Army**
    **Address Unknown**

4

CSM Narducci was stationed at Fort Bragg and has personal knowledge of housing defects including the Wilkes' complaints.

12. **Mitchell D. Holbrooks**
    **Roofing Contractor**
    **Address Unknown**

    Mr. Holbrooks was the roofing contractor who repaired the Wilkes' roof. He is a former employee of Corvias. He was last known to be employed by "Roofman" in Lawrenceville, GA.

13. **John Picerne**
    **Founder/Chairman of the Board – Corvias**
    **1405 S County Trail #530**
    **East Greenwich, RI 02818**
    **401-228-2800**

    Plaintiffs are informed and believe that Mr. Picerne has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

14. **Patrick Bucolo**
    **Resident Manager-Corvias**
    **Fort Bragg**

    Plaintiffs are informed and believe that Mr. Bucolo has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

15. **Leonard Jones**
    **Resident Manager-Corvias**
    **Fort Bragg**

    Plaintiffs are informed and believe that Mr. Jones has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

16. **Amber Smiley**
    **Resident Assistant Manager-Corvias**
    **Fort Bragg**

    Plaintiffs are informed and believe that Ms. Smiley has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

17. **Vanessa Hargrave**
    **Resident Associate-Corvias**
    **Fort Bragg**

Plaintiffs are informed and believe that Ms. Hargrave has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

18. **Jenneisha Monroe**
    **Resident Associate-Corvias**
    **Fort Bragg**

    Plaintiffs are informed and believe that Ms. Monroe has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

19. **Mallory Dixon**
    **Resident Service Specialist-Corvias**
    **Fort Bragg**

    Plaintiffs are informed and believe that Ms. Dixon has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

20. **Kianna Amos**
    **Resident Service Specialist-Corvias**
    **Fort Bragg**
    Plaintiffs are informed and believe that Ms. Amos has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

21. **Heather Fuller**
    **Operations Director- Corvias Management**
    **1405 S County Trail #530**
    **East Greenwich, RI 02818**
    **401-228-2800**

    Plaintiffs are informed and believe that Ms. Fuller has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

22. **Deb Osmanski**
    **Former Program Office Administrator (Office Manager)**
    **Corvias-Fort Bragg**
    **Current Address Unknown**
    **Current Employer is ER Wagner in Menomonee Falls, Wisconsin**
    **800-558-5596**

    Plaintiffs are informed and believe that Ms. Osmanski has knowledge related to all facets of Corvias' military housing operations at Fort Bragg.

23. **Michael Melia**
    **Former Director of Construction – Corvias**
    **Current Address Unknown**
    **Current Employer is RQ Construction in Pinehurst, North Carolina**

**760-631-7707**

Plaintiffs are informed and believe that Mr. Melia has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

24. **Jeremy Stefanko**
    **Former Senior Maintenance Manager**
    **Corvias Military Living, LLC**
    **Current Address Unknown**
    **Currently Employed by Cumberland County, NC**

    Plaintiffs are informed and believe that Mr. Stefanko has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

25. **Steve Maxwell**
    **Former Facilities Director**
    **Corvias Military Living, LLC**
    **Current Address Unknown**
    **Currently Employed by Balfour Beatty Communities in Wetumpka, Alabama**

    Plaintiffs are informed and believe that Mr. Maxwell has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

26. **Steve Boothe**
    **Former Director of Facilities Operations**
    **Corvias Military Living, LLC**
    **Current Address Unknown**
    **Currently Employed by Hunt Companies in Providence, Rhode Island**

    Plaintiffs are informed and believe that Mr. Boothe has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

27. **Charles Connors**
    **Director of Capital Assets**
    **Corvias Group**
    **1405 S County Trail #530**
    **East Greenwich, RI 02818**
    **401-228-2800**

    Plaintiffs are informed and believe that Mr. Connors has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

7

28. **Chuck Cavaretta**
   **Former Vice President of Construction**
   **Corvias**
   **Current Address Unknown**
   **Current Employed by The Cassidy in Winter Haven, Florida**

   Plaintiffs are informed and believe that Mr. Cavaretta has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

29. **John Shay**
   **Senior Vice President of Construction & Development**
   **Corvias**
   **1405 S County Trail #530**
   **East Greenwich, RI 02818**
   **401-228-2800**

   Plaintiffs are informed and believe that Mr. Shay has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

30. **Cindy Hart**
   **Assistant Operations Director- Corvias**
   **Fort Bragg, North Carolina**

   Plaintiffs are informed and believe that Ms. Hart has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

31. **Mike Sarisky**
   **Operations Director-Corvias**
   **Fort Bragg, North Carolina**

   Plaintiffs are informed and believe that Mr. Sarisky has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

32. **Mark Foraker**
   **Former Business Director – Corvias (Fort Bragg)**
   **Current Address Unknown**
   **Currently Employed by Barvin in Houston, Texas**

   Plaintiffs are informed and believe that Mr. Foraker has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

8

33. **Robert Smith**
    **Maintenance Manager- Corvias, Fort Bragg**
    **1405 S County Trail #530**
    **East Greenwich, RI 02818**
    **401-228-2800**

    Plaintiffs are informed and believe that Mr. Smith has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

34. **Robert Leonard**
    **Facilities Director- Corvias, Fort Bragg**
    **1405 S County Trail #530**
    **East Greenwich, RI 02818**
    **401-228-2800**

    Plaintiffs are informed and believe that Mr. Leonard has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

35. **John Teague**
    **Service Center Coordinator- Corvias, Fort Bragg**
    **51 Skytrain Drive**
    **Fort Bragg, NC 28307**
    **910-764-4868**

    Plaintiffs are informed and believe that Mr. Teague has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

36. **Katie Culbreth**
    **Service Center Coordinator-Corvias, Fort Bragg**
    **51 Skytrain Drive**
    **Fort Bragg, NC 28307**
    **910-764-4868**

    Plaintiffs are informed and believe that Ms. Culbreth has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

37. **Michele Wooten**
    **Staff Accountant- Corvias**
    **406 Pershing Ct.**
    **Fort Riley, KS 66442**
    **785-717-2244**

Plaintiffs are informed and believe that Ms. Wooten has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

38. **Scottie Miller**
**Former Senior Manager- Corvias, Fort Bragg**
**Current Address Unknown**
**Currently Employed by Hunt Military Housing in Austin, Arkansas**

Plaintiffs are informed and believe that Mr. Smith has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

39. **Matt Brigman**
**HVAC Installer**
**Sandhills Heating, Refrigeration & Electrical**
**Laurinburg, NC**

Plaintiffs are informed and believe that Mr. Brigman is a maintenance worker for an outside vendor who worked on HVAC systems in military houses at Fort Bragg, NC.

40. **Scotty Locklear**
**J&L Contractors & Maintenance Services**
**Pembroke, NC 28372**
**910-280-0901**

Plaintiffs are informed and believe that Mr. Locklear has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

41. **Toni Cornelius**
**Professional Engineer-Cornelius Consulting**
**4004 Park Avenue**
**Wilmington, NC 28403**

Plaintiffs are informed and believe that Ms. Cornelius has knowledge related to construction, maintenance, and management of military housing at Fort Bragg.

42. **Elizabeth A. Field**
**Director, Defense Capabilities and Management**
**United States Government Accountability Office**
**441 G St., NW**
**Washington, DC 20548**

202-512-2775

Ms. Field has knowledge of the GAO's monitoring of privatized housing including analysis of data provided by all 14 private partners. Ms. Field authored a report entitled, "Military Housing Privatization: Preliminary Observations on DOD's Oversight of the Condition of Privatized Military Housing. Ms. Fields testified on these topics before the Senate Armed Services Committee.

43. Hon. Ryan D. McCarthy
Former Secretary of the United States Army
Millennium Corporation
1400 Crystal Drive, Suite 400
Arlington, VA 22202
703-436-1343

As part of his duties as Secretary of the Army, Mr. McCarthy monitored the status and condition of military housing. He visited Army installations across the country to observe the condition of military housing, including a visit to Fort Bragg in September 2020. Following his visit, McCarthy stated, "What you saw over time is an abdication of responsibility. We outsource this to a corporation. That's the danger when you set up these public-private partnerships. Over time, you get lazy. As an institution, we got lazy. The wake-up call came two years ago. It is embarrassing and it is awful".

44. Col. Phillip Sounia
Former Garrison Commander- Fort Bragg
United States Army
Address Unknown

May have knowledge regarding the housing conditions given his post.

45. Senator Elizabeth Warren
309 Hart Senate Office Building
Washington, DC 20510
202-224-4543

Senator Warren investigated military housing companies and submitted a written report dated April 30, 2019.

46. Shannon Razsadin
Executive Director of Military Family Advisory Network
22015 W. 66th St.
Unit 860635
Shawnee, KS 66286
202-821-4195

Ms. Razsadin and MFAN released a report that over 67% of all Bragg families surveyed reported manifest effects from maintenance, repairs and remediation.

47. Heather Beckstrom
Current or Former Tenant/Resident
Address Unknown
bckstromheather@gmail.com

Ms. Beckstrom has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

48. Stephanie Blackadar
Current or Former Tenant/Resident
Address Unknown
juggalatis@hotmail.com

Ms. Blackadar has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

49. Jessica Brueck
Current of Former Tenant/Resident
Address Unknown
Jessica.lynn.brueck@gmail.com

Ms. Brueck has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

50. Regan Burke
Current or Former Tenant/Resident
Address Unknown
morethanamilkmaid@yahoo.com

Ms. Burke has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

51. Courtney Burks
Current or Former Tenant/Resident
Address Unknown
courtflavin@yahoo.com

Ms. Burks has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

52. Cacee Cobarrubia

Current or Former Tenant/Resident
Address Unknown
Cacee.nesbit93@yahoo.com

Ms. Cobarrubia has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

53. **Shyla Curry**
Current or Former Tenant/Resident
Address Unknown
Shylacurry98@gmail.com

Ms. Curry has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

54. **Marissa Dilliard**
Current or Former Tenant Resident
Address Unknown
Marrissa.dilliard@gmail.com

Ms. Dilliard has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

55. **Pennalla Evans**
Current or Former Tenant/Resident
Address Unknown
Mrsevans3013@gmail.com

Ms. Evans has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

56. **Vicki Ragsdale**
Current or Former Tenant/Resident
Address Unknown
Mrsforcier1031@gmail.com

Ms. Ragsdale has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

57. **Tia Geisler**
Current or Former Tenant/Resident
Address Unknown
Tia.c.geisler@gmail.com

Ms. Geisler has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**58. Julie Hilliard**
   Current or Former Tenant/Resident
   Address Unknown
   Juliehilliard23@gmail.com

   Ms. Hilliary has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**59. Sarah Lenox**
   Current or Former Tenant/Resident
   Address Unknown
   Sarahjclark1747@gmail.com

   Ms. Lenox has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**60. Jacqueline Haven Lyons**
   Current or Former Tenant/Resident
   Address Unknown
   havenbrandhorst@gmail.com

   Ms. Lyons has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**61. Chanda Martin**
   Current or Former Tenant/Resident
   Address Unknown
   Chandamartin279@gmail.com

   Ms. Martin has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**62. Emya Roberts**
   Current or Former Tenant/Resident
   Address Unknown
   Emyareneerob15@gmail.com

   Ms. Roberts has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**63. Tamara Terry**
   Current or Former Tenant/Resident
   Address Unknown
   Jcm72611@gmail.com

Ms. Terry has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**64. Amber Woollett**
   **Current or Former TenantResident**
   **Address Unknown**
   **amberdw@live.com**

   Ms. Woollett has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**65. Sabrina Collins**
   **Current or Former Tenant/Resident**
   **Current Contact Information Unknown**

   Ms. Collins has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**66. Danielle Olson**
   **Current or Former Tenant/Resident**
   **Current Contact Information Unknown**

   Ms. Olson has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC

**67. Tara Michelle**
   **Current or Former Tenant/Resident**
   **Current Contact Information Unknown**

   Ms. Michelle has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**68. Ashlee Monzalvo**
   **Current or Former Tenant/Resident**
   **Current Contact Information Unknown**

   Ms. Monzalvo has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

**69. Toby DeJoinville**
   **Current or Former Tenant/Resident**
   **Current Contact Information Unknown**

   Ms. DeJoinville has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

70. **Amber Lace**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Lace has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

71. **Courtney Wong**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Wong has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

72. **Alexis Danielle Martin**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Martin has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

73. **Liz Stitt**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Stitt has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

74. **Taylor Hinshaw**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Hinshaw has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

75. **Cassandra Manis**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Manis has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

76. **Lillian Bradford**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

Ms. Bradford has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

77. **Lorena Butler**
   **Current or Former Tenant/Resident**
   **Current Contact Information Unknown**

   Ms. Butler has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

78. **Jennalynn Apedaile Thomas**
   **Current or Former Tenant/Resident**
   **Current Contact Information Unknown**

   Ms. Thomas has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

79. **Danielle Jackson**
   **Current or Former Tenant/Resident**
   **Current Contact Information Unknown**

   Ms. Jackson has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

80. **Lee Nash**
   **Current or Former Tenant/Resident**
   **Current Contact Information Unknown**

   Mr. Nash has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

81. **Tyler Cissna**
   **Current or Former Tenant/Resident**
   **Current Contact Information Unknown**

   Ms. Cissna has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

82. **Jessica Lynn Brueck**
   **Current or Former Tenant/Resident**
   **Current Contact Information Unknown**

   Ms. Brueck has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

83. **Alena Martinez**

Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Martinez has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

84. **Meagan Heady Solorzano**
    Current or Former Tenant/Resident
    Current Contact Information Unknown

    Ms. Solorzano has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

85. **Sharon Land**
    Current or Former Tenant/Resident
    Current Contact Information Unknown

    Ms. Land has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

86. **Taylor Bryant**
    Current or Former Tenant/Resident
    Current Contact Information Unknown

    Ms. Bryant has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

87. **Jessica Allen**
    Current or Former Tenant/Resident
    Current Contact Information Unknown

    Ms. Allen has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

88. **Jennifer Burt**
    Current or Former Tenant/Resident
    Current Contact Information Unknown

    Ms. Burt has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

89. **Briana Kramp**
    Current or Former Tenant/Resident
    Current Contact Information Unknown

Ms. Kramp has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

90. **KayKay Jackson**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Jackson has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

91. **Hannah Gagnon**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Gagnon has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

92. **Cat Billet**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Billet has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

93. **JayBee Bar**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Bar has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

94. **Jayla Garcia**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Garcia has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

95. **Kayla Reed**
    **Current or Former Tenant/Resident**
    **Current Contact Information Unknown**

    Ms. Reed has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

96. **Brittany Opsomer**

Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Opsomer has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

97. Kaytlin Erickson
Current or Former Tenant/Resident
Current Contact Information Unknown

Ms. Erickson has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

98. Amanda Anderson
Current or Former Tenant/Resident
Address Unknown
a.anderson0228@gmail.com

Ms. Anderson has personal knowledge of housing defects based on her experience as a tenant/resident of Corvias at Fort Bragg, NC.

99. Amy Lohrenz and Major Michael Lohrenz are former residents. These individuals may have knowledge as per their lawsuit, *see Lohrenz v. Bragg Communities, LLC,* No. 5:2022cv00044 (E.D.N.C.).

100. Plaintiffs in the *Addi* case and witnesses identified in that case may have knowledge regarding Corvias business operations, customer service, repair and maintenance practices, which while occurring at Fort Meade in Maryland could be relevant insofar as they reflect common corporate practices that were also used and imposed at Fort Bragg. *See Addi v. Corvias Management-Army, LLC,* No. 1:2019cv03253 (D. Md.).

Supplemental Answer dated 5/6/22:

DESIGNATED AS CONFIDENTIAL PER PROTECTIVE ORDER

CONFIDENTIAL - REDACTED



**NONCONFIDENTIAL:**

      **Hannah Hurd, Assistant Resident Manager at Corvias, Fort Bragg, North Carolina, United States. May have knowledge regarding Corvias property management practices. States that she oversees a team of five in the Pope and Ardennes communities.**

      **Don Agel, Agel's Home Inspections, Fayetteville NC. Phone: (910) 224-5076. May have knowledge regarding repair, maintenance, tenant service issues.**

      **Wina Hathaway. Employed in contracts and vendor management with Corvias, at Fort Bragg, since 2014. May have knowledge regarding repair, maintenance, tenant service issues.**

      **PFC Anthony Blankenship, wife Brittney, son Jason. Per news reports, this family moved to Fort Bragg in August 2018:**

      **Pfc. Anthony Blankenship points to mold on the grout of his bathroom and a greenish mildew stain around the tiles next to the toilet.**

      **"That's kind of a mold pattern growing underneath," he says. "Workers at times just put new grout over the mold. At times, contractors wouldn't show up at all for problems ranging from clogged plumbing to faulty ventilation ducts."**

      **"We'd call again, and they'd say we don't have any recollection you put in a work order," says Blankenship, who moved into this ranch-style house at Fort Bragg, N.C., back in August with his wife, Brittney, and their toddler, Jason.**

"A lot of families, unfortunately, their house is worse than ours," says Brittney.[1]

Heath Burleson.  Corvias Partnership Advisor.  Public biography shows intimate involvement in Corvias MHPI matters.[2]  Corvias materials state that in 2019 he was one of the key executives who belatedly agreed that Corvias would fund $325M in direct investment into its Army portfolio in order to remedy the longstanding housing problems.  According to Corvias, as the Senior Vice President of Operations, he was responsible for the oversight and management of Corvias' managers across the Army and AF portfolio. In 2018 he assumed the role of Partnership Advisor for the Corvias Property Management portfolio which has a 2020 annual budget of $435M and development/construction budget of $335M.

Mark Esper.  In his role as Secretary of Defense, Esper went on record regarding the poor housing conditions.  Examples:

"In too many cases, it is clear the private housing companies failed to uphold their end of the bargain, a failure that was enabled by the Army's insufficient oversight," Esper said. "We are determined to investigate these problems and to hold our housing contractors and chains of command accountable."[3]

SGT Terry Blood and wife, Krysta.  Tenants of the Corvias housing at Fort Bragg. Ms. Blood may have subsequently been hired by Corvias.  Their complaints are described in news articles:

Sgt. Terry Blood and his wife, Krysta … showed the shoddy repairs at their house at Fort Bragg.

Krysta points to the ceiling inside a closet in her garage. She says a subcontractor just plastered over what is a widening stain from a leak that has also damaged the floor. The source of the leak is the bathtub.

"For four years, that tub water has been leaking from children's baths," she says. "Can you imagine what kind of water has been in between the floors for that time?"

Are their friends having troubles as well?

"Pretty much the exact same issues," says Terry Blood. "Actually one of our friends right across the street, they just got surveyed, and they have found

[1] https://www.cpr.org/2019/03/08/shoddy-maintenance-of-military-housing-under-scrutiny-by-senate-military-leaders/
[2] https://www.congress.gov/116/meeting/house/110611/witnesses/HHRG-116-AP18-Bio-BurlesonM-20200303.pdf
[3] https://apnews.com/article/2f34561f12c743ec8ef349becd9c0802.

cracks. In the summer months they have grass growing up through their floor."[4]

Col. Kyle Reed, Fort Bragg Garrison Commander. May have knowledge regarding the Corvias MHPI involvement at Fort Bragg. Should have knowledge regarding the fallout from the press coverage, publicity and Congressional hearings occurring in 2018-19, including steps the Army forced Corvias to take to remedy matters.[5]

Greg Jackson, Chief of Housing, Fort Bragg, Directorate of Public Works. May have knowledge regarding the Corvias MHPI involvement at Fort Bragg. Should have knowledge regarding the fallout from the press coverage, publicity and Congressional hearings occurring in 2018-19, including steps the Army forced Corvias to take to remedy matters. Has knowledge regarding how in the past, residents thought Housing (Army) and Corvias were synonymous (which would tend to disincentivize soldiers from complaining).[6]

Krista Lindholm. Fort Bragg tenant. May have knowledge of housing problems at Fort Bragg. Quoted as saying: "I've seen the mold, and it's legit," Krista Lindholm said of mold in a neighbor's house. "They're sick, their kids are sick and housing is just not coming and dealing with it."[7]

Donnie R. Smith, Maintenance Manager at Corvias. May have knowledge regarding Corvias repair and maintenance practices. Contact information: Administrator, Dual Impact LLC, Fayetteville, North Carolina; Donnie Smith Construction, LLC, 426 North Whittington Lane, Dunn, NC, donniecsmith@embarqmail.com, (910) 890-3660, (910) 897-4847.

Lisa Sanford. She was an assistant property manager, Corvias, Fort Bragg, 2005 to November 2017. She may now be working as a community manager in the Raleigh area.

Marcy C. Woodard. 2908 Winton Drive, Fayetteville NC. Employed as an IT service manager at Corvias, Fort Bragg, November 2017 to present. Previously employed as an IT management lead (2015-17), a network administrator (2010-2015) and as a desktop administrator (2006-2010), and resident service specialist (2005-06) for Corvias/Picerne.

Peter Sims, managing director for Corvias. He has knowledge regarding Corvias being compelled to install HVAC replacements and other renovations at 5,300 homes at Fort Bragg.[8] This renovation work was being done as part of Corvias' agreement to pay $325 million toward housing improvements subsequent to the late 2018 Reuters news article and resultant controversy and Congressional hearings.

---

[4] https://www.wamc.org/2019-03-07/shoddy-maintenance-of-military-housing-under-scrutiny-by-senate-military-leaders.

[5] https://www.fayobserver.com/story/news/2019/04/19/installation-housing-initiatives-see-way-forward-residents-speak-up-at-town-halls/64863691007/

[6] https://www.fayobserver.com/story/news/2019/04/19/installation-housing-initiatives-see-way-forward-residents-speak-up-at-town-halls/64863691007/

[7] https://www.wral.com/soldiers-families-complain-to-tillis-about-fort-bragg-housing/18662015/

[8] https://www.corvias.com/news/corvias-updates-more-85-percent-fort-bragg-homes

**Taylor Padgett.  Fort Bragg Corvias housing resident.  Complained of mold problems in her housing occurring since February 2021.**

As the problem got worse, she hired an independent home inspector who went through the house and found major issues with the maintenance of the home. He said they contributed to the mold problem.

"We found a bunch of damage issues with the exterior and roofing problems," said Don Agel of Agel Home inspections. "There was cracked brick veneer allowing water to get into her child's playroom."

He also found problems with the water heater and stove.

"There is a natural gas leak at the water heater and a natural gas leak at the oven," Agel said.

The Padgett family is currently in an on-post hotel while the property management company makes repairs.[9]

**Mary Humphreys.  Corvias corporate spokesperson.  Denied that there were any problems at the Padgett's residence.**

**Fort Bragg Garrison Command Sgt. Major Jeffery Loehr.  May have knowledge regarding the MHPI housing program and the Corvias housing issues.**

**Regan Burke.  Fort Bragg Corvias home tenant.  Complained of mold problems with her Corvias home:**

Regan Burke's family was moved to two different temporary houses on-post since September 2020 after mold was found all over her original house.

Burke said a military inspector from on-post said the home "was uninhabitable."

Last week, the family was finally placed into new permanent housing but was still trying to get someone to pay for the replacement of their mold-infested possessions.

Regarding the problems being experienced Padgett, Burke, and other homeowners, Loehr said: "As the housing property management, Corvias is responsible for ensuring prompt and professional maintenance.[10]

---

[9] https://www.cbs17.com/news/local-news/cumberland-county-news/fort-bragg-officials-call-mold-issues-with-on-base-housing-a-high-priority/

[10] https://www.cbs17.com/news/local-news/cumberland-county-news/fort-bragg-officials-call-mold-issues-with-on-base-housing-a-high-priority/

Unidentified Corvias employee, first name Leonard. Leonard was a gentleman who called into CSPAN to speak about how he was working for Corvias when he was fired from his job at Fort Bragg in 2019. He called on or about July 22, 2019 to complain that he was being unjustly blamed for the housing issues. He said he was age 67; that it was a shame how the residents were treated; that he and other employees lost their jobs; that the company was trying to make the workers feel it was their fault; that they did what they had to do to keep their jobs; that he was there for 10 years; and that he knew what these military wives were talking about.[11]

Authors of the Army Inspector General Report, Report ID-1903, Feb.-March 2019.[12] The report found that family concerns about health and safety issues in military housing are widespread, revealing systemic problems with relationships between the Army and housing contractors. The government's current oversight of these projects was insufficient to identify housing challenges. Inspectors found there was lack of joint authority, confusion regarding roles and responsibilities, lack of training, dramatic personnel cuts and lack of transparency among privatized housing companies. Inspectors uncovered a 2013 Army policy that specifically prohibited health and welfare inspections of military housing. Two-thirds of the 1,180 residents of military privatized housing communities who participated in the IG survey stated they were dissatisfied with their overall housing experience. Sixty-four percent said they would move off post if there were no financial costs or concerns, according to the report. The review was ordered by then-Secretary of the Army Mark Esper in the wake of reports about widespread problems of mold, water leakage, vermin infestations and other problems in military housing.[13]

<u>Supplemental Answer dated 7/8/22:</u>

101.     **Aledrea Bogner**
         **Casablanca Community Manager**
         **Current Contact Information Unknown to Wilkes Family**

         This was one of the main people Ashley Wilkes talked to with Corvias about her family's housing issues.

102.     **Tammy Wilbur-Hoistad**
         **Tammy was the "ombudsman" for all of Bragg.**
         **Current Contact Information Unknown to Wilkes Family**

         This was one of the main people Ashley Wilkes talked to with Corvias about her family's housing issues.

---

[11] https://www.c-span.org/video/?c4809169/user-clip-corvias-employee-fired-called-report-unjustly-blamed-housing-issues
[12] https://www.army.mil/e2/downloads/rv7/families/releaseable-housing-inspection.pdf
[13] https://www.upandcomingweekly.com/local-news-briefs/6565-military-housing-still-a-problem

103. **Anthony "Ty" Morris**
**Mr. Morris worked for Directorate of Public Works (DPW) at Fort Bragg.**
**Current Contact Information Unknown**

**In his role at DPW, Mr. Morris became knowledgeable about some of the Wilkes Family Corvias housing problems while family was at Bragg.**

104. **Chris Barnes**
**Mr. Barnes worked for DPW at Fort Bragg.**
**Current Contact Information Unknown**

**In his role at DPW, Mr. Barnes became knowledgeable about some of the Wilkes Family Corvias housing problems while family was at Bragg.**

**Interrogatory No. 3**. State in detail Your employment history for the last ten (10) years. For all military service, identify where You were stationed, where You resided while stationed there, and Your duties and responsibilities at each station.

**Answer:**

**Plaintiffs object to the interrogatory to the extent that it purports to seek information that is irrelevant and not likely to lead to the discovery of admissible evidence. Plaintiffs further object on grounds the interrogatory is overly broad and unduly burdensome in seeking employment information pre-dating the relevant time period.**

**Without waiving any objections, Plaintiffs state:**

**1.** **Ashley Wilkes: September 2012-May 2013: Student; July 2013-December 2014: Hairstylist at "Tiffany's Hair Spa" in Clarksville, TN; December 2014-present: Stay-at-home parent.**

**2.** **Christopher Wilkes: February 2012-March 2014: Sergeant/Aviation Section and skills instructor; March 2014-present: Sergeant First Class; stationed in Germany since 2021.**

**Interrogatory No. 4**. Identify where You have lived in the last ten (10) years including the address, the dates You resided there, whether it was a single family or multifamily structure,

whether You owned or rented/leased the residence, and the name and contact information of any owner, lessor and/or property manager if you rented/leased the residence.

**Answer:**

**Plaintiffs object to the interrogatory to the extent that it purports to seek information that is irrelevant and not likely to lead to the discovery of admissible evidence. Plaintiffs further object on grounds the interrogatory is overly broad and unduly burdensome in seeking employment information pre-dating the relevant time period.**

**Without waiving any objections, Plaintiffs state:**

**1. Ashley Wilkes: February 2014-April 2014: 709 Red Hollow Dr. Springfield TN 37172 (single family home owned by parents). April 2014-October 2014: 1722 Thistlewood Drive, Clarksville TN 37042 (rental townhome). October 2014-March 2017: 1480 Trainer Rd, Clarksville TN 37042 (owned; single family residence). March 2017-July 2020: 112 Hirsch Circle, Fort Bragg NC (rental; single family unit). July 2020-December 2020: 39 Viking Court, Fort Bragg NC (rental; duplex/townhome). January 2021-present: Westfalenstr. 22, apt. 2, Wiesbaden, Germany 65191 (rental; apartment). Previous property managers are unknown.**

**2. Christopher Wilkes: Feb 2012-April 2014: Barracks on Fort Campbell. April 2014-October 2014: 1722 Thistlewood Drive, Clarksville TN 37042 (rental; townhome). October 2014-March 2017: 1480 Trainer Rd, Clarksville TN 37042 (owned; single family). March 2017-July 2020: 112 Hirsch Circle, Fort Bragg NC (rental; single family). July 2020-December 2020: 39 Viking Court, Fort Bragg NC (rental; duplex/townhome). January 2021-present: Westfalenstr. 22, apt. 2, Wiesbaden Germany 65191 (rental; apartment).**

**Interrogatory No. 5**. Describe in detail any inspection, remediation, maintenance and/or repairs related to housing or habitability issues, including but not limited to mold, water intrusion, water leakage, water seepage, or flooding You experienced at any address identified in Your previous answer, including all communications and actions that You or others took in response.

**Answer**:

**Plaintiffs object to the extent that the interrogatory is overly broad and unduly burdensome and seeks information neither relevant nor likely to lead to the discovery of admissible evidence, including to the extent that the discovery requests seek information predating the relevant class period.**

Without waiving any objections, Plaintiffs state:

Plaintiffs are informed and believe that Defendants possess inspection, remediation, maintenance and/or repair records that are responsive to this request. Plaintiffs make reference to the facts alleged in the Complaint, as amended. Plaintiffs recall submitting approximately 33 work orders. Additionally, Plaintiffs would add the following:

In March of 2017, SFC Wilkes and Mrs. Wilkes and their young son moved to Fort Bragg, NC. They decided to live on post due to the projected short time frame that SFC Wilkes would be stationed at Fort Bragg.

At that point, SFC Wilkes was ranked as an E6 and the housing allowance (BAH or Basic Allowance for Housing) rate for the Wilkes family in the Bragg area was $1,344.

The Wilkes were in contact with a Corvias employee for approximately three months before their arrival at Fort Bragg. This employee told them that they only qualified for one type of home in the Casablanca community.

The Wilkes knew it would be smaller than what they were used to, but again, this would be short-term and the Plaintiffs reasonably believed the housing would be acceptable for a military family with a two-year-old and soon-to-be newborn come August 2017.

The Wilkes were pressured to sign for a home before arriving by being told it could be months of wait if they did not accept the home. They were only offered a junior enlisted home due to the low availability of homes for three-bedroom families with senior enlisted soldiers.

After moving in, however, within about 33 months, the family had about 33 work orders. These work orders consisted mostly of structural issues with their Corvias military housing rented home.

Upon moving in, the Wilkes filled out an inspection sheet to write down damages that existed before they moved in to prevent themselves from being charged when they later moved out. On this sheet, Mrs. Wilkes listed sagging blinds, loose hardware for towel racks, cracked brick in the carport, sagging floors in the master bathroom, among many other issues. Some of the issues were rectified within a week. Others were never taken care of and were ignored by Corvias.

The family had several plumbing issues during the first nine months, but the big issues began in January 2018. Their freezer started leaking water, and the fridge would also turn into a freezer. All of their food would be ruined every time. They had put in work orders several times over 2018.

The first time someone came out, they asked Mrs. Wilkes for a wire hanger, and used it to "fix" their refrigerator. This did not work, and the issue continued. The water was

28

spilling out onto the floor in the kitchen. Mrs. Wilkes asked for a permanent fix, but Corvias continued to only clear the ice out and that was the only thing they did to fix it.

On September 15, 2018, Hurricane Florence came through. This blew shingles off of their roof. SFC Wilkes had to tarp their roof himself because water was pouring into the family's living room and they were told no one was coming. No one made it to their home for this work order until October 10, 2017, even after repeated calls.

Notes were made on the work order that there was no sheet rock damage and that the family needed roof repairs. Mrs. Wilkes heard nothing for weeks. Maintenance was coming to their home for other work orders, but for some reason, Corvias was not contracting anyone out for hanging sheetrock and for the roof repairs that they needed.

SFC Wilkes was away for a military school and had to call Corvias and plead with someone to help get the home fixed. He spoke with several people and finally in late November 2017, someone agreed to meet with Mrs. Wilkes to see their home.

Corvias at that time finally replaced our fridge, and were able to get a contractor to come out. These contractors placed shingles over the same damp plywood, which led to a slew of continuous roof issues for the next year and a half that the family was still battling in December 2019.

In November of 2018, Mrs. Wilkes had noticed the base of her toilet was leaking a disgusting fluid. Corvias replaced the wax seal, but this did nothing to fix the issue. At this time, the floor in the bathroom started to get even softer and sag even more.

In March of 2019, Corvias finally sent out a contractor to assess the master bathroom floor. The contractor agreed the floor needed to be replaced. They also had to jack the entire bathroom up because there was no support joist under the bathroom at all. This repair left a visible seam in the bathroom floor.

The floors in the living room and kitchen were in such horrible shape, that Corvias finally agreed to replace them after multiple complaints in October 2019. Their home was torn apart for five days during this time. Corvias also had their cracked brick replaced on the side of the home in the carport. This took around a week and the Wilkes were unable to use their carport during that time.

The work order was in for three months before being completed. The contractor would only complete the masonry work if a giant pine tree was removed from beside their home. It was only one foot away from the side of the home, and its roots were causing uneven floors, cracking brick and driveway issues.

Mrs. Wilkes began to notice July 2019 that their roof was sagging where the repairs had been made in December 2018. Corvias sent out the same contractor to assess and repair the issue. They found that the wood under the shingles was moldy, warped, and rotted and needed to be replaced. They ripped out the entire section of the roof and redid the repair.

The roof immediately began to sag again. Mrs. Wilkes had Corvias look at this section of their roof since October 2019 numerous times. Corvias sent the same contractor to assess the roof. He stated the old work was done correctly and he believed there was no reason to redo the roof.

In December 2019, Corvias finally sent out a new contractor who immediately said their entire roof needed to be replaced. This was set to begin on Friday, December 13, but was delayed to Wednesday, December 18. Meanwhile, there was a dumpster in the family's driveway, making it unusable for another week.

Whenever the family did have the Corvias workers/contractors come out and finally begin the work, the roof was so weak from sagging and from the use of quarter-inch plywood where the original repair was, that the contractor fell through the roof, causing a giant piece of sheet rock to fall in to the family's living room just feet away from the children.

There was insulation and sheetrock dust all over the home. Corvias sent over a contractor to patch the hole in their ceiling and these contractors cut the sheetrock inside of the home, covering it in sheetrock dust so bad, that the family could not stay in the home that night, and they had to stay at a hotel. They had to have Corvias pay for someone to clean their entire home due to the abysmal performance.

The family had mold growing on their window frames in many rooms in their home the entire time that they lived in the home. Within a week of wiping them clean, the spots came back. Mrs. Wilkes met with contractors, maintenance staff, management, and more about all of these issues. She had to schedule her entire life around repairs on the home.

This home should have never had tenants move into it.

The Wilkes spent around $1,468 on their Corvias home per month. They thus cumulatively spent close to $56,000+ in rent for a home that should not have had anyone living in it, never mind a family with a young child and a pregnant mother.

<u>Supplemental Answer dated 5/6/22</u>:

With regard to whether Mr. or Mrs. Wilkes ever had significant inspections or repairs at other residences where they have lived aside from the Corvias home at Fort Bragg: The family recalls that there were no major repairs made to any of their other homes except the home that Ashley Wilkes owned (Trainer Road) before Fort Bragg had an HVAC issue in maybe 2015 or 2016. The Wilkes were landlords of the home and had some repairs done after they moved out over the years. They just sold it in October but haven't lived there since March 2017.

Also, the Wilkes have had two work orders for their current home, where they have been for a little under 1.5 years.

**Interrogatory No. 6**. State each and every instance in which You contend a defendant failed to properly address a housing or habitability issue, including but not limited to alleged water or moisture intrusion, leak, ceiling or roof leak, flooring issue, structural issue, lead-based paint, mold, or suspect fungal growth; provide the dates thereof; and state what You contend the defendant should have done differently. Set forth all facts on which You base Your contentions. If You are relying on any written documents or records, identify those documents and records, and state the material in each document which You contend demonstrates improper conduct.

<u>Answer</u>: **See Plaintiffs' response to Interrogatory #5.**

<u>Supplemental Answer dated 5/6/22</u>:

Plaintiffs have provided responsive information regarding Defendants' failures to address housing issues and habitability in connection with the other interrogatories herein, one or more of which ask overlapping questions.

Defendants have asked Plaintiffs to describe "what the defendant should have done differently." (See discovery letter dated 4/25/22, p. 13). To the extent that the question calls for expert testimony, it is largely premature, as the due date for the Plaintiffs to name their experts has not yet arrived. To the extent this is a contention interrogatory, it is once again somewhat premature. However, based on the information obtained to date, Plaintiffs show as follows:

The things the Defendants should have done differently include:

1. Making a full and fair assessment of the existing housing conditions for the inventory of 6000 to 7000 housing units, or homes, that Corvias took over responsibility for when it won the bid for the 50 year ground lease for the housing at Fort Bragg in 2003.

2. Communicating a fair and accurate assessment of the true condition of the existing housing inventory, and what would be needed to make sure the housing was in an acceptable and habitable status for the military families, to the Army, prior to or at the time of the bid award in 2003.

3. Once Corvias won the bid and entered into the 50 year contract, Corvias had a duty to use Corvias Construction to tear down and rebuild or extensively renovate the deficient units. It should never have required the amount of tenant suffering from living in poor conditions, that occurred, before Corvias would remedy the problems. As it turned out, it was only after tenant complaints across multiple bases, investigative news coverage by Reuters and others, and Congressional hearings, that Corvias announced it would spend over $300 million to remedy the problems. If Corvias had timely and properly remedied the problems years earlier when it should have done so, the Plaintiffs would not have incurred their suffering and damages.

4. Once Corvias won the 50 year contract, the evidence indicates that the company's top management was far more interested in expanding Corvias' portfolio of bases, and branching out into new areas like managing the housing for students bodies at schools, rather than carrying out and adequately funding its 50 year commitment to provide excellent livable housing. Corvias should have focused on carrying out the duties it had agreed to perform at the outset of the 50 year contract, rather than abandoning them.

5. By the time the putative class period opened, in 2016, the situation on the ground at Fort Bragg was that Corvias was understaffing its tenant service, repair and maintenance capacity, and had not spent the monies or exercised the initiative to tear down and renovate the numerous units (like those of the Plaintiffs) that were in unacceptable condition. Corvias should have been better funding and staffing tenant service, repair and maintenance, and should have rebuilt or renovated applicable units.

6. As of 2016, Corvias was using remote call centers to save money. Corvias should have had adequate, properly funded, supported, overseen, audited, and trained, employed Corvias staff at the base, to interact and communicate with tenants and their families and to address their concerns.

7. As of 2016, Corvias had engendered a corporate culture which led to a pattern and practice of fraudulent, unfair and deceptive conduct and practices by its customer service and repair and maintenance personnel. Corvias should not have allowed these practices to occur.

8. Most of the repair and maintenance personnel were outsourced, that is to say, the typical Corvias repair and maintenance workers who came out to the families' homes were not employed by Corvias at all, due to Corvias' desire to minimize costs and overhead and not have to pay employee wages and benefits. Corvias should not have used outsourced personnel. It should have had more of a directly employed, well-supported presence.

9. As of 2016, the outside vendors Corvias used for repair and maintenance received poor to mediocre pay. They were not well-supervised by Corvias. Corvias should have paid them better and supervised and trained them better. Instead, Corvias made sure that they acted unfairly and deceptively toward customers when it came to root causes, chronic and longstanding unit problems, water damage and rot and mold. Corvias should not have allowed this situation to flourish. Corvias was aware of the fact that (or was willfully blind to the fact that) the housing was replete with units that were plagued with problems and unacceptable for leasing out to families. Corvias should have replaced or rebuilt those units to start with. But aside from that fact, Corvias should have adequately repaired and maintained those units. Corvias should have not told contractors not to use the word "mold." It should not have encouraged contractors to minimize problems and lie to tenants about conditions. It should not have kept its repair and maintenance vendors on such a limited budget and scope of authority that they were not allowed to work to address root cause problems.

10. As of 2016, Corvias was using its pattern and practice of fraud and deception with regard to repair and maintenance to result in purported work orders and unit and tenant records that were false because they omitted key data regarding water damage, mold, tenant complaints, and other such things.

11. As of 2016, Corvias in the tenant-facing part of its enterprise, both through its own direct employees and through its contractors, took a position of blanket denial that mold problems existed. This was improper given the true facts.

12. Corvias should have trained and overseen its staff and vendors such that their work order records and tenant and unit records were true and accurate and could later be properly reviewed and audited. It did not. The faulty state of the records was later noted by the GAO and by one or more of the Plaintiffs themselves.

13. Corvias knew or should have known as of 2016 that the HVAC systems in units were badly compromised by water damage, mold and filth collecting in the HVAC ductwork. Corvias furthermore knew or should have known that in the cases of many of the homes, access to see inside the ductwork was impractical. In short, Corvias knew, while the tenants did not, of conditions like those reflected by the ductwork in the home of the Thomas family (see supplemental documents produced). Corvias never should have allowed the

conditions to grow to that extent, and never should have allowed unwitting tenants, mainly families with young children, to live in that environment.

14. Corvias knew that the housing for the lower enlisted servicemembers was far worse than some of the housing reserved only for the higher ranked tenants such as upper level officers. Corvias however failed to remedy the problem in time to prevent the experiences endured by the Plaintiffs.

15. Corvias knew that lower ranked servicemember tenants who leased the Corvias homes were much more likely to have spouses, and one or more infants or young children, compared to other families in other leased housing settings. This cohort group has higher vulnerability to filthy and unsafe conditions in the homes.

16. Corvias knew that many of the families resided in leased units that were not self-standing, but rather, were in structures that also had one, two, or three other units in them. Corvias as the owner and the landlord had the duty to ensure the upkeep and safety of the structure exterior, the roofing, the HVAC system, and the common areas. Corvias knew that the conditions in one unit could suffer due to the conduct of tenants in other adjoining units or due to its own failure to adequately maintain and service the other units. One or more of the Plaintiffs who lived in structures with more than one unit in them noted the presence of smells of moldy, mildewed, water-rotted conditions, and Corvias was also aware that the older the unit or the structure, the more like that it had problems that worsened over time unless Corvias rebuilt or renovated the structure.

**Interrogatory No. 7**. Describe in detail every instance in which You sent or received a complaint, inquiry, or other communication concerning a housing or habitability issue, including but not limited to water or moisture intrusion, leak, ceiling or roof leak, flooring issue, structural issue, lead-based paint, mold, or suspect fungal growth in (or on the outside or perimeter of) military housing at Fort Bragg, including all follow-up communications and actions that You or others took in response to each such issue and identify the persons involved.

**Answer:**

Objection. This interrogatory is vague and overly broad. Plaintiffs cannot recall "every instance" where a communication was made concerning military housing defects.

Without waiving any objections, Plaintiffs state:

See Plaintiffs' response to Interrogatory #5.

Plaintiffs are informed and believe that Defendants are in possession of all maintenance and repair requests submitted by Plaintiffs, along with all records related to Defendants' responses.   Additionally, Plaintiffs make reference to the facts and allegations set out in the Amended Complaint.

<u>Supplemental Answer dated 5/6/22</u>:

The Plaintiffs have described what they can recall in terms of their efforts to complain and communicate to Corvias in their answers to the other interrogatories.  Plaintiffs respectfully direct the Defendants to those answers.  Further, the Plaintiffs have produced and are continuing to produce all responsive complaint or communication-related documents they can locate.  Plaintiffs note that culled from its own business records, Corvias already should have a full set of all emails and other written documentation of such communications between Corvias and the Plaintiffs.

**Interrogatory No. 8**.  If You allege you were exposed to mold, lead-based paint, or other allegedly harmful substances while at Fort Bragg, describe such exposure in detail including the date such exposure took place, where such exposure took place, the date You first experienced symptoms and any how You confirmed such exposure involved the alleged substance. If You are relying on any written documents or records, identify those documents and records, and state the material in each document which You contend demonstrates the presence of the alleged substance.

**<u>Answer</u>:**

Objection.  Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home.  Rather, Plaintiffs are seeking, *inter alia*, allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times.  *See In re NC Swine Farm Nuisance Litig.,* Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony).  Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.

Without waiving any objections, Plaintiffs state:

**See Plaintiffs' response to Interrogatory #5.**

**Plaintiffs make reference to the facts and allegations in the Amended Complaint. Plaintiffs are informed and believe that Defendants possess all maintenance and repair records, including Plaintiffs' work requests.**

**Supplemental Answer dated 5/6/22:**

**Plaintiffs have provided information regarding their recollections as to exposures to mold, carbon monoxide and other harmful substances while at the Corvias housing, in their answers to the other interrogatories above. Plaintiffs respectfully direct the Defendants to those answers.**

**Interrogatory No. 9**. State whether or not You have been treated by, diagnosed by, or admitted to any hospital or other healthcare facility in the last ten (10) years and if so, state the name of the hospital or facility, the dates of treatment, diagnosis, or admission, the illness or condition involved and the names and addresses of the health care provider(s) who treated You.

**Answer:**

**Objection. Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home. Rather, Plaintiffs are seeking,** *inter alia,* **allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times.** *See In re NC Swine Farm Nuisance Litig.,* **Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony). Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.**

**Without waiving any objections, Plaintiffs state:**

**Plaintiffs are willing to meet and confer with Defendants for purposes of facilitating appropriately limited medical records discovery. However, broad medical discovery such as in a personal injury case is not appropriate herein.**

**Supplemental Answer dated 5/6/22:**

**The Wilkes did not make any allegations whatsoever about health effects. See FAC ¶¶ 143-157. They are hesitant to produce medical records and they feel their records are not**

necessary to support any claim they are personally making. However, they are having the undersigned counsel to obtain their medical records. Once the undersigned counsel receives and reviews the records with the family, Plaintiffs will further supplement this response.

<u>**SUPPLEMENTAL ANSWER DATED 7/8/2022:**</u>

Plaintiffs provided their signed revised Medical Authorizations to Defendants on May 27, 2022 and June 8, 2022.

As to medical providers Plaintiffs have seen in the last 10 years, Plaintiffs recall the following:

In Springfield, TN, and from 2012-2014, Ashley was seen for dental work. She also may have gone to an urgent care center. She does not recall the names of the providers, the doctors seen, or the location of the provider office; but even then, it would've been before 10-year mark.

At Fort Campbell, Christopher saw multiple military doctors at Blanchfield Army Community Hospital. He does not remember the doctors' names.

In Clarksville, TN, Ashley saw midwives/OBGYN at Vanderbilt center for women's health in Springfield TN. As a part of this, she saw multiple midwives through birth and post-partum and one doctor. She cannot remember any of their names.

In Clarksville, TN, Christopher saw military doctors at Blanchfield Army Medical Center. He does not remember any of the doctors' names.

In Clarksville, TN, █████ saw the following providers: Dr. Hunter Butler at Pleasant View Children's Clinic. It is important to note that she was seen by this same doctor at two of the Pleasant View Children's Clinic's locations (Springfield and Clarksville). It is Ashley's recollection that this clinic is tied to Vanderbilt and all of the medical records would be obtained from one location. █████ possibly had 2 ER visits to Blanchfield Army Community Hospital as well. No other information is recalled about the providers.

In Fort Bragg, Ashley saw the following providers: Midwives at Baby & Co in Cary, NC, one visit to Womack Army Medical Center Labor and Delivery, and, OBGYN/NP at Fayetteville Women's Health in Fayetteville, NC. One of the midwife's names was Jualeah Earl (certified nurse and midwife). She does not remember any of the other provider names.

In Fort Bragg, Christopher saw Womack Army Medical Center doctors. They do not remember any of the doctors' names.

In Fort Bragg, █████ saw the following providers: Dr. Caban at Phycinity PLLC, and he had to go to the Womack Medical Center ER one time (they do not remember doctor's name).

In Fort Bragg, ███ saw the following providers: Dr. Caban at Phycinity PLLC. ███ also had a referral to see a pediatric orthopedic surgeon at Duke first and then UNC Chapel Hill for a second opinion. They cannot remember the names of the treating doctors.

In Germany: the Wilkes family all saw their PCMs at Wiesbaden Health Clinic. These doctors have changed and they are not certain of the doctors' names. Also, Christopher, Ashley and ███ have been seen at Landstuhl Regional Medical Center. They do not recall the names of the treating doctors, except for one. Christopher just had surgery in November - Dr. Shray was the treating doctor (pediatrist – foot surgery).

**Interrogatory No. 10**. State whether You have undergone a physical examination in the last ten (10) years. If so, state the date of any such examination, where it was conducted, who conducted the examination and whether there is a report or other Document concerning such physical examination.

**Answer:**

Objection.  Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home.   Rather, Plaintiffs are seeking, *inter alia,* allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times.   *See In re NC Swine Farm Nuisance Litig.,* **Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony).  Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.**

Without waiving any objections, Plaintiffs state:

Plaintiffs are willing to meet and confer with Defendants for purposes of facilitating appropriately limited medical records discovery.  However, broad medical discovery such as in a personal injury case is not appropriate herein.

**Supplemental Answer dated 5/6/22:**

The Wilkes did not make any allegations whatsoever about health effects.  See FAC ¶¶ 143-157.  They are hesitant to produce medical records and they feel their records are not necessary to support any claim they are personally making.  However, they are having the undersigned counsel to obtain their medical records.  Once the undersigned counsel receives and reviews the records with the family, Plaintiffs will further supplement this response.

**Interrogatory No. 11**. State whether You have consulted any health care provider in the past ten (10) years. If so, specify in detail the nature of the condition for which You consulted the health care provider and the name and address of each health care provider who provided treatment for the condition.

**Answer:**

**Objection. Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home. Rather, Plaintiffs are seeking, *inter alia,* allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times. *See In re NC Swine Farm Nuisance Litig.,* Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony). Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.**

**Without waiving any objections, Plaintiffs state:**

**Plaintiffs are willing to meet and confer with Defendants for purposes of facilitating appropriately limited medical records discovery. However, broad medical discovery such as in a personal injury case is not appropriate herein.**

**Supplemental Answer dated 5/6/22:**

**The Wilkes did not make any allegations whatsoever about health effects. See FAC ¶¶ 143-157. They are hesitant to produce medical records and they feel their records are not necessary to support any claim they are personally making. However, they are having the undersigned counsel to obtain their medical records. Once the undersigned counsel receives and reviews the records with the family, Plaintiffs will further supplement this response.**

**SUPPLEMENTAL ANSWER DATED 7/8/2022:**

**See Plaintiffs' Answer to Interrogatory 9 above, as supplemented.**

**Interrogatory No. 12**. State whether You ever experienced any respiratory conditions, breathing difficulties, asthma, allergies, headaches, skin conditions, chronic nasal congestion, chronic sinus infections, or lead poisoning symptoms. If so, describe the treatment You received

for such condition, including the name and address of each healthcare provider who treated you, the time period in which you were treated, and any prescription or over-the-counter medications taken to treat such conditions.

**Answer:**

**Objection. Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home. Rather, Plaintiffs are seeking,** *inter alia,* **allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times.** *See In re NC Swine Farm Nuisance Litig.,* **Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony). Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.**

**Without waiving any objections, Plaintiffs state:**

**Plaintiffs are willing to meet and confer with Defendants for purposes of facilitating appropriately limited medical records discovery. However, broad medical discovery such as in a personal injury case is not appropriate herein.**

**Supplemental Answer dated 5/6/22:**

**The Wilkes did not make any allegations whatsoever about health effects. See FAC ¶¶ 143-157. They are hesitant to produce medical records and they feel their records are not necessary to support any claim they are personally making. However, they are having the undersigned counsel to obtain their medical records. Once the undersigned counsel receives and reviews the records with the family, Plaintiffs will further supplement this response.**

**SUPPLEMENTAL ANSWER DATED 7/8/2022:**

**See Plaintiffs' Answer to Interrogatory 9 above, as supplemented.**

**Interrogatory No. 13**. Describe the injuries You contend You sustained as a result of the Your military housing experience at Fort Bragg. If you claim You are still afflicted with or suffering from the effects of any such injury, describe Your claim and all supporting evidence in detail.

<u>**Answer:**</u>

**Objection.  Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home.  Rather, Plaintiffs are seeking, inter alia, allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times.  *See In re NC Swine Farm Nuisance Litig.,* Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony).  Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.**

**Without waiving any objections, Plaintiffs state:**

**See Plaintiffs' response to Interrogatory #5.**

**Plaintiffs during the pertinent times suffered discomfort, annoyance, irritation and loss of use of their ability to enjoy their property.  *See In re NC Swine Farm Nuisance Litig.,* No. 5 7:14-cv-00180-BR (E.D.N.C.), jury instructions filed at Doc. 262, on April 26, 2018, at p. 14 (private nuisance jury instruction for damages: "The plaintiffs claim that the interference with the use and enjoyment of his or her property has caused him or her anger, embarrassment, annoyance, inconvenience, decreased quality of life, and/or physical and mental discomfort. There is no fixed formula for placing a value on these alleged harms. You will determine what is fair compensation by applying logic and common sense to the evidence.").**

**Plaintiffs further suffered from a loss of the comfort, quiet and enjoyment and habitability of their rented premises during the pertinent times.**

**Plaintiffs further suffered from the injury of not getting the benefit of their bargain with regard to their rented housing.  During the pertinent times, the Plaintiffs duly and timely paid any and all rent that was due and owing for their rented Corvias military housing home.  However, they did not receive the quality of rented housing to which they were entitled and for which, with their limited means, they paid.**

<u>**Supplemental Answer dated 5/6/22:**</u>

**The Wilkes did not make any allegations whatsoever about health effects.  See FAC ¶¶ 143-157.  They are hesitant to produce medical records and they feel their records are not necessary to support any claim they are personally making.  However, they are having the undersigned counsel to obtain their medical records.  Once the undersigned counsel receives and reviews the records with the family, Plaintiffs will further supplement this response.**

<u>**SUPPLEMENTAL ANSWER DATED 7/8/2022:**</u>

**See Plaintiffs' Answer to Interrogatory 9 above, as supplemented.**

**Interrogatory No. 14**. If You were treated, attended or examined by any physician(s) or others for the injuries identified in responses to Interrogatories 12-13, state the names and addresses of all such persons and the nature of the medical treatment given by each physician or other person. If any diagnostic tests were performed, state the type of test performed, name and address of the place where it was performed, date each test was performed and what each test disclosed.

<u>**Answer:**</u>

**Objection. Plaintiffs are not claiming personal injury damages and do not intend to adduce expert medical causation or treating provider testimony at trial with regard to allegations of any diagnosed medical disease or illness caused to the Plaintiffs by the exposure to the harmful conditions at the Fort Bragg home. Rather, Plaintiffs are seeking, inter alia, allowable damages for private nuisance, including for their discomfort, annoyance and loss of use and enjoyment of their home during the pertinent times.** *See In re NC Swine Farm Nuisance Litig.,* **Master Case No. 5:15-CV-00013-BR, 2017 U.S. Dist. LEXIS 92674, 2017 WL 11575366 (E.D.N.C. June 16, 2017) (finding that nuisance claim regarding effects of living with unpleasant swine farm odor did not require medical expert testimony). Accordingly, Plaintiffs should not be obligated to cooperate with intrusive medical discovery.**

**Without waiving any objections, Plaintiffs state:**

**Plaintiffs are willing to meet and confer with Defendants for purposes of facilitating appropriately limited medical records discovery. However, broad medical discovery such as in a personal injury case is not appropriate herein.**

<u>**Supplemental Answer dated 5/6/22:**</u>

**The Wilkes did not make any allegations whatsoever about health effects. See FAC ¶¶ 143-157. They are hesitant to produce medical records and they feel their records are not necessary to support any claim they are personally making. However, they are having the undersigned counsel to obtain their medical records. Once the undersigned counsel receives and reviews the records with the family, Plaintiffs will further supplement this response.**

**SUPPLEMENTAL ANSWER DATED 7/8/2022:**

See Plaintiffs' Answer to Interrogatory 9 above, as supplemented.

**Interrogatory No. 15**. Identify any communications, whether written or oral, You had with any person, including but not limited to other residents of Fort Bragg, environmental consultants, and members and civilian employees of the Army, media outlet, or federal, state or local government agency, official, staff member or employee wherein you discussed any alleged housing issues at Fort Bragg, including but not limited to mold, health or habitability issues.

**Answer:**

Objection. This Interrogatory is vague and overly broad. Plaintiffs cannot possibly remember and recount each and every conversation, written or oral, that they had over the course of multiple years, let alone the topic of each conversation.

Without waiving any objections, Plaintiffs state:

See Plaintiffs' response to Interrogatory #5.

Defendants are believed to have records kept in the normal course of business and reflecting numerous of the complaints and relevant communications from, to and with the Plaintiffs, or either of them.

**Supplemental Answer dated 5/6/22:**

Plaintiffs described their interactions and communications that they could recall with regard to their housing at Fort Bragg, in their response to the interrogatories above. They respectfully direct Defendants to those responses.

**Interrogatory No. 16.** If You have ever been convicted or pleaded guilty, no contest, or entered an Alford plea to an offense punishable by imprisonment of more than one year or any crime of dishonesty or false statement, regardless of the punishment actually imposed, please state the date of each conviction or plea, the name and location of the court in which You were convicted

or pleaded in, and the crime of which you were convicted or pleaded guilty, no contest, or entered

an Alford plea to.

**Answer:**

**Objection.  Plaintiffs object to the extent that the discovery requests is overly broad, unduly burdensome, unlimited in time, and otherwise harassing and seeking of irrelevant information that is not likely to lead to the discovery of relevant evidence.  Plaintiffs further object that the scope of the request is unlimited in time. Plaintiffs further object to the extent the discovery requests would purport to elicit information on old matters or misdemeanor matters with no potential relevance herein.**

**Without waiving any objections:**

**Not applicable.**

**Interrogatory No. 17.**  Identify each person whom You may call as an expert witness at

trial.  With respect to each expert, state his or her name and address, the subject matter on which

the expert is expected to testify, the substance of the facts and opinion to which the expert is

expected to testify, and a summary of the grounds for each opinion.

**Answer:**

**Objection.  The time for the Plaintiffs to be obligated to name any of their experts in this matter has not yet arrived.**

**Without waiving any objections, Plaintiffs state:**

**Plaintiffs have not yet selected their expert witnesses in this matter.**

**Plaintiffs reserve the right to supplement this response in due course.**

**Interrogatory No. 18**.  List any photographs, diagrams, or other exhibits which you or

your attorney have which you will or may introduce at trial.

**Answer:**

Objection.  The time for the Plaintiffs to be obligated to determine and disclose their list of exhibits for trial in this matter has not yet arrived.

Without waiving any objections, Plaintiffs state:

Plaintiffs have not yet selected their exhibits in this matter.

Plaintiffs reserve the right to supplement this response in due course.

Interrogatory No. 19.  Have You ever been named as a plaintiff or defendant in any type of litigation other than this lawsuit?  If so, please state the name, county court or federal district, and case number as well as the outcome of the litigation.

**Answer:**

Objection.  Plaintiffs object to the extent that the discovery requests is overly broad, unduly burdensome, unlimited in time, and otherwise harassing and seeking of irrelevant information that is not likely to lead to the discovery of relevant evidence.

Without waiving any objections:

No.

Interrogatory No. 20.  Please state the full names and dates of birth of any person who resides, or resided at the time period of the allegations contained in the Amended Complaint, with You at Fort Bragg.

**Answer:**

Objection.  Plaintiffs wish to safeguard relevant information regarding their minor children.

Without waiving any objections, Plaintiffs state:

No other individuals resided with Plaintiffs' family during the relevant times.

The names of Plaintiffs' minor children are:



The family lived at 1480 Trainer Rd Clarksville, TN when ▮▮▮▮ was born.

They lived at 112 Hirsch Ft Bragg when ▮▮▮▮ was born.

**Interrogatory No. 21.** Itemize and show how you calculate any damages claimed by You in this Action, whether economic, non-economic, or other.

**Answer**:

Objection. This interrogatory calls for a legal conclusion and attorney work product. Moreover, Plaintiffs have not formulated a settlement demand at this stage.

Without waiving any objections, Plaintiffs state:

See Plaintiffs' response to Interrogatory #13.

**Supplemental Answer dated 5/6/22:**

Actual damages will be calculated in accordance with the allowable categories of damages under the North Carolina Pattern Jury Instructions and/or traditional jury instructions for whichever causes of action the Court may allow to go to trial. Contract damages could be measured by the total amount of the BAH rent paid by the soldier or on his behalf, or some percentage thereof, on the theory that the soldier paid to receive decent accommodations, did not receive them, and did not receive the benefit or the bargain. Damages for private nuisance would include damages for discomfort, annoyance, irritation, annoyance, and loss of use and enjoyment. Damages for breach of the warranty of habitability may include via the measure of damages by the difference between the value of the rented premises in its uninhabitable condition and its fair market rental value otherwise. Under Chapter 75, a prevailing plaintiff may be entitled to three times actual damages.

Plaintiffs reserve the right to supplement to the extent they are able to identify damages in other respects including out of pocket expenses; moving expenses; costs associated with relocating to a new home that would not otherwise have been expended; values of lost or damaged clothing, linens or furniture; etc.

Plaintiffs do not claim lost wages or lost income (e.g., taking time away from work because of the conditions at the home, and suffering lost wages as a result).

Plaintiffs reserve the right to allege other claims including but not limited to punitive damages if the discovery so supports in assessing the gravity of the fraud and recklessness-related allegations in the complaint, e.g. regarding the work order process and purported tenant customer service facility of the enterprise.

Date:  July 8, 2022.                          Respectfully submitted,

                                              s/John Hughes
                                              Mona Lisa Wallace
                                              NC State Bar No. 009201
                                              John Hughes
                                              NC State Bar No. 22126
                                              WALLACE & GRAHAM, PA
                                              525 N. Main Street
                                              Salisbury, North Carolina 28144
                                              Telephone: 704-633-5244
                                              Fax: 704-633-9434
                                              mwallace@wallacegraham.com
                                              jhughes@wallacegraham.com

                                              J. Anthony Penry
                                              N.C. Bar No. 8936
                                              PENRY | RIEMANN PLLC
                                              2245 Gateway Access Point, Suite 203
                                              Raleigh, NC 27607
                                              (919) 792-3891
                                              Andy.Penry@PenryRiemann.com

                                              Robert S. Metro
                                              S.C. Bar No. 69494
                                              BAUER & METRO, PC
                                              Post Office Box 7965
                                              Hilton Head, SC 29938
                                              (843) 842-5297
                                              Rmetro@bauerandmetro.com
                                              Appearing pursuant to Local Rule 83.1(e)

                                              *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2022, I served this document on counsel for the Defendants herein, by <u>email</u>, as follows:

Mark P. Henriques
Matthew F. Tilley
WOMBLE BOND DICKINSON (US) LLP
3500 One Wells Fargo Center
301 South College Street
Charlotte, North Carolina 28202-6025
E-mail: Mark.Henriques@wbd-us.com
E-mail: Matthew.Tilley@wbd-us.com

Thomas J. Yoo
HOLLAND & KNIGHT LLP
400 S. Hope St., 8th Floor
Los Angeles, CA 90071
Thomas.Yoo@hklaw.com

Jessica L. Farmer
HOLLAND & KNIGHT LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Jessica.Farmer@hklaw.com

Date: July 8, 2022.                    Respectfully submitted,

                                       s/John Hughes
                                       Mona Lisa Wallace
                                       NC State Bar No. 009201
                                       John Hughes
                                       NC State Bar No. 22126
                                       WALLACE & GRAHAM, PA
                                       525 N. Main Street
                                       Salisbury, North Carolina 28144
                                       Telephone: 704-633-5244
                                       Fax: 704-633-9434
                                       mwallace@wallacegraham.com
                                       jhughes@wallacegraham.com

DocuSign Envelope ID: 3C31AD3C-BEC1-4ACF-B33D-18283093A5B8

# VERIFICATION

I, pursuant to 28 U.S.C. § 1746 hereby declare under penalty of perjury the following is true and correct:

1. I am a competent adult, over the age of eighteen, and this Declaration is based on my personal knowledge.

2. I am a Plaintiff in the military housing lawsuit brought against the Corvias enterprise for the housing at Fort Bragg.

3. From time to time, I have provided information to my lawyers to prepare "interrogatory responses."

4. I have now been asked to verify that as to the responses being served, the information that is in them that came from me or that I know personally, in fact is true to the best of my knowledge. I have gone over these interrogatory responses.

5. Where those responses contain facts about my family or me personally and other facts of which I have personal knowledge, I swear and affirm under penalty of perjury that those facts and statements are true to the best of my knowledge.

6. Where the facts are based on information provided by other people, I state that I believe that information to be true.

7. Where the facts are about other things like facts learned from public records, I am relying on my attorneys and the investigation that my attorneys did.

8. I declare under penalty of perjury that the foregoing is true and correct.


Dated: _____

Signature: _____

Printed name: Ashley Wilkes


Dated: ____7/8/2022_____

Signature: _____

Printed name: Christopher Wilkes

# VERIFICATION

I, pursuant to 28 U.S.C. § 1746 hereby declare under penalty of perjury the following is true and correct:

1. I am a competent adult, over the age of eighteen, and this Declaration is based on my personal knowledge.

2. I am a Plaintiff in the military housing lawsuit brought against the Corvias enterprise for the housing at Fort Bragg.

3. From time to time, I have provided information to my lawyers to prepare "interrogatory responses."

4. I have now been asked to verify that as to the responses being served, the information that is in them that came from me or that I know personally, in fact is true to the best of my knowledge. I have gone over these interrogatory responses.

5. Where those responses contain facts about my family or me personally and other facts of which I have personal knowledge, I swear and affirm under penalty of perjury that those facts and statements are true to the best of my knowledge.

6. Where the facts are based on information provided by other people, I state that I believe that information to be true.

7. Where the facts are about other things like facts learned from public records, I am relying on my attorneys and the investigation that my attorneys did.

8. I declare under penalty of perjury that the foregoing is true and correct.

Dated: _7/8/2022_____

Signature: _A☉w_____

Printed name: Ashley Wilkes


Dated: _____

Signature: _____

Printed name: Christopher Wilkes