# EXHIBIT B

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2                  Civil No. 5:20-cv-00336-D

 3

 4    SSG SHANE PAGE, et al.,        )
                                     )
 5             Plaintiffs,           )
                                     )
 6    vs.                            )
                                     )
 7    CORVIAS GROUP, LLC, et al.,    )
                                     )
 8             Defendants.           )
      _____)
 9

10

11

12          VIDEOCONFERENCE VIA ZOOM DEPOSITION

13                           OF

14                     HEATH BURLESON

15                     June 28, 2022

16                       12:02 p.m.

17                     Dothan, Alabama

18

19

20

21

22

23

24

25    Reported by:  Elizabeth Ellsworth, RPR
```

## Page 2

```
 1            APPEARANCES
 2  ON BEHALF OF PLAINTIFFS:
 3       J. Anthony Penry, Esquire
         PENRY RIEMANN PLLC
 4       2245 Gateway Access Point
         Suite 203
 5       Raleigh, North Carolina 27607
         919-833-9449
 6       andy.penry@penryriemann.com
 7       Eric Rainey, Esquire
         13 1/2 Eagle Street
 8       Suite F
         Asheville, North Carolina 28801
 9       eerainey@protonmail.com
         828-515-1714
10
         Robert Metro, Esquire
11       BAUER & METRO, P.C.
         38a New Orleans Road
12       Hilton Head, South Carolina 29928
         843-842-5297
13       rob@bauermetro.com
14       John Hughes, Esquire
         Richard Sieg, Esquire
15       Jolie Savage, Esquire
         WALLACE & GRAHAM, P.A.
16       525 North Main Street
         Salisbury, North Carolina 28144
17       704-633-5244
         jhughes@wallacegraham.com
18       rsieg@wallacegraham.com
         jsavage@wallacegraham.com
19
20
21
22
23
24
25
```

## Page 3

```
 1       APPEARANCES (CONTINUED)
 2  ON BEHALF OF DEFENDANTS AND HEATH BURLESON:
 3       Thomas J. Yoo, Esquire
         HOLLAND & KNIGHT LLP
 4       400 South Hope Street
         8th Floor
 5       Los Angeles, California
         213-896-2400
 6       thomas.yoo@hklaw.com
 7
         Jessica L. Farmer, Esquire
 8       HOLLAND & KNIGHT LLP
         800 17th Street N.W.
 9       Suite 1100
         Washington, D.C. 20006
10       202-955-3000
         jessica.farmer@hklaw.com
11
12  ALSO APPEARING:
13       Lacey James, videoconference technician
14
15            VIDEOCONFERENCE DEPOSITION OF HEATH
16  BURLESON, a witness called on behalf of Plaintiffs,
17  taken remotely before Elizabeth Ellsworth, Registered
18  Professional Reporter and Notary Public, in and for
19  the State of North Carolina, on Tuesday, June 28,
20  2022, commencing at 12:02 p.m.
21
22
23
24
25
```

## Page 4

```
 1            INDEX OF EXAMINATIONS
 2  BY MR. PENRY . . . . . . . . . . . . . . . . . PAGE 6
 3
 4             INDEX OF EXHIBITS
 5  NUMBER     DESCRIPTION                          MARKED
 6  Exhibit 1  Heath Burleson biography                  9
 7  Exhibit 2  Resident Responsibility Guide - 2018     38
 8  Exhibit 3  Resident Responsibility Guide - 2021     46
 9  Exhibit 4  Statement by John Picerne 2/13/19        53
10  Exhibit 5  Military Construction, Veterans          86
               Affairs, And Related Agencies
11             Appropriations for 2021
12  Exhibit 6  Military Housing Privatization          116
               Initiative Tenant Bill of Rights
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1              PROCEEDINGS
 2              * * * * *
 3       THE COURT REPORTER:  Participating attorneys
 4  recognize that all parties, including the witness
 5  and court reporter, are participating remotely.
 6       In lieu of an oath administered in person,
 7  the witness will verbally declare that their
 8  testimony in this deposition is under penalty of
 9  perjury and will be the truth, the whole truth,
10  and nothing but the truth.
11       Counsel stipulates that all objections to
12  the remote participation are waived.
13       Please indicate your agreement by stating
14  your name and who you represent on the record,
15  beginning with Mr. Penry.
16       MR. PENRY:  My name is Andy Penry.  I work
17  with Penry Riemann PLLC.  With me is Eric Rainey,
18  who works with our firm.  We are in Wilmington,
19  North Carolina today.
20       THE COURT REPORTER:  Mr. Metro?
21       MR. METRO:  Sure.  My name is Rob Metro.  I
22  work with Bauer & Metro in Hilton Head, South
23  Carolina, and we consent or waive any objection.
24       THE COURT REPORTER:  Mr. Yoo?
25       MR. YOO:  Thank you.  Thomas Yoo and Jessica
```

Page 6

1 Farmer from Holland & Knight representing the
2 defendants and the witness today, Mr. Burleson.
3 　　　THE COURT REPORTER: Is that everyone who is
4 participating today?
5 　　　MR. HUGHES: John Hughes is here just
6 attending to listen. I will be on mute. I am
7 attorney for the plaintiffs.
8 　　　THE COURT REPORTER: Mr. Burleson, do you
9 verbally declare that your testimony in this
10 deposition will be under penalty of perjury and
11 will be the truth, the whole truth, and nothing
12 but the truth?
13 　　　THE WITNESS: Yes.
14 　　　THE COURT REPORTER: Thank you.
15 　　　We may begin, Counsel.
16 　　　MR. PENRY: Thank you.
17 　　　* * * * *
18 　　　HEATH BURLESON,
19 declared to tell the truth, the whole truth and
20 nothing but the truth under penalty of perjury and was
21 　　　examined as follows:
22 　　　EXAMINATION
23 BY MR. PENRY:
24 　　Q.　Mr. Burleson, we met just a few minutes ago.
25 I'm Andy Penry. I'm a lawyer in North Carolina. With

Page 7

1 me is Eric Rainey, who works with my firm. We are
2 located in Wilmington, North Carolina today, and we
3 are taking your deposition.
4 　　　We may get up and get down. I'm sure you
5 will too. If you need a break, please feel free to
6 say so. You can take a break anytime, unless there is
7 a question pending, at which point you need to answer
8 the question and then take a break, okay?
9 　　　And we have -- as you probably know, we are
10 going to start now and will finish no later than 5:30,
11 so you have notice as to when we are going to do
12 this.
13 　　　Have you ever given a deposition before?
14 　　A.　Yes.
15 　　Q.　On how many occasions?
16 　　A.　Once.
17 　　Q.　What was -- what kind of case was that?
18 　　A.　That was the Addi case at Fort Meade.
19 　　Q.　All right. And was that deposition
20 transcribed, to your knowledge?
21 　　A.　Yes.
22 　　Q.　Do you still have a copy of that deposition?
23 　　A.　I don't believe so.
24 　　Q.　All right. When did you have -- when did
25 you have your deposition taken in the Addi case?

Page 8

1 　　A.　Last July, August, September, I believe.
2 Somewhere in that time frame. I don't recall
3 exactly.
4 　　Q.　2021?
5 　　A.　2021, yes.
6 　　Q.　All right. Other than that, have you ever
7 had your deposition taken before?
8 　　A.　No.
9 　　Q.　Have you ever -- have you ever testified
10 under oath in a -- in a lawsuit or an arbitration?
11 　　A.　No.
12 　　Q.　Now, you have testified under oath before
13 Congress, correct?
14 　　A.　No.
15 　　Q.　You have testified before Congress, right?
16 　　A.　Yes.
17 　　Q.　You weren't under oath?
18 　　A.　No.
19 　　Q.　Okay. On how many occasions have you
20 testified in Congress?
21 　　A.　Once.
22 　　Q.　And that was in, I believe, March of 2020,
23 correct?
24 　　A.　March of 2020, correct.
25 　　Q.　All right. Are you -- and I believe you

Page 9

1 are, but I want to make sure, are you here represented
2 by counsel?
3 　　A.　Yes.
4 　　Q.　So Mr. Yoo and Ms. Farmer are your lawyers
5 for the purposes of this deposition, correct?
6 　　A.　That is correct.
7 　　Q.　By whom are you employed now?
8 　　A.　I am employed by Mayroad.
9 　　Q.　And you started that work in December of
10 '21, according to your LinkedIn, didn't you?
11 　　A.　That is correct.
12 　　Q.　So we are going to look at your CV.
13 　　　MR. PENRY: Mr. Rainey, if you can put this
14 in.
15 　　　We are giving you and the court reporter and
16 everybody else a copy of the bio that was
17 prepared when you were at Corvias, okay? Tell me
18 when you have it and can read along with me.
19 　　　This will be Exhibit 1, Madam Reporter.
20 　　　(Exhibit 1 marked for identification.)
21 　　　MR. YOO: Can you show it on the screen?
22 　　　MR. PENRY: I don't think we can show it on
23 the screen, no.
24 　　　We can? Okay. We are going to try to.
25 　　　MR. YOO: Thank you.

Page 14

1  Q.  All right.  Do you know why they were not
2  paid out?
3  A.  I don't recall.
4  Q.  Were the incentives based upon your
5  performance?
6  A.  Yes.  They were based upon my performance as
7  well as -- yeah, based upon my performance.  Yes.
8  Q.  Does Corvias, any of its entities with which
9  you were engaged, does it have written standards for
10 making the incentive or bonus payments?
11 A.  So each, as I recall -- well, for me, there
12 were goals that were set up on an annual basis, and
13 the achieving of those goals was the basis for the
14 metrics for any potential payout.
15 Q.  And was that stated in writing somewhere?
16 A.  It was.  But as I mentioned a second ago,
17 it's been many years since those actual metrics were
18 in writing and it then became more of an arbitrary
19 payout.
20 Q.  Who decided to make you -- to make those
21 incentive payments to you?
22 A.  I reported to Michael De La Rosa.
23 Q.  And what was Mr. De La Rosa's job?
24 A.  He was president and COO as I last recall.
25 Q.  And does he still work for Corvias?

Page 15

1  A.  No.
2  Q.  Where does he work now?
3  A.  I do not know.
4  Q.  For how long was he -- what years was he
5  your direct supervisor?
6  A.  Roughly 2006 -- yeah, 2006 until 2021.
7  Q.  Until you left?
8  A.  Correct.
9  Q.  All right.  Were you ever a direct -- did
10 you ever directly report to John Picerne?
11     MR. YOO:  Objection.  Vague and ambiguous.
12     MR. PENRY:  Go ahead.  You can answer it.
13 A.  In what capacity do you mean?  What are you
14 referring to?
15 BY MR. PENRY:
16 Q.  Was he ever your direct supervisor?
17 A.  No, not that I recall.  No.
18 Q.  All right.  So I'm looking at your bio and
19 it says that you -- on the second line, that you
20 reported directly to ownership.  Do you see that?
21 A.  Thank you.  I see it, yes.
22 Q.  Okay.  What ownership did you directly
23 report?
24 A.  That is in reference to Michael De La Rosa.
25 Q.  Nobody else?

Page 16

1  A.  No.  I reported directly to Michael.
2  Q.  Okay.  Let's look at the fourth line,
3  "Serving as an owners representative, he provides
4  solutions and decision-making support for military
5  leaders, works very closely with legal counsel."
6      Don't tell me what you said with legal
7  counsel, but tell me which legal counsel you believe
8  is stated in this bio -- is identified in this bio.
9  A.  So it wouldn't be any one individual.  It
10 would be a multitude of firms that we worked -- or
11 that I, rather, worked closely with during that time.
12 Q.  Did you have an in-house lawyer?
13 A.  Corvias had an in-house lawyer, yes.
14 Q.  Who was that?
15 A.  His name is Bill Culton.
16 Q.  Spell his last name.
17 A.  C-U-L-T-O-N.
18 Q.  Is he still with Corvias, to your knowledge?
19 A.  To my knowledge, yes.
20 Q.  And did you work very closely with him?
21 A.  Bill and I communicated often.
22 Q.  All right.  And which outside firms did you
23 communicate with?
24     MR. YOO:  Objection.  Overly broad.
25 BY MR. PENRY:

Page 17

1  Q.  Go ahead.  You can answer.
2  A.  We worked with Goulston & Storrs.  I worked
3  with Holland & Knight.  I worked with a small firm
4  called Petty and Livingston.  Those are the three that
5  were probably more frequent.
6  Q.  Let's look one line up where your bio says
7  that you managed relationships along an expansive U.S.
8  military portfolio that includes seven U.S. Army
9  partnerships and six U.S. Air Force partnerships.
10     Do you see that?
11 A.  I see that.
12 Q.  Can you name the seven U.S. Army
13 partnerships?
14 A.  I can.
15 Q.  What are they?  Or what were they?
16 A.  Fort Meade, Fort Bragg, Fort Polk, Fort
17 Rucker, Fort Riley, Fort Sill, and Aberdeen Proving
18 Ground.
19 Q.  To your knowledge, are all of those Army
20 facilities still being -- still working with Corvias
21 with regard to military housing?
22 A.  To my knowledge, yes.
23 Q.  What are the six Air Force partnerships?
24 A.  Eielson Air Force Base, Edwards Air Force
25 Base, Eglin Air Force Base, Hurlburt Field, McConnell

Page 26

1 listed out a moment ago.
2  Q. Do you know why Corvias was interested in
3 divesting itself of those -- of the Air Force
4 Continental Group installations?
5  A. I do not know.
6  Q. In terms of the transaction for when
7 Harrison Street purchased those entities, who did you
8 represent in that transaction, Corvias or Harrison
9 Street?
10  A. I was a Corvias employee.
11  Q. Okay. So you were on the Corvias side of
12 that transaction, correct?
13  A. That is correct.
14  Q. And after that correction -- that
15 transaction was closed, you moved over to Mayroad,
16 correct?
17  A. Correct.
18  Q. Who represented -- who did you negotiate
19 with on the Harrison Street side?
20  A. I was not involved in the negotiations. I
21 was more of sharing due diligence and providing
22 updates on the Air Force Continental Group. So I
23 wasn't involved in the negotiation.
24  Q. Okay. Well, let's go back to the 2013
25 transaction. You are obviously working for Corvias at

Page 27

1 that time, correct?
2  A. When the Air Force Continental Group closed,
3 yes, I was -- yes.
4  Q. And who did you negotiate with, the Air
5 Force itself or someone else?
6  A. The Air Force.
7  Q. All right. And you say that it resulted in
8 a $455 million partnership, correct?
9  A. That $455 million partnership is the total
10 budgeted development cost at the time of closing.
11  Q. And again, that's not confidential, is it,
12 or private?
13  A. That was not --
14  MR. YOO: Hold on. Objection to the extent
15  it calls for a legal conclusion.
16 BY MR. PENRY:
17  Q. You can answer.
18  A. We see it here before us.
19  Q. Right. So it's obviously not confidential,
20 correct?
21  MR. YOO: Same objection.
22 BY MR. PENRY:
23  Q. You can answer.
24  A. Corvias obviously determined not to keep
25 that confidential, but the way Corvias manages its

Page 28

1 business versus the way Harrison Street manages its
2 business is really two separate things.
3  Q. With regard to your work at Mayroad, are you
4 an owner of that business or are you just an employee?
5  A. I am just an employee.
6  Q. You have no ownership interest, right?
7  A. I have no ownership interest.
8  Q. Okay. Let's look at down here Select
9 Experience and Accomplishments. The third bullet,
10 "Engages with senior representatives from the
11 U.S. Army," right?
12  A. I see that.
13  Q. Which senior representatives from the
14 U.S. Army did you engage with particularly at Fort
15 Bragg?
16  A. At Fort Bragg, with regard to Fort Bragg, or
17 with the overall portfolio? It's kind of three
18 separate questions.
19  Q. Well, answer Fort Bragg first, please.
20  A. As it relates to Bragg Communities, which
21 is, in essence, the partnership with the United States
22 Army, I would have engagements with senior mission
23 commander, various colonels. I would also have
24 conversations and engagements with various
25 representatives both in the military as well as DOD

Page 29

1 civilians at the Pentagon level.
2  Q. Who was your primary contact from the
3 military at Fort Bragg?
4  MR. YOO: Objection. Vague and ambiguous.
5 BY MR. PENRY:
6  Q. You can answer.
7  A. I had -- every two years command would
8 change out. So it varied, again, every two years.
9  Q. Who was your primary contact when you left
10 Corvias?
11  A. Well, now, when I left Corvias is two
12 separate things. My responsibilities over the Army
13 portfolio ended in the spring, plus or minus, of
14 2020.
15  Q. Okay. So who was your primary contact at
16 Fort Bragg from 2018 until 2020?
17  A. The last garrison commander I remember, and
18 I believe it was in that time frame, was Colonel Kyle
19 Reid.
20  Q. And when you say you engaged with him, what
21 does that mean? Did you speak with him on a daily
22 basis or at some time or something less than that?
23  A. Something far less than that.
24  Q. Who was the person, the Corvias employee
25 that was on base and responsible for the work that

Page 30

1 Corvias did?
2     MR. YOO: Objection. Vague and ambiguous as
3 to Corvias.
4     Andy, it would be helpful if you could
5 specify which Corvias entity you are talking
6 about.
7     MR. PENRY: Any Corvias entity, Bragg
8 Communities or anybody else.
9     MR. YOO: Overly broad.
10 BY MR. PENRY:
11   Q.  You can answer.
12   A.  Yeah, it is -- that is broad.
13   Q.  Well, just tell me who was the person from
14 Bragg Communities that was the person who had
15 oversight of that entity's work at Fort Bragg.
16   A.  I was assigned to Bragg Communities, but
17 Bragg Communities did not have any employees.
18   Q.  All right.
19   A.  The last person -- you asked about another
20 Corvias entity. The last person that I recall who
21 worked for Corvias Property Management, I believe her
22 title was operations director. Titles have changed
23 quite often, so I'm not trying to be evasive. It's
24 just trying to remember the various titles. Her
25 name -- I just totally lost her last name. Her name

Page 31

1 was -- Heather was her first name. But she was the --
2 I believe operations director was the title.
3   Q.  Heather Fuller?
4   A.  Fuller, that's it.
5   Q.  And what was her job?
6   A.  Heather's job, again, spring of 2020, when
7 my responsibilities shifted to other projects, she was
8 the operations director. So she was working for
9 Corvias Management. So she led the property
10 management operations at Fort Bragg.
11   Q.  Which Corvias entity was responsible for any
12 work that was done at Fort Bragg, whether it's
13 maintenance, construction, any work that was done at
14 Fort Bragg?
15     MR. YOO: Overly broad. Vague and
16 ambiguous. Calls for a legal conclusion.
17 BY MR. PENRY:
18   Q.  You can answer.
19   A.  There is multiple entities. I'm happy to
20 walk through the list, but it would take some time.
21 There are multiple entities.
22   Q.  Go ahead.
23   A.  Well, we just talked about the property
24 management entity, Corvias Management. So that entity
25 will manage subcontractors and work related to the

Page 32

1 operations -- the day-to-day operations of the
2 property management function.
3     There is also another entity that is Corvias
4 Construction. Corvias Construction is another entity
5 that manages -- or actually serves as a general
6 contractor on behalf of Corvias Development, who hired
7 the construction entity, and those entities work on
8 behalf of Bragg Communities.
9   Q.  Any others?
10     MR. YOO: Overly broad.
11 BY MR. PENRY:
12   Q.  You can answer.
13   A.  From Bragg Communities below, those are the
14 four entities.
15   Q.  All right. Were they all under the
16 supervision of Heather Fuller or did they each have
17 their own people who were responsible for their work?
18   A.  Heather Fuller was responsible -- again,
19 when I left my responsibilities in spring of 2020,
20 Heather was responsible solely for the property
21 management entity Corvias Management.
22   Q.  Who was responsible for the other entities
23 that you just described?
24   A.  I had responsibilities for Bragg
25 Communities. I was assigned to Bragg Communities, as

Page 33

1 well as assigned to multiple other installations in a
2 similar capacity.
3     As far as the construction and development
4 entity, I do not recall. I know there had been a lot
5 of -- not a lot, there had been some turnover in those
6 roles. I do not recall who had responsibility for
7 those two entities.
8   Q.  Did you personally work at Fort Bragg, have
9 an office there, for example?
10   A.  No, I did not have an office at Fort Bragg.
11   Q.  How often -- from 2018 to 2020, how often,
12 generally, would you visit the Bragg installation?
13   A.  Generally, from '18 to '20 -- this is a
14 guess -- probably three times on average per year.
15   Q.  When you were the SVP for operations from
16 2013 to 2018, how often did you visit the Bragg
17 installation?
18   A.  It probably would have followed about a
19 couple of times a years. Again, I was responsible for
20 13 installations.
21   Q.  And what was your job as senior vice
22 president of operations at Corvias?
23   A.  I was responsible for oversight and
24 management of the various entities at each of those 13
25 installations.

Page 34

1  Q.  What's the difference between the work you
2  did as SVP of operations and the work you did as a
3  partnership advisor?
4  A.  The role shifted into a little bit more of
5  the engagement, as I mentioned a moment ago, with -- I
6  think the comment said legislative consultants and we
7  narrowed that down to lobbyists.  So it was really
8  more engaging with those folks, engaging with members
9  on the Hill, et cetera.  So it was an evolution of the
10 role from the SVP of operations to the partnership
11 advisor.
12 Q.  When you were the SVP of operations, to whom
13 did you directly report?
14 A.  It was Michael De La Rosa, as I previously
15 shared.
16 Q.  So the whole time, from 2013 to 2018,
17 correct?
18 A.  From '13 to '18, yes.
19 Q.  At your current job, to whom do you report?
20 A.  Excuse me.  I report to a managing director
21 for Harrison Street.
22 Q.  Who is that?
23 A.  His name is Jim Hennessy.
24 Q.  And where is he?  Is he in Chicago or
25 somewhere else?

Page 35

1  A.  He is in Chicago -- or out of the Chicago
2  office, rather.
3  Q.  During the time from 2013 until you left
4  Corvias, where did you live?
5  A.  From '13 -- I lived in Dothan, Alabama.
6  Sorry, it took me a moment to process the question.
7  Q.  I guess, let me ask it a better way.
8      You have lived in Dothan, Alabama at least
9  from 2013 until now, correct?
10 A.  That is correct.
11 Q.  And during your whole time you have worked
12 for either Corvias or Picerne, have you lived in
13 Dothan, Alabama?
14 A.  Since 2005.
15 Q.  Have you ever lived in Fayetteville or near
16 Fort Bragg?
17 A.  No, no.
18 Q.  Did you ever have an office at Fort Bragg?
19 A.  No.
20     MR. YOO:  Asked and answered.
21 BY MR. PENRY:
22 Q.  Are you familiar with the work order
23 policies of Corvias Property Management?
24 A.  No.  You would need to speak with the
25 Corvias Management folks as far as how work orders are

Page 36

1  managed.  I'm not in that level of detail.
2  Q.  Did you have any responsibility for work
3  orders at all?
4  A.  No.
5  Q.  Do you know who had responsibility for work
6  orders in Fort Bragg?
7  A.  Again, work orders would be managed by the
8  Corvias Management entity.  So, as we have discussed a
9  moment ago, that would fall under, at the time I left
10 responsibilities for Fort Bragg, would have fallen
11 under the then operations director Heather Fuller.
12 Q.  Heather Fuller, you say?
13 A.  Yes.
14 Q.  Do you know the names of any people that
15 reported to her at Fort Bragg?
16 A.  Last I recall, there were 150, 170 team
17 members working for Corvias Management at Fort Bragg.
18 So that's a large team.
19 Q.  Do you have any familiarity with the Yardi
20 software?
21 A.  I'm familiar with Yardi and the fact that it
22 is the property management software that Corvias
23 Management utilized, but I don't think I have ever
24 logged in to Yardi.
25 Q.  All right.  Who made the decision, if you

Page 37

1  know, at Corvias to use the Yardi software?
2      MR. YOO:  Vague and ambiguous as to Corvias.
3  A.  Which Corvias entity are you referring to?
4  BY MR. PENRY:
5  Q.  Any entity that worked at Fort Bragg, the
6  ones that you told me a few minutes ago.  Who within
7  those entities would have used the Yardi software, to
8  your knowledge?
9      MR. YOO:  Overly broad.  Compound.
10 A.  I don't believe anybody other than the
11 Corvias Management entity that we just discussed at
12 Fort Bragg would utilize Yardi.
13 BY MR. PENRY:
14 Q.  I'm going to ask you a couple of questions
15 about the Corvias Resident Responsibility Guide, okay?
16 A.  Okay.
17 Q.  Do you know anything about the Corvias
18 Resident Responsibility Guide?
19 A.  I know what the Corvias Resident
20 Responsibility Guide is.  I cannot recall the last
21 time I would have looked at that document.
22 Q.  What is Corvias Military Living?
23 A.  Corvias Military Living is an entity
24 above -- for the purpose of our discussion of Fort
25 Bragg, is an entity above Bragg Picerne Partners,

Page 50

1  have made this comment in many forums through many
2  years, is that MHPI overall is subject to a lot of
3  aging infrastructure, and because that aging
4  infrastructure exists there is definitely an
5  opportunity for improvement.  So that aging
6  infrastructure can literally mean some of the older
7  homes that have gone through an expected life cycle
8  and are ready for redevelopment and/or some form of
9  renovation.
10           The term "aging infrastructure" can also --
11  or does in the context that I use it, can also
12  literally mean the infrastructure in the purest
13  development sense.  It could mean the underground
14  utilities that feed a neighborhood.  It could be the
15  lateral lines that are supplied to a home.  So the
16  term "aging infrastructure" is really more of a
17  broader term for the whole of MHPI.
18     Q.  Can you tell us which communities within
19  Fort Bragg you consider to be aging and in need of
20  renovation?
21           MR. YOO:  Objection.  Overly broad.  Vague
22     and ambiguous.
23     A.  No.  I can't answer that question.  I don't
24  know.  Again, it's a broader statement about, you
25  know, if a home needs renovation, if a home needs to

Page 51

1  go through redevelopment, you know.  Those are the
2  types of things that need to be addressed in
3  partnership with the Army, and they are.
4  BY MR. PENRY:
5     Q.  All right.  Can you name the communities in
6  Fort Bragg?
7     A.  No.  I can't list all of the communities at
8  Fort Bragg.
9     Q.  Okay.
10    A.  For clarification -- sorry to go back.  When
11  you say "communities," I'm assuming you mean
12  individual neighborhoods.
13    Q.  Yes.
14    A.  So I was answering in the context of
15  neighborhoods, okay.
16    Q.  That is what I mean.
17        Okay.  Give me just a second.
18        When Mr. Picerne testified before Congress
19  in February of 2019, he said that the company was
20  returning to the gold standard level of resident care
21  that defined our company from the start.  Do you know
22  what he meant by "gold standard"?
23           MR. YOO:  Objection.  Lacks foundation.
24    A.  The gold standard was really in reference to
25  getting back to some of the customer centric

Page 52

1  experience level items.  Through the years, due to
2  pretty severe BAH reductions, various amenities and
3  various services had to be discontinued in agreement
4  and in coordination with the United States Army.  And
5  so the documents that you are referring to and the
6  comments about the "march to the gold standard" were
7  really referencing that, that soft customer service,
8  reopening community centers.
9           If I recall, there was also call centers
10  that were outsourced, which as a result of that
11  document which was put together by Corvias
12  Management -- I wasn't involved in that -- bringing
13  back call centers to the communities.  There were
14  community centers -- I think I just mentioned that --
15  that were closed due to funding challenges, and
16  community centers were reopened.  So it was various
17  items like that, sort of that soft customer service
18  enhancement.
19    Q.  To your knowledge, is there some document
20  that describes what the Corvias gold standard is?
21    A.  I recall there was a document that was
22  referred to as the "march to gold standard," yeah.
23    Q.  Okay.  And describe that document, please.
24    A.  Not being smart, but I just did.  So I was
25  trying to think if there is anything else contained in

Page 53

1  that, which I am sure there are some other items.  I
2  believe there were some items about vehicles that
3  maintenance folks were using were more readily
4  identifiable, getting back to some of the basics of
5  ensuring name tags, uniform upgrades, town halls,
6  those types of things.
7     Q.  Mr. Picerne also said, or at least wrote as
8  part of his presentation to Congress, that Corvias had
9  hired a world-renowned specialist to review our mold
10  and mildew procedures.  Do you know who that person
11  is?
12           MR. YOO:  Andy, could you maybe show that
13     reference to Mr. Burleson?  I don't know that he
14     knows these things off the top of his head.
15           MR. PENRY:  Okay.  Sure, we can.  Give us a
16     second to put it in.  It will be Exhibit 4.
17           (Exhibit 4 marked for identification.)
18  BY MR. PENRY:
19    Q.  Can you see it, Mr. Burleson?
20    A.  Yes, sir.  I see the document.  It says
21  February 13, 2019 at the top.
22    Q.  Okay.  If you will look at the bottom,
23  Mr. Picerne says in his statement, "We're returning to
24  the 'gold standard' level of resident care that
25  defined our company from the start."

Page 54

1      Do you see that?
2   A.  I see that.
3   Q.  That's what I was asking you about before.
4      So if we can go to the next page -- and by
5  the way, this is February 13, 2019.  So you were still
6  employed by Corvias at that time, correct?
7   A.  That is correct.
8   Q.  All right.  Did you have any role in helping
9  Mr. Picerne prepare this statement?
10  A.  I recall providing some edits or comments to
11 the statement overall, but again, that was 2019.
12  Q.  You saw it before it was presented to
13 Congress, right?
14  A.  I did.
15  Q.  Okay.  Let's look at the second page.  The
16 first bullet point under "First," "We are living the
17 'Corvias Commitment.'"
18     What is the "Corvias Commitment'"?
19  A.  It goes on to, I believe, explain it, where
20 it says "a series of specific commitments, to our
21 residents, that we," Corvias, "will respond promptly
22 to a request, actively seek feedback, and make changes
23 when we," Corvias, "need to do better."
24  Q.  Was the Corvias Commitment documented in a
25 paper or a document somewhere other than this?

Page 55

1   A.  If I'm remembering correctly, that would
2  have been part of that "march to gold" document.  I
3  don't recall it being something separate.
4   Q.  Okay.  If we'll look to -- under "Second"
5  with the bullet points.  The second bullet point,
6  "We're moving our resident call centers back to the
7  local installations."
8      Do you see that?
9   A.  Right.  I do see that.
10  Q.  Was that done at Fort Bragg?
11  A.  Yes.
12  Q.  Who was in charge of the local call center
13 at Fort Bragg, if you know?
14  A.  That would have been someone from Corvias
15 Management.  I don't know who had the lead with that
16 task.
17  Q.  Who was the person at Corvias Management
18 that was responsible for Fort Bragg?  Was it Heather
19 Fuller or somebody else?
20  A.  I don't believe Heather started until later
21 in the year of '19.  I know that Sharon Shores had
22 property management responsibilities at Fort Bragg.
23 Before that, it was -- oh, shoot.  Before that, it was
24 Mark Foraker.  I believe he was immediately before
25 Sharon.  I think there was also another gentleman in

Page 56

1  between the two of them.  Good grief.  Mike Sariskey
2  was in between Mark and Sharon.
3   Q.  Sharon now works for Mayroad, right?
4   A.  That is correct.
5   Q.  When did she start working at Mayroad?
6   A.  In its inception mid-December of 2021.
7   Q.  Other than you and Sharon, what other
8  Corvias employees went from Corvias to Mayroad?
9   A.  103, 102 employees.
10  Q.  So it was a large number of people, correct?
11  A.  It was, yes.  For the most part, it was the
12 entire property management team as a whole across all
13 six of the Air Force installations that we discussed
14 earlier.
15  Q.  Did Ms. Shores work at one of the Air Force
16 installations?
17  A.  She has worked at one of the Air Force
18 installations.
19  Q.  Where was she working when she left Corvias
20 and came to Mayroad?
21  A.  She was serving in an overall property
22 management capacity for the Air Force Continental
23 Group.
24  Q.  When did she -- is there some point at which
25 she stopped working on the Bragg facilities?

Page 57

1   A.  Yes.
2   Q.  When was that?
3   A.  That would have been -- I don't recall -- as
4  I just said a moment ago, I don't recall when Heather
5  started.  I believe that would have been, plus or
6  minus, summer of '19, summer-fall, somewhere in that
7  time frame.  I just -- I don't recall specifically.
8   Q.  Let's look at -- under "Second," let's look
9  at the third bullet point.  "We hired a world-renowned
10 specialist - at no cost to the government - to review
11 our mold and mildew procedures, so that here, too, we
12 are living up to the gold standard."
13     Do you see that?
14  A.  I do.
15  Q.  Do you recall the name of that
16 world-renowned specialist?
17  A.  Yes, I do.
18  Q.  What is it?
19  A.  I believe it was TRC.  I believe that was
20 the name of the company.  TRC, I think that's right.
21  Q.  Did they do any work at Bragg, to your
22 knowledge?
23  A.  TRC work at Bragg?  Not to my knowledge.
24  Q.  Where did they do their work?
25  A.  Well, they did an overall view across all of

Page 58

1 the 13 installations, and I think it says -- yeah, I
2 just saw that. It's to review mold and mildew
3 procedures. So if I'm remembering correctly, TRC went
4 in, put together a really holistic look at the overall
5 mold policies and procedures all the way down to the
6 SOPs.
7     If I'm remembering correctly, too, what they
8 did is they actually took a lot of -- through their
9 recommendations, took a lot of the ambiguity out for
10 any potential, what's referred to as SFG, suspected
11 fungal growth. And it really created more of an "if
12 this" -- no, an "if then, do" situation, where if
13 there is some suspected fungal growth and it's within
14 a certain size, you flip to the SOP, or you flip to
15 the recommendation and you are going to do this. And
16 it really took a lot of the ambiguity out, and
17 involvement, from just one entity or one individual.
18 I know that the Air Force -- or excuse me, the Army
19 folks were involved in those processes as well.
20     So yeah, that's what I remember about TRC.
21 Again, not directly related to Bragg, but that comment
22 was for the overall portfolio of 13 installations.
23     Q.  Did TRC actually visit any of the
24 installations?
25     A.  I do not -- I don't know. I don't know if

Page 59

1 they did, the installations as a whole. Now, they did
2 have involvement at Bragg, so yes, I know that --
3 excuse me, Fort Meade. I know they visited Fort
4 Meade.
5     Q.  Do you know whether they visited Fort Bragg?
6     A.  I do not know if they visited Fort Bragg. I
7 don't believe so. I don't believe they visited the
8 installations in reviewing the policies and
9 procedures, but I just don't know.
10     Q.  And obviously, you don't know whether TRC
11 did any testing of any facilities at Fort Bragg,
12 correct?
13     A.  I do not know that to be fact, but I do not
14 believe that they did.
15     Q.  Okay. Let's look at the next page, the
16 "Finally." "We took the proactive step to provide our
17 military partners with a detailed weekly work order
18 situation report."
19     Do you see that?
20     A.  I do.
21     Q.  Did you actually do that?
22     A.  Yes, that was done. Yes, that was being
23 done. And it was to provide the Army partners at Fort
24 Bragg an update on what was going on with work orders.
25     Q.  And who was responsible for providing the

Page 60

1 detailed weekly work order situation reports?
2     A.  That would have been somebody from the
3 property management team. So through the process that
4 we just talked about, it would have been Sharon to
5 Heather. And my understanding or my -- yeah, I think
6 it was continuing to occur when my responsibilities
7 ended in the spring of '20.
8     Q.  So those were documents that were made by
9 Corvias, correct, that were created by Corvias?
10     MR. YOO:  Vague and ambiguous as to Corvias.
11 BY MR. PENRY:
12     Q.  Who created the documents?
13     A.  I don't believe, in the context of the work
14 order situation report, that it was an actual report
15 that was printed out and given. I believe it was more
16 in the context of the Army partners at each of the
17 installations had access to the Yardi system to go in
18 and see a custom report that's in the system versus
19 anything that was physically printed out and handed.
20 I believe that was the case.
21     Q.  Is there something that is -- is there a
22 document or electronic document that is a weekly work
23 order situation report?
24     MR. YOO:  Vague and ambiguous.
25     A.  My understanding is yes, that was -- that

Page 61

1 was done. But again, I believe that was something
2 that was managed, not necessarily something that was
3 physically handed. But it allowed -- access was
4 allowed from the Army partners into the Yardi system.
5 BY MR. PENRY:
6     Q.  And that was the report? They were simply
7 allowed into the Yardi system?
8     A.  Well, that's what I was saying. So in the
9 system, custom reports can be created. I am probably
10 not translating or sharing that. It makes perfect
11 sense in my mind. But in the system, reports can be
12 created and somebody then can come in and see those
13 reports with a roll up of information. I believe
14 that's what was being shared.
15     Q.  Were those reports created within the Yardi
16 system?
17     A.  Yes. To my knowledge, yes.
18     Q.  So weekly work order situation reports were
19 created and resided in the Yardi system, correct?
20     A.  To my understanding, yes.
21     Q.  And I think you said that the military had
22 access to the Yardi system to look at those weekly
23 work order situation reports, correct?
24     A.  To my knowledge at the time, yes.
25     Q.  To your knowledge, when you left Corvias,

Page 62

1  were those weekly work order situation reports still
2  available to be reviewed in the Yardi system?
3       A.   To my knowledge, yes.
4       Q.   Are you aware as to whether any of those
5  weekly work order situation reports were deleted from
6  the Yardi system?
7       A.   I have no reason to believe that.
8       Q.   All right.  Who was in charge of the Yardi
9  system in Fort Bragg -- at Fort Bragg?
10      A.   I don't know specifically.  I would -- it's
11 not fair for me to assume or --
12           MR. YOO:  Don't assume.  Don't assume or
13      guess.  If you know, you can provide the
14      information, but we don't want you to guess.
15      A.   I don't know, then.
16           MR. PENRY:  You know, Thomas, that violates
17      every rule we have in the Eastern District of
18      North Carolina.  Please don't do that again.  We
19      don't coach our witnesses here.  And you don't
20      need to respond to me.  I'm just telling you.
21           MR. YOO:  Well, I am going to respond to
22      you.  I wasn't coaching the witness.  And, Andy,
23      I'm surprised you would want any witness to guess
24      or speculate on the record.  I thought I was
25      simply reiterating what we all want and what the

Page 63

1       basic rule is in any federal court.
2            MR. PENRY:  Yeah, I'm aware of the rules in
3       federal court, and I just told you what they
4       were.  But we're going to go on.  I don't want to
5       argue with you on the record if I can possibly
6       avoid it.
7  BY MR. PENRY:
8       Q.   Okay.  We are moving to page -- yeah, there
9  is no page numbers to this.
10           Okay.  You see the second paragraph on this
11 sheet, "Corvias is paid a property management fee."
12           Is that true?
13      A.   A Corvias entity is paid a property
14 management fee.
15      Q.   Which entity was paid property management
16 fees relating to Fort Bragg?
17      A.   Corvias Management.
18      Q.   And do you know how that property management
19 fee was calculated?
20      A.   I don't recall the specific details, but the
21 fee -- and it varied from deal to deal.  So we are
22 talking about really two separate things.  The
23 fees -- the property management fee structure at the
24 time of '19 was the same property management fee
25 structure that Bragg Communities agreed to with the

Page 64

1  United States Army when the deal closed back in -- I
2  don't remember the exact date -- 2002, 2003.
3            So in this context, I don't remember the
4  details.  Again, each deal was a little bit different.
5  But there was a base -- or is still, a base management
6  fee -- property management fee, as well as an
7  incentive fee.  The incentive fee -- and each one had
8  a different percentage, and I do not recall what those
9  percentages were.  Again, they varied from deal to
10 deal.  So out of the 13 deals, I just can't remember
11 those percentages.
12           But in the incentive portion, there was a
13 list of very specific metrics.  And if those metrics
14 were achieved, then the United States Army would
15 verify the submission document to ensure that those
16 metrics were, in fact, achieved, and then the Army
17 released the incentive fee to Corvias Management.
18      Q.   Did Corvias Management have to provide a
19 payment application or other information to the Army
20 relating to the calculation of the incentive fees?
21      A.   Yes.
22      Q.   And did that document have a name?
23      A.   No.  I have just always referred to it as
24 the incentive fee submission, but I don't know that it
25 had a specific name.

Page 65

1       Q.   Some employee of Corvias was required to
2  sign that submission, correct?
3       A.   Yes.
4       Q.   And was it treated like a, for example,
5  payment application for construction, that it was
6  signed under oath or by notarization?  Was it that
7  kind of thing or was it not?
8            MR. YOO:  Objection.  Vague and ambiguous.
9       Overly broad.
10 BY MR. PENRY:
11      Q.   Let me try again.
12           Was the incentive submission provided under
13 oath?
14      A.   No.
15      Q.   And to whom did it go?
16      A.   It went from the management entity to
17 the -- now this is in broad terms.  But it went from
18 the management entity to the partnership, garrison
19 command and the RCI partners at each installation --
20 this is in the Army context -- for their review.  Once
21 there was concurrence from the garrison commander that
22 all of the incentives that Corvias Management believed
23 should be paid, he or she would then verify that with
24 consultation from their DOD civilian teams.
25           Once you had that concurrence and that

**Page 66**

1  approval, it went up to the secretary at the Army
2  secretariat level. And the Army secretariat, I
3  believe their consultants would review the document.
4  Actually, I know the consultants reviewed the
5  document, and then ultimately, it went to some level
6  of the capital ventures directorate or some level of
7  the deputy assistant secretary for sign off. And once
8  that occurred, it instructed the United States Army as
9  well as -- well, instructed the United States Army to
10 release the funds from the lockbox agent and then
11 Corvias Management would be paid.
12     Q.  You mentioned consultants. You meant
13 consultants to the military?
14     A.  Consultants to the Army.
15     Q.  Okay. Who are those consultants?
16     A.  Jones Lang LaSalle, JLL.
17     Q.  Okay. And did Corvias ever interact with
18 that consultant, to your knowledge --
19         MR. YOO: Objection. Overly broad. Vague
20     and ambiguous.
21 BY MR. PENRY:
22     Q.  -- relating to the incentive fees?
23     A.  Sure. JLL may have some questions, "Hey,
24 you know, we just need a little bit of clarification
25 on this." Or, you know, in some cases -- and this was

**Page 67**

1  rare, but it's the first thing that popped into my
2  head. In some cases, there may be a rounding error,
3  you know. So instead of it being $5.38, it should
4  have been $5.37. But it was really that level of
5  minutia that the JLL consultants would dive into on
6  those incentive fee payments.
7      Q.  Did you have any -- was that part of your
8  job to deal with the incentive payments?
9      A.  Occasionally, I would review the documents,
10 but it had been -- it's been many years since I have
11 been in that level of detail.
12         MR. YOO: Andy, could we take a 10-minute
13     break? I apologize for interrupting. I have
14     someone that's walking into a hearing for me on
15     the hour.
16         MR. PENRY: No, that's fine. We can --
17     let's see. It's 1:48 Eastern. Let's come back
18     at 2:05. Does that work for you?
19         MR. YOO: It does. Thank you.
20         (Off the record.)
21 BY MR. PENRY:
22     Q.  Mr. Burleson, we are still looking at the
23 exhibit that's Mr. Picerne's statement that was
24 provided to the joint committee -- subcommittee.
25         So we are looking at a page that has some

**Page 68**

1  information about emergency work orders. Do you see
2  that?
3      A.  I do.
4      Q.  And "97 percent of 3,645 total emergency
5  work orders at our Army communities were responded to
6  within eight hours and completed within 24 hours."
7          Do you see that?
8      A.  I see that.
9      Q.  Are there documents reflecting that
10 statement?
11     A.  Do you mind scrolling up just a little bit?
12 I'm sorry. I guess it would be down. I'm sorry.
13     Q.  Yeah, okay.
14     A.  Right there. That's what I was trying to
15 get, the context.
16         Okay. I'm sorry. Can you ask the question
17 again?
18     Q.  Are there documents that reflect -- that
19 demonstrate the 97 percent statement in Mr. Picerne's
20 statement?
21     A.  To my knowledge, not documents, but
22 information that can be accessed via the Yardi system.
23     Q.  Okay. So are the emergency work orders in
24 the Yardi system?
25     A.  As I shared earlier, I'm not a Yardi expert,

**Page 69**

1  but my understanding is that everything work order
2  related is in that Yardi system, and so data can be
3  pulled to give this type of information.
4      Q.  Do you know what data is within the Yardi
5  system? Do you know what the universe of it is?
6          MR. YOO: Overly broad. Vague and
7      ambiguous.
8  BY MR. PENRY:
9      Q.  Let me ask it again.
10         Do you know what documents are entered into
11 the Yardi system?
12     A.  I could speculate, I could assume, but I
13 don't know as fact. So I -- I don't know that I can
14 answer that question.
15     Q.  Who would know the answer to that question,
16 if anyone, within Corvias?
17     A.  It would be somebody within Corvias
18 Management because that's the software system that
19 they use every day.
20     Q.  Can you give me a name of someone in Corvias
21 Management?
22     A.  The last I recall -- I think I shared this
23 earlier. The last I recall was Holly Costello.
24     Q.  What is Yardi?
25     A.  Yardi is a property management software

Page 70

1 system.
2    Q. And do you use it with Mayroad?
3    MR. YOO: Objection to the extent it calls
4 for confidential trade secret information at
5 Mayroad.
6    MR. PENRY: That's a fair objection.
7 BY MR. PENRY:
8    Q. Can you answer the question, though?
9    MR. YOO: You do not have to answer that
10 question with regard to your current employer.
11 It is not a party to this lawsuit.
12    MR. PENRY: All right. I'll withdraw that
13 question.
14 BY MR. PENRY:
15    Q. Yardi is something that's used by property
16 managers quite frequently; isn't that true?
17    A. Yes. I believe Yardi is a popular property
18 management software system.
19    Q. And how was it used at Fort Bragg?
20    A. Can you be more specific?
21    Q. Yeah. How did you use it? What did you use
22 it for?
23    MR. YOO: Objection. Lacks foundation.
24 BY MR. PENRY:
25    Q. You can answer.

Page 71

1    A. The property management team, Corvias
2 Management, used it as their software system to manage
3 the property -- manage the property management
4 operations.
5    Q. Did they use any software to manage the
6 property operations other than Yardi, to your
7 knowledge?
8    A. To my knowledge, no. To my knowledge, no.
9    Q. Do you know when the property management
10 function at Bragg started using Yardi?
11    A. My understanding is that Yardi had been used
12 since the inception at Fort Bragg, since the closing
13 in 2002, 2003.
14    Q. Is there any IT person within Corvias that
15 is responsible for Yardi?
16    A. As it stands today, I don't know. I have
17 been so far removed. It's been years, so I don't
18 know.
19    Q. When you were at Corvias, was there someone
20 in the IT function that was responsible for Yardi?
21    A. I believe there was.
22    Q. Do you have a name of that person that you
23 can give us?
24    A. I just -- nobody's name is popping in my
25 head. No, I don't recall.

Page 72

1    Q. When you were at Corvias, who was in charge
2 of the IT department, if there was one?
3    A. During my -- when I last was involved with
4 Corvias, it was a gentleman named Lazz McKenzie.
5    Q. Where was Mr. McKenzie's office?
6    A. He was based out of the Rhode Island office,
7 yes.
8    Q. Okay. Do you know whether he is still
9 employed by Corvias?
10    A. My understanding is that he is not -- or the
11 last I heard, rather, he is not employed by Corvias.
12    Q. Do you know where he is now?
13    A. I do not know. No, I don't.
14    Q. But the last you knew, he was at least
15 working in Rhode Island, correct?
16    A. The last I knew, when he was with Corvias,
17 he was -- he lived in Rhode Island. But like I said,
18 my understanding, he's no longer with Corvias.
19    Q. When did he leave?
20    A. I don't know. I don't know if I heard that
21 in late fall. I don't know if I heard that early
22 spring. I don't remember when somebody shared that
23 with me. I don't know.
24    Q. Of what year?
25    A. It would have either been towards the tail

Page 73

1 end of last year, '21, or the beginning of '22, but I
2 just -- I don't know.
3    Q. Did he live in Providence?
4    A. I believe he lived in the Greater Providence
5 area. There's lots of little towns.
6    Q. I know. I have a child that's in school
7 there, so -- there is a lot of little towns, so. . .
8    Okay. Let's go down to the "Looking Ahead,"
9 okay? Do you see that paragraph?
10    Mr. Picerne says, "We're tapping more than
11 140 million in a formerly trapped reserve account."
12    Do you know what he means by a "formerly
13 trapped reserve account"?
14    A. I do.
15    Q. What is it?
16    A. There were some challenges that the
17 projects, not just Corvias projects, but multiple
18 projects -- there were some challenges that caused
19 some of the reinvestment reserve accounts within MHPI
20 to be tied up. And that $140 million was finally
21 released. The $140 million that he is referring to
22 here -- or is referred to here, rather, had been
23 released at that time, plus or minus. I don't
24 remember the exact time frame it would have been
25 released.

Page 74

1  Q.  Why was it tied up?
2  A.  There was an issue with one of the debt
3  service providers with multiple MHPI projects
4  requesting a year's worth of debt service to be held
5  in escrow which was not part of the original deal, and
6  so that caused a lot of reinvestment reserve account
7  funds to be trapped.  Again, fortunately those were
8  released somewhere around this time frame.  I don't
9  remember the exact date.
10  Q.  Which debt service provider was that?
11  A.  It was a company called Ambac.
12  Q.  Do you know why Ambac did what it did?
13  A.  I don't know what their motivation was to do
14  that across MHPI.
15  Q.  Did they not tell anybody what it was?
16  A.  I'm sure they had a story.  I just -- I
17  don't recall.  I think that was resolved in '18, at
18  some point of '18, but that's so many years ago.  I
19  just -- I don't recall the details.
20  Q.  Did it have anything to do with issues in
21  maintenance at Fort Bragg or any other facility?
22  A.  No, no.  That's two totally different
23  things, totally different.
24  Q.  Then we say -- Mr. Picerne says, "and a new
25  investment of 323 million."

Page 75

1  What was the new investment of 323 million?
2  A.  That was what was referred to at the
3  time -- I think Corvias ended up changing the official
4  name.  But as I recall, that was the -- at the time, I
5  know -- it was referred to as AIM UP.  That was the
6  323.  I think it ended up being 325.  But it didn't
7  close until later on in '19.
8  Q.  It was called what?  Ama?
9  A.  AIM UP.  A-I-M, U-P.
10  Q.  Is that a -- what does that mean?
11  A.  So as soon as I just said it out loud, it
12  made me think about the acronym.  I believe it
13  standed -- stood, rather, for Army Infrastructure --
14  I don't remember what it stood for.  Army
15  Infrastructure -- yeah, I don't remember.  I don't
16  remember.  Sorry.
17  Q.  Was this only a Corvias project to get the
18  new investment of 323 or 325 million or was it more
19  than Corvias?
20  A.  No, what is being referenced here, "new
21  investment of 323," was an Army/Corvias initiative.
22  Q.  All right.  Where did the money come from?
23  A.  The money is basically a pledge against
24  future deposits in each one of the installation's
25  reinvestment reserve account.  And when I say "each,"

Page 76

1  it's actually six of the seven Army installations.
2  This was an Army initiative.  Air Force was not
3  involved.  One installation did not participate.
4  Q.  Can you explain what you mean by a pledge
5  against -- I guess, what did you say?
6  A.  I believe I said a pledge against future
7  deposits into the reinvestment reserve account.
8  Q.  All right.  Can you describe how that
9  worked?
10  A.  Yeah.  Let me think of the best way to
11  explain it.
12      So each project has a reinvestment reserve
13  account.  So Fort Bragg, Fort Rucker, Fort Polk, all
14  of the -- actually, all of the MHPI deals have a
15  reinvestment reserve account.  All of the funds within
16  the program stay within the program.  Everything that
17  flows down to the bottom of the cash waterfall in
18  essence goes into this reinvestment reserve account
19  which is the project's savings account which the Army
20  controls.
21      The reinvestment reserve account at some
22  installations was relatively strong.  Some
23  installations, it needed a little bit -- a little bit
24  more help.  So what Corvias and the Army put together
25  was an ability to pledge future deposits into those

Page 77

1  reinvestment reserve accounts in order to get an
2  initial cash influx of the 323 -- again, I believe it
3  was 325, which allowed for a push for meaningful
4  redevelopment as well as some energy efficiency
5  upgrades across six of the installations.
6  Q.  So all of the future reserves are pledged,
7  correct?
8  A.  Not all.  I don't recall what percentage,
9  but it's not -- I don't believe it was all.
10  Q.  And tell us what you mean by "pledged."
11  A.  In essence, that is the collateral for the
12  loan, for the assurance of the loan.  Each of the
13  projects have to pay back their commensurate portion
14  of the loan, but through a normal process of utilizing
15  the reinvestment reserve account, it could have been
16  many, many, many years before some meaningful
17  redevelopment would happen at base X.  This allowed
18  for a meaningful two-year push -- plus or minus two
19  years was the original plan.  I have been so far
20  removed from it, I don't know where it ended up.  I
21  think it may have been a little bit longer than two
22  years -- a meaningful push for redevelopment.
23  Q.  Did that deal require congressional
24  approval?
25  A.  I don't believe -- I don't know.  I don't

Page 78

1 recall. It required Army approval. Army was
2 shoulder-to-shoulder through the whole process.
3    Q.   But you don't know whether it required
4 congressional approval or not?
5    A.   No, I don't. I don't recall.
6    Q.   Okay. We are going to go to five pages in.
7         Okay. Still looking at Mr. Picerne's
8 statement.
9         You are going to hear some noise. I have
10 three teenage girls wandering into my house. So if
11 you hear something, that's what you hear.
12   A.   Okay.
13        MR. YOO: Good luck today, Andy.
14        MR. PENRY: You know, luck is not on my side
15 today.
16 BY MR. PENRY:
17   Q.   We see, "Our homes are built 100 percent in
18 compliance with federal regulations."
19        Do you see that?
20   A.   I see that.
21   Q.   Do you know which federal regulations are
22 being referenced there?
23   A.   I do not know.
24   Q.   Okay. And "with third-party inspectors."
25        Do you see that?

Page 79

1    A.   I see that.
2    Q.   Have there been third-party inspections of
3 the work that Corvias has done at Fort Bragg?
4    A.   Yes.
5    Q.   By whom?
6    A.   I believe the company was F&R, was the name
7 of the company.
8    Q.   F&R?
9    A.   F&R.
10   Q.   And that's Froehling & Robertson?
11   A.   Yeah.
12   Q.   And what did they do?
13   A.   They did third-party code compliance, as I
14 recall.
15   Q.   Typically, I can tell you, because I know,
16 F&R usually is a soils company. Did they do something
17 other than soils work?
18        MR. YOO: Objection. Lacks foundation.
19 BY MR. PENRY:
20   Q.   Tell me again what they did.
21   A.   F&R, as I recall, provided third-party code
22 compliance inspections.
23   Q.   Do you know why that was done by a third
24 party?
25   A.   My understanding is that is typical, or was

Page 80

1 typical -- is typical across all of MHPI.
2    Q.   All right. Are there any other third-party
3 inspectors that you can remember that did some
4 inspections on Fort Bragg housing?
5    A.   Not that I recall at this time.
6    Q.   Do you recall a company named Paragon?
7    A.   I do recall a company called Paragon.
8    Q.   What do you recall about that?
9    A.   I remember Paragon provided some assistance
10 with some roofing work. I don't remember if they did
11 work beyond that. That's what I remember at this
12 point.
13   Q.   Who hired Paragon, do you know?
14   A.   I do not -- I do not know.
15   Q.   Do you know whether it was Corvias or
16 someone else?
17   A.   I do not know.
18   Q.   How about F&R? Do you know who hired them?
19   A.   I believe F&R was hired at the onset of the
20 initial development period by Corvias Development.
21   Q.   All right. Have you ever reviewed any of
22 the home inspection reports prepared by Paragon?
23        MR. YOO: Objection. Lacks foundation.
24 BY MR. PENRY:
25   Q.   Have you ever seen home inspection reports

Page 81

1 from Paragon?
2    A.   I do not recall that.
3    Q.   Have you ever seen home inspection reports
4 at Fort Bragg by any home inspection service?
5    A.   I do not recall.
6    Q.   Did Corvias hire anyone to inspect homes at
7 Fort Bragg?
8         MR. YOO: Vague and ambiguous as to Corvias.
9    A.   A Corvias entity, Corvias Development, hired
10 in order to do the third-party code compliance
11 inspection.
12 BY MR. PENRY:
13   Q.   Did Corvias Management or any other Corvias
14 entity that was responsible for activities at Fort
15 Bragg hire an inspection to -- for mold inspections --
16 an inspector for mold inspections?
17        MR. YOO: Overly broad. Lacks foundation.
18   A.   I do not know.
19 BY MR. PENRY:
20   Q.   Do you know whether the United States
21 government, whether the Department of Defense or Army
22 order inspections of the houses at Fort Bragg?
23   A.   Inspections by who?
24   Q.   By anyone.
25        MR. YOO: I'm sorry. I didn't hear. Did

Page 82

you say "order inspections"?
MR. PENRY: Yes.
A. The Army in this case -- yeah, the Army did -- across all of MHPI, requested 100 percent home inspections. And I believe that was sometime around the spring of '19, plus or minus. But that was -- I believe that was led by the United States Army.
BY MR. PENRY:
Q. Was it done at Fort Bragg?
A. It occurred at all Army installations.
Q. Do you know what entity did those inspections?
A. What entity from the United States Army? No, I do not know.
Q. Well, did the Army do it itself or did it hire someone, to your knowledge?
A. I believe the Army did it themselves. That's my recollection.
Q. Have you ever seen any results or reports relating to those inspections?
A. I don't recall any specific report. I don't know if the information would have been shared at a high level, be it a conversation, if it was shared at a detailed report with some formal report. Again, that was spring of '19. I just -- I do not recall.

Page 83

Q. Well, did Corvias receive copies of the inspections that were done at the behest of the Army?
MR. YOO: Vague and ambiguous as to Corvias.
A. Again, I'm not sure which Corvias entity you are referring to.
BY MR. PENRY:
Q. Corvias Management. Any Corvias entity that was responsible for Fort Bragg.
A. Yeah, my answer is the same. I don't recall if there was a formal report that was given, if there was a spreadsheet, if it was just conversations, if it was, "Hey, we need you to look into these homes." I just -- again, it was 2019. I don't remember those details.
Q. Do you know whether there are documents in the possession of the Corvias entities that are responsible for Fort Bragg relating to the inspections done by the Army or at its behest?
A. I do not know.
Q. Who is the person at Fort Bragg employed by any Corvias entity that is responsible for Fort Bragg that serves as the custodian of records?
MR. YOO: Objection to the extent it calls for a legal conclusion.
BY MR. PENRY:

Page 84

Q. You can answer.
A. As far as any records or what's kept or what is available, I do not know. My predecessor, Mr. Pete Sims, would probably be the best person to ask.
Q. Who is it? What's his name?
A. Pete Sims.
Q. And he's your predecessor in what job?
A. In the context of Bragg Communities.
Q. All right. Where is he now?
MR. YOO: I think he meant -- I think he meant successor.
A. I said "predecessor." My goodness, thank you very much, guys. I didn't eat enough of my sandwich. My brain is not working.
BY MR. PENRY:
Q. Tell me what Mr. Sims' job is, please.
A. I believe his official title is managing director for DOD partnerships. I believe it's something like that.
Q. By whom is he employed?
A. I do not know. I do not know which entity employs him.
Q. Do you know what his responsibilities are with regard to Fort Bragg?
A. I do not know the details.

Page 85

Q. Do you know where he lives?
A. He lives in Utah.
Q. In Utah?
A. Utah.
Q. Do you know where in Utah he lives?
A. I do not.
Q. Okay. How long has he had this -- the job he has now?
A. Plus or minus spring of 2020.
Q. But he is your successor, right?
A. "Successor" is a much better word. Yeah, successor.
Q. In other words, he took your job?
A. He did.
Q. Okay. All right. Let's look at the next page. One more page.
In the second paragraph, Mr. Picerne's statement says, "We have always taken pride in being the best at what we do. Although we have slipped, we will get back to that 'gold standard' place."
Do you see that?
A. I see that.
Q. Do you agree with him that Corvias had slipped?
A. The context of this was in not 100 percent

Page 86

1  fulfilling the resident expectations as it relates to
2  communication, some of the services that I mentioned
3  earlier that had to be reduced due to the BAH
4  reductions.  This was really much more -- as I recall,
5  much more of a generic term and tying back -- it
6  really says it here in the second -- the end of that
7  sentence to "get back to that 'gold standard.'"  So
8  it's really in that customer experience is what I
9  recall the context.
10     Q.   So do you agree with him that "we have
11  slipped" and "we will get back to that 'gold standard'
12  place"?
13     A.   Yes.  I believe that was an accurate
14  statement at the time.
15     Q.   We are going to now look at some of the
16  testimony from you in Congress, and Mr. Rainey is
17  going to upload that thing and it might take a minute,
18  so bear with us.  And I'll ask you some questions
19  about it while he is loading it.
20          (Exhibit 5 marked for identification.)
21          How did you -- how was it that you got
22  selected to give testimony before Congress?
23     A.   That's a good question.  I don't know.
24     Q.   Who told you that you were going to give
25  testimony before Congress?

Page 87

1   A.   I believe it was Michael De La Rosa.  I
2  believe that's -- yeah, that's who I reported to.
3     Q.   All right.  Do you know why Mr. De La Rosa
4  asked you to give testimony to Congress?
5     A.   I had -- in the role that I had at the time,
6  one of my responsibilities was educating members on
7  the Hill that were tied to -- directly tied to the 13
8  installations that comprised the MHPI portfolio.  And
9  I don't know why I was selected.  I would assume,
10  which I shouldn't assume, that it was related to that.
11     Q.   All right.  And you did interact with
12  elected officials in Washington, correct?
13     A.   Yes, from a capacity of meeting their
14  offices and, you know, continuing to educate their
15  offices on MHPI.
16     Q.   Did you interact with Senator Tillis from
17  North Carolina?
18     A.   Yes.
19     Q.   And tell us what interaction you had with
20  Senator Tillis.
21     A.   I believe I had a couple of interactions in
22  person with Senator Tillis.  There was also
23  interaction with staffers from his office, you know.
24  If they ever had a question or a constituent happened
25  to reach out with a concern, they would engage me to

Page 88

1  ask for details surrounding the concern.
2     Q.   You are aware that Senator Tillis did an
3  inspection of some of the homes at Fort Bragg, aren't
4  you?
5     A.   I'm aware that he visited several homes on a
6  couple of occasions at Fort Bragg.  I was with him on
7  I believe it was two separate occasions.
8     Q.   You were with him both times he went?
9     A.   I know it was once.  I remember it vividly.
10  I believe it was also a second time, I believe it was.
11     Q.   And do you remember Senator Tillis pointing
12  out mold to you in one of the houses?
13     A.   No, I don't remember him pointing out mold
14  in a house.
15     Q.   Do you remember Senator Tillis pointing out
16  to you anything in the houses relating to water
17  intrusion?
18     A.   I do recall a spot that he pointed out in
19  one house.  I believe a repair had been made or a
20  repair was in process.  I do recall that.
21     Q.   Did Senator Tillis express to you concern
22  about the condition of the houses in Fort Bragg?
23     A.   I don't recall him specifically addressing
24  the concern directly to me.
25     Q.   Do you know whether Senator Tillis expressed

Page 89

1  his concerns to Mr. Picerne?
2     A.   I don't believe so.
3     Q.   All right.  We are looking at page 79 of the
4  transcript, and I'll ask you this.  We talked earlier
5  about whether you had given testimony under oath, and
6  you said you were not sworn for your congressional
7  testimony, true?
8     A.   Yes, I do not recall being under oath for
9  the testimony.
10     Q.   But everything you said was true, wasn't it?
11     A.   To the best of my recollection.
12     Q.   Well, can you recollect anything that you
13  said in your testimony that was not true?
14     A.   No.
15     Q.   So I ask you again, the testimony that you
16  gave to the Congress of the United States of America
17  was truthful, true?
18          MR. YOO:  Objection.  Asked and answered.
19  BY MR. PENRY:
20     Q.   You can answer.
21     A.   Again, that's true.
22     Q.   Okay.  Let's take a look at the paragraph
23  that says "together with our armed service partners."
24          Do you see that?
25     A.   Yes.